# Exhibit 49, Part 2 of 4

the forward agreements, and he did not ask for that knowledge as his task was to hedge the bank's risk. He did not conduct an analysis of how the different players could make money and he does not believe that it was necessary. He cannot answer whether delivery after the record date is a deviation from market conditions. It is possible that it is a deviation from Danish market conditions.

He had no reason to believe that Jones Day did not want to give him the full picture of the arrangement. He can rule out that Jones Day told him over the phone that the entire transaction involved only three parties, because he would have reacted to that. If there were only three parties, the arrangement would be circular with the risk that it was a pro forma arrangement, and he would not have advised as happened.

Condition 5 in the same draft of July 21, 2014 about "unconditional ownership" originates from I's tax opinion, so this refers to tax ownership.

"Legal ownership" in premise 7 means "beneficial ownership", while "the legal owner" refers to the civil law owner. He cannot answer how to record that the shares are delivered to the bank on the same day when they leave the bank on the same day. The assumptions in a legal opinion make it clear to the recipient how to perceive the facts. Assumptions cannot be detached from reality. The assumptions must be verifiable by the recipient. He was asked to insert premise 9 that the proposed transaction was not structured by North Channel Bank. It could make a difference if the arrangement was structured and not just fully known. Condition 11 was inserted because, in light of the corporate fraud cases, whether the bank received a normal fee could have a bearing on the bank's liability. He finds it difficult to assess the significance of removing the individual condition. He wrote in paragraph 5.2(3) of the same draft that North Channel Bank's role in the proposed transaction was not comparable to that of the responsible parties in the Company Steamer cases because it was his assessment that they had a higher degree of knowledge than North Channel Bank in the proposed arrangement. By "the responsible parties" he meant advisers, lawyers, accountants and especially banks. He does not agree that North Channel Bank

**805**

could see that there was no business purpose for the arrangement of the pension plans.

He had an expectation that SKAT would carry out a check upon receipt of an application for a refund of withheld dividend tax.

It is still his opinion, as explained to the High Court as reproduced on p. 199 of its judgment of June 23, 2021, that "tax fraud" is a broad concept and that "dividend stripping transaction" is not a firmly defined concept, but concerns dividend arbitrage. When he explained in the same place that he did not take it so seriously when transactions are described with the word "abusive" or characterized as criminal, it must be understood that he reacted to it, but that he expected to get more information.

The wording of point 7.1. in the legal opinion of August 4, 2014 is a typical opinion wording, as you bear responsibility until this date. Customers cannot normally use a draft legal opinion for anything. There could be rule changes. It is not uncommon for an opinion to be reconfirmed later.

He probably received H's e-mail of July 15, 2015 during his summer vacation. The reconfirmation was signed on July 24, 2015 by N, who was his partner colleague in the tax department. He was not personally involved in the reconfirmation. His advice to North Channel Bank ended on August 4, 2014, when he signed

his legal opinion.

U.2024.746H - SKM2024.123.HRH

He does not remember that he sent an email on March 18, 2016 to H and K with an update on the latest developments in relation to applications for refund of dividend withholding tax. It was a generic email that he sent to several people. He does not remember if he thought that North Channel Bank might be involved.

The newsletter that H forwarded to on June 22, 2017, among others T1 and T2, the witness had sent to many, including H. He does not remember if he thought that North Channel Bank might be involved.

There was certainly no indication of fraud. There was also no indication that there could be fraud in the event, but fraud was possible. If the caveats were adhered to, no fraud could be committed in the event.

*V2*

*V2* has explained, among other things, that he took over as CEO of North Channel Bank on January 1, 2017, after the extraordinary audit conducted by KPMG at the request of BaFin had led to the previous management no longer being considered "fit and proper". He did not read KPMG's report on the extraordinary audit in its entirety until after he took office. Prior to this, he had been provided with extracts from the report by the group of owners. The conclusions in the report did not raise any "red flags" in relation to cum/ex transactions, but instead focused on the fact that the bank had not complied with the procedure when the custody business was introduced as a new product in 2014, and that it had not carried out the necessary customer due diligence within the framework of the anti-money laundering legislation in connection with the "on boarding" of the pension plans.

The corporate structure of North Channel Bank remains as stated in section 3.1 of the KPMG report. This is a common ownership structure in Germany, although it is not widely used in the banking sector. Among other things, the structure makes it possible to enter into

"profit-and-loss sharing agreements" for tax purposes. North Channel Bank was founded in 1924 as a family and friends bank under the name Bankhaus Oswald Gruber. The bank changed its name to North Channel Bank when it was bought by some North American investors in 2009. North Channel Bank's three main shareholders bought the bank in 2012. From the beginning of 2014, the bank did business with shares traded around the time of the dividend. The bank's only other real business was financing life insurance.

He is aware of the inquiry of March 24, 2017 from the German deposit guarantee scheme, and that Jones Day and Bech-Bruun were also contacted in this connection about the advice previously provided. However, there are some things that get mixed up in relation to the dividend case. Immediately after joining the bank, he learned that there was a loan portfolio with SPVs within an intermediate structure with a large number of companies. The loan portfolio almost equaled the bank's equity and was linked to a person associated with the ownership group. He indicated to the deposit guarantee scheme that he could not perform due diligence on this and that an extraordinary audit was needed. Already in 2017, the Deposit Guarantee Fund came to the conclusion that provisions should be made corresponding to the size of the loan portfolio on the SPVs, which would lead to the bank being unable to continue operating. In 2018, it was decided that the group of owners was not "fit and proper" to run a bank, and from that point on, as CEO of North Channel Bank, he has only looked after the interests of the bank and not the interests of the owners.

He does not recall seeing Attorney N's letter of April 5, 2017 to Attorney A at Jones Day.

In February 2017, Finanzamt Mainz Mitte contacted North Channel Bank about a legal aid request from the Danish authorities regarding refund of dividend tax. T2 and T1 from the former

management, who were still employed by the group, indicated that they would take care of the inquiry, but the witness asked to see their response. He was told that the bank had secured legal opinions from both Danish (Bech-Bruun) and Belgian (Jones Day) lawyers and was also sent these opinions. He did not think further in this context

**806**

about KPMG's report from the extraordinary audit in 2016. He assumes that he has seen Attorney U's letter of April 2, 2019 to SØIK and Kammeradvokaten. It was a rude awakening when North Channel Bank was searched in June 2017 based on requests from Danish and German authorities. All material relating to the custody business was seized in this connection, and the process led to legal action against the bank at the High Court of Justice in London. North Channel Bank only became aware of the legal action in October 2018, even though the summons was issued in early summer 2018. The payment claim of around DKK 1.1 billion was of such a size that going concern was not possible without an arrangement with the parties involved. Instead of declaring North Channel Bank bankrupt, it w a s considered to try to sell the bank in free trade instead. North Channel Bank was aware that, contrary to what is possible under US law, a "deal" could not be made with the authorities in Denmark that also included criminal liability. SØIK wanted a judgment to be passed on the bank and that it should be a "visible" fine. The purpose of Attorney U's letter was to illustrate to SØIK that there was a risk that the possibilities of limiting the loss would be compromised if SØIK went too hard. In 2018, the bank had contact with many authorities, including the Federal Criminal Police Office (BKA), and it was clear to the bank that it had to work proactively if it was to survive. His working hypothesis was to find a solution whereby the payment of the fine would be deferred so that the payment could be taken from the proceeds of a sale of the bank. In this way, the bank would be able to survive in the time leading up to a sale, despite a large fine. They succeeded in reaching an agreement that the fine would not have to be paid here and now.

The letter of intent was an important document to be presented to the auditors at the end of the year, as it was crucial to the acceptability of the bank's accounts. The material to which the authorities were given access under clauses 4.1 and 4.2 of the letter of intent was the due diligence data room to be set up for potential buyers of the bank. North Channel Bank saw no reason not to be fully transparent to the Danish and Belgian authorities, and therefore, among others, Kammeradvokaten was given access to the data room. However, certain parts of the material were extracted in the usual way to comply with the rules on personal data and banking secrecy. However, there was unlimited access to the material, as it was made available in the data room. He does not recall whether discussions were held with Bech-Bruun or Jones Day about access to the material at this time.

In 2017 and 2018, North Channel Bank's American owners were very interested in knowing who the bank had contact with at the Danish authorities. North Channel Bank has no knowledge of the content of the US owners' agreements with the Danish authorities.

He has not been asked to certify the size of the fees received by North Channel Bank, but the bank has prepared a statement of the income that the bank has had in connection with the custody business. He cannot remember whether the statement was made at the request of the Attorney General or SØIK, but the statement formed the basis for the fine during the criminal proceedings at the Court in Glostrup.

Both the bank and the bank's owners had an interest in the fine being included in the total settlement amount to be paid by the bank, but the motives were different. For the bank, it was crucial for the bank's equity and the possibility of going concern, while the owners were only interested in the bottom line.

North Channel Bank's letter of April 1, 2019 to SØIK should be read in light of the fact that SØIK had asked the bank to prepare a statement of where the pain threshold was in relation to the bank's ability to pay fines and compensation, and the letter thus contains a simulation of different scenarios. The simulation showed that the bank's pain threshold was EUR 3 million in relation to going concern. It would have been extremely difficult for the bank to pay a fine of DKK 110 million. The total compensation mentioned in the letter covers both fine and damages. Prior to the meeting on March 22, 2019 referred to in the letter of April 1, 2019, the bank had also made efforts to enter into dialogue with the right people and authorities about the matter.

In the conditional inter-creditor agreement from September 2019, mutual confidentiality was agreed between the parties. The parties can exempt the bank from the confidentiality requirement, but this would require very good reasons. He does not know if the bank has been asked about the possibility of waiving confidentiality in relation to Bech-Bruun, but he will assume so. The agreement does not contain an obligation to cooperate, e.g. to raise claims against others, but a number of limits have been set for what the bank can do as part of the general business operations leading up to a sale etc. The issue of sharing documents and data with the tax authorities is regulated in the Letter of Intent.

He is aware that the Attorney General's Office has received a large number of documents from North Channel Bank, but he does not know if the number is 58,000. The personal data rules have been observed in this connection. Bech-Bruun has been denied access to the same documents with reference to the data protection rules, but he has no other knowledge of the reason for this. He is

**807**

not aware that Bech-Bruun has been given access to 12,000 documents, and the bank has not produced any documents to Bech-Bruun.

The bank's press release of December 7, 2021 should be read in light of the fact that the price for the bank in 2018 was estimated to be between EUR 40 and 58 million. It has since turned out that this amount was set too high and the corrective pricing is now between €20 and €35 million. It is correct that a pricing between 50 and 70 million euros is stated in North Channel Bank's letter of April 1, 2019 to SØIK. There has been a very motley crowd that has shown interest in buying the bank, for example, an old English investment bank has been in the running as a possible buyer. There have also been very frivolous inquiries. Now there is an investor with roots in the real estate sector who wants to enter the banking market. The investor in question is considered serious and has already been approved for purchase by BaFin in another context. A decision is expected during the summer. North Channel Bank has a full banking license. The sale of the bank is conditional on BaFin approving the buyer and that the procedural warning in this case from Bech-Bruun is revoked. If the bank is not sold, BaFin has indicated that the bank's operations must cease.

By letter of October 8, 2019 to the Danish tax authorities, North Channel Bank waived attorney-client privileges in connection with the case so that the bank's advisors were released from their duty of confidentiality. This is thus a matter that has since been

agreed and is not part of the inter-creditor agreement. The content of the letter has been agreed between Attorney U and the Attorney General, and the bank has not entered into a deeper assessment of who should be exempted and why.

North Channel Bank has been committed to providing free access to information in the process to ensure transparency. The bank has always cooperated with the authorities, but initially the focus was on issues other than the cum/ex transactions in the bank's custody business.

He has not previously seen the press release of December 16, 2021 from ReedSmith. Jones Day lawyer H has had a role in advising North Channel Bank on the purchase agreement, but it has not been advice on material matters. He has not himself had a discussion with H about whether H could give evidence in this case, but it has been discussed between his colleague ... and H. When North Channel Bank has spoken out against H giving testimony, it is because they are nervous that a testimony could harm the bank in the future in light of the litigation warning that Bech-Bruun has made of the bank during this case. This is also what is stated in attorney Jakob Lentz' letter of December 20, 2021 to attorney U, where attorney Lentz reproduces attorney U's statement to this effect.

He became aware that there was an issue with circular transactions and cum/ex transactions during the second half of 2017. In the fall of 2017, T2 and T1 were pushed out of the overall group structure, and North Channel Bank then gained access to further information. North Channel Bank then initiated thorough investigations of payment flows etc. in the bank. During 2018, they realized what had been going on. There were almost 500 transactions. The uncovered setup had nothing to do with banking operations. When you looked at the bank's payment systems, you saw no payments. It was a closed business, clearly for one purpose only - to issue Dividend Credit Advices.

The whole set-up with the American pension plans was characterized by the fact that there was no business risk and that the dividends were circulating around the same players. A structure where the buyer, seller and broker all operate within the same bank is unthinkable. There is no doubt that North Channel Bank has been an instrument in a well-planned fraud targeting several states.

He is familiar with the transaction diagram that K sent to A by email dated April 10, 2014. His impression as a banker is that it contains a very clear description of what is to take place, even if one looks at the graphic illustration alone. It indicates that it is a closed circuit where all counterparties including the broker have accounts at North Channel Bank and that the transactions go to zero. The dividend thus travels in a circle and it is simulated that North Channel Bank has received the dividend. You can see that no one makes money on the construction and that there is no arbitrage or business purpose. The whole arrangement is automated. This is also why North Channel Bank has agreed to pay a fine.

If you can read German, you will also see that there is a very high degree of thoroughness in the description of reporting obligations and the like. If you just look at the individual account, the transaction looks genuine enough, but this is not the case when you look at the overall transaction pattern. Moreover, if the arrangement had been real, it would have started with a credit and not a debit as in this case. The arrangement is based, among other things, on the use of the WP2 system and the use of Dwpbank (Deutsche WertPapierService Bank) as service provider. Dwpbank is thus used as a clearing bank for a number of German banks, and there is no independent review in Dwpbank of transfers made by the bank via the WP2 system. North Channel Bank's letter of May 11, 2015 to Campbellpur Pension Plan is an example of an ordinary "Dividend Credit Advice". However, it is a statement with positively incorrect content. Had the

**808**

If the content of the document had been correct, so that there had actually been shares and a dividend payment, money would have been transferred within the TARGET/SWIFT system, and that money trail does not exist in the case.

Other than the letter of intent, the inter-creditor agreement and the waiver of attorney-client privileges, there are no agreements between the Tax Administration and North Channel Bank.

*V3*

*V3* has explained, among other things, that the Special Control unit was established in 2013. At that time, there were approximately 100 employees. He was part of the sub-task Project Single Cases. They received the cases from Other Efforts. It was a requirement that the cases were complex fraud cases and that the fraud was covered by section 289 of the Penal Code. They were not allowed to find cases themselves. By their very nature, their investigations were primarily retrospective. Most employees in Special Control were tax accountants. They were generalists with a nose for control. Special Control did not have independent authority to, for example, stop payments of dividend tax refunds.

Prior to June 2015, he had no skills in the area of exchange, and neither did anyone else in Special Control. He was part of the project management team and thus helped to allocate cases. Typically, there was one caseworker per case. He first received a case about a refund of dividend tax on June 17, 2015, when he received a notification through V13.

When he spoke to V13 on June 17, 2015, they had no other information than what was stated in the lawyer's notification of June 16, 2015. He had not yet seen the lawyer's email of June 17, 2015, as he was on a course. At the meeting on June 17, 2015, he and V13 agreed that the case should be placed with him. They waited for further information from the lawyer, which came on June 18, 2015. He started working on the case on June 18, 2015. The request from the lawyer was unusual only because of the amount involved, although it was probably a little more detailed than the typical request.

The first thing he did was to read through the inquiries and identify the actors. He searched for all the names in their then record system, Captia, and in SKAT's decision system. A reclaim agent would not have been created as a party in the system. He also searched for parts of names to make the search as broad as possible, but he didn't get a single hit. He also searched for the pension plans on the internet, but he didn't find anything. The lack of hits didn't mean that he didn't see the request as serious. The next step was to look at the double tax treaty with Malaysia, and he investigated what the processes were actually like.

At a meeting on June 22, 2015, he spoke with V13 and others about the case. He then contacted the trade office because he could not make any progress himself. He did not have the impression that it was a burning platform. He found V6 through the personnel records and sent an email on June 24, 2015, asking for an explanation of the process. He did not contact the lawyer, as it was V13 who had the contact, and the lawyer also wanted the case to be handed over to SØIK. It also seemed as if the lawyer had provided all the information in his possession. He was aware of the existence of the 3S system, where you can look up companies' tax returns. He did not know that 3S was used to process dividend tax refund cases. There are probably more than 100 IT systems in SKAT. It was not natural at the time to go to 3S. If he had joined 3S at that time and had the relevant rights, he would not have gotten any hits on the first actors, but he would have gotten hits on some of the pension plans. The bank statements that the lawyer provided, they could not

use for so many things, including not being able to see what the amounts relate to.

V6 did not respond to his inquiry of June 24, 2015. He therefore called V6 by phone and left a message. Around June 30, 2015, he contacted a colleague of V6 who referred him to V6. However, he still did not hear from V6. He couldn't really do anything more on his own, so he was on hold. He did not perceive the matter as urgent. He does not recall V13 telling him that she was told that there was a man in Taastrup who was involved in the fraud. He was not informed at the time that V13 had been in contact with V17 and he therefore did not hear about V17's statement that there was nothing to go on. In the period from July 2 to 27, 2015, there was a summer holiday. If he had thought that there was a burning platform, he would have handed the case over to someone else during the vacation period.

He received the request from HM Revenue & Customs on July 30, 2015. He did not immediately inform his manager as it was during the holiday period. They already had some of the information in the request from the lawyer, but there was also a detailed description of the players and the overall setup. The request from HM Revenue & Customs was clearly more detailed than the request from the lawyer, as it included more names. They only received the list of 180 names on August 6, 2015. SKAT has not paid any money directly to Solo Capital. He immediately connected the inquiry from HM Revenue & Customs with the lawyer's inquiry.

He called V6 again on July 30, 2015. When he heard nothing, he called V18 on August 3, 2015. He told her about the case and she again referred him to V6. V18 asked him to send some information and suggested

**809**

a meeting on August 6, 2015 in Høje-Taastrup. He did not do any further searches as there was now a gap in the subject area. V18 said that they needed the names of the final recipients. The payments to the reclaim agents could have been found, as they are booked in the financial system SAP38, but you would only be able to see the gross amounts. He would need help searching in SAP38.

Present at the meeting on August 6, 2015 in Høje-Taastrup were two people from Store Selskaber, ... who was the process owner for dividend, V18, V6, a student and the witness. At the meeting, he presented the problem. He had been informed by his contact in HM Revenue & Customs that there would be another attack, which he told V18. V18 would go to V17 for a general stop payment. It was her decision and he thought it was sensible, even though it was a heavy-handed intervention.

After the meeting, they went down to V6's office. On the table there were large piles of paperwork, which he leafed through and spotted names from the list. The piles consisted of applications with attachments in physical form. The case archive for the current year was also in V6's office, while the archive for previous years was in the basement. V6's spreadsheets only included the names of actors, but not the payments. V6 showed him how to find dividend recipients in 3S.

He was seconded part-time to the FIU from September 1, 2015 to June 2016. He was to assist with his knowledge as a tax accountant. This did not mean that he had free access to the FIU's material. He was given specific tasks that he had to solve. He had a duty of confidentiality with regard to SØIK's investigation. In practical terms, he often sat at SØIK when he worked for SØIK. He did not physically take information from SØIK to SKAT. The cooperation between SKAT and the FIU

took place in such a way that status meetings were held about once a month. SØIK could not comment on the investigation, so it was more information from SKAT to SØIK. As far as

he remembers, the meetings were primarily about where SKAT was in the review of the material.

He first heard about the KPMG report around August 2018 from Kammeradvokaten. He had neither seen it in his capacity as a tax employee nor as an employee of SØIK. Around the same time, he first heard that Bech-Bruun had advised North Channel Bank. The police report did not mention the KPMG report because they did not know about it. Had they known about it at the time, they would have clearly referred to it in the report. He was not involved in SØIK's requests for search and production submitted to the Court in Lyngby.

He is aware of an internal memo dated January 8, 2016 from Special Control. On August 6, 2015, an email arrived from Great Britain with a list of 184 named companies, which coincided with the names from the list in the lawyer's report - now stated with the correct name.

The first police report regarding the DKK 6.2 billion revealed that it concerned 126 companies that had submitted 2120 requests for reimbursement. The figures were compiled by an IT man based on the list received from the UK. They verified the information, but at this stage they could not find any evidence of fraud. They found the specific applications when they were to be handed over to SØIK. The report was therefore "suspected fraud", but it was necessary to investigate the case in order to assess this. Soon after the report, they were sent home from SØIK and asked to come back with a better clarified case. The next step was to see what was on the four custodians mentioned. At some point, they created a spreadsheet with the individual applications and pension plans etc. They entered all the information they could find, including application date, reclaim agent, custodian, shares, number, dividend per share, total dividend amount, tax withheld, refund amount and payout date. There was also information on the "ex date" and "payment date".

He was also the one who filed the second police report in November 2015. The additional DKK 2.9 billion emerged as a result of further investigations into the four custodians in question. The third police report concerned an amount of DKK 3.2 billion. KOI was discovered because a task force was set up in SKAT and came across KOI, which was similar to what they were already familiar with. It was important that everything was included. At this point, they were aware of the total amount associated with North Channel Bank.

In the period from January 1, 2012 to August 6, 2015, approximately DKK 14.2 billion was paid out in the blanket scheme, of which DKK 12.7 billion is believed to be fraud. The difference of approximately DKK 1.5 billion was deemed not to be fraud, which was based on a probability assessment because underlying data could not be verified.

He has not previously seen the summons issued by SKAT against Solo Capital and others in England. He agrees that item 25 contains an enumeration of the payments that make up the approximately DKK 12.7 billion that has been reported to the police. Section 5.b. lists the nine custodian banks that have been reported to the police. He cannot say when Special Control became aware of North Channel Bank's involvement in the fraud. They found out about North Channel Bank through the reclaim agents that were the subject of their investigation.

He is familiar with the memo of September 1, 2016 entitled "Detailed account of SKAT's notifications to SØIK with focus on the control actions carried out between the various notifications". At this time, applications from the Danish tax authorities had been

**810**

further claims would be filed. However, they later found one more

affected reclaim agents and custodians. They assumed that no

Reclaim Agent. The only German bank was North Channel Bank. It was also the only custodian that claimed to be a bank.

He recognizes the August 9, 2016 email from O sent to ... with an xlm file attached. He recalls it stating that North Channel Bank allegedly acts as a broker for at least 24 small US employee pension funds, all of which are young and have no large financial volume. Mr. O is the only designated competent authority, so all requests went through him.

He remembers reading the email of September 9, 2016 from C to V13. He does not recall whether he was surprised that the Germans needed information about Danish cum/ex cases. V13's reply to C the same day should be seen in light of the fact that a request had been sent to Germany at that time. He does not know which dialog the response refers to. He does not remember more details about the follow-up. He knows that he and V13 talked about Germany and that it was difficult to get information.

O forwarded the email of October 10, 2016 from the Finanzamt für Steuerstrafsachen to him. The identity of the German bank did not appear, but they tried persistently over a long period of time to get the information from the German authorities, but they did not succeed. The information must have gone to the police instead. He did not consider who the German bank might be. He simply took note of the information. He does not know if V13 or others were informed about the email. They did not investigate further on the basis of this email, as they had reported what was to be reported in the case. Whether they used the information in relation to current cases, he does not remember.

He did not specifically follow the tender for the legal investigation in December 2016, but he handed over some documents for the investigation. The assignment was all documents from the period that could be relevant to the fraud case. He knew that Bech-Bruun won the tender. He was not involved in finding material for other investigations, apart from the SIR's report from September 2015.

It's true that in 2015, the average processing time for dividend tax refund cases was between eight days and two months.

*V4*

*V4* has explained, among other things, that her workplace was physically located in Ballerup and Høje-Taastrup, although management had offices in Jutland.

She has not prepared the memo of September 5, 2007 about the dividend administration in Ballerup. She does not recall having seen the memo of
September 17, 2006 on accelerated repayment of withheld Danish dividend tax etc. but she is aware of the issue mentioned in the memo.

She is familiar with the Ministry of Taxation's memo of November 14, 2007 on the refund of Danish dividend tax to persons with limited tax liability. Her unit always had to do a lot to convince the rest of the organization that there were real problems in the withholding tax area. Her initial focus was on the difficulties in complying with the 30-day rule for interest payments. In her opinion, this was not an issue that could be solved by reorganizing the administrative procedures, as the Ministry of Taxation suggested. In connection with a legislative change in 2012, a six-month rule was introduced.

She has given a comprehensive statement to the Commission of Inquiry concerning SKAT about SIR's audit investigation from 2009 of the proceeds from withholding tax on foreigners. She has also given a comprehensive statement to the Commission of Inquiry about her assessment of the conclusion in SIR's report

from 2010. The SIR's 2010 report stated that it was possible to issue multiple dividend notes for the same dividend in the case of omnibus deposits. However, she did not feel that this was the case, but it is true that there was a risk of this happening.

U.2024.746H - SKM2024.123.HRH

Nothing came of the memo she sent to V8 by email on October 28, 2010, as Denmark was deeply involved in the OECD discussions at the time.

In connection with her testimony to the Commission of Inquiry, she gave a comprehensive description of the issue of control of the dividend area. For her unit, it was a bookkeeping and keying task. They had unsuccessfully applied for funds to carry out controls. She therefore agrees with the description of the task of administering dividend tax given in section 3 of the Head of Citizens' and Legal Security's report from February 2016.

She understood the SIR's 2013 report to mean that formal, but not substantive, controls were carried out under the forms system. As far as the spreadsheet scheme (the bank scheme) was concerned, the situation was rather that the banks did the work that actually belonged to her unit. They were confident in the banks' handling of the task.

She has given a comprehensive explanation to the Commission of Inquiry about the continued relevance of the SIR's 2010 report even after the SIR's 2013 report was issued.

When she explained in the Commission of Inquiry that "every senior manager" knew about the problem that there was no real possibility of controlling the refund of dividend tax, she was referring to V8, V19 and V17, among others.

She has given a full explanation in the Commission of Inquiry about the course of the dialog meeting with V20

**811**

October 24, 2013. What was stated in her statement regarding The "reimbursement gap" referred to the fact that there was no possibility of control and that you had to rely on the material received from third parties.

When she sent a memo in an email dated October 4, 2011 directly to Head of Department D, it was because the Department was not separate from SKAT at that time. V8 was aware that she had contacted the department. D forwarded the inquiry to E who, however, completely rejected it. It is in this light that her email of November 21, 2011 to E, among others, should be read. She cannot remember whether she received a reply to the email.

The applications in the form scheme were received by regular mail. V22 was responsible for opening and inspecting the mail. V22 retired on November 1, 2013, and she succeeded herself on December 1, 2013.

All applications were initially put into V6. In 2013, the number of employees started to go downhill. She can't remember who was still in the unit when she retired. It is true that in 2007 and the following years, V6 processed around 90 percent of all dividend refund applications. The cases were processed in the 3S system, from which lists were generated for the payments. Everything was stored in bundles, so they had good control of the documentation.

She has given a comprehensive explanation in the Commission of Inquiry on access to payment of refunded dividend tax and on countersignature. Countersigning was abolished in 2011 as there were so few employees left that they could not maintain a separation of functions. The accounting department was only given the list of payments, not the actual application material.

She has given a comprehensive explanation in the committee of inquiry on local accounting approval. It took place as stated in ...'s email of May 14, 2014.

When it came to the validity of the documents presented to them, all they could do was look at what was sent and trust that the material was genuine and the information correct. The form was required to be notarized and signed by the

foreign tax authority so that they could know which double tax treaty was involved. If the station and signature were missing, the applications were returned. This happened often, and this practice was not abandoned in her time. At some point, however, there was a change in relation to applications from the US, so that it was sufficient to attach a certificate from the US authorities. She cannot remember who decided that this was sufficient to fulfill the documentation requirement.

She is aware that reclaim agents were used. This scheme emerged sometime after 2010, when zero tax was introduced on pensions in the US. The applications for dividend refunds from US pension plans slowly started to be submitted from 2010. They spent a lot of time trying to figure out what pension plans actually were. She does not recall that the amounts involved were as large as those shown in the application of May 12, 2014 from Goal Group. Moreover, she was not familiar with this reclaim agent. In her time, the large amounts were in the bank scheme, as she has also explained to the Commission of Inquiry. The use of reclaim agents only took place on the blanket scheme. There was no need for agents through the banking scheme.

North Channel Bank's "dividend advice" of April 9, 2014 to the Van derlee Technologies Pension Plan is an example of a dividend note. She does not recognize the handwriting on the note. She has provided the Investigation Commission with a comprehensive explanation as to whether there were formal requirements for such a dividend note. The dividend note was central to the case processing. She trusted the banks. This case can only have gotten so big because someone they trusted was committing fraud. A bank that has issued a dividend note has no way of knowing whether dividend tax has actually been withheld in the distributing company, just as the bank has no way of determining who the right person is.

"beneficial owner". The dividend note must document that dividends have been paid to the specified recipient. The dividend notes were issued by the banks through which the money flowed, and the banks were at least able to follow the flow of money. After all, the money had to end up with the dividend recipient. A refund amount of DKK 37 million was not unusual. They hadn't experienced dividend fraud, but they wondered what could happen during the process.

She does not recall having come across the name Y, which appears, among other things, in the power of attorney of April 15, 2014 issued by Vanderlee Technologies Pension Plan.

She has not seen many certificates similar to the April 7, 2014 certificate issued to Vanderlee Technologies Pension Plan by the US Department of Treasury. The use of these certificates was in its infancy during her time at SKAT. In accordance with the requirements of the relevant double tax treaty, the foreign tax authority had to certify that the refund applicant was taxable in that country. She has not come across certificates where the watermark indicates that the certificate is

"void". She would have wondered about

that. She doesn't remember Solo Capital.

When reviewing the applications, they tried to make sure that it was actually a US pension fund. However, they only had to consider the formalities, and if the form appeared to be in

**812**

order, they had few options other than to pay out the refunded withholding tax. The requirement under the double tax treaty that at least 50% of the beneficiaries had to be US residents was not tested further and it was assumed that this was the case. If one had

Copyright © 2024 Karnov Group Denmark A/S

had a signature of the US authorities on the form, the signature of the US authorities would also include a certification of this fact.

With regard to the premises on page 19, first paragraph, of the Eastern High Court's judgment of May 23, 2018 in the appeal case against, among others, V6, it was not a usual procedure that no countersignature was made. V22 conducted a thorough review of the applications upon receipt of the case, and already at this stage, several applications were rejected. The application was then registered in 3S. The file from 3S had to be countersigned by V22 before it went to the accounting department, and at this point V22 did not look at the applications again. They had very few employees and the volume of applications increased a lot. They had a huge workload, so they couldn't check everything, which they weren't allowed to do because it would bring everything to a standstill. The counter signature before the transition to accounting was therefore a matter of form. In accounting, there also had to be two signatures. She believes that there was a special procedure in the accounts department for payments over a certain limit. She can't remember if the countersignature requirement was waived in 2011/2012. If it looked right, they had to honor the disbursement request. They did not have to do anything other than formal checks.

In 2011, she was contacted by the Holbæk Tax Center, which was tasked with monitoring the tax conditions of employees in SKAT, and informed that they had a pending case regarding V6. However, she was never told what the case was about. She definitely trusted G, who was in charge of developing the dividend part of the 3S system and was otherwise extremely good at his job. When she found out that V6 had committed a crime, she was completely stunned.

She was one of the authors of the problem catalog in 2006. "Dividend tax is a very small part of the tax system and the revenue is not large. That's probably why not many people were interested in the area. At the time, it was decided that the administration of dividend tax should be done together with the interest system, which was not appropriate as dividends are only paid out once a year. The problem was that there was no reconciliation between what was reported and what was declared.

The dividend administration always received remarks from SIR because they could not pay out the refunded dividend tax within 30 days. This meant that interest accrued on the amount. This was later changed so that interest only accrued after six months, and this issue was also mitigated by the introduction of the banking scheme.

She saw the 2009 law change as a big improvement. The change in the law in 2012 did not lead to more thorough case processing in the area of dividends, but now it was possible to complete the case processing within the deadline for payment of interest.

The challenges regarding the omnibus depots were a global problem, and Denmark put a lot of energy into the work in the OECD. She was also involved in this work and has participated in many meetings under the auspices of the OECD. Among other things, work was done on a solution with a central reporting system for distributions, but this was not feasible in terms of security or IT. To her knowledge, V12 was not particularly involved in TRACE, but he was the foreign director and probably followed the process. Whether TRACE was a thing of the future depended on how it was put together, but an acute problem could not be solved in TRACE.

*V5*

*V5* has explained, among other things, that he has re-read his statement to the High Court as reproduced in the judgment of June 23, 2021 in preparation for today, and he can admit this.

He had many different roles at Bech-Bruun. He had his daily work in the tax department, but he also had a regular role in

to do with real estate. He attended many international conferences where his function was to sell the company in the best possible way. This resulted in a wide range of cases that he forwarded.

Jones Day was on Bech-Bruun's list of preferred partners in Germany, and the companies occasionally visited each other. He must have met H in that context. He had not previously heard of North Channel Bank.

When he received the email of February 3, 2014 from H, he had an idea of what "dividend stripping" was, but it was far from his own field of expertise, so he knew immediately that the email should be forwarded to the relevant partner. He had heard something from A and N about the "loopholes in German tax law", but he did not think that this could occur in Denmark. He does not believe that he heard about this before he received the email of February 3, 2014. He probably thought, based on the email, that there was a client who was concerned about where they were in relation to the legislation. He sometimes receives emails where people are worried about whether they have done or will do something criminal. He doesn't remember if he thought much about the wording of the email. For him, it was just a matter of getting the inquiry to the relevant partner. He may have been in doubt as to whether the inquiry should go to the banking department or the tax department. A could have chosen to forward the email or reject it.

**813**

He does not remember if he left a phone message for H but he has not spoken to him. He sent the email of February 5, 2014 with a price estimate. He does not remember how the estimate was made, but it was probably A who made it and asked him to send it.

He was a copy recipient of A's email of February 18, 2014 with the first draft of the legal opinion because he was "caught" in the email string. He had not seen the draft beforehand. He simply deleted these emails as he was busy with other things. This also applies to K's email of April 10, 2014, where the German diagram was attached. He certainly did not look at it, as he does not understand German. He has never heard of anyone at Bech-Bruun giving advice in German. Nor did he read K's email of April 15, 2014, where the English summary was attached. He was not involved in the settlement with North Channel Bank in June 2014. The fact that he signed the letter of October 29, 2015 to North Channel Bank with an invoice attached was probably due to A's resignation. He does not remember that he sent the invoice on January 21, 2016. He can see that it was prepared by N.

He did not hear about H's inquiry of July 15, 2015. He was not aware of the reconfirmation of July 24, 2015.

He does not remember more about the correspondence in November 2015 between H and Bech-Bruun than what is stated in the reproduction of his statement before the Eastern High Court in the judgment of June 23, 2021. He did not make a connection to North Channel Bank. He did not participate in any conference call on November 11, 2015. He did not pay special attention to N's emails of November 11 and 16, 2015 to H. He first read the legal opinion at the end of October 2018. There was nothing in it that struck him.

A's specialty was banks and financial institutions. He had a deep specialized knowledge of the area. He was very skilled, so he was completely comfortable entrusting the case to him. Due diligence and money laundering checks are always done by the partner in charge of the case, so it must have been A.

It is not legally possible to get dividend tax refunded twice. In 2014, he was unaware that dividend tax fraud was taking place in Denmark. He could not have imagined it.

*V6*

*V6* has explained, among other things, that he reported to V4 until her retirement. After that, he reported to V18 on a daily basis, as the actual boss, ..., was located in Jutland.

V18 was involved in the tasks, but mostly in terms of meeting case processing times. He did not discuss professional issues with anyone after V4 and V22 retired. There was a written guide for case management. It described the things that had to be fulfilled in order for an application to be approved. Among other things, it stated that the tax liability had to be verified and that there had to be a dividend note. There also had to be a certificate from the foreign tax authorities on the form itself, otherwise the application would be rejected. It was a daily occurrence that applications were rejected. However, US applicants were allowed to attach a separate statement from the tax authorities as proof of tax liability, so there was no stamp or signature on the form itself. This special arrangement for the US predates his time. SKAT's application form was intended for applicants from all over the world and was not reserved for applicants from the USA. He is familiar with the text of the statement of April 7, 2014 from the US tax authorities regarding the Vanderlee Technolo- gies Pension Plan. Such a tax certificate was sufficient, as it states somewhere that US pension plans are exempt from tax liability. He does not remember seeing a certificate with the watermark "void". He does not know what "void" means.

They talked in the department that there was "a huge hole" in the scheme, and they probably also talked about the risk of fraud. He did not know what was paid out each month under the blanket scheme. He did not keep track of that. Nor does he know the total amount on an annual basis.

He is familiar with the reclaim agent Goal. He also remembers Acu-pay, Syntax and KOI. He does not remember if reclaim agents were used before 2012. The use of reclaim agents did not give rise to any special considerations. The applications from US pension plans for significant millions of dollars probably started around 2014. They did not investigate what kind of pension plans they were. He doesn't remember if he had heard of the A/C Vanderlee Technologies Pension Plan. They didn't consider how many shares you needed to own to be eligible for a $26.6 million refund, but you could figure it out. A shareholding of around DKK 4 billion was not remarkable, as he was used to big numbers. He did notice the amount, but there was documentation for it.

He has handwritten the refund amount on the dividend note of April 4, 2014 issued by North Channel Bank to Vanderlee Technolo- gies regarding shares in A.P. Møller. He does not recall whether he had heard of North Channel Bank prior to May 2014. They did not inquire whether North Channel Bank was registered in

VP Securities, as they never did this. He also remembers Solo Capital, which acted as a custodian. They did not investigate whether Solo Capital was a bank, but he took that for granted. They attached importance to the dividend note, as it must show to whom it was distributed and how much tax was withheld. He cannot see that it could be issued by anyone other than a foreign bank. He has not heard of compensatory dividends before. If he had

**814**

If he had heard that two dividend notes had been issued on the same share, he would have said that it was not possible.

He does not remember anything about the documentation issued by North Channel Bank appearing different from the documentation from other custodians, as described in SKAT's report of August 24, 2016 to SØIK.

He does not know what the average amount per dividend note was before the fraud case. An increase from an average of DKK 40,000 per dividend note before the fraud case to around DKK 3 million per dividend note in the fraud case

The case is significant, but it wasn't necessarily suspicious because both distributions and reimbursements were increasing every year. He looked at it carefully but didn't find anything worrying. He may have spoken to V18 about it, but he doesn't remember. There was no one checking his work. He didn't notice that there was a significant similarity between the applications because there were also a lot of other applications, so he didn't have the full picture. He was not aware of the significant development in the figures, as shown in the diagram on page 3 of the Tax Agency's memo of October 30, 2018 entitled "Status: Bank scheme and share lending in the field of dividends".

He does not remember the name Y. He did not notice that there were many powers of attorney signed by Y.

He doesn't know what the "void" statement means.

He doesn't remember if he got busier in 2013 and 2014. They were in the process of training new employees, but this was due to the task being moved to Jutland.

He has only read the double tax treaty with the US in excerpts. He does not recall whether he has read Article 22(2)(e) of the treaty, which requires that more than 50% of the beneficiaries, members or participants of the pension plan must be natural persons who are residents of one of the contracting states.

He has not received any money or other consideration for processing dividend tax refund claims from Solo Capital, any reclaim agent or anyone else. He was not a party to the fraud. At no time did he suspect that North Channel Bank, the 27 named pension plans involved in the case, the reclaim agents or Y were perpetrating a fraud against the Danish state.

## Requester

*4.1. Tax administration*

In particular, *the Tax Administration* has stated that it has been established that the Danish state has been defrauded of DKK 1.1 billion and that North Channel Bank, which was advised by Bech-Bruun, has been fined DKK 110 million for the dividend tax refund fraud.

*Basis of responsibility*

Bech-Bruun is liable to pay damages to the Danish Treasury for the advice provided by the law firm to North Channel Bank. Bech-Bruun advised on transactions that had no other purpose than to extract money from the Danish treasury, and the advice relates to the transactions for which the bank has been punished. The bank's former management has relied on Bech-Bruun's advice in the German criminal case, and Bech-Bruun's advice has also been used by the bank as a legal fig leaf for the fraud in connection with the German Financial Supervisory Authority's investigation of the bank. In other words, Bech-Bruun has advised the bank on what turned out to be fraud. This applies even though Bech-Bruun did not know that the firm was providing advice for the purpose of a fraud and had no intention of contributing to a fraud. Bech-Bruun showed a worrying indifference to the very premise for the relevance of the advice, namely that the Danish state suffered a loss, including a loss caused by criminal behavior, as was actually the case. Given the natural weight of evidence attached to bank documents, Bech-Bruun could not rely on an assumption that the Danish State would check the refund requests. Unlike Bech-Bruun, the tax authorities did not have full access to the fraudsters' master plan.

Bech-Bruun knew that, assuming that there were shares in the company, two dividend notes would be issued for the same share, namely the North Channel Bank dividend note and the dividend note from the share lender's bank. Firstly, issuing two dividend notes is one dividend note too many, assuming that

which are shares, as two dividend notes mean that a refund can be sought twice on the same shareholding, which would be criminal. The setup that Bech-Bruun assessed and advised on enabled such criminal behavior. Bech-Bruun did nothing to prevent such double reimbursement and did not reserve in its assumptions against such double reimbursement. Maximally, Bech-Bruun distanced the bank's role from the double reimbursement. Secondly, it is strange that North Channel Bank would issue a dividend note when North Channel Bank knows that another bank is also issuing a dividend note to the person registered in that bank as the owner of the shares and recipient of the dividend. Bech-Bruun even knew that the third party had disposed of the shares for tax purposes and therefore could not use a dividend note for anything except tax fraud. Third, Bech-Bruun knew that this risk of fraud could have been avoided by following the normal market settlement rules, because using the usual T+3 rules, only one dividend note would be issued. Fourthly, Bech-Bruun received no explanation for the risk element of two times

**815**

dividend notes, and Bech-Bruun did not inquire further into this, even though it could see that it was not connected. Fifth, Bech-Bruun knew that the cum/ex model was used for alleged fraud in Germany, and in emails dated February 3, 2014 and April 16, 2014, Bech-Bruun was clearly nervous about this model, where fraud was committed by separating the delivery of dividends from the delivery of shares.

 You sell the share cum, i.e. with a dividend, but deliver ex, i.e. without a dividend, and the dividend is moved by a compensation payment. This separation probably served a purpose, but Bech-Bruun did not consider why, even though the law firm could see - among other things from the German transaction description presented - that North Channel Bank and the pension plan would separate the dividend and the delivery of shares in the same way as in Germany. Bech-Bruun could thus see that there were only three parties in the set-up, which was circular and ended in zero for all parties involved. Bech-Bruun could see that no shares or money came into the circular process and that none of the parties ended up with shares or money. Meanwhile, A concentrated more on North Channel Bank being able to distance itself from what was happening than on preventing illegal refunds. It seemed important to advise North Channel Bank on how it could protect itself against liability on the assumption that North Channel Bank only received a standard fee.

 Bech-Bruun has made many mistakes, and the mistakes are individually gross. The advice is highly unusual and grossly negligent. Bech-Bruun's defense is basically that the law firm has written itself out of the problems with the transaction chain based on a consideration that legal opinions should be something special, where you can operate uncritically in a fantasy world. Bech-Bruun believes that you can assume your way out of liability in relation to the defrauded party. Furthermore, it is incorrect that it is not possible to commit fraud with the assumptions that Bech-Bruun inserted in its advice to the fraudster, as the third party unjustifiably received a dividend note and could therefore apply for a refund. Bech-Bruun has not succeeded in writing its way out of the problems, and it would also be highly questionable to adhere to a legal situation where the lawyer can write his way out of the problems - without the problems being removed or prevented once they have been identified. Because Bech-Bruun forgets that their advice does not concern a situation where it is their client who is the injured party.

Bech-Bruun's advice concerns the situation where a third party, the Danish state, is the injured party. Advice that is even based on the assumption that this third party has suffered losses and is therefore liable. The general rule is that you cannot disclaim any liability to a third party and that, on the contrary, you must warn against it, especially when the risk in the case is too high.

Copyright © 2024 Karnov Group Denmark A/S

to third parties is obvious. In addition, there is the lawyer's special position in society. It is the lawyer's task to promote justice and counteract injustice, as stated in the Code of Conduct. The lawyer must not turn a blind eye. And the lawyer is certainly not allowed to advise on how the client can distance themselves from responsibility. What the court must decide is not Bech-Bruun's liability in the relationship between Bech-Bruun as a lawyer and its client. Here, the client may perhaps take the risk that the assumptions could have been investigated if they are assumptions that the client himself has the opportunity to verify. But hardly when the assumptions concern matters that are the lawyer's work, such as legal assessments. After the company steamer cases, it is clear that when you have advised a client, you as an advisor may risk being liable for damages to a third party if the client has acted in a negligent manner.

*Assignments and warnings*

The content and wording of Jones Day's email of February 3, 2014 contained a clear indication that the German cum/ex transactions in Denmark would be faked and thus a clear indication of potential fraud. It was therefore incumbent on Bech-Bruun to ensure that the client did not - consciously or unconsciously - participate in this. Bech-Bruun knew that cum/ex was problematic, and Bech-Bruun ended up advising on a cum/ex model, i.e. a transaction where you buy the shares with the right to dividends, but have them delivered without dividends. The buyer of the shares will not be the same as the recipient of the dividend. Cum/ex is dangerous because it short-circuits the connection between ownership and the receipt of dividends. The ownership is blurred and there is a risk of fraud with the proceeds. Bech-Bruun was aware of this inherent risk, and if you insert share loans at one or both ends of the transaction chain, there are even more people who can take advantage of the blurring of ownership.

This type of trade cannot take place under normal market conditions. The market standards for trading and delivery are such that you will be registered as the owner at the time when VP Securities checks to whom dividends are to be paid if a purchase is made at the latest time when you can buy with the right to dividends. If you buy after this time, you are not entitled to the dividend and you will not be paid a dividend. When trading in accordance with market conditions, the cum/ex situation therefore does not arise. In their advice, Bech-Bruun did not address the reasons for this separation of the delivery of shares from the dividend, although Bech-Bruun was aware that this was the tool of the cum/ex fraud in Germany. If you trade outside the regulated market (OTC), you follow the market conditions for settlement on that market,

**816**

on which the shares are traded. Therefore, when the market has changed its settlement cycle, the OTC market has historically followed suit.

*The theme of the mission*

The scope of Bech-Bruun's legal opinion was whether it would be a liability or criminal offense for North Channel Bank in the proposed transaction to issue ownership documentation to be used to recover withheld dividend tax, and the scope was thus based on the assumption that the state would suffer losses. This is a highly unusual assignment, particularly given that North Channel Bank was allegedly only to serve as an ordinary custodian bank and to be paid in the form of a customary fee.

When North Channel Bank asks Bech-Bruun, it is because this is not a standard contractual situation. The cum/ex trades meant

that the bank would not receive a payment attributable to the distributing company. All trades were settled simultaneously and

the dividends were lent out. The transactions were set up so that there would be no shares in the bank's custody account or dividends in the bank's accounts at the time when the bank had to declare the contents of the custody accounts and accounts. Nor would there be anything else in the bank's deposits and accounts. Under these circumstances, it is extremely risky to issue dividend notes, and it is no less risky when the bank and Bech-Bruun knew that another bank would also issue dividend notes if there had been shares.

*I's opinion*

Bech-Bruun has stated that it was reassured by I's tax opinion. However, it was not this opinion that Bech-Bruun ended up commenting on.

I's transaction model, which was included in Bech-Bruun's first draft legal opinion, was later replaced with the English summary of the German transaction diagram and contained a completely different description. One of the changes was that they went from using futures to using forwards. The only assumption was that this would not make any economic difference. In the new model, which replaced I's transaction model, insight was also gained into the seller's transactions, and Bech-Bruun was made aware that the seller did not own the shares, but that the seller would borrow them - i.e. that it would be a short sale. They also changed the condition that the borrower of the pension plan could not receive the dividend. In I's opinion, the dividend should remain in the bank, but in the model that Bech-Bruun assessed, the payment flowed directly out of the bank again. So did the shares, and when the dividends or compensation, like the shares, flow through the bank, this enables the fraud with pure bookkeeping entries without money and shares. This was a breach of one of the key assumptions of I's assessment, according to which the pension plan would only lend the shares with no dividend rights attached.

However, I's opinion was not in itself suitable to reassure Bech-Bruun. It concerned a transaction where purchase and sale were to be settled on the same day. The purchase agreement was entered into before the ex-date and the sale agreement on or after the ex-date, but the market conditions were waived so that the shares would be delivered to the pension plan under the purchase agreement on the same day as the pension plan was to deliver them under the sale agreement. The pension plan would even lend the shares in the period leading up to the sale, even though the pension plan never received the shares before they were to be delivered. It is not reassuring that the bank in this situation had to produce documentation that the pension plan owned the shares, and I's opinion cannot have reassured Bech-Bruun. In any case, it could not have influenced Bech-Bruun's final opinion, where the transaction description was completely different.

*The final opinion*

The tax administration does not agree that the German transaction description submitted to Bech-Bruun as part of the advisory process can be disregarded.

However, even on the basis of the information Bech-Bruun received in English - and thus without including the German transaction description - it can be analyzed that things do not add up and that there is a risk that there are no shares. Cum/ex is thus counterproductive for tax speculation where there are shares and where it is about a tax-exempt person seeking a refund on a taxpayer's shares. It creates uncertainty of evidence and leads to two dividend notes, only one of which should be used, and there are no advantages to such a model. Cum/ex, on the other hand, is productive if a wrongful refund is to be obtained, e.g. if there are no shares. Then you can get by with bookkeeping entries and paper trails.

There are many different versions of Bech-Bruun's legal opinion, but the different drafts have all had the same con-

Copyright © 2024 Karnov Group Denmark A/S

clusion. The final version of the content of Bech-Bruun's legal opinion was available in July 2014 and was signed in August 2014.

*The business rationale*

There was no business rationale behind the setup presented to Bech-Bruun. It was about getting a refund without risk - in other words, speculating on making money on the dividend tax that would be paid by the distributing company. The question is whether this should be done with real share trades, pro forma or, as was clearly shown for Bech-Bruun, without shares. When there is no business purpose, but only a clear tax advantage, as was also the case in the company steamer cases, Bech-Bruun should consider as part of its advice whether there was a risk of a

**817**

disregard of SKAT's interests, meaning that the Danish state would suffer losses. This does not mean that Bech-Bruun could not advise, but if you choose to advise on transactions with no business purpose, you walk the line between legal tax planning and a wide range of illegalities - from tax evasion to fraud. The standard of responsibility will be harsh if you fall down on the wrong side.

*The model as described in the legal opinion*

As far as the role of North Channel Bank is concerned, A, an expert in the taxation of dividends, claiming that he should only comment on the role of a custodian bank and that the custodian bank should only issue a statement on shares held in a securities depository is itself culpable.

Thus, the parties agree that Bech-Bruun should look at the registrations in the custody account. A custodian bank gives an opinion on whether the customer has shares and dividends in his account with the bank. This is a statement that would normally concern civil law ownership - it concerns the matters registered in the bank. The bank had to declare the ownership of a dividend. In addition, Bech-Bruun's advice to North Channel Bank involved a somewhat unique situation in that the bank had received information about how and why the pension plan would structure its trades, which meant that North Channel Bank could consider whether the pension plan was the owner for tax purposes and thus whether the usual documentation would be misleading due to the specific circumstances. North Channel Bank thus had so much insight into what was going on that the bank had a dual role, which firstly meant that the bank would be an ordinary custodian bank and therefore had to take an interest in the civil law ownership, and secondly that North Channel Bank had so much knowledge of the transactions that they also had to take an interest in the tax law ownership. There would have been no need for the bank to have insight into the transactions if the bank was just a normal custodian bank. The bank gets this insight because it has to deliver something unusual; namely a dividend note, even though the shares are not in the bank's custody at the crucial time at the end of the record date, and even though the bank cannot see in its own books whether the dividend comes from the distributing company. This involvement of the bank and the bank's approach should in itself have been a danger signal for A as an experienced tax expert.

A knew that the bank would only be a custodian bank for a short period of time and would issue dividend notes in an unusual setup - the day the shares went in, they would go out again. A knew that the dividend notes would be used to apply for a refund of dividend tax and that the documents would be given probative value by the tax authorities because they were

issued by a regulated financial institution with no interest in declaring that a dividend had been received on a given shareholding. A knew that the entire credibility of the bank would be

in a document that could be presented to the tax authorities and that would be relied upon by the tax authorities without further scrutiny, as is normally the case with third party submissions. The role of North Channel Bank and its questions to Bech-Bruun were highly unusual and required a thorough assessment due to the obvious risk of causing a loss to the State by issuing false dividend notes.

In terms of the deals involved in the transactions, which all occur on the same day (the trade date), it's a complicated setup with many parties where everything flows back and forth. The shares and compensation payments flow from a third party to the seller to a pension plan to a third party on the same day. According to legal opinion, the share settlement date is after the dividend record date, and so this is a term that deviates from normal market terms and creates a cum/ex problem, separating the transaction track from the dividend right and enabling fraud. The share loans in the model presented to Bech-Bruun also deviate from the ordinary loan terms on dividend payments on borrowed shares, where the lender is entitled to receive an amount corresponding to the dividends paid on the shares during the loan period. The lender thus has the price risk on the shares and the right to any dividends on the shares. The loan agreements in Bech-Bruun's opinion deviate from this. Firstly, the timing of the conclusion of the agreement is formulated in a very complicated way. On the trade date, it is agreed to enter into a share lending transaction on the settlement date that the shares will be lent on the settlement date. In other words, you agree on the trade date that you will agree and settle a share loan on the settlement date. Legally, this means that the share loan agreement is concluded on the trade date. Secondly, it is agreed that the seller will borrow shares plus dividends. The loan must be settled on the share settlement date, i.e. after the record date, and the terms of the agreement state that since the shares are delivered ex dividend, the third party will make a compensation payment to the seller. This goes against the standard agreements where the stock lender keeps the proceeds, but if you don't do it this way, there is no compensation payment coming into the system. Without a compensation payment, the bank cannot falsely document the receipt of a dividend in the form of a compensation payment. In this setup, the compensation payment is thus a key element in the dividend fraud. Similar conditions apply to the pension plan's lending to third parties.

*Ownership*

Ownership of dividends is inextricably linked to ownership of shareholdings.

**818**

As far as civil law ownership is concerned, dividends are paid to the person who is registered as the owner at the end of the dividend registration date. This was not the pension plan. The pension plan did not receive the shares until after the record date and had to deliver them to the borrower on the same day. The pension plan was thus not an owner at the end of the record date and should therefore not receive dividends as a registered owner in the distributing company. The custody account records were thus not a basis for issuing documentation that the pension plan had received a dividend. In relation to the civil law concept of ownership, A has fundamentally misunderstood the concept during his testimony before the High Court, as he has explained that, in his opinion, the civil law ownership of shares was transferred at the time of the agreement. However, listed shares are a generic commodity, and the ownership of the shares is therefore only transferred upon binding individualization, i.e. when the transaction is settled and the shares are registered in the

new depository. Until then, you only have a claim against your counterparty. Section 19 of the Danish Sale of Goods Act, which states that the purchase of shares includes all dividends due after the conclusion of the purchase agreement, does not regulate the transfer of ownership in this context,

but only the contractual relationship between buyer and seller - i.e. the buyer's claim for delivery. A thus incorrectly assumed that the pension plan would become the owner at the time of the agreement.

For tax ownership, it is the time of agreement that is decisive, and when lending shares, the lender remains the owner unless the borrower sells the shares, in which case the buyer becomes the owner and the lender's ownership ceases. However, it is also questionable whether the tax ownership was with the pension plan.

The pension plan does enter into an agreement to purchase shares with the associated price risk, but at the same time a forward agreement is entered into, i.e. a tailor-made agreement that removes the price risk again. In addition, a share loan agreement is entered into. Thus, neither shares nor risk are held by the pension plan. Both shares and compensation payments also pass through on the share settlement date. It is very doubtful whether the pension plan is the owner for tax purposes in this situation.

In addition, the pension plan had entered into a physical forward agreement, according to which the pension plan was to enter into an agreement on the trade date that the pension plan would deliver the shares to a third party on the forward settlement date. In other words, the pension plan and the third party agreed on the trade date that the pension plan would deliver the shares to the third party at a certain price. This is equivalent to a forward purchase and is thus in accordance with the preparatory works to the Capital Gains Act a disposal. The pension plan had therefore sold the shares and for this reason was not the owner for tax purposes.

The same applies if you were to look at beneficial ownership. The pension plan had no ownership risks and was therefore not a beneficial owner.

North Channel Bank should therefore not in any context declare the pension plan for the owner. Banks cannot and should not declare something they are not sure about. Ownership cannot be certified based on probabilities. If there is doubt, it must be included in the declaration. It must not appear unreservedly as standard documentation, which Bech-Bruun has mistakenly endorsed.

*Prerequisites etc.*

A legal opinion is ordinary legal advice and does not constitute abstract, theoretical works based on some special legal basis. This also means that the assumptions that form the basis of a legal opinion cannot be detached from reality. In addition, there is no evidence to suggest that assumptions can be used to write oneself out of liability to third parties. The assumptions therefore have no significance in relation to liability to the Danish state unless they specifically modify the course of the transaction.

Assumption 5 that the pension plan will acquire unconditional ownership of the shares on the trade date and will have full ownership rights over the shares on the dividend approval date, including the right to receive the dividend declared on that date, relates to legal matters and is therefore not an assumption that the bank can verify. On the contrary, it relates to the matters that A knows something about and therefore makes no sense as a prerequisite for a legal opinion.

There is no doubt that Bech-Bruun during the trial understood it as a presumption of civil law ownership, but the presumption is incorrect, as the pension plan was not a civil law owner, and Bech-Bruun could see this from the transaction description. In addition, A explained during his testimony that the assumption

concerned the tax ownership. When Bech-Bruun and A do not agree on the significance of the condition, it cannot have any significance. A's explanation that he had copied the premise from I's opinion cannot be accepted either,

as you had to assess whether the pension plan was the owner under tax law and therefore could not have assumed ownership under tax law. The dividend follows the ownership, and with the doubt about the ownership, North Channel Bank could not issue an unconditional dividend note, and you could not mitigate the doubt about the ownership by inserting condition 5.

The ownership assessment was a legal assessment, and that was at the heart of the bank's question.

Assumption 7 states that North Channel Bank's systems will show that the pension plan is the legal owner of

**819**

the shares. This is an error in the bank's registers, which should show a maximum of the shares from when they were delivered to the pension plan until they were handed over the same day. Bech-Bruun should have pointed this out. It is also incorrect to state in the premise that North Channel Bank's records will show that the dividend represents an actual dividend, as the records will at most show that an amount has gone into the account. Mr. A's explanation that he assumed that North Channel Bank would have access to the stock lender's bank and that he could imagine going to them to trace the dividend back to the distributing company has not found its way to his legal opinion, nor is it common for a custodian bank to do so. Therefore, condition 7 does not constitute a reassuring, but rather an aggravating circumstance.

Bech-Bruun should have advised the bank against issuing dividend notes to the pension plan, because the bank had full knowledge of the questionable ownership and the lack of market conformity both in terms of the purchase agreement and the share loan. By issuing the dividend notes, North Channel Bank committed gross fraud against the Danish Tax Administration and thus the Danish state. Every lawyer knows that you cannot apologize for having legally misinterpreted the knowledge you have. Ignorance of the law does not exonerate.

The model involves issuing two dividend notes. Each of these two dividend notes can be used to create a refund for the same shares. Mr. A has explained that he was aware that two dividend notes could be issued for the same dividend, although there would not be two that could be claimed. It is incomprehensible how he could conclude that North Channel Bank could issue dividend notes without incurring criminal liability. A could not write himself out of this risk by inserting assumptions in his legal opinion. Assumption 8 concerns that North Channel Bank will not issue ownership documentation to others. It is irrelevant, as A has explained that he knew that ownership documentation would be issued to the lender - just by another bank.

Condition 13 concerns that North Channel Bank has no reason to believe that others will seek reimbursement. This does not solve the problem. The model could be used for fraud, which could happen in the form of double reimbursement, but it is obvious to consider whether it could also be used for other types of fraud. When you have knowledge that something like this can happen and you play a role in it - either by issuing a dividend note or by giving an opinion - then you are responsible. Because you can see what's going to happen. You can't distance yourself from responsibility.

Requirement no. 11 about a fee that did not deviate from custodian bank fees in general only makes sense in relation to an assessment of evidence. In the corporate steamer cases, some of the banks had charged unusually high fees for participating in some events. This was seen as evidence that the banks had known that something was wrong, and therefore it pointed to liability. But it's not a question of the fee being liable - it was just an element

of proof. The insertion of this premise may be due to a clear distrust of the bank or be hidden advice on how the bank can distance itself from what is going on. The bank may well include

work - as long as it can't be proven to be linked to the transactions. It is difficult to read it any other way. It is in any case an eclatant indifference to whether the Danish state suffers losses.

*The role of the borrower*

In addition to both the pension plan and the lender receiving a dividend note, the pension plan also had to lend the share. The lending had to take place on the trading day - i.e. the day of the general meeting or earlier. It is noteworthy that the pension plan's lending of the share is on exactly the same terms as when the lender lent the share. The two loan agreements are described in exactly the same wording in Bech-Bruun's legal opinion. If the borrower of the pension plan sells the share, there is thus a new potential owner and also a risk of situations with double reimbursement or triple reimbursement etc. In principle, it is thus a chain that can continue indefinitely. Bech-Bruun should have declined to advise or should have concluded that there was a risk of liability and punishment. Whether North Channel Bank's role is near or far is not decisive. There is a risk to third parties, namely the state. And North Channel Bank is an active participant in the set-up, and Bech-Bruun can see it all in the same way. You can't avoid responsibility by distancing yourself from your role.

*Many yield notes*

Bech-Bruun should have considered the role of the lender and borrower in the set-up. If the lender held shares and was liable for tax, the lender would receive the dividends on the shares into its account, withholding tax would be withheld and the lender would be registered as the recipient of the dividend income. If the lender was to be exempt from taxation, the lender would have to prove to the tax authorities that the income did not accrue to him. Especially in a tax arrangement, this would probably not be possible and would have undesirable complexity and create problems for the other parties involved. In this situation, all parties would want settlement to take place on market terms. If the lender had the shares and was tax-exempt, the lender could seek reimbursement itself and there would be no arbitrage gain from using the pension plan's tax exemption. The set-up is therefore also meaningless in this situation. The only remaining sense in the model is that you have to use it to issue dividend notes without there being any shares with the lender.

**820**

Thus, the purpose is to get North Channel Bank to wrongfully issue dividend notes so that the pension plan can wrongfully apply.

Also in relation to the borrower, the loan creates a clear risk of another unjustified dividend note for the same dividend. It basically does not make sense that the set-up includes this loan. It incorporates an additional risk, namely that the shares are sold before the general meeting and thus the pension plan is no longer the owner. This shows that the pension plan is completely indifferent to maintaining its ownership and has no desire to hold the shares, just as it shows that the bank does not care. The bank is willing to certify ownership even though the shares have been passed on. In other words, all players are willing to pass on ownership, which they would not be willing to do if there were actually shares. Pension plan on-lending means that the positions of the seller and the pension plan offset each other. Everything one gets in, the other gives back. That's zero at the North Channel Bank custody level. And if you just put up cash collateral for the loan, which corresponds to the purchase price, it also results in zero at the account level. So the loan serves a clear purpose - to offset positions. They must offset each other because it is a posting task where you have to fake that there are

shares. However, since there are never any shares, there can't be anything at the end of the day in shares or money that would have to appear in a depository. It would have to be reconciled to the share depository or to accounts. And when everything in North Channel Bank has to balance each other out, how could Bech-Bruun be

sure that the same did not also happen with third parties, and that the third parties could be one? Neither of the parties had any benefit from these deeply peculiar agreements if it was a matter of the pension plan seeking reimbursement on someone else's shares. On the other hand, it provided a clear opportunity to wrongfully seek reimbursement and the possibility of offsetting positions to zero and thus actually doing without shares.

It was apparently the third party, i.e. the seller's lender, who was to obtain the unjustified refund, but it makes no sense for the pension plan to orchestrate a setup that allowed for this. Even if it did, it would be a clear liability for the bank, but there would be no financial gain for anyone other than the third party (lender and borrower) who may wrongfully seek reimbursement. Instead, the arrangement is that the third party does not own shares and the pension plan and North Channel Bank create a complex set of agreements that allow for dividend notes and unjustified refund claims. The loans show how the purpose of the cum/ex model can only be to obtain unjustified reimbursement and how this can be done without shares.

It's clearly irresponsible.

*The economy*

If Bech-Bruun had considered the economics of the transactions they were presented with, it would have revealed that it was a model with no business justification and it was clear that it was a tax dodge.

The model contained no economic rationale for the pension plan, and it is in itself problematic that A has explained that he did not consider this issue. The very complex explanation given by Bech-Bruun as to why the pension plan had a profit opportunity as part of market speculation in the price after distribution seems far-fetched and also does not correspond to what the pension plan did.

The model did not contain any economic rationale for the seller either, because the seller is a short seller and at the same time has hedged and thus fully hedged his position. The seller will only act in this way in collaboration with the other players and is thus only involved to transfer ownership to the pension fund.

Neither the pension plan nor the seller has a financial interest in the trades, but they are both customers of North Channel Bank and their positions in the bank offset each other through the opposing forward agreements. Bech-Bruun could see that.

In relation to the bank, the situation was that the seller's loan was matched by the pension plan's loan and the seller's forward was matched by the pension plan's opposite forward. If you add them together, you get zero. So if they have the same bank - and possibly the same omnibus account - then you get zero in the account. In summary, with the model as it was presented in English, Bech-Bruun could have analyzed the parties' positions and concluded that the arrangement made no sense unless it was about seeking reimbursement wrongfully. And when it was the pension plan's model, logically, it had to be the pension plan that would make the profit by wrongfully seeking reimbursement, i.e. that the third party had no shares and that the model was therefore without shares. Bech-Bruun should have made that analysis. Everything was laid out in front of them. Bech-Bruun did not have to get very far in the analysis before they would have discovered that they clearly should have refrained from providing this advice or answered "no" to the fact that North Channel Bank could participate without risking compensation or criminal liability.

It's not a question of Bech-Bruun understanding complex banking law or special registration rules. It was a wide range of different problems, each of which should have led to a

"No". A could have realized that there was a risk that the setup

could be completed without shares, and when you analyze it through, the arrangement only makes sense when it

**821**

takes place without shares. If there were shares in the arrangement, ordinary market conditions would have been followed. If there were shares, the set-up with two dividend notes was intended to benefit third parties by allowing them to seek unjustified refunds, which would also be criminal.

It is clear that North Channel Bank should not confirm anything. There were no shares or money in the bank, only paper trails.

Bech-Bruun was aware of the facts, which means that Bech-Bruun should have reached the opposite conclusion in its opinion and thus forced North Channel Bank not to cooperate or even inform the authorities. With Bech-Bruun's knowledge of the facts, Bech-Bruun cannot apologize that Bech-Bruun had misunderstood the legal basis such as the rules on civil law ownership of shares. It generally applies that you are expected to know the law. And that certainly applies here, where Bech-Bruun was hired as a specialist lawyer to analyze the Danish conditions. It is irrelevant that Bech-Bruun had not foreseen that this would be fraud and that it was assumed that there would be shares. The bank thus openly asked about criminal and compensation liability, and A himself saw the risk of fraud - at least in the form of two dividend notes for one shareholding. It was therefore not unforeseen that this could be fraud, and it should have been the main focus for Bech-Bruun.

*The German transaction description*

An assessment of the model that Bech-Bruun advised on requires a full overview of the transaction, which Bech-Bruun got with the German and English transaction description. Bech-Bruun could not apologize for not understanding the German version - you have to insist on it being translated or do it yourself.

An examination of the German transaction description, which is not difficult to read and understand at the crucial points despite the extensive text, shows very clearly that, in addition to North Channel Bank and the broker, there would only be the three players X, Y and Z, so that there was only one third party, which is not possible without the arrangement becoming circular. The transaction description also shows that accounts are set up for all parties in North Channel Bank, that it all takes place internally in the bank, and that it is a zero-sum game all the way around in relation to all deposits and accounts. Everything offsets each other - there are no shares and no money. Everyone is credited and debited an equal amount. No one is richer or poorer

- It runs through all three of them and the bank.

You can see that it all starts with a debit at the bank. This doesn't make any sense. If there was a dividend coming into the bank, it should be credited to the bank first. The payment then moves in a circle from the bank to customer X to customer Y to customer Z and ends up back at the bank, where it covers the original debit. Even if the whole thing could start strangely with a debit to the bank - if you didn't show the credit from VP Securities - it makes no sense that it then also ends up being credited to the bank. But was there a dividend? One can conclude that the dividend does not end up anywhere. If there is a dividend, it has to come from somewhere. Someone has to be shrinking - and there isn't. It's very clear that it's a

"closed shop" - a closed circuit. You can clearly see that all parties have accounts and deposits at North Channel Bank. You can see that the transactions go to zero. Nobody makes any

money - everything breaks even. It seems unlikely that A would not have leafed through the seven pages to some extent, and he has also

Copyright © 2024 Karnov Group Denmark A/S

invoiced North Channel Bank for this. The next question is whether A should have understood this. A knew how dangerous this type of transaction is. The warning lights had been flashing since he received the first inquiry. He knew that this was an area where cheating was taking place. Cum/ex and double reimbursement were fresh in his mind. A not only needed, but also had a duty to get a full overview. A knew that the English transaction description was a "read-easy version" of the illustration of what North Channel Bank and the pension plan would do.

If you compare the two transaction descriptions, you can see that the German text is significantly longer and more detailed and includes information about what happens on the transaction side. Bech-Bruun should have asked more about this. Even with the transaction description presented to A in English, it was not excluded that the third party was the same. It is clear from the German transaction description, and the purpose of the English summary was to bring A's understanding "in line" with the illustration. There is nothing to indicate that Jones Day, neither when sending the transaction description nor during meetings held about the model with Bech-Bruun, tried to keep it hidden from A that the third party was the same.

Even if it is assumed that A did not fully understand the German transaction description, this does not change the fact that he was sent the description and that it contains drawings and figures which are not dependent on linguistic understanding. A should therefore have understood the description, which has the character of a master plan for what the parties to the arrangement intended to do both together and separately. The description of the bank's role is very detailed and shows the bank's central role in the arrangement. The fact that the description is in German also indicates that the description was prepared by the German bank - North Channel Bank. With this master plan in hand, the

**822**

Bech-Bruun saw that this was the bank's model, and Bech-Bruun was actually told this when Jones Day informed them that the bank was considering a change in structure. Bech-Bruun could therefore see that there was something completely wrong in the bank's description of the context. This should have made Bech-Bruun take a closer look and demand a translation of the document if A really did not understand the essence. A translated version clearly showed that it was illegal and at best pro forma - and that it was without shares.

*Case law*

Bech-Bruun is subject to strict professional responsibility.

In UfR 2000.2267 H it was established that if a bank issues a custody statement without holding the shares, it must explain that it does not hold the shares and that they are with a third party. This standard of responsibility can be applied to North Channel Bank. North Channel Bank knew, and Bech-Bruun could see that, at best, the shares would be with the seller's lender when the dividend was due. And that the dividend would thus at best be with this third party. If North Channel Bank nevertheless chose to issue a note, North Channel Bank - in the words of the Supreme Court - had to point out that the shares and dividends were with a third party not chosen by the bank. If North Channel Bank had made such a reservation in its dividend notes, SKAT would naturally have asked about the reason for this.

In the Supreme Court judgment, the custody statements had been induced by fraud on the part of the two shareholders, and they had the opportunity to acquire most of the compensation amount that would come from a claim for damages against the declarant. Under the circumstances, there was no basis for a claim

against the bank, as you cannot be compensated for a false statement that you yourself have induced by fraud. This is not the same situation in the present case, where it is the tax authorities

Copyright © 2024 Karnov Group Denmark A/S

administration, which, as an injured third party, claims compensation from Bech-Bruun for Bech-Bruun having approved that North Channel Bank could issue dividend notes without reservation.

The central case law in the field of advisor liability is the company tax cases, and the leading judgment on advisor liability is UfR 2000.365/2 H (the Thrane judgment), where emphasis was placed on the fact that the sale of the profit company was not a normal business transaction and that under the circumstances in which the sale had taken place, there was special reason for the seller and the seller's advisors to be aware of the risk of violating the interests of the tax authorities.

It is a very similar situation in this case, as the transactions created a not insignificant risk of loss without Bech-Bruun doing anything to avert the tax authorities' loss, and Bech-Bruun has tried unsuccessfully to write its way out of the problems with its assumptions alone.

The liability standard established by UfR 2000.365/2 H has also been applied in the cases in the company timber complex where there was an acquittal, including e.g. UfR 2006.145 H, which among other things showed that there is a quite extensive duty of investigation for the sellers

- or for other actors involved in transactions without a business purpose that create a risk of loss for the tax authorities.

Bech-Bruun's conduct in advising North Channel Bank must be seen in relation to the practice from the company tax cases, but a stricter assessment of Bech-Bruun must be made because the model presented had no commercial purpose at all, not even on the surface. A had also realized the risk that the model could be used for double reimbursement, which is clearly illegal. There were also a number of factors that raised questions as to whether the pension plan was a beneficiary at all, and the core of the need for the advice was therefore unjustified reimbursement. If the standard from the company tax cases is to be followed, Bech-Bruun is therefore liable for damages to the Tax Administration, but the situation is aggravated for Bech-Bruun compared to the company tax cases because Bech-Bruun has advised on a model, while in the company tax cases only advice was provided on one specific transaction.

In both the dividend cases and the corporate tax cases, actors have tried to justify their models with reference to abstract ideas about "holes" and theoretical profit opportunities. In the corporate tax cases, the speculation was whether you could profit from the latent tax burden. In the dividend cases, the speculation is whether you could make a market arbitrage and monetize your tax advantage by trading around the dividend date. In both cases, it is very difficult to understand how the profit would be there on market terms, but it is easy to understand the rationale if fraud is involved.

*Liability standard - legal opinion*

Bech-Bruun's views on the liability standard for advice provided in the form of a legal opinion would be an innovation that should not be allowed in Danish law.

Consultants are responsible for their advice. You can limit an assignment or refrain from looking at specific issues in an analysis, but you cannot write your way out of things, as Bech-Bruun tries to do. In that sense, legal opinions are nothing special. There is no question of North Channel Bank obtaining an abstract opinion. North Channel Bank presented a model for what they intended to do, and Bech-Bruun had to relate to that model. They could do that in the form of a legal opinion, but if they could see that the model created risks for the state as a third party, they could not avert these risks by inserting some

reservations in their legal opinion.

**823**

Copyright © 2024 Karnov Group Denmark A/S

Bech-Bruun had to either write clearly to North Channel Bank that the bank would risk criminal or civil liability if the bank participated in these transactions, or contact the Danish state and inform them of the potential fraud that their client had set in motion. Reservations in a legal opinion are something you can use inter partes, but it is not something that can avert the risk of the state's loss.

*Causality and adequacy*

Bech-Bruun's legal opinion has been or is expected to be invoked by, among others, the bank's former management and the bank's main shareholders during the pending criminal proceedings.

The advice was about the bank's responsibility to issue dividend notes for some proposed transactions. The advice was obtained in order for North Channel Bank to issue this standard documentation, and the case documents show how the advice was used before, during and after the process.

There was a close temporal connection between the advice and the applications for reimbursement to SKAT. Bech-Bruun's draft was finally in place on May 5, 2014, when it was sent to North Channel Bank. Jones Day's overlay memo was sent to North Channel Bank on May 9, 2014, and the first refund applications were submitted to SKAT on May 12, 2014.

There was a clear connection between Bech-Bruun's irresponsible behavior and the Tax Administration's losses. Overall, the advice was obtained to issue dividend notes. North Channel Bank obtained advice from Bech-Bruun before submitting refund applications to SKAT. It was only after Bech-Bruun had approved the model that the first applications were submitted. North Channel Bank requested advice because North Channel Bank needed it.

Bech-Bruun has tried to turn the question around in hypothetical ways. Would North Channel Bank have submitted applications if Bech-Bruun had not given its opinion? Would the fraudsters have used a bank other than North Channel Bank if North Channel Bank had not been available? These are counterfactual questions and they cannot remove causality. The fact of the matter is that you will never know. Because Bech-Bruun gave its opinion, and therefore North Channel Bank was available as a bank for the fraud. It is up to Bech-Bruun to prove that North Channel Bank would have acted anyway if Bech-Bruun had not advised as it did. There is thus a causal link between the advice and the loss.

With its advice, Bech-Bruun was part of the setup of the unlawful refund applications that ended up causing the tax administration a loss of billions. Even though Bech-Bruun did not intentionally participate in a criminal fraud, it does not change the fact that Bech-Bruun actually played a role in the scheme. An actor who participates in the planning of a model is liable for the damage caused by the model. It is a joint and several liability with the other responsible actors.

There were many heavy players, such as banks, pension plans, companies founded in different jurisdictions and lawyers, who together defrauded SKAT. It was a complex setup. The actors included fraudsters, such as the backers and the bank, but also actors who had no intent to defraud, but who contributed through negligent or grossly negligent behavior because they did not think things through, such as Bech-Bruun, which approved the model. These actors are jointly liable for the loss that they collectively caused. This joint responsibility was also seen in the company steamer cases.

*The legal basis for the assessment of causation.* Firstly, there is at least a relaxed burden of proof for causation in a case like this,

where there is a liability for negligence. Secondly, the burden of proof is relaxed because Bech-

U.2024.746H - SKM2024.123.HRH

Bruun has made clear errors in his advice. This means that the burden of proof in this case has actually been reversed, cf. UfR 2002.2000 H, where the Supreme Court ruled that in the event of a clear legal error, liability can only be discharged if it must be assumed with a significant degree of probability that there is no causal relationship. In other words, the Supreme Court reversed the burden of proof so that the tortfeasor had to prove that there was no causality. In this case, where Bech-Bruun has also committed clear errors, the same principle must apply, and Bech-Bruun must prove with a significant degree of certainty that there is no causal connection.

The tax administration has also referred to UfR 2002.2176 H on a bank's culpable issuance of an incorrect stock exchange announcement in connection with a share issue, where it was stated that doubts about causality should not benefit the tortfeasor if there is clear culpa.

Bech-Bruun has advised with clear errors in a very risky environment. Doubts about how things would have turned out if they had not given their advice should not be given to them. Instead, Bech-Bruun must prove that their advice was not necessary for North Channel Bank, and Bech-Bruun has not provided a good explanation for this.

Even a purely chronological review of the course of events shows that there was a reason why North Channel Bank sought advice from Bech-Bruun, and that there is thus a causal relationship. Internally at North Channel Bank, a plan was made for the project called "Fennec". On January 29, 2014, this plan was sent around North Channel Bank, and you can see that one of the tasks is "Legal Opinion for Fennec Process". The management of North Channel Bank was listed as responsible for this item. This internal plan shows thus,

**824**

how this opinion affected the start of the project. The assignment had a deadline at the green line - the beginning of week 10, which was in early March 2014. At that time, Bech-Bruun had provided their advice in the form of an opinion dated February 21, 2014. That opinion was an unsigned draft, but it was effectively final from Bech-Bruun at this point. The changes made during April and May did not change Bech-Bruun's conclusion. On May 5, 2014, Bech-Bruun's advice was final. On May 9, 2014, Jones Day sent the updated German opinion, which was on top of Bech-Bruun's opinion, and three days later the first refund application with North Channel Bank dividend notes was sent to SKAT. There is a clear connection between Bech-Bruun's advice and the refund applications. Bech-Bruun's advice concerned whether it was punishable or liable, and North Channel Bank asked for a "should" opinion via Jones Day. Both the structure and purpose of the project show that Bech-Bruun's advice was obviously important. The same goes for the temporal context. There is thus a causal link between Bech-Bruun's advice and North Channel Bank's behavior, regardless of whether North Channel Bank violated the KYC rules and NPP procedures. The fact that North Channel Bank incurs an expense of EUR 14,650 in connection with obtaining advice from Bech-Bruun emphasizes that the advice was needed and that there is a causal link between the advice and the unjustified refunds.

North Channel Bank's use of the advice also appears from the course of events after Bech-Bruun had issued its opinion. North Channel Bank posted the transactions to its custody accounts and its accounts. And North Channel Bank generated dividend notes using Dwp-Bank's WP2 system as if it were a normal and legitimate banking transaction.

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H – SKM2024.123.HRH

This is because North Channel Bank was a bank. A German regulated bank subject to the German Financial Supervisory Authority BaFin, and the bank referred BaFin to the legal opinions obtained, including from Bech-Bruun.

As a professional advisor, Bech-Bruun is not exempt from liability for having been misled by the bank. Bech-Bruun had all the information needed to reach the right result. Bech-Bruun provided the tools for the fraud in the form of wrongful issuance of dividend notes by endorsing and advising on the model. There is thus a causal link when North Channel Bank has issued dividend notes contrary to the facts, but in accordance with the model that Bech-Bruun assessed. This applies regardless of whether North Channel Bank booked the fictitious trades exactly as Bech-Bruun had assumed.

North Channel Bank carried out the transactions that Bech-Bruun advised on. The documents in the case show that North Channel Bank followed the same system for all of the transactions in North Channel Bank that form the basis of the claim for damages. It was not excluded that the third party in Bech-Bruun's legal opinion was the same, which means that there could be a closed circuit in the bank between three parties. This was also the fact that had been presented to Bech-Bruun.

Bech-Bruun's objection that no transactions were made at all because there were no shares has no bearing on the assessment of causality. The absence of reality and shares in the transaction chain was possible because the transactions were circular, and this was made possible by Bech-Bruun's transaction description. The fraud and the structure was so complete that it could create traces across accounts and depots, and in terms of accounting and as a desktop exercise, there were transactions. It is a smokescreen when Bech-Bruun has referred to the times of posting and the sequences of the transactions in the depots and accounts.

Bech-Bruun has referred to the fact that the first transactions were carried out on March 14, 2014 and that the first dividend notes were issued on March 24, 2014. In addition, Bech-Bruun has emphasized that Bech-Bruun's opinion was not finalized until August 4, 2014. None of these objections dispute that there was a causal link between Bech-Bruun's advice and the unauthorized applications that led to the loss.

North Channel Bank started booking trades already in March. At that time, Bech-Bruun had made a final draft on February 21, 2014 that there should be no risk of either criminal liability or liability for damages and was ready to settle for this. It was thus a fairly final assessment. If North Channel Bank started booking transactions in reliance on this, it does not change the causal link, as Bech-Bruun's advice was a long advisory process with the same conclusion throughout. Furthermore, until the dividend notes were submitted to SKAT, it was a closed circuit without external actors, where the transactions could be rolled back without risk. The risk only arose when North Channel Bank's dividend notes were submitted to SKAT, and there is a strict temporal causal relationship with Bech-Bruun's advice. Bech-Bruun's draft was finalized on May 5, 2014, when it was sent to North Channel Bank. Jones Day's overlay memo was sent to North Channel Bank on May 9, 2014, and the first reimbursement request was sent out on

May 12, 2014. What matters is that North Channel Bank perceived the draft as final and acted in reliance on it, and that

**825**

It was not later changed. The course of events after May 5, 2014 also shows that Bech-Bruun also considered the signature to be a formality.

*Adequacy*

Bech-Bruun has the burden of proof for lack of adequacy, and it has not been lifted. As a commercial lawyer, Bech-Bruun cannot avoid liability for its advice on the grounds that Bech-Bruun could not foresee the consequences of its advice. Bech-Bech provided advice on whether the bank, by issuing standard documentation, could be liable to prosecution. Then the bank issued standard documentation and was penalized. In this context, it is irrelevant whether the bank is punished for complicity or direct fraud.

They even advised on the bank's liability. And then the bank did something liable. This is the most likely consequence if Bech-Bruun's advice was wrong. Specifically, Bech-Bruun advised on whether the bank could be liable to pay compensation for the state's losses if an unauthorized request was made on the basis of the documentation issued by the bank. Thus, it is not only obvious that the state may suffer losses. In fact, the advice was based on an assumption of loss to the Danish tax authorities based on the bank's documentation. This loss cannot be incalculable.

The model posed a risk of fraud, and the reservations in the legal opinion did not mitigate this.

SKAT's management has no bearing on adequacy. Bech-Bruun knew that the evidence to be attached to applications for refund of dividend tax consisted of the standard documentation that Bech-Bruun advised North Channel Bank to provide without liability.

The size of the loss suffered by the Tax Administration has nothing to do with adequacy. It is therefore also irrelevant whether the loss is proportional to Bech-Bruun's fees.

*Own fault and acceptance of risk*

Bech-Bruun has not lifted the burden of proof that the Tax Administration was at fault or accepted a risk of being exposed to fraud. Bech-Bruun was presented with the model that gave rise to the fraud and grossly negligently overlooked all the danger signals, which has a spillover effect on any own fault, whose fundamental relevance thus pales. It is socially unsustainable to allow for limited liability or complete exemption from liability for an advisor who has advised on a model that ends in fraud. Such a view has been legally challenged

- also in relation to own fault - in, among other things, the timber company case. Here, it was a breach of responsibility to advise in such a situation where the risk of loss was obvious - and the claims for compensation should not be reduced with reference to own fault. It also goes without saying that the state, and especially the Tax Administration, where more than

1,000 billion DKK flows through annually, and which is highly dependent on third parties reporting and making declarations correctly and faithfully, will not stand a chance in a society where people can responsibly be encouraged to make declarations where they are not sure that what they are declaring is true.

In addition, the fraud not only affected Denmark, but also took place in a number of other countries. In Europe alone, losses have been calculated at DKK 410 billion. This shows that there were no special conditions in the Danish controls that caused the fraud to be directed at Denmark, and it also shows how serious the fraud really was. Bech-Bruun has asked the High Court to assess whether the Danish Tax Administration has acted irresponsibly in its organization and administration of the dividend area in the period 2007-2015. Bech-Bruun has the burden of proof and has attempted to lift this burden by presenting fragments of the full picture. Bech-Bruun has not presented the High Court with a basis which, in the opinion of the Tax Administration, makes it possible for the High Court to decide on

page 106

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

the issue of own fault and acceptance of risk.

*The general process*

U.2024.746H - SKM2024.123.HRH

It is Bech-Bruun's position that the administration was irresponsible, which can be attributed to SKAT (now the Tax Administration), and that it was a direct consequence of the irresponsible administration that fraud could occur.

In its statement of claim, Bech-Bruun has pointed to the reports from SIR, the State Auditors, the National Audit Office and Bech-Bruun itself, which were prepared after the fraud had been discovered. None of these reports expresses a tort law assessment of SKAT's actions or contains a specific assessment of the applications that contained documentation from North Channel Bank or any of the other applications.

It is fundamentally wrong that, in the present case, the verification was irresponsible. The inspection contained a very strong documentation requirement, which included a statement from a bank that appeared to be an independent third party and which showed that what the applicant requested was correct: That the applicant company owned the shares as they were in the company's custody on the distribution date, that the applicant had been paid a net dividend and that dividend tax had been withheld in Denmark. When an independent third party confirms information that has otherwise been provided in good faith to SKAT, you are in control.

Bech-Bruun has pointed out that in 2006 and 2007 there were warnings about challenges in the administration of dividend tax, including difficulties in verifying ownership of the shares.

In the process, Bech-Bruun criticizes the criticism, but overlooks the big picture and the follow-up on this criticism. In addition, the criticism goes way back in time.

**826**

For example, in both 2010 and 2013, the tax administration commissioned SIR to assess the area. The audit review is followed up and the area is in continuous focus. The area has never been overlooked. In SIR's report from 2013, it is also assessed that the control in the blanket scheme is solid.

In the process, Bech-Bruun highlights a number of wishes for different solutions to a fundamental challenge at SKAT, namely the challenge of verifying the beneficial owners of the shares when applying for a refund of withheld dividend tax, but overlooks that there was no focus on the actual requirements for the refund applications and their control. There were some good and solid documentation requirements in that control.

There were no concrete signs of fraud and it was therefore not an area where resources should be urgently prioritized during this period. It should also be remembered that the risk of fraud is present in all areas of tax administration. The fact that Bech-Bruun points to the risk of fraud as something special is not accurate. This information must be included in the overall risk picture in the tax administration area. Based on the full picture, Bech-Bruun must demonstrate that it should have prioritized differently by downgrading its resources, for example in the VAT area, in order to allocate more resources to the dividend area. Bech-Bruun has only highlighted the dividend area
- and is thus nowhere near meeting the burden of proof. There was no knowledge of fraud before 2015.

The fraud committed by V6 in 2007 gave rise to a full and thorough investigation and has no connection to the fraud in 2014 and 2015.

At the time of SIR's 2010 report, no fraud had yet been identified, and the report was superseded by the later report from 2013. The report was submitted in accordance with applicable rules, and there was follow-up on the report, which could not be described as particularly critical at the time. The nature of the report was such that something had to be done, but there was no

actual fraud. You have to see it in relation to the risk picture in the entire administration.

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

The report led to the establishment of a working group to focus on the lack of reconciliation between the dividend declaration and the reporting of dividend recipients, and these problems were solved through, among other things, rule changes. In relation to the technical treatment of foreign shareholders, it was decided to work on an international solution in the OECD under the TRACE project, as this was a global problem. It is not irresponsible that the TRACE project was chosen to continue, even though it was ultimately not realized.

The SIR itself followed up on the 2010 report with its 2013 report, which was submitted in accordance with the guidelines. The 2013 report was not critical of the form system, where the SIR concluded that the control processes were in order.

There is no basis to assume that the follow-up on the audit reports from 2010 and 2013, despite clear warnings and recommendations in the reports, was completely inadequate and characterized by a lack of management involvement and the postponement or closure of items for follow-up without justification.

Bech-Bruun's reference to SIR's report from 2014 is not relevant, as this report does not specifically concern follow-up on the dividend area, but the general follow-up on SIR's reports.

SIR's 2015 report was prepared under great time pressure immediately after the fraud was discovered and at a time when the extent of the fraud and the technical execution of the fraud had not yet been uncovered, including whether it involved the use of forged documents or whether it involved the use of real documents but with incorrect content. It should also be noted that the report was prepared at a time when it was known that fraud had occurred on a very large scale, and that SIR's conclusions must therefore be read with hindsight. It is striking that SIR's assessment of the area is very different from the assessment that SIR had in 2013 in particular. Finally, it should also be borne in mind that the report is not an assessment of the law of damages. Neither SIR, nor later Rigsrevisionen, has addressed the processing of the applications with documentation from North Channel Bank.

The fact that the responsibility for dividend administration has been divided among several people does not mean that no one is responsible. The individuals responsible for the sub-processes bear the responsibility, and the overall responsibility is ultimately anchored with the CEO, as also stated by SIR. It might have been a liability issue if there was no one responsible at all, but that was not the case. It is not a liability that responsibility has been spread out among several people.

The error highlighted by Bech-Bruun, which in 2013 and 2014 meant that a partial check for 100 percent reimbursement could not be performed in the 3S system in relation to two listed companies, is not the fault of Bech-Bruun. It was one of several tools, and the lack of functionality did not mean that the relevant information was not checked. There are also no circumstances in the accounting approvals that indicate own fault. Fluctuations in dividend tax refunds were registered. This occurred for the first time in the local approval for May 2014 and the reason for this was investigated, after which it was plausibly concluded that the increase in refunds was due to receiving more applications from US pension plans, which in

**827**

increasingly owned Danish shares. In addition, income from dividend taxes also increased from 2005 to 2015 (to June) from DKK 6.69 billion to DKK 18.51 billion, i.e. approximately 177%. Refunds increased somewhat more from DKK 1.18 billion to DKK 8.73 billion, i.e. 640%. These are large increases. You can also see that there is continuous revenue from the dividend tax. The total value of the Danish stock market also increased and approached DKK 2,000 billion in 2014 and 2015. Finally, the

Copyright © 2024 Karnov Group Denmark A/S

The primary function of the accounting controls in the department was solely to act as an indication of whether the economic assessments that were prepared three times a year were fairly accurate. The figures could not be used for an in-depth causal relationship clarification.

The factual statement from February 2016 by the Head of Citizen and Legal Security cannot be used as an argument that all types of taxes in SKAT's area must be thoroughly reviewed and that SKAT's case processing, as claimed by Bech-Bruun, has been in violation of the administrative law official principle. The tax authorities not only can, but also must prioritize the considerations. Particularly in the area of dividends, there has been a sensible balance. A very solid starting point had been created, where the documentation requirements included verification of the applicant's information. The processing time was prioritized both for the sake of the citizen and the treasury due to the risk of interest charges, while also ensuring that Denmark was an attractive country to invest in.

The nature and scope of the checks that SKAT has carried out on the specific applications go beyond a formal check. The harsh criticism in Rigsrevisionen's report from 2016 is an expression of hindsight. Rigsrevisionen itself was continuously involved in the area and received SIR's reports, which did not lead to any comments from Rigsrevisionen at the time or to reservations on the state's accounts.

The legislative amendment from 2012 and what is stated in the preparatory works for this legislative amendment is not relevant to this case.

*Concrete applications*

Bech-Bruun must not only point out irresponsible behavior by the authority. Bech-Bruun must also prove that this conduct is related to the fact that payments were made in accordance with the applications submitted with documentation from North Channel Bank. However, Bech-Bruun has not been able to point to anything in the applications that is relevant to the assessment of this case that should have prompted SKAT's employees to react. The applications are accompanied by genuine documentation from two third parties verifying what the applicant claims. A bank regulated by the German Financial Supervisory Authority confirming that there is a shareholding and that a net dividend has been received. And a certificate from the IRS confirming the US tax liability information. Both third parties with a naturally high level of credibility.

Bech-Bruun has thus not demonstrated that even if a different control had been applied, these applications would have been rejected. It has not been demonstrated that errors were made anywhere in the tax administration when processing these applications.

*The course in summer 2015*

Bech-Bruun has stated that SKAT should have stopped the payment already in June 2015, and in the loss statement, Bech-Bruun has deducted everything after the lawyer's first contact with SKAT on
June 16, 2015.

The inquiry was handled "by the book" and immediately prompted investigations and inquiries to V6 and others, but there was no question of a "burning platform". It was not until the inquiry was received from the British tax authorities, including a list of 185 companies on August 6, 2015 and information about an impending attack against SKAT on August 10, 2016, that there was a secure basis for making a decision to stop the payments of dividend tax refunds. Thus, SKAT has not been at fault for not stopping the payments at an earlier date. Regardless of whether SKAT may have been at fault, Bech-Bruun's conduct is, however, so grossly irresponsible that any fault on its part cannot be attributed any significance.

*Acceptance of risk*

When organizing the administration of the dividend tax area, SKAT has not accepted a risk that may result in the lapse or reduction of Bech-Bruun's liability. It would be strange if there was an acceptance of risk in all cases where there is only a risk of fraud due to possible challenges in systems and control contexts. This would mean that compensation in fraud contexts is not possible.

*Tab*

The loss is the amount paid out by the Tax Administration in reliance on the dividend notes prepared by North Channel Bank as part of the model advised by Bech-Bruun. In the period from From May 12, 2014 to July 22, 2015, a total of DKK 1,135,775,442.18 was paid out as a result of refund requests from a total of 27 pension plans. Bech-Bruun has not disputed the calculation of the amounts.

The tax administration's total loss amounts to DKK 12.7 billion, of which approximately DKK 1.1 billion (just over 8 percent) is caused by Bech-Bruun, North Channel Bank, a number of pension plans and a number of other players. Under the general rules of Danish law, these parties are jointly and severally liable for the loss. Bech-Bruun's objections that there should be a subsidiary liability to the Tax Administration are completely detached from reality and Danish law. The tax administration can claim its full loss from each of the tortfeasors, but of course not more than

**828**

100 percent. The tax administration has therefore issued summons against these actors, including Bech-Bruun.

*The settlement agreement*

A number of players in the dividend case have approached the Tax Administration with a view to reaching a settlement. Bech-Bruun is not one of these parties. In this connection and as part of its loss mitigation, the Tax Administration has entered into a settlement that is of importance to this case. The settlement is an overall solution reached with 61 pension plans, 56 natural persons and 102 companies. Of those 61 pension plans, only 26 of the 27 pension plans that used North Channel Bank are included in this case. The agreement thus covers a much larger part of the dividend case than the part for which Bech-Bruun is responsible. Bech-Bruun has tried to characterize the settlement as unusual. However, there is nothing unusual in the fact that the injured party is trying to cover its loss. The settlement must take into account the international and complex nature of the fraud that Bech-Bruun advised on. In accordance with what is customary, the settlement in this case is also confidential. This has also been established by the High Court, as only parts of the settlement have been ordered to be disclosed in this case. The tax administration has therefore produced parts of the settlement, a side agreement to the settlement, an inter-creditor agreement with, among others, North Channel Bank and a side agreement to this agreement. The latter two are not part of the settlement but may be relevant to the claim against Bech-Bruun. These parts of the relevant agreements document the basis and amount of the claims against the individual settlement parties, including the items included in the settlement amounts, terms for payment of the settlement amount and business information. Approximately DKK 1 billion has already been paid under the settlement.

The settlement covers a total loss of DKK 2,937,851,407, where the claim in this case of approximately DKK 1.1 billion only accounts for just under 37%. The settlement thus covers almost DKK 1.8 billion that has nothing to do with North Channel Bank and Bech-Bruun. In other words, more than half of the settlement relates to a completely different loss.

The payment obligation in the settlement is a total obligation and the payments of approximately DKK 1 billion can therefore not be directly attributed to the individual parties to the settlement.

It is agreed that the Tax Administration cannot recover its loss twice and that the claim against Bech-Bruun must be reduced by the

payments received by the Tax Administration from a settlement party to the extent that the payment covers the loss for which Bech-Bruun is solida- risk liable. However, Bech-Bruun shall not be credited with payments that have nothing to do with Bech-Bruun's tortious act.

A clear starting point for a distribution mechanism for payments under the settlement can be found in a distribution according to the principal amounts in the settlement. This would mean that the aforementioned 37% would govern the distribution.

However, the tax administration has chosen a distribution according to the mechanisms in the settlement itself. This is a more accurate method that puts Bech-Bruun in an even better position. The settlement means that all parties must waive the reimbursement amount that has been wrongfully paid by the Tax Administration. However, the parties to the settlement do not have to account for the part paid to other parties that are not part of the settlement. This is what is described as the net proceeds in section 2(e)(1)-(4) of the settlement agreement, and it is the method for calculating the basis, size and items in the settlement claim. The settlement corresponds to what would be payable under US law if the Tax Administration in its litigation succeeded in finding that the pension plans' claims were unjustified without being able to prove that there was fraud.

This saves the tax administration large legal costs and litigation risk. On the other hand, the tax administration is paid what can be expected as one of several possible outcomes in a court case. The difference between the net proceeds and the gross proceeds can be pursued with the other parties involved in the case, i.e. those who have received the amounts in question or participated on another basis.

This is a reasonable and objective starting point for the calculation of a settlement amount. It is very misleading when Bech-Bruun has tried to interpret the settlement as being "a very favorable arrangement". However, whether the settlement is in fact favorable is irrelevant to this case. If any jointly and severally liable parties are dissatisfied with the settlement, they can do something about it. It follows from the principle of the relativity of contracts that contracts do not have effect for third parties. Bech-Bruun is therefore not precluded from seeking recourse against Bech-Bruun's co-liable party. And conversely, Bech-Bruun is free to enjoy the reduction of loss. In other words, Bech-Bruun is only better off as a result of the settlement agreement. If no settlement had been reached, the Tax Administration would not have received any amount, and Bech-Bruun, as joint tortfeasor, would be liable for the full amount in this case.

The calculation of the net proceeds is based on a fixed amount of DKK 1.55 billion, which must be paid in all circumstances and which can be adjusted upwards if it turns out that the parties to the settlement have received a larger share of the refunds than this amount. The settlement sum is adjusted by preparing a Net Proceeds list, a so-called Net Proceeds List, which is a statement of what the settlement parties have calculated and documented their net proceeds to. The tax administration checks this list, cf. clause 2(e) of the settlement. The Tax Administration claims that the net proceeds on the list are higher than what the settlement parties themselves had calculated according to the principles of the agreement.

**829**

The tax administration and Bech-Bruun have overlapping interests. The tax administration has a clear interest in ensuring that the settlement amount is as high as possible, and this will ultimately reduce the claim for which Bech-Bruun is liable. The

total net proceeds are between approximately DKK 1,728 million and DKK 1,765 million, which implies an increase in the settlement amount from DKK 1.55 billion. The amounts have been calculated and documented on the basis of a very large number of underlying documents. This is also the reason why it has taken so long to prepare a net sample list. According to the agreement, it is this list that determines the settlement amount. There is a range in the list that the parties

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

must agree on before there is a final net proceeds list, and there is a process for this in the settlement. The range for the final net proceeds and thus the settlement amount has been agreed, and Bech-Bruun as a third party cannot legally object to this. In other words, Bech-Bruun has no legal interest in gaining access to the considerable amount of documents on which the net proceeds list is based. Bech-Bruun's possible objections to such a calculation and distribution in the net sample list must therefore be handled as part of a possible recourse claim.

The net proceeds list is a suitable instrument for calculating and distributing the profit between the pension plans that used North Channel Bank as custodian bank and those that did not. The list shows which items the settlement is made up of, and thus how much of it is attributable to North Channel Bank, for example.

The list shows that between $398.1 million and $400.8 million can be attributed to applications from pension plans that only submitted applications based on dividend notes issued by North Channel Bank. In addition, between DKK 244.3 million and DKK 246.5 million can be attributed to the North Channel Bank share of applications from pension plans that have used both North Channel Bank and one or more other custodians. According to the settlement parties' calculation, North Channel Bank's share is thus DKK 642,482,368 out of DKK 1,728,414,356. According to the Tax Administration, the share amounts to DKK 647,306,924 out of DKK 1,764,762,172. In both cases, the share is thus around 37%, which is very close to the share that would result from a distribution according to the principal.

This means that an amount of between DKK 642.4 and 647.3 million will have been paid on the part of the claim for which Bech-Bruun is liable if the settlement agreement is fulfilled in full. Bech-Bruun will thus be credited with payments corresponding to the part of the settlement attributable to the part of the loss for which Bech-Bruun is liable. Conversely, Bech-Bruun is not credited for payments relating to the part of the settlement that has nothing to do with Bech-Bruun's liability. This is very reasonable and in accordance with the settlement's statement of the settlement amount. And it is a distribution method that puts Bech-Bruun in a better position than other of the Tax Administration's legitimate alternatives, as the payments could, for example, have been used to cover interest on the claim in advance.

The claim against Bech-Bruun will only be written down when and if the tax administration receives payments under the settlement. At present, the parties to the settlement have actually paid DKK 1,010,139,979.41. It is these payments that will be used to write down the claim. The payments cannot be attributed to any of the individual settlement parties. The payments must therefore be a proportional payment of the claim of DKK 1,728-1,765 million, which reflects the calculation method for the settlement agreement. This implies a proportional distribution of approx. 37%.

At the time of the summons, the Tax Administration had calculated North Channel Bank's share of the settlement claim at approximately DKK 634 million, out of a total smaller settlement sum of DKK 1,550 million. This corresponds to a share of approx. 40.93%, which the Tax Administration has allowed to benefit Bech-Bruun. The Tax Administration has thus written down the claim against Bech-Bruun by 40.93% of the billion received instead of 37%, corresponding to approximately DKK 400 million. The written-down claim against Bech-Bruun now amounts to DKK 722,290,313.77. This puts Bech-Bruun in a better position than the obvious starting point with a distribution based on the principal and also better than the distribution according to the actual distribution of the settlement claim, which appears from the net proceeds.

Bech-Bruun has not been able to provide a different model for how payments under the settlement should be distributed, and it is neither a real nor a serious proposal that any payment should be used to write down the claim against Bech-Bruun one by one.

The tax administration has presented all relevant information currently available for use in the calculation pursuant to the settlement, and the tax administration has otherwise favored Bech-Bruun in its choice of method. Under the circumstances and given the seriousness of Bech-Bruun's culpable conduct, any ambiguity in the allocation must be detrimental to Bech-Bruun.

*Letter Agreement and Intercreditor Agreement*

Alongside the settlement agreement, a so-called letter agreement has been entered into - a side agreement under which a separate repayment of fees accrued to North Channel Bank must also be made. The amount must be at least DKK 50 million. However, such payment presupposes that it is possible to complete a sale of the bank. A creditor agreement has also been signed whereby the Tax Administration will also receive 86.97% of the sale price in the event of a sale of North Channel Bank. Bech-Bruun will be credited with this amount if the sales agreement is completed. If this does not happen, North Channel Bank will go bankrupt.

The reason for the creditor agreement is to ensure that the state's losses are covered in the best possible way, as a bankruptcy will lead to a

**830**

modest dividend (if any), just as the FIU's fine demands will be subordinated. In other words, this is an initiative that puts all parties involved in the case in a better position.

However, the bank has not yet been finally sold and Bech-Bruun is blocking a sale of the bank by not withdrawing the defense of the bank in this case.

If, contrary to expectations, the High Court should find that the claim cannot be finally determined at this time, this cannot lead to Bech-Bruun being acquitted. It does not make Bech-Bruun less responsible for the loss suffered by the Danish treasury that Denmark has tried to limit the loss as much as possible. In that case, the tax administration must succeed in its alternative or more alternative claim. *Limitation and passivity*

The tax administration's claim against Bech-Bruun is not time-barred or lapsed by inaction.

The limitation period is three years and the period is generally calculated from the occurrence of the damage, cf. section 2(4) and section 3(4) of the Limitation Act.

1. However, what is central to this case is the general suspension rule set out in section 3(2).

The tax administration became aware of the content of Bech-Bruun's advice on June 29, 2018 (translated in August 2018). This is the earliest time from which the limitation period can start, and since the summons was filed on June 8, 2020, the claim cannot be time-barred.

Bech-Bruun has stated that North Channel Bank was reported to the police on August 24, 2016, and that settlement negotiations with, among others, the owners of North Channel Bank were initiated at the end of 2016.

The North Channel Bank negotiations took a long time, but they only began in early 2019. Before that, SKAT Special Control had been investigating the dividend case and its participants from the summer of 2015 with the aim of recovering money and making police reports. They also wanted to hold those involved liable under tort law.

However, the Tax Administration had not become aware of Bech-Bruun's advice and its content until it received the KPMG report in the summer of 2018, where the two opinions were attached as appendices. There is no basis for establishing that the Tax Administration had come into possession of the report earlier than in the summer of 2018, and there is no basis for establishing that the Tax Administration's failure to comply with requests complicates Bech-Bruun and the High Court's assessment of the issue, and that this fact should be detrimental to the Tax Administration. The letter of February 6, 2017 from the German tax authorities to KPMG in Germany does not change this.

U.2024.746H - SKM2024.123.HRH

The same applies to the email of October 10, 2016 from the German tax authorities to SKAT in response to SKAT's inquiry of October 5, 2016. The email refers to shares and volume and a German bank to which Bech-Bruun and an unnamed German law firm should have submitted a statement.

This is not sufficient to suspend the limitation period. You need more, and you need to know the content of the advice. This is a claim for damages, and only when you know the facts of the case can the limitation period begin to run. The tax administration must therefore be able to conclude that incorrect advice was given and that there is a causal link. At the time, this was not possible with the information provided in the email.

The Danish Tax Agency attempted to obtain additional information from the German authorities, and at the same time they tried to obtain material about

North Channel Bank, including the request that appears to have given rise to the letter of February 6, 2017. After receiving the email of October 10, 2016, the Tax Administration initiated further investigations. However, despite several reminders, the material was never handed over. After a year and a half - in the summer of 2018 - the German authorities finally refused to hand over the information, stating that the information had been handed over to SØIK.

The fact that SØIK received the information in 2017, and that it forms part of the basis for the rulings from the Court in Lyngby, does not change the fact that the material did not reach the Tax Agency from SØIK. Bech-Bruun has not lifted the burden of proof that the Tax Administration has shown prosecutorial passivity.

*The interest requirement*

The tax administration sent a demand for interest on April 2, 2020. This means that according to the rule in section 3(2) of the Interest Act, you are entitled to interest from 30 days thereafter, i.e. from May 2, 2020. This includes the interest from this date - and thus also the interest from the legal action. This is the Tax Administration's main claim 3 together with the ongoing interest in claim 1. Claim 3 is a monetary calculation of the interest claim from precisely May 2, 2020, when interest will start according to section 3(2) of the Interest Act and until September 3, 2021. This is the date on which the Tax Administration last adjusted its claim downwards due to payments from others than Bech-Bruun. The ongoing interest after September 3, 2021 is covered by the Tax Administration's claim 1.

The statement of claim is undisputed, but Bech-Bruun claims that interest should be paid at a lower rate or not at all on the basis that the claim is so doubtful that Bech-Bruun has "good reason" to await a court decision before payment and that the state has no interest expenses for financing in the current economic climate.

The tax administration's claim is not doubtful and the tax administration is entitled to interest from the

**831**

at least from legal action. The state's interest expense level cannot be given significance when the state is to be awarded procedural interest. The waiver of interest under the settlement agreement with the bank's owner and customers cannot lead to Bech-Bruun not having to pay statutory interest. The settlement regulates the relationship between the parties and does not limit claims against third parties.

The Tax Administration argues that "special circumstances" justify that the Tax Administration's claim must bear interest from the time of payment pursuant to section 3(5) of the Interest Act, cf. the Tax Administration's main claim 2. Bech-Bruun is liable

for damages for advice that has led to a loss of billions for the Danish Treasury through criminal offenses, and it is for example this situation that is covered by the provision.

U.2024.746H - SKM2024.123.HRH

The Tax Administration has also referred to the fact that Bech-Bruun did not disclose its advice, just as Bech-Bruun knew that the prerequisite for the relevance of the advice was that the state would suffer losses and that the client was in doubt whether it could be punishable. Bech-Bruun's conduct in the case, which showed indifference and disregard for the state's interests, thus constitutes a special circumstance that indicates that interest must be paid from the time of payment.

The tax administration's claim for interest is also supported by Bech-Bruun's conduct in the years following the revelation of the dividend case and the ongoing uncovering of Bech-Bruun's role. Bech-Bruun continued to advise North Channel Bank in 2015 and 2017

- also at the same time as the execution of an independent legal investigation for the Ministry of Taxation. With these new questions from North Channel Bank, all alarm bells should have rung again. By looking up the old case, one would be able to read the advice in hindsight and with knowledge of the dividend case.

Bech-Bruun's advice only came to light when the tax authorities received the legal opinion prepared as an appendix to the KPMG report in the summer of 2018. The tax authorities received no information about Bech-Bruun's correspondence with Jones Day or that Bech-Bruun had received the German master plan. The tax authorities only received this information in 2019 and not from Bech-Bruun. In the intervening period, the Ministry of Taxation brought a disqualification case against Bech-Bruun before the Danish Bar and Law Society and the courts, where Bech-Bruun invoked the duty of confidentiality and therefore did not give the Ministry of Taxation insight into the correspondence presented in this case. Instead, Bech-Bruun provided descriptions of the advice, which in the opinion of the Tax Administration is not correct.

The process shows how the Tax Administration was prevented from raising the claim until the Tax Administration obtained the information from another source that made it possible to raise a compensation claim against Bech-Bruun.

Given the scope and nature of the case, the tax administration did not take too long to issue a summons against Bech-Bruun, and they did not want to raise a claim before the basis for this had been investigated and assessed. Therefore, there is no basis for rejecting the interest claim in whole or in part.

*Bech-Bruun*

*Bech-Bruun* has stated in particular that Bech-Bruun is not part of the exchange case and that there is no connection between Bech-Bruun's legal opinion and the fraud committed by North Channel Bank.

However, the fraud has become the mirror through which the Tax Administration retrospectively assesses the facts of the case in relation to Bech-Bruun on the basis of fragments and unsubstantiated assumptions, including more general and incorrect assumptions about the price formation of distributions, that two dividend certificates cannot be issued in relation to one and the same share, which is also a new claim that must be rejected by the High Court, cf. Section 363 of the Danish Administration of Justice Act, and the alleged market practice according to which, among other things, agreements to purchase shares in 2014 were fulfilled after three days (T+3) with delivery of shares and that dividends were paid the following day (T+4).

*Case disclosure*

The case has been characterized by the Tax Administration's lack of contribution to the clarification of the case.

Public authorities are subject to general rules and principles of administrative law also as parties in legal proceedings, and authorities generally recognize "a natural obligation to contribute to the clarification of the case", cf. UfR 1998.16 H. This is a natural obligation that must apply in particular when the authority itself is the claimant and the claim is substantial.

Copyright © 2024 Karnov Group Denmark A/S

The inclusion of Bech-Bruun as a defendant is related to the agreements that North Channel Bank and its owners and customers have entered into with the Danish tax authorities.

During the preparation of the case, Bech-Bruun made a number of requests regarding both the settlement agreement and the credit agreement, which the Tax Administration did not wish to fulfill, which led to Bech-Bruun's discovery request of 20 January 2021. By order of 29 September 2021, the High Court granted the Tax Administration discovery orders regarding specified parts of the credit agreement and the settlement agreement. The information is necessary to determine which payments under the settlement agreement originate from pension plans that have used Dividend Credit Advices issued by North Channel Bank in applications for refund of dividend tax, and which thus undoubtedly must be deducted in a claim against Bech-Bruun. The tax administration has chosen not to comply with the production order, as the material presented, of which the vast majority is crossed out, is completely insufficient for this purpose.

The edition requirement is also not met with the information in the presented "Net Proceeds List", which is without

**832**

documentation. The tax administration has admitted that such underlying documentation exists, but has referred to the fact that the documentation is extensive, irrelevant to the case and subject to confidentiality.

In Bech-Bruun's opinion, it is completely incomprehensible that this material has not been shared with the defendant and the High Court, also in view of the discovery order.

Thus, there is still no documentation as to who paid a billion dollars to the tax authorities or how much of it can be attributed to North Channel Bank. Nor has the Tax Administration been willing to state with whom Bech-Bruun should be jointly and severally liable, just as the Tax Administration itself has not been willing to state with whom settlements are made, who pays and what is paid.

In assessing the insufficient fulfillment of the disclosure order, the High Court should also take into account that the Tax Administration has previously provided incorrect information about the settlement agreement, including the number of pension plans that had used Dividend Credit Advices from North Channel Bank and which were parties to the settlement agreement.

Bech-Bruun has nothing against the law firm's external correspondence being included in the case, but this presupposes equality, which Bech-Bruun has not achieved, not even through the attorney general's data room, for which a fraction of the material has been selected.

The tax administration has had unlimited access to the bank's archive, while the bank has denied Bech-Bruun any access.

In favor of the tax authorities, the bank waived its lawyers' duty of confidentiality and later also to Bech-Bruun, but the bank nevertheless refused Bech-Bruun access to lead H as a witness, and in this connection the state has failed to exert its influence.

The state agreed to confidentiality with the parties to the settlement agreement and the credit agreement, even though the state was also considering bringing claims against Bech-Bruun where the agreements would have an impact.

In its summary pleading, the Tax Administration submitted a new plea, which the High Court has refused to consider, and subsequently the Tax Administration has submitted three pleadings and several hundred pages of new documents. The new plea has now been resubmitted in a new guise during the proceedings. Among the new documents is also the email of

October 10, 2016 from the German tax authorities, which contradicts everything the plaintiff has claimed during the preparation and which, in Bech-Bruun's opinion, proves that the Tax Administration's possible claim is time-barred. There is among the

U.2024.746H - SKM2024.123.HRH

new appendices also presented individual excerpts from the correspondence with the US tax authorities, to which access was denied during the preparation and continues to be denied in other parts.

This case management by the Tax Administration must be included in the assessment of evidence of the facts of the case.

*Lack of accountability*

Basically, there is no basis for liability for Bech-Bruun. Culpa is required for this.

The tax administration must prove that Bech-Bruun, judged in relation to the specific assignment, did not do what can be expected of a lawyer. According to case law, this requires that the breach is both concrete and material. Neither of these requirements is even remotely met.

Bech-Bruun's legal opinion expressly states that North Channel Bank would receive dividends (or compensation payment equivalent thereto) and that it would be the receipt thereof that would justify the bank's issuance of Dividend Credit Ad- vice.

Both I's tax opinion and Bech-Bruun's legal opinion are thus based on an undoubted receipt of dividends. The question in the tax opinion is whether the conditions for seeking a refund of the withheld dividend tax would be met (not least the reality and legal ownership of the dividends for the US pension plan). The question in Bech-Bruun's legal opinion is whether the bank would have any risks in a situation where SKAT, on the basis of an application, pays a refund of dividend tax, but subsequently reassesses the specific transaction and, contrary to the tax opinion, concludes that the conditions for a refund are not met after all, namely that the pension plan is not the beneficial owner.

The fact that North Channel Bank actually chose to issue notes without having received any dividends (or compensation payments corresponding thereto) has nothing to do with either tax opinion or legal opinion and cannot justify liability for Bech-Bruun. As a general rule, a lawyer is not considered in relation to third parties to have contributed to the execution of his client's transactions (or lack thereof) simply because the lawyer has previously advised the client on the client's legal position, for example given a legal opinion.

It is incorrect for the Tax Administration to state that the relevance of Bech-Bruun's legal opinion implied losses for SKAT. On the contrary, it is both well-founded and customary for a bank to seek to hedge its risks, and this naturally also applied in connection with North Channel Bank considering offering a new product. A assessed a situation without taking a position on whether the risk of loss to the state was likely or not.

In relation to legal opinions, it has been established in case law that a lawyer's potential liability must be assessed on the basis of the lawyer's assignment as agreed with the client, including stated assumptions, cf. UfR 2005.2534 H.

Bech-Bruun's assignment was to provide a legal opinion on a German bank's risks under Danish law and as

**833**

subcontractor to an international law firm that dealt with regulatory issues under German law. Bech-Bruun's assignment and the expectations of Bech-Bruun under the fault rule must be determined with this in mind.

A legal opinion can only be invoked by the client, cf. UfR 2005.918 H, and the reservations made in such a legal opinion can be relied on, cf. UfR 2005.2037 H. It has also been established that a lawyer is not liable for matters covered by assumptions in a legal opinion, see UfR 2005.2037 H.

This Supreme Court practice already makes it clear that there is no basis for liability for Bech-Bruun in connection with the legal

opinion of 4.

August 2014. The tax administration's argumentation is a construction created for the occasion - a fiction that only testifies that the tax administration's claim has no legal basis.

It is thus a fundamental flaw in the Tax Administration's argumentation - and also contrary to the tax authorities' later recommendations against cross-border tax evasion from November 2014 - that Bech-Bruun's assignment is disregarded.

It was outside the scope of Bech-Bruun's limited assignment to assess tax law issues, just as it was outside the scope of the assignment to assess elements of the transaction description, including purchase agreements, loan agreements and forward contracts, all of which could also be subject to foreign law, see sections 2 and 7 of the legal opinion, as well as the parties to these agreements.

The comprehensive German transaction description, which the Tax Administration has referred to in its argumentation that Bech-Bruun has acted in breach of responsibility when advising North Channel Bank, among other things because a review of the description would show that the transaction pattern was circular and without commercial purpose, was by agreement with Jones Day expressly not part of the basis on which A was to prepare its legal opinion, and the German transaction description is therefore completely irrelevant to the case.

A further fundamental flaw in the Tax Administration's argumentation is that the Tax Administration ignores that Bech-Bruun's legal opinion was a so-called "should" opinion and thus indicated a certain doubt and risk.

Furthermore, it is a fundamental deficiency that the Tax Administration in its assessment of selected parts of the transaction description in section 3 of the legal opinion simply disregards sections 3.4 and 3.9 as well as assumptions in section 4 and reservations in section 5 (and also qualifications in section 7).

The assumptions form a crucial part of the legal opinion, and the conclusion herein cannot be read separately from the 13 explicit assumptions that appear in section 4 of the legal opinion.

The qualifications in paragraph 5 of the legal opinion leave no doubt as to how Bech-Bruun would have judged the situation if North Channel Bank's customers did not own any shares at all, or where North Channel Bank would confirm customers' receipt of dividends in the form of Dividend Credit Advices even though the bank had never received any actual cash flow corresponding to the dividend payment, let alone a situation where the bank would not only act as a custodian bank but commit fraud itself.

The legal opinion leaves no doubt as to how Bech-Bruun would have judged fraud by North Channel Bank in issuing Dividend Credit Advice without receiving dividends and without real shares and real cash flows.

The tax administration's claim is also based on the assumption that a lawyer providing a legal opinion has a duty to verify facts and assumptions, just as the lawyer should not be able to make reservations. This assumption is fundamentally wrong, which is standard in a legal opinion and thus also in Bech-Bruun's legal opinion of August 4, 2014. Considerations for third parties do not change this.

Attorney liability towards third parties requires something special, cf. UfR 2005.918 H, where a lawyer had not incurred liability for damages towards investors by giving legal opinions on a project that turned out to be without economic reality, as it was not the investors that the lawyer had advised and given legal opinions to.

For its part, the tax administration refers to the Supreme Court's practice in cases concerning company emptying. The reason for this is presumably that the cases established liability for damages against the tax authorities as a third party. This case law supports

U.2024.746H - SKM2024.123.HRH

However, the Tax Administration's point of view. The Tax Administration argues for a significant tightening of the existing case law in violation of the general rules on damages under Danish law.

In UfR 2000.365 H on company liquidation, the Supreme Court took as its starting point that the trade with surplus companies was not "a normal business transaction" and that it must appear as "an obvious possibility" for the seller and the seller's advisors that there would be self-financing, i.e. that the purchase of the surplus company would be financed with the company's own funds. According to the premises, this entailed a risk of loss for the tax authorities as a creditor of the surplus company. The Supreme Court emphasized that the advisors "recommended the sale and managed its implementation". According to the Supreme Court, it was

"at the time of the sale" that they neglected to take into account the tax authorities' risk, as the seller and the seller's advisors did nothing "real" to avert this risk. This was the reason why the Supreme Court found liability for damages "at the

834

the sale of the profit company". Thus, it was the advisors' involvement in the implementation that gave rise to liability in relation to the tax authorities.

This is also evident from acquittal judgments which were not appealed to the Supreme Court, see for example FED 2000.884 V and TfS 2000.732 V as well as the High Court's judgment concerning an auditor reproduced in UfR 2004.2955 H (the auditor was not involved in the appeal to the Supreme Court). In the company timber complex, the buyer's bank was also found liable for damages, but on different grounds, cf. UfR 2000.365

H. Banks on the buyer side had thus had positive knowledge of the violation of the self-financing prohibition, as these banks could see that the company was acquired with their own funds, and according to the Supreme Court, this violation had even been "crucial to the bank's risk assessment". Nevertheless, the banks did

"nothing ... to avert the resulting risk of disregarding the interests of the tax authorities". In comparison, banks on the seller's side were acquitted, even though they could very well possess the purchase agreement and have the same knowledge as both the seller's advisors and the buyer's bank, see for example UfR 2004.3027 H.

Case law in cases of corporate defalcation shows that not even positive knowledge in itself can justify liability under Danish law's general rules on damages, as this also requires either advice "at the time of the transfer", i.e. in connection with the specific transaction, or a safeguarding of own interests at the clear expense of the interests of third parties.

Case law in cases of corporate emptying therefore emphasizes that there is no basis for liability for Bech-Bruun.

Bech-Bruun had no basis to suspect North Channel Bank, let alone positive knowledge of an offense. Bech-Bruun did not recommend clients of North Channel Bank to carry out transactions. Nor did Bech-Bruun assist in the execution of specific transactions, just as Bech-Bruun had no role in relation to the specific applications, which, according to information, caused SKAT a loss. Nor did Bech-Bruun subsequently review any specific transactions.

In accordance with its assignment, Bech-Bruun only assessed the legal risks for North Channel Bank as a custodian bank in connection with a model for customer transactions on a general level and within specified assumptions and reservations. Bech-Bruun did not comment on whether the transactions would meet the tax law conditions for refund of dividend tax, not least in terms of beneficial ownership. On the contrary, the legal risks assessed by Bech-Bruun were based on the fact that the conditions (including beneficial ownership) might not be fulfilled.

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

Specifically, the conclusion in Bech-Bruun's legal opinion is correct, and the bank would thus not have incurred liability (let alone criminal liability) if the bank had actually only acted as a custodian bank and only issued notes upon actual receipt of dividends and or compensation payments corresponding thereto.

Bech-Bruun neither had nor should have had the slightest idea that the bank had the intention or would be able to carry out fraud of the kind for which the bank later received a substantial fine, cf. also FED 1999.368 Ø. Thus, there was a significant difference to the company stealing cases in that while the company stealing cases concerned an actual trade in shares, this case was pure fiction, as there were no shares to trade and it was completely unknown to the advisor. In contrast to the company stealer cases, A was provided with information about the actual transaction.

Furthermore, it must be included in the assessment of Bech-Bruun that Bech-Bruun was not involved in specific transactions or applications for refund of withholding tax, while SKAT in the processing of the specific applications agreed to completely dispense with material checks, regardless of the risks of fraud and deception being known to SKAT and the Ministry of Taxation. It was SKAT and not Bech-Bruun that had the opportunity to establish that something was wrong with the specific applications. At the same time, Bech-Bruun was unaware that SKAT, in violation of the applicable rules, did not carry out material checks before the refund of dividend tax was paid.

A fundamental difference to corporate tax evasion is that in the corporate tax evasion cases, the profit companies held SKAT's money, so to speak, whereas here the money was in the treasury and subject to SKAT's control. The risk picture here was therefore significantly smaller than in the corporate tax evasion cases.

Bech-Bruun will not be held jointly and severally liable with the criminal persons and companies that participated in the fraud, such as North Channel Bank and persons associated with the bank. An advisor who, on an initial and general level, may have acted with simple negligence cannot be held jointly and severally liable with criminal parties who have acted specifically and intentionally. Furthermore, the tax administration has to a large extent not wanted to disclose with whom Bech-Bruun should be jointly and severally liable.

*Lack of causality*

The tax administration has not met the burden of proof for a causal link between the tax administration's losses and the advice provided by Bech-Bruun. Thus, it is not Bech-Bruun's advice that is the cause of SKAT's loss in the form of payments of DKK 1.1 billion based on refund applications attached to dividend notes from North Channel Bank.

The tax administration's view that due to clear errors made by Bech-Bruun during the audit, the burden of proof

**835**

the advice has actually been reversed so that the burden of proof that there is no causal relationship lies with Bech-Bruun, has no support in case law, see in particular UfR 2015.2075 H.

Bech-Bruun's legal opinion is not at all suitable for inclusion in connection with specific applications for refund of dividend tax. The legal opinion is thus not given to a client with shares and dividends, and the legal opinion does not concern a specific transaction, just as the legal opinion does not concern the tax law assessment of such a transaction. It is thus a legal opinion that does not concern tax law, but tort law, and which is given to a bank that is not a taxable entity in Denmark. It was not given to the Danish Tax Administration, and there is no connection to the Danish Tax Administration as a third party in connection with the legal opinion.

The lack of a causal link is demonstrated by the Tax Administration's argumentation, which starts and ends with the remark that

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

North Channel Bank needed the assessment for "something", but without specifying what this "something" should be.

In any case, it must be clear that Bech-Bruun's legal opinion could not be used for "anything" until it was delivered on August 4, 2014.

A gave his legal opinion on August 4, 2014 based on the legal position on that day, which was long after the production of dividend notes had started and also long after many applications had been sent in May 2014 and large refunds had been paid and losses suffered by SKAT, albeit not yet recognized.

The Tax Administration has sought to solve the time challenge by instead referring to a draft legal opinion dated May 5, 2014, which Jones Day has submitted to North Channel Bank.

However, this must be rejected already because this fifth draft was not shared with Bech-Bruun at all. In addition, the signing, which only took place on August 4, 2014, can in no way be treated as a formality, just as it is clear from the context that the legal opinion was not final until the signing had taken place.

A draft legal opinion is not a legal opinion. The draft of May 5, 2014 was prepared by Jones Day, and at that time Bech-Bruun had not completed its advice, which is also reflected in the fact that Jones Day returned after May 5, 2014 and asked A to sign and submit a legal opinion, which happened on August 4, 2014.

That the draft of May 5, 2014 would have been of central importance to the bank is also contradicted by the fact that the bank could not locate any draft when KPMG asked. If the May 5 draft had been considered material to North Channel Bank, the bank would have saved it and been able to present it when asked.

The lack of annual coherence is also evident in other ways than in a temporal context. The legal opinion is about a German bank's risks more generally in relation to a new product, and it is included in the context of a German legal opinion, among others. This shows that any use of legal opinion has to do with regulatory conditions in Germany - and at product level rather than at transaction level.

Nor is there any basis for claiming that the applications would not have been submitted in the absence of Bech-Bruun's legal opinion. On the contrary, it appears from the information in the case that North Channel Bank's planning of the fraud was initiated more than six months before Bech-Bruun was even contacted, and a German legal opinion from Jones Day (with Danish and Belgian opini- ons attached) was reportedly not an issue until January 2014. Bech-Bruun's legal opinion was not to be used against Danish authorities and has not been used in Denmark. On the contrary, SKAT would have made the payments in connection with applications from customers of North Channel Bank, even though Bech-Bruun had not provided a legal opinion.

Thus, it was not used in connection with applications to SKAT and was not submitted to or shared with applicants, Y or reclaim agents, and it was also unsuitable to be shared with Danish authorities because it concerned confidential advice on risks for a bank and not an applicant in the imaginary situation where SKAT would find that the applicant, the pension plan, was not the rightful owner.

There is also no indication that legal opinion was to be used internally in the German bank to convince anyone to engage in the transactions - and certainly not in relation to the bank's management, who had embarked on a well-planned fraud and who used different e-mail addresses than the bank for the purpose. Nor is there anything to indicate that legal opinion was to be used against uninitiated employees of the bank, as there was a

need to convince, for example, in compliance or another control function. This is also supported by the fact that the legal opinion was ordered by the bank's executive board in accordance with the milestone plan referred to by the Tax Administration. If it had been compliance or another control function that had needed a legal opinion, the request would have originated from there and not from the Executive Board. It is also a fact that compliance was not a focus point for the bank.

Instead, legal opinions seemed to have been a contingency plan for external use with German authorities, as the bank subsequently tried in vain in connection with BaFin's referral of June 17, 2015.

**836**

The legal opinion was thus part of a cover up, but was not decisive for the bank. It can be assumed that the bank would have done what it did, even if the legal opinions had not been issued subsequently. There is nothing to suggest that legal opinions were a necessary milestone to initiate the fraud.

Finally, there are strong indications that North Channel Bank was one of several channels and that the fraud would have continued with other custodians if Bech-Bruun or Jones Day had not provided legal opinions. For this reason too, there is no support for the Tax Administration's view of causation.

The paper trail left behind at North Channel Bank doesn't say anything about causality either.

*Lack of predictability*

The tax administration's loss was not foreseeable for Bech-Bruun. Basically, Bech-Bruun's submission of a legal opinion to North Channel Bank has not increased the danger or risk associated with SKAT's administration of applications for refund of dividend tax, and certainly not when considering North Channel Bank's adoption of a fine for fraud, which in itself is an unforeseeable event, see also section 6.3.1 of the legal opinion. A criminal offense will normally exempt from liability due to lack of foreseeability.

A assessed a possible criminal liability for the bank, but it concerned complicity in tax fraud, not fraud. The loss suffered by the Tax Administration as a result of North Channel Bank's fraud is not a consequence of Bech-Bruun's legal opinion, and it is certainly not a foreseeable consequence.

North Channel Bank acted contrary to what the bank informed Jones Day and Bech-Bruun and contrary to what was stated in the legal opinion, both in terms of the factual description (section 3.4) and the assumptions, including, for example, assumption no. 5 about ownership or right to dividends, no. 10 about acting solely as a custodian bank and normal procedures for custodian banks and no. 11 about standard fees. Thus, the fraud did not develop in a direction corresponding to Bech-Bruun's legal opinion. It was not foreseeable to Bech-Bruun that North Channel Bank would engage in "transactions" that were inconsistent with the agreed description in Bech-Bruun's legal opinion, or that North Channel Bank would do so in a role other than as a custodian bank, or that North Channel Bank would issue false dividend notes.

The applications also concern alleged shareholdings that were both enormous and completely unrealistic, both in terms of the nature of the pension plans and North Channel Bank, which has also been noted by SØIK. We are talking about 82 applications, which together would require shareholdings for a very large amount of billions. This can be compared to the fact that A did not know whether there would be more than one or a few transactions at all.

U.2024.746H - SKM2024.123.HRH

There is also a huge discrepancy between the fee of EUR 14,650 that Bech-Bruun received for the preparation of the legal opinion and the size of the claim raised.

The lack of foreseeability is also supported by the Tax Administration's settlement agreement with pension plans and other alleged fraudsters who, according to the information provided, have only been charged their own enrichment corresponding to about half of the refunded amount from SKAT, even without adding interest. Equal treatment of Bech-Bruun implies a reduction of the claim for damages to the modest fee actually received less costs.

*Statute of limitations*

The limitation period for the claim raised by the Tax Administration against Bech-Bruun is three years, and the period is generally calculated from the occurrence of the damage, i.e. the payment of the refund of dividend tax, which took place in the period from June 17, 2014 to August 6, 2015.

The summons of June 8, 2020 was thus issued long after the expiry of the limitation period, and the Tax Administration has not provided documentation that the limitation period has been suspended under section 3(2) of the Limitation Act or that the claim has not otherwise been forfeited by inaction.

Case law shows no sympathy for creditors who have not pursued claims in a timely manner when they actually had knowledge of the circumstances that could justify a possible claim. This applies even if the creditor is a public authority. The threshold is not high, cf. UfR 2010.277 H and UfR 2017.2023 H.

Specifically and in relation to North Channel Bank itself, SKAT has not been in excusable ignorance of either the claim or the bank from August 24, 2016, when SKAT itself reported the bank to the police. In relation to the claim against Bech-Bruun, it is crucial when SKAT was no longer in excusable ignorance that Bech-Bruun had advised North Channel Bank in relation to transactions in the dividend case. The decisive factor is thus when the plaintiff learned or should have understood that Bech-Bruun had advised North Channel Bank on the bank's involvement in transactions covered by the dividend case.

It is not, as claimed by the Tax Administration, only with the receipt of KPMG's report of June 29, 2018, that the Tax Administration became or should have become aware of Bech-Brun's advice and the potential claim for compensation.

When assessing this question, the email of October 10, 2016 from the German authorities to SKAT is crucial. This email, which arrived almost two months after SKAT's third police report of August 24, 2016 against, among others, North Channel Bank, contains

**837**

information of such a content and nature, compared with the other information available to SKAT, that there can be no doubt that it relates to North Channel Bank's activities during the proceeds case. V3, who was a co-signatory on the police report and had been involved in the case for a long time, has explained that he also received this email. It is obvious that the email was about North Channel Bank, and SKAT must have realized this in October 2016 - or at least should have realized it. What SKAT received with the email of October 10, 2016 was the essence of KPMG's report in the form of the information that Bech-Bruun had advised North Channel Bank on the bank's involvement in the transactions. It is thus incorrect when the Tax Administration in the summons, the reply, pleading 1 and the summary pleading has stated that it was not until SKAT received the KPMG report in June 2018 that SKAT was informed that North Channel Bank had been advised by Bech-Bruun about the bank's involvement in

the transactions in question.

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

transactions in question. SKAT was told otherwise in October of 2016, and from that time the limitation period ran.

It cannot justify suspension of the limitation period that V3 did not at that time consider who the bank might be or investigate this further. The same applies in relation to SKAT's subsequent attempt to obtain additional information from the German authorities. Thus, on October 10, 2016, the German authorities shared sufficient information for SKAT to conclude that there was a potential claim against Bech-Bruun.

Any claim against Bech-Bruun is therefore time-barred.

*Acceptance of risk*

The tax authorities have accepted the risk that dividend tax refund fraud could occur. This is illustrated by the investigations into the dividend administration that were launched after the publication of the alleged fraud in August 2015, which contain a scathing criticism of the dividend administration and control in the area.

Already in connection with a memorandum of September 29, 2006 to the Tax Administration on the so-called TDC case, it was stated that it was not possible to see who was the recipient of the dividends. This was also discussed at a meeting on October 9, 2006 in the dividend administration, and the issue of the administration in the dividend area was addressed in SKAT's problem catalog of November 7, 2006. In a memorandum dated September 5, 2007, it was stated, among other things, that the Dividend Administration largely refunds withheld Danish dividend tax in accordance with double taxation treaties without (the possibility of) checking anything other than that the limited tax liability has been certified. This fraud risk, which was openly disclosed, was accepted by SKAT. Over the years, the tax authorities maintained this acceptance of risk. Although the issue was considered from time to time, nothing was actually done to address the risk, which was reiterated in the Ministry of Taxation's Internal Audit report from 2010. The working group set up on the basis of the 2010 report did not address the risk of fraud. A legislative amendment in 2012, where the Danish Parliament was given the prospect that the tax authorities would be expected to increase focus and control of withholding tax refunds to ensure that no unlawful refunds of dividend refunds were made, did not lead to controls being introduced in the area. The Ministry of Taxation's Internal Audit report from 2013 - despite increasing refunds - also did not lead to the introduction of controls in the dividend refund area, as it was in fact based on a possible future cooperation in the OECD.

The Ministry of Taxation's own subsequent evaluation of the efforts in the dividend area as well as the conclusions of the National Audit Office and the State Auditors indicate that the risk has been accepted and that the administration in the area has been irresponsible, attributable to SKAT.

The reckless management of the dividend tax area can be attributed to SKAT, and it was a direct consequence of the reckless management that fraud could occur.

In this situation, you cannot later turn to an advisor, and based on the fault rule and alleged negligence, recover the hole in the treasury left by the realization of this risk. This is especially true when in 2012, before the fraud started, the government assured parliament and the public that it was definitely carrying out controls and would increase focus on this.

The tax administration cannot apologize for the authorities' prioritization of the use of resources - especially not in a case like this, where the tax administration itself is the claimant. The general tort rules of Danish law do not provide a legal basis for delegating or privatizing public authority tasks such as control

Copyright © 2024 Karnov Group Denmark A/S

applications, nor the financial risk associated with it.

The introduction of new control measures in March 2016 in connection with the resumption of dividend tax refunds has also shown that it was possible to easily and quickly establish a control system that to a much higher degree secured SKAT against unjustified refunds of withheld dividend tax. This should have happened much earlier.

*Own fault*

The tax administration has shown its own fault through a combination of omissions and actions. SKAT made no real checks and had no adequate reactions to the many warnings that were issued. SKAT processed the applications received and sent the money to the applicants - or rather to the four reclaim agents, who were the only ones SKAT was in contact with.

**838**

Specifically, SKAT's acceptance of risk and own fault over a period of almost ten years must be compared with A's behavior in connection with the preparation of the legal opinion, which lasted for half a year and with far less information.

In relation to SKAT, there are a large number of other factors which, if they had been handled properly, would each have prevented the fraud or at least - if not completely avoided - would have led to it being discovered at a much earlier stage and before North Channel Bank even started in spring 2014.

The Ministry of Taxation did not comply with the formal control requirements set out in the Ministry of Taxation's accounting instructions, and no substantive control was carried out at all, even though this was a requirement under both the accounting instructions and general rules of administrative law, including the principle of legality and the official maxim.

The specific case processing of the individual applications was therefore deficient. None of the applications contained a certification from the foreign tax authority confirming that "the beneficial owner is covered" by the relevant double tax treaty, cf. section 22(2)(e) of the double tax treaty between the USA and Denmark. SKAT's action of only receiving a tax certificate as explained by V4 and V6 did not meet this requirement. When SKAT relied solely on this certificate and disregarded the form's expectation of a certification in relation to the double taxation agreement, there was a clear and significant deficiency. The certificates from the tax authorities also came in various forms, including a large number marked "void", without this giving rise to any control or return of the applications. The power of attorney documents, which are all based on powers of attorney issued by Y, should also have given rise to suspicion and further investigation by SKAT. However, according to V4's and V6's explanations, it is unreasonable to conclude that the power of attorney and signature rules were not included in the control despite the requirement in the accounting instructions to check the authenticity and validity of documents as part of the formal control. It should also have given cause for consideration that Y combined a large number of completely unknown pension plans. Furthermore, the applications that North Channel Bank was involved in concerned dividend refunds concerning the same seven Danish companies, and the shareholdings appeared very similar.

This was a systemic problem. Dividend administration was perceived as a bookkeeping office and the task as a key task.

V6 accepted all applications and conducted an unconscious voting, as also established in the High Court's judgment of May 23, 2018 in the criminal case against him. It was a grossly irresponsible scheme where a single HK employee was left without

No monitoring will be alone in processing and granting applications with payments.

It is also self-inflicted that SKAT's caseworker V6 was a criminal and therefore unfit to be employed by SKAT.

Simple numerical analysis would also have shown that something was very wrong in the dividend administration. Fraud accounted for 89% of total refunds in the blanket scheme in 2012-2015 and 95% if you look at 2014 and 2015 alone. In 2010-2012, the bank scheme was more than twice as large as the blanket scheme, but in 2013, when fraud really took hold, the bank scheme was overtaken by the blanket scheme, and it exploded in 2014 and 2015. In 2014, the blanket scheme was more than twice the size of the bank scheme, and in 2015 - up to and including August 6, when the payment stop was implemented - the blanket scheme was eight times the size of the bank scheme. The reimbursement rate increased from around 11-12% in 2010 and 2011 to 17% in 2012 and to just under 50% in 2014 and 2015.

The events in the summer of 2015 were also an expression of the tax authorities' own fault, which means that there is no loss that can be claimed from Bech-Bruun.

The payments that took place after the first inquiry from the lawyer about possible fraud, i.e. payments after June 16, 2015, are thus forfeited through no fault of their own. The report from the lawyer clearly indicates that this is an ongoing fraud that requires quick action, and the tax authorities should have reacted much faster than they did by not stopping the payments until August 2016.

*Loss assessment and edition markup*

The loss suffered by the Tax Administration cannot be claimed against Bech-Bruun.

The claim asserted by the Tax Administration against Bech-Bruun is based on the fact that in the period from June 17, 2014 to On August 6, 2015, a total of DKK 1,135,775,442.18 in dividend tax refunds was paid to US pension plans that had used a Dividend Credit Advice issued by North Channel Bank in their applications. From this, the Tax Administration has deducted DKK 413,485,128.41 in connection with payments under the settlement agreement from May 2019, after which the claim is calculated at DKK 722,290,313.77 (plus interest).

Bech-Bruun has no basis for contesting the numerical calculation of the amount paid out totaling DKK 1,135,775,442.18, but on the other hand, this amount does not constitute documentation of a loss that the Tax Administration can claim from Bech-Bruun. A's legal opinion was given on August 4, 2014, and losses incurred before this date cannot therefore be

**839**

applicable to Bech-Bruun. Thus, applications from before August 4, 2014 must be disregarded. This means that an amount of DKK 282,329,482.50 must be deducted.

Furthermore, SKAT should have stopped the payments immediately upon receiving the specific inquiry from the lawyer, and no later than June 16, 2015. This means that payments made subsequently do not constitute losses that can be claimed against Bech-Bruun. This amount amounts to DKK 317,898,703.83.

Already as a result of these accruals, the Tax Administration's total payments of DKK 1.1 billion in a loss statement must be reduced by DKK 282 million for the period before August 4, 2014 and by DKK 318 million for the period after June 16, 2015. This brings the amount from DKK 1.1 billion down to DKK 600,228,186.33.

In addition, SKAT's claims must be reduced due to the settlement reached by the tax authorities. Bech-Bruun does not

know the final settlement amount, but the Tax Administration has stated that just over DKK 1 billion has been paid under the agreement. However, Bech-Bruun has not received documentation for how much of the

Copyright © 2024 Karnov Group Denmark A/S

this payment attributable to the use of dividend notes from North Channel Bank, including primarily the 27 pension plans that used such dividend notes.

However, of the billion received, the Tax Administration allocates DKK 413 million to pension plans that used dividend notes from North Channel Bank. According to the plaintiff, the remaining amount must be further reduced by DKK 413 million, i.e. from DKK 600 million to DKK 187 million. However, Bech-Brun cannot know that the reduction is not greater and in principle reaches up to the full billion, as there is no documentation for the allocation made by the Tax Administration to the individual custodians, including North Channel Bank. Thus, a loss cannot be reimbursed to Bech-Bruun either, as the settlement sum of DKK 1 billion already received exceeds the amount that could be claimed as a loss against Bech-Bruun. Without any documentation of what the net proceeds are for pension plans that have used North Channel Bank and without documentation of what has been paid by the individual settling parties, the entire amount paid must be attributed to North Channel Bank and thus deducted from the claim against Bech-Bruun, which is the full amount of just over DKK 1 billion.

To the extent that a settlement has been reached with the reclaim agents who have handled applications relating to North Channel Bank as well as applications relating to other custodians, part of the settlement amounts must be attributed to North Channel Bank and thus deducted from the claim against Bech-Bruun. This - and any other settlement agreements that Bech-Bruun is not aware of - also means that the Tax Administration's loss assessment cannot be used as a basis.

Therefore, there is no documented loss that the Tax Administration can claim against Bech-Bruun.

The tax administration has failed to comply with its duty to mitigate *losses and* is therefore also prevented from asserting claims against Bech-Bruun.

Recovery of the amounts that the tax authorities have unjustifiably paid must generally precede a claim for damages against Bech-Bruun, and a claim against Bech-Bruun must presuppose that the Tax Administration has documented that recovery has not been possible. Such documentation does not exist.

In addition, the May 2019 settlement agreement in itself constitutes a breach of the loss mitigation obligation.

Bech-Bruun has submitted a subsidiary claim for acquittal for the time being and has claimed that, in any event, there is currently no basis for ordering Bech-Bruun to pay damages.

A judgment against Bech-Bruun - and Bech-Bruun's fulfillment thereof - must thus be assumed to have the consequence that, for example, the Tax Administration's settlement parties could refrain from making further payment under the settlement agreement, as the Tax Administration would otherwise obtain double coverage for its claim. Given that the Tax Administration already has an unpaid claim against the settlement parties and the present crime, the amount must first and foremost be collected from the alleged fraudsters before any claim can be made against Bech-Bruun, cf. also the principle in UfR 2000.2267 H.

The alternative claim submitted by the Tax Administration in pleading 3 of November 19, 2021, with its reference to "advice to North Channel Bank" is indefinite and more comprehensive than the Tax Administration's submissions. The claim should therefore be dismissed. In the alternative, Bech-Bruun should be acquitted of the claim, just as Bech-Bruun should be acquitted of the more subsidiary claim made in pleading 4 of December 17, 2021.

*Interest rates*

There is no basis for applying section 3(5) of the Interest Act in accordance with the Tax Administration's claim.

On the other hand, it is obvious to use section 5(3) of the Interest Act to completely abolish interest with reference to the principle also expressed in the legislative history of the Danish Debt Instruments Act (which before the Interest Act contained rules on procedural interest) regarding cases where a claim is so doubtful that the debtor may have good reason to await a court decision before payment. This applies with particular force in relation to the state, which does not have interest expenses for financing in the current economic climate.

Bech-Bruun has also argued that the tax administration's waiver of interest in relation to the bank's owners

**840**

and customers must also be given effect for Bech-Bruun. It should not be accepted that the Tax Administration with one hand has offered the suspected fraudsters lenient terms, including interest relief, while the Tax Administration demands that Bech-Bruun be treated as if it was Bech-Bruun that had been guilty of the fraud.

In all cases, there is no basis for claiming interest on any claim for damages from an earlier date than the commencement of the case, cf. section 3(3) of the Interest Act. Bech-Bruun has not committed fraud, nor has there been any enrichment or other liquidity advantage for Bech-Bruun. Furthermore, the tax authorities did not make a claim until six years after the unauthorized payments, which must be compared with the tax authorities' acceptance of risk and the demonstrated own fault.

## The High Court's reasoning and result

The case concerns a claim for damages from the Danish Tax Administration against Bech-Bruun I/S in connection with the advice provided by Attorney A to North Channel Bank in 2014 regarding a possible liability for the bank by participating in a planned tax arrangement with refund of Danish dividend tax. Attorney A communicated with counsel from the German department of the law firm Jones Day.

At that time, SKAT refunded withheld Danish dividend tax upon application accompanied by documentation for payment of dividends with withheld Danish dividend tax and documentation that the dividend recipient was covered by a double taxation agreement under which the dividend was not taxable in Denmark. The existence of a Dividend Credit Advice was a key element for reimbursement.

Already after the initial email of February 3, 2014 from Attorney H and A's response on the same date and the assignment, it is clear that A's task was to assess North Channel Bank's possible criminal or civil liability by issuing a Dividend Credit Advice, including that in the arrangement two Dividend Credit Advices would be issued for the same dividend, whereby there would be a risk that double refund of dividend tax would be sought and paid. North Channel Bank's potential liability would be most obvious if the recipient of the Dividend Credit Advice that North Channel Bank would issue would not be the correct dividend recipient for tax purposes.

Thus, already from the start of the assignment, A had a special reason to exercise caution in its advice. The advice, which must be described as model advice, must therefore be judged according to a heightened culpability standard. SKAT (later the Tax Administration) as the injured party will be able to claim such liability for fault even though the advice was provided to the client, but there is no special obligation to safeguard SKAT's interests beyond this.

On August 4, 2014, A signed and submitted a statement (Danish Opinion) in the form of a legal opinion on North Channel Bank's involvement in the tax arrangement. After the email correspondence on August 5.

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

However, it must be assumed that the content of the consultancy was already fixed on May 5, 2014 and the subsequent email of June 23, 2014 from K and A's invoicing on the same day.

In relation to A's advice, there are two quite different main issues. First, whether A acted culpably in concluding that North Channel Bank "should not be subject to Danish civil liability involving an obligation to compensate the Danish state for any losses resulting from the bank's role in the proposed transaction" in carrying out the transactions described in the tax arrangement. This involves a legal assessment of the transactions. Secondly, whether A acted culpably by not realizing what turned out to be the case, that the interests in the tax arrangement would dispose in such a way that the tax arrangement would be circular, and that it was either pro forma or consisted solely of paper transactions without shares and real cash flows. This involves an assessment of what was likely to actually happen.

*The advice on the transactions described*

The assessment of A's liability for the advice cannot be made solely on the basis of the conclusion in his Danish Opinion, but must include the overall content of the Danish Opinion, including both the described model (the proposed transactions) in section 3 and the express assumptions in section 4, seen in the light of the assignment and the information A had received during the advisory process. Thus, assumptions and reservations cannot be disregarded.

Early in the process, the advice was based on a Danish Tax Opinion dated June 27, 2012, prepared by Attorney I from Hannes Snel- lmann Advokatpartnerselskab, which concluded, among other things, that a US pension fund should be entitled to claim a full refund of the Danish dividends withheld on the shares (i.e. the Danish dividend tax) pursuant to the double taxation treaty between Denmark and the US. However, during the advisory process, the model described by Attorney I was changed on various points, partly on the initiative of the client and partly on the initiative of A. In addition, A received additional information about the model in relation to the information provided in attorney I's tax opinion. Thus, there was no tax opinion regarding the model that A advised on, and thus no external tax law assessment of whether the recipient of the Dividend Credit Advice that North Channel Bank would issue would be the right dividend recipient for tax purposes.

**841**

A was aware of this, as he explicitly stated in the declaration in section 5.2 that this implied an element of uncertainty in the conclusion.

According to section 2.1.1 of A's declaration, the tax treatment in Denmark of parties other than North Channel Bank in the proposed transaction is not assessed. Furthermore, the declaration in sections 4.5-7 contains various assumptions about ownership of the shares. According to their wording and context as well as A's explanation to the High Court, this ownership must be considered to concern the legal/civil law ownership of the shares and not the tax law ownership.

Accordingly, the statement does not make any representation or assumption that the recipient of the Dividend Credit Advice that North Channel Bank would issue would be the proper dividend recipient for tax purposes. However, as stated above, North Channel Bank's potential liability would be most obvious if the recipient of the Dividend Credit Advice that North Channel Bank would issue would not be the correct dividend recipient for tax purposes. The question for A was thus whether North Channel Bank would incur liability for issuing a Dividend Credit Advice without knowledge or consideration of whether the recipient

would be the proper dividend recipient for tax purposes.

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

A also considered the significance of the risk that the dividend recipient was not considered to be the correct dividend recipient for tax purposes. A thus explained to the High Court that the tax ownership was central to his advice, that he assessed that I's tax opinion was correct and that he based it on this. In the conclusion in sections 5.2.1 - 5.2.3, A also expressly drew attention to three different circumstances which prevented him from reaching a more definitive assessment of North Channel Bank's position. These circumstances all related to tax ownership.

It was described to A early in the email correspondence that North Channel Bank's role in the arrangement would be limited to providing custodian services to the parties to the arrangement. Accordingly, A inserted express conditions in clauses 4.9 to 4.12 of the declaration to ensure that the bank was exclusively a custodian bank and acted as such in accordance with both its own standard procedures and normal custodian bank procedures.

Based on the above, the High Court does not find that A, under the conditions stated in the declaration, acted culpably by not explicitly addressing in the declaration whether the recipient of the dividend would be the correct recipient for tax purposes, concluding that this would not be the case, and consequently advising North Channel Bank not to participate in the arrangement.

During the High Court's consideration of the case, the parties have agreed that the seller's sale of the borrowed shares involves a taxable disposal of the shares, which means that the pension plan is considered the rightful owner of the shares for tax purposes, unless the pension plan has disposed of the shares in such a way that the tax ownership has been transferred to a third party. The High Court finds that there is at least no such certainty that the pension plan, by lending the shares or by entering into the forward agreements as described in the arrangement, will no longer be considered the owner of the shares for tax purposes that it can be considered culpable to consider the tax ownership to remain with the pension plan. The fact that another bank has previously issued a Dividend Credit Advice for the dividend does not in itself mean that North Channel Bank is not entitled to issue a Dividend Credit Advice for the same dividend when the recipient of this Dividend Credit Advice is both the owner under civil law, as provided, and the correct tax owner.

It is further noted that it is unlikely that North Channel Bank will be liable if a third party who lends the shares to the seller in the arrangement seeks a refund of dividend tax, even though he will not be entitled to do so. The third party in question has no relationship with North Channel Bank in the arrangement, the bank has not issued any Dividend Credit Advice to him, and according to the assumption in section 4.13, the bank has no reason to assume or information or knowledge as to whether the third party will apply for a refund of dividend tax on the shares. Such an application and refund would also be punishable as fraud.

A's advice, which as stated is a "should-opinion", on transactions carried out in accordance with the stated model can thus not be considered culpable.

*Paper transactions without shares and real cash flows.*

The question is then whether A should have realized what turned out to be the case - that the stakeholders in the tax arrangement would dispose so that the tax arrangement would be circular, and that it was either pro forma or consisted solely of paper transactions without shares and real cash flows.

The High Court notes that the implementation of the tax arrangement as pro forma or without shares and real cash flows is criminally

must be considered ordinary fraud that is simply camouflaged by complicated transactions.

The High Court finds that according to A's explanation, it cannot be assumed that A reviewed and understood the German diagram. Thus, on April 14, 2014, when he received the diagram, A stated that his knowledge of German

**842**

were unfortunately insufficient to the required level, and he gave the client three options to resolve this situation, including that the client should pay (a modest sum) for their translation. However, the client chose another option - namely that A should instead base his further advice on the previous model with some changes and the more comprehensive English text description of the transactions prepared by K, which was sent to A the next day. It follows from this that A, by agreement with his client, was not to include the German diagram in his advice.

The High Court finds that it cannot be considered culpable that A, in the assumptions in sections 4.9 to 4.12 of the declaration on the bank's role solely as an ordinary custodian bank, the provisions in section 3 on the role of third parties, in section 3.4 on the pension plan's receipt of dividends and the assumptions in sections 4.5-4.7 on shares and  dividends, assumed that the stakeholders would dispose of the shares in accordance with the model so that the arrangement would not be circular and so that A was talking about real shares. 4.5-4.7 on shares and dividends were based on the assumption that the stakeholders in the tax arrangement would act in accordance with the model, so that the arrangement would not be circular and that the shares and cash flows were real.

Thus, the High Court does not find that A has acted culpably in his advice by not realizing that the model would be used to defraud the Danish treasury of withholding tax, and as consequence thereof advised against using the model.

The High Court therefore upholds Bech-Bruun I/S' main claim for acquittal.

The High Court also notes that the Tax Administration cannot be considered to have made a new plea in the above-mentioned pleas and thus gone beyond the scope of the High Court's order of February 28, 2022.

*Legal costs*

The subject matter of the case consists of a claim for damages of approximately DKK 725 million plus interest, totaling approximately DKK 1.25 billion.

The case has been the main hearing for 18 court days. There has been extensive preparation, including a discovery order. There is no information on how many lawyer hours were spent on the case.

In practice, the legal costs in a case involving such large values must be determined on a discretionary basis after an assessment of what can be considered reasonable, also taking into account the scope and nature of the case. Furthermore, account must be taken of both the scope of the work and the responsibility associated with the conduct of the case.

On this basis, the High Court sets the legal costs to Bech-Bruun I/S at DKK 6 million excluding VAT to cover legal expenses.

In addition, the Tax Administration must reimburse Bech-Bruun I/S' translation expenses of DKK 189,953.70.

## For it is recognized as right

Bech-Bruun I/S is acquitted.

The Tax Administration must pay DKK 6,189,953.70 in legal costs to Bech-Bruun I/S within 14 days. The amount is subject to interest according to section 8a of the Interest Act.

## Supreme Court ruling

In a previous instance, judgment was handed down by the 12th division of the Eastern High Court on
April 28, 2022 (...).

Copyright © 2024 Karnov Group Denmark A/S

Five judges participated in the adjudication: Jens Peter Christensen, Ole Hasselgaard, Rikke Foersom, Peter Mørk Thomsen and Moham- mad Ahsan.

## Claims

*The appellant, the Tax Administration,* claims that (1) the respondent, Bech-Bruun I/S, shall pay DKK 705,821,108.92 with interest from September 28, 2023, (2) Bech-Bruun shall pay DKK 446,605,946.27, and (3) Bech-Bruun shall pay DKK 201,954,297.55.

The Tax Administration has also claimed that (4) Bech-Bruun must repay DKK 6,189,953.70, which the Tax Administration has paid to comply with the High Court's judgment, with interest from May 24, 2022.

In the alternative, the Tax Administration has claimed that Bech-Bruun must recognize that it is liable for damages for the advice to North Channel Bank. In the further alternative, Bech-Bruun must acknowledge that it is liable to pay compensation for the Tax Administration's losses as a result of applications for refund of withheld dividend tax dated in the period 12 May 2014 to 22 July 2015 based on Credit Advices issued by North Channel Bank, alternatively for a shorter period. *Bech-Bruun* has claimed that the Tax Administration's claims 1-3 should be upheld, claim 4 should be dismissed, the alternative claim should be dismissed, alternatively acquitted, and the more alternative claim should be acquitted.

## Supplementary case presentation

The Supreme Court has received additional material about North Channel Bank's circumstances, losses, settlements and calculation of claims as well as SKAT's circumstances.

## Explanations

Additional testimony has been submitted to the Supreme Court by A.

## Requester

In particular, *the Tax Administration* has argued that Bech-Bruun is liable for the Tax Administration's loss of DKK 1,135,775,442.18, which arose when a number of pension plans, banks, financiers, paying agents and lawyers with different involvement constructed a

**843**

criminal setup that tricked SKAT (today the Danish Tax Administration) into paying out the mentioned amount. The essence of the scheme was that tax-free American pension plans appeared as recipients of Danish taxed dividends based on dividend notes from a German bank, North Channel Bank, even though they had never received dividends, and they thus wrongfully received a refund of dividend tax.

Bech-Bruun undertook to prepare a legal opinion that North Channel Bank should not be liable for damages or criminal liability for its participation in the set-up. By issuing the legal opinion, Bech-Bruun contributed to North Channel Bank issuing dividend notes that were genuine but incorrect in content. Bech-Bruun was aware that an application for a refund of dividend tax required bank documentation for the receipt of dividends (dividend note) and that North Channel Bank would issue such documentation. Bech-Bruun knew that if Bech-Bruun gave a "should-opinion" that the bank would not be liable, then the bank would participate in the set-up and issue dividend notes. Bech-Bruun's issuance of a legal opinion with the desired conclusion was an active act on Bech-Bruun's part. The action was culpable. Bech-Bruun could have refrained from advising or issued its legal

opinion with the opposite - and thus correct - conclusion.

Bech-Bruun was able to gain full insight into the model to be used for the fraud through a transaction diagram. Bech-

Copyright © 2024 Karnov Group Denmark A/S

Bruun therefore knew that North Channel Bank had full knowledge of what was going on. When North Channel Bank also participated as a custodian bank by issuing dividend notes, the bank would be liable if the applications were improper, regardless of whether its role was large or small.

Bech-Bruun was aware of the risk and thus the potential consequences of the advice - namely the state's loss - and should therefore have ensured in its advice that it did not contribute to undue reimbursement. Bech-Bruun did not live up to this obligation.

In the company tax cases, the courts ruled that the advisors to the sellers had a duty to safeguard the interests of the tax authorities, just as the sellers did. Bech-Bruun also has this duty. However, unlike the company steamer cases, Bech-Bruun was aware of the risk of the tax authorities suffering losses, and this was the very core of what Bech-Bruun was commenting on. Bech-Bruun's liability is stricter than what follows from the company stamp cases, as Bech-Bruun's client, North Channel Bank, does not correspond to the sellers in the company stamp cases, but to the criminal buyers. Bech-Bruun advised the bank convicted of fraud.

The liability of Bech-Bruun must be assessed as a liability for complicity. Bech-Bruun's liability shall be assessed on the basis of the act that caused the damage without taking into account what the tortfeasor may have agreed with other actors in the set-up.

Bech-Bruun was warned about the risk of double reimbursement and both wrongful and criminal reimbursements. It is extremely rare in compensation cases that the tortfeasor has been warned so directly about the potential harmful effects of their actions. The email of February 3, 2014 from the law firm Jones Day contained clear danger signals, although it was noted that a "structure paper" had not yet been seen. There is nothing in the case to support that such an email would be customary. Jones Day's email should have given extra cause for caution, as it appeared that Jones Day was willing to advise the bank even though the bank knew that its customers would engage in potentially criminal transactions, double refunds, tax fraud and dividend arbitrage. Jones Day's sole focus was whether the bank would risk liability for this and not whether fraud etc. could be avoided. This fact, which must be described as a warning, thus tightens the requirements for Bech-Bruun. Therefore, Bech-Bruun should have ensured that their advice could not be used for criminal offenses when Jones Day explicitly pointed out the risk of this.

Bech-Bruun understood that there was a risk of improper reimbursement due to cum/ex. Given the warning and understanding of this, Bech-Bruun should have ensured in its advice that no opportunity was created to apply for a wrongful refund, but although Bech-Bruun immediately realized this risk of unjustified refund, it was not handled. Instead, Bech-Bruun ended up approving that North Channel Bank issued dividend notes in a cum/ex model.

Bech-Bruun accepted the use of the criminal cum/ex model that did not serve a legitimate purpose. Bech-Bruun could see that there was no business purpose. The only realized purpose was dividend arbitrage, but the model was counterproductive to seeking a dividend refund. Instead, it was suitable for fraud. It made no sense for trades to be structured as cum/ex if they were ordinary trades or dividend arbitrage. In that case, you could trade on normal terms. On the other hand, it made sense if the purpose was to obtain improper refunds. Bech-Bruun was aware that cum/ex was a deviation from normal market conditions that could be used for criminal acts. Bech-Bruun thus chose to advise on transactions with no commercial purpose.

purposes where strict due diligence requirements apply due to the risk of misuse or criminal purposes.

Together and separately, the cum/ex model, the dividend note without receiving dividends and compensation payments under share loans were inexplicable if the purpose was tax arbitrage. If the actors in the model had a shareholding, it would have been simple to simply

**844**

transfer the shares to the pension plan, which would appear as the owner, receive dividends and dividend notes and apply for a refund. However, the unexplained circumstances made sense if the purpose was to seek reimbursement without shares.

Bech-Bruun could see and accepted that two dividend notes would be issued for one dividend, and that incorrect documentation for withholding tax on dividends would be issued. Bech-Bruun deliberately failed to familiarize itself with the German transaction diagram, which showed the fraud model in plain text. The transaction diagram Bech-Bruun received showed how the fraud was to be structured with offsetting accounting entries where dividend notes were to be issued anyway. Even on the surface, it was clear from the transaction diagram that the trades were pro forma, and a closer look revealed that the "trades" took place without shares, money and thus dividends. Given the circumstances, Bech-Bruun had a duty to understand the model as a whole before expressing an opinion on it, and Bech-Bruun could not choose to disregard knowledge that Bech-Bruun was in possession of by agreement with the client when giving advice.

Bech-Bruun should have realized that the dividend notes would violate section 163 of the Danish Criminal Code, as North Channel Bank did not know whether the note (declaration) was correct. If the offense content of section 163 is realized and there is also intent to enrich, there is an imminent risk of fraud under section 279 of the Danish Criminal Code, which North Channel Bank has been convicted of. Bech-Bruun had the information to realize this risk.

Bech-Bruun knew that North Channel Bank's dividend notes were to be used to apply for a refund of Danish dividend tax. Bech-Bruun should therefore in any case have ensured that the pension plan was tax-legal owner, as North Channel Bank's dividend notes were to be used towards the Danish tax authorities in a model that the bank was part of and had full insight into. Bech-Bruun could see that the pension plan was not the tax owner of the dividend.

Bech-Bruun was an expert in dividend taxation and had extensive practical experience, including with foreign shareholders. Bech-Bruun's defense consists of views on limitations in assignments, assumptions and reservations. "You cannot write your way out of a professional responsibility to third parties. On the contrary, lawyers are obliged to exercise critical judgment and investigate suspicious circumstances before giving advice. Bech-Bruun has thus committed gross and clear errors that give rise to liability.

Bech-Bruun's legal opinion was sent on Monday, May 5, 2014. On Friday, May 9, 2014, Jones Day issued its legal opinion based on, among other things, Bech-Bruun's legal opinion. On Monday, May 12, 2014, SKAT received the first refund applications based on dividends from North Channel Bank. Bech-Bruun knew that the dividend notes would lead to the payment of dividend refunds from the Danish Treasury. North Channel Bank and the other actors involved in the fraud naturally requested Bech-Bruun's advice because they needed it. The payment of the dividend refund is thus an intentional consequence of the advice, and the refund is a causal consequence of this advice.

The close temporal connection between Bech-Bruun's final legal

opinion and the first unjustified refu-

sion applications with dividend notes from North Channel Bank is clear. It was a specifically formulated task that Bech-Bruun's legal opinion was to be obtained. When the first positive conclusion from Bech-Bruun was available, the first preparatory actions could be initiated, and when the final advice was available, the refund applications could be submitted.

Specifically, Bech-Bruun's engagement, the advisory process, the execution of the transactions Bech-Bruun advised on, the subsequent use of Bech-Bruun's advice, and Bech-Bruun's subsequent confirmations of the advice together and separately prove a causal connection between Bech-Bruun's liability-claiming advice to North Channel Bank and the Tax Administration's losses.

The causal link between Bech-Bruun's negligent advice and the Tax Administration's loss also follows from the fact that there are no relevant differences - if any - between the description in Bech-Bruun's legal opinion and the booked transactions.

The tax administration's loss was an adequate consequence of Bech-Bruun's negligent advice. Bech-Bruun could see that a refund would be applied for on the basis of the dividend notes that Bech-Bruun authorized North Channel Bank to issue, and Bech-Bruun was not interested in the size of the applications and thus the Tax Administration's loss until a claim for compensation was made against Bech-Bruun.

It was also foreseeable to Bech-Bruun that dividend notes from North Channel Bank could be used in connection with unjustified refund applications that would result in a loss for the Tax Administration if Bech-Bruun approved the set-up. Whether these dividend notes would have a false content because the set-up was carried out with pro forma transactions or without actual share and cash flows is irrelevant, but Bech-Bruun was in fact in possession of information to realize that it should be without shares and money. Since the set-up was to be carried out without shares and money, the Tax Administration's potential loss as a result of unjustified refund applications with dividend notes from North Channel Bank was difficult to delineate. It was thus not inconceivable to Bech-Bruun that the Tax Administration's loss could be very large, and Bech-Bruun

**845**

Therefore, Bech-Bruun could not escape liability based on the size of the loss. Bech-Bruun even knew that a single reimbursement request could concern a very large amount.

The Tax Administration has proved the loss. It is undisputed that the Tax Administration has suffered a loss of DKK 1,135,775,442.18 by paying refunds in accordance with unlawful refund applications attached to dividend notes from North Channel Bank. The Tax Administration has reduced its claim by the payments that the Tax Administration has received from other claimants. The reduction has been made proportionally, as the payments were received from claimants who had contributed to both the North Channel Bank part and other wrongful refund applications. The principal then amounts to DKK 705,821,108.92.

The loss was caused by North Channel Bank, Bech-Bruun and others who have contributed to the wrongful reimbursement applications. When there are multiple tortfeasors who are all liable for a loss, they are jointly and severally liable, after which the injured party is free to choose which tortfeasor to go after.

Bech-Bruun argues that their liability for damages must lapse due to the Tax Administration's own fault and acceptance of risk. This is Bech-Bruun's burden of proof, and it has not been proven.

The tax administration has been exposed to an unprecedented fraud in which a group of bankers and financiers coordinated an international, complex and extensive fraud scheme. This fraud

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

cannot be blamed on the Tax Administration. It can only be blamed on the people, companies and advisors who participated and advised. No one at the Tax Administration was aware that there was fraud in the dividend case.

The view on risk acceptance does not make sense. The fact that there is a risk of incorrect refund applications is a basic condition that SKAT shares with everyone else who disburses money. This is especially true in areas with mass administration, such as VAT and social benefits. There are risks associated with all areas of tax administration, and the allocation of resources is a matter of prioritization - not an acceptance of risk.

SKAT's administration of the dividend refund area was in accordance with the legal basis. The underlying financial system on which SKAT had to carry out refund controls is simple and standardized, especially when it comes to listed companies. The robustness of the system is further confirmed by how complicated a setup the fraudsters in the Danish dividend case had to establish in order to succeed with the fraud.

SKAT has carried out both formal and substantive checks before payment was made. It has thus been established that the "necessary information and prescribed supporting documents and documentation" are available and that "rates and calculations" are correct. It was also verified that the "information is plausible", as a foreign tax authority and an independent credible party - a bank - have stated so.

On June 16, 2015, Special Control in SKAT received a report of suspected fraud with refund of dividend tax. At this point in June 2015, there was no basis for suspending all payments in this area. The inquiries mentioned "suspected fraud" of up to DKK 500 million and did not contain any concrete evidence. Only with the information from the UK tax authorities could the information from the first notification be confirmed to such an extent that it could be assessed whether there was sufficient basis for taking action. On August 6, 2015, the same day SKAT received the information from the UK tax authorities, the refund payments were stopped.

The Tax Administration's claim is not time-barred. The limitation period was suspended until the Tax Administration received sufficient factual information to assess that there was a basis for issuing a summons against Bech-Bruun, cf. section 3(2) of the Limitation Act. The Tax Administration received such factual information at the earliest on

June 29, 2018, when the Tax Administration received Bech-Bruun's legal opinion. As the summons was issued less than three years from this date, the claim is not time-barred.

The email of October 10, 2016 from Finanzamt für Steuerstrafsachen und Steuerfahndung Wuppertal to the Tax Administration did not give reason to initiate investigations of Bech-Bruun with the consequence that the Tax Administration at an - unknown - time in the subsequent period "should have become aware" of the compensation claim against Bech-Bruun. The email did not provide the Tax Administration with a basis for raising a claim for damages against Bech-Bruun.

Even if there is a higher duty of investigation, it cannot imply that the Tax Administration should have obtained insight into Bech-Bruun's advice prior to June 8, 2017. The commencement of a duty of investigation does not terminate the suspension period. The suspension only ends when the creditor received or should have received sufficient information to assess its claim. The suspension only ends if the creditor's ignorance can be blamed on the creditor. Therefore, it can never be at the time when any obligation to investigate begins.

According to section 3(5) of the Interest Act, the tax administration's claim shall bear interest from the time of payment, as the damage was caused by

unlawful conduct, and the Tax Administration has been prevented from raising the claim at an earlier stage.

If the Supreme Court finds that the claim cannot be calculated on the present basis, Bech-Bruun must be ordered to recognize its liability for damages under

**846**

The tax administration's alternative or more alternative claim. *Bech-Bruun* has argued in particular that there is no basis for liability. In circumstances such as the present, where a lawyer was undisputedly unaware of the client's fraud, liability to third parties in accordance with case law requires at least that the lawyer has been specifically involved and committed a clear error of a certain gravity for which the lawyer can be blamed to such an extent that the lawyer must bear the loss. These basic conditions for breach of the liability standard are by no means met. A legal opinion is a legal assessment of a given fact given to a client. The client's purpose of a legal opinion is to uncover a legal risk, while the lawyer in his legal opinion will make every effort not to express an opinion on anything other than the fact presented or assume any risk other than that required by the lawyer's assignment. The facts in a legal opinion are determined together with the client, to which are added assumptions and qualifications, which are also agreed with the client. Facts and assumptions are neither checked nor verified. In general, a lawyer's liability to third parties requires something special, and this applies in particular to a legal o p i n i o n ,  which by its content can only be relied upon by the client.

Bech-Bruun's legal opinion of August 4, 2014 aimed to assess the "liability consequences for NCB of acting as a custodian bank" under Danish law. The subject was a hypothetical situation, which was set up for the purpose of assessing the bank's risks based on specific assumptions and reservations. Such a risk assessment is a typical example of the scope of legal opinion, and it is quite common in a risk assessment to include "worst case". In the legal opinion, Bech-Bruun did not comment on whether the bank's customer would meet the tax law conditions for refund of dividend tax. On the contrary, the legal risks assessed by Bech-Bruun were based on the hypothetical situation that SKAT would subsequently find that the conditions of Danish tax law were not met, including not least the condition of legal ownership. In order to establish liability, it would be necessary, but not sufficient, that Bech-Bruun in connection with the preparation of the legal opinion should have realized that North Channel Bank would commit fraud. There is no basis for this.

The assessment of the basis for liability must be based on Bech-Brun's assignment. The assignment concerned a legal opinion, and it stated that "the question to be answered in my opinion is whether, from a Danish tax law perspective, the client can be held liable or even prosecuted for supporting/facilitating a tax evasion by one of the other actors in this transaction (which was the reason why we requested the Danish tax opinion)". The concern thus related to the fulfillment of general conditions for refund of dividend tax and was not related to the bank, but to the bank's customer and transaction.

As the situation was presented to Bech-Bruun, there was a legitimate need for advice, and it was fully justified for Bech-Bruun to take on the assignment. Any other Danish law firm with the necessary competencies would have done the same. Bech-Bruun naturally assumed, in accordance with I's tax opinion and like Jones Day, that there would be shares and that dividends would be received after withholding tax. The fact that A did not know of any business purpose other than the customer's tax advantage, and that the bank's customer thus apparently engaged

in dividend arbitrage, did not change anything.

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

The tax administration has attached great importance to the German transaction overview, which, according to the tax administration, should show that the transaction only consisted of three parties and would be circular. However, A could not understand the German transaction overview, and it was removed from the advisory services by agreement and replaced with the English transaction description at Jones Day's responsibility.

In the legal opinion, Bech-Bruun concluded that "NCB should not be subject to Danish civil liability involving an obligation to compensate the Danish state for any losses resulting from its role in the proposed transaction" and that "NCB should not be subject to Danish criminal liability resulting from its role in the proposed transaction". This was thus a so-called "should" opinion, as the use of the word "should" indicated a certain uncertainty in the assessment and thus a certain risk. It is explicitly stated that Bech-Bruun did not further verify, let alone "stamp of approval" of the transaction description or the assumptions. Furthermore, three explicit reservations were formulated in connection with the conclusion on liability.

In its argumentation in this case, the tax administration seeks to disregard the above-mentioned circumstances and reverse the established understanding of legal opinions. The argumentation is based on unknown constructions that a lawyer who gives a legal opinion should have a duty to verify facts and assumptions, just as the lawyer should not be able to make reservations, and this should in particular apply in relation to third parties.

The three reservations and the legal opinion as a whole leave no doubt as to how Bech-Bruun would have assessed a situation where North Channel Bank's customers would not own any shares at all, thus constituting fraud. A had made it clear from the beginning that dividend tax could not be refunded more than once. He later had the opportunity to emphasize that the bank's customer could not claim a dividend tax refund

**847**

without ownership of shares with dividend rights at the time of the distribution.

It is disputed that "T+3" was market practice. There is no basis for claiming that deviation from this or other alleged market conditions would have been unusual or unfounded, let alone suspicious, just as any suspicion would not concern the bank as a custodian. Especially with regard to "cum/ex" and the Tax Administration's comparisons to Germany, the tax authorities have generally stated that the case was not similar to the earlier events in Germany.

Liability issues in cases of fraud by others sometimes arise for auditors, and the Supreme Court has shown restraint in imposing liability, see e.g. UfR 2014.1346 H. Case law in the cases on company emptying shows that positive knowledge of a transfer, which is not a normal business transaction and which includes a significant "additional proceeds", does not in itself justify liability under the general liability rules of Danish law. This requires further specific participation of a certain significance (aiding and abetting). Unlike the company steamer cases, Bech-Bruun did not recommend that clients of North Channel Bank carry out transactions, and Bech-Bruun had no dialog with the bank and certainly not the bank's clients. Nor did Bech-Bruun assist in the execution of specific transactions, and Bech-Bruun had no role with regard to the specific applications that caused SKAT losses.

In the present case, there is no basis for a stricter standard of liability. The fact that bank customers' participation in dividend arbitrage would justify a stricter liability standard cannot apply to the advisor who, in accordance with his assignment, provides a legal opinion to the bank on the bank's, as opposed to the bank customer's, legal position. For the

848

the lawyer who advises a bank, it cannot justify a tightening of the liability standard that another bank may also, under the circumstances, issue a note in connection with the same dividend. On the contrary, it must be common, especially in connection with compensation payments. Furthermore, the legal opinion concerned the hypothetical situation where SKAT subsequently found that the bank's customer was not entitled to a refund of dividend tax, and where it would be expected that another customer of another bank could be entitled to a refund.

The recommendations in the Danish Ministry of Taxation's report from November 2014 on strengthened advisor and industry cooperation to counter cross-border tax evasion - several of which with effect from July 2019 are reflected in new provisions in the Code of Conduct - would not provide a basis for criticism of Bech-Bruun even if they had existed earlier and even if Bech-Bruun had specifically provided tax advice.

Bech-Bruun cannot be held jointly and severally liable with the criminal persons and companies that have acted specifically and intentionally in a fraud.

The fictitious transactions in North Channel Bank directly contradicted Bech-Bruun's legal opinion on numerous points, including explicit assumptions and reservations.

There is a lack of both causation and foreseeability. The fraud involving the willful issuance of false notes was in progress before Jones Day and Bech-Bruun issued their legal opinions. There is every reason to believe that the fraud would have been committed even if the legal opinions had not been available. The only possible use of legal opinions was towards the auditors and authorities in Germany, who, however, did not require legal opinions, and who, moreover, would only contact us long after the dividend notes had been issued to customers.

The tax administration has the burden of proof for causation. Causation basically requires that North Channel Bank would not have committed fraud in the absence of Bech-Bruun's legal opinion. There is not the slightest evidentiary support for this.

If North Channel Bank had theoretically considered one or more legal opinions to be of importance to whether the bank would commit fraud by registering fictitious share and money movements and intentionally issuing false notes, the bank would have had Jones Day's and Bech-Bruun's legal opinions in place in final, signed form beforehand. This did not happen. Final legal opinions were not requested until July 2014 and were only submitted in August and September 2014.

The possible use of a legal opinion had to do with the bank's regulatory conditions in Germany. Bech-Bruun's legal opinion should not and could not be used in Denmark. With regard to Germany, there is no documentation that Jones Day's or Bech-Bruun's legal opinions were used internally in North Channel Bank as a basis for decision-making or otherwise. Any external use towards, for example, an authority required finalization and signature. The drafts of May 2 and May 9, 2014 (on Danish, German and Belgian law) did not constitute advice for which a lawyer can be held liable. The drafts of May 2 and May 9, 2014 preceded the submission of the refund applications to SKAT in Denmark, but not the registrations and issuance of dividend notes in Germany. This is crucial, as the registrations and issuance of dividend notes involved the bank, while dividend tax refund applications did not. In fact, the dividend notes had left the bank long before the filing of the refund applications, and the dividend notes were then subject to the control of others. The draft legal opinion from February 2014 did indeed also precede the registration and issuance of dividend notes in Germany, but does not justify

causation. The drafts amounted to even less than the May drafts advice for which a lawyer could be liable.

The claimed loss is not a foreseeable consequence of Bech-Bruun's legal opinion. Basically, Bech-Bruun's provision of a legal opinion to North Channel Bank has not increased the danger or risk associated with SKAT's administration of applications for refund of dividend tax.

It was not foreseeable to Bech-Bruun that the North Channel Bank client would enter into a "transaction" that was inconsistent with the transaction description in Bech-Bruun's legal opinion, or that the bank would assume a role other than that of a custodian, or that the bank would commit fraud by recording fictitious share and money movements and intentionally issuing false notes.

Nor was it foreseeable that the refunds related to alleged stock holdings that were both enormous and completely unrealistic, both in terms of the nature of the pension plans and North Channel Bank.

Any claim is forfeited by limitation. The limitation period must be calculated from October 10, 2016 at the latest, when SKAT was informed by the German authorities that Bech-Bruun had issued a "declaration" that a German bank involved in the "dividend case" as custodian bank had acted "legally". If SKAT at the time had legally believed that there could be a basis for liability for a Danish advisor, the email provided SKAT with the factual basis. The only German bank that appeared in the "dividend case" was North Channel Bank, and the volumes stated in the email corresponded to the dividend notes issued by this bank, which SKAT itself had collected and analyzed. This had led to a police report against the bank in August 2016, which was shortly before the receipt of the email of October 10, 2016. At the time the summons was issued in June 2020, the claim was thus time-barred.

The tax administration has the burden of proof for suspension of the limitation period, and the tax administration has not met this burden of proof. It is inherent in the 3-year limitation period that the creditor may have work to do while the limitation period runs. Thus, the limitation period does not only run from the time when the claimant has a full overview of the case or comes into possession of evidence that the claimant attaches particular importance to.

There is acceptance of risk and own fault. In 2007, SKAT and the Ministry of Taxation deliberately chose not to carry out any material checks on applications for refund of dividend tax, and this choice was maintained, despite the Ministry of Taxation informing the Danish Parliament to the contrary in 2012, and despite the fact that SKAT from 2012 to 2015 paid out ever-increasing billions based on applications from unknown American pension plans. It came as a surprise to everyone and of course also to Bech-Bruun that this was fraud. SKAT could and should have discovered that the refund applications submitted in 2014 with dividend notes issued by North Channel Bank were unusual. SKAT should have realized very quickly that something was terribly wrong.

The acceptance of risk shown by SKAT does not prevent the Tax Administration from pursuing claims against the persons who have willfully committed or participated in fraud, but it excludes claims for compensation against Bech-Bruun.

The management of the dividend area has been irresponsible, which can be attributed to SKAT (now the Tax Administration) as its own fault. It was a direct consequence of the irresponsible management that refunds were paid in accordance with applications accompanied by notes from North Channel Bank,

and it would be unacceptable to order Bech-Bruun to bear the consequences of this. In a case such as the present, where the authority itself is the claimant, it is irrelevant that public law obligations of control do not apply in this case.

The starting point seeks to protect taxpayers or advisors. The tax administration's ability to prioritize resources does not allow it to save all resources and thereby delegate the required control to private advisors.

Furthermore, it is an expression of SKAT's own fault that it was not until August 6, 2015 that SKAT suspended the processing of applications for refund of dividend tax, even though SKAT had already received the first inquiry from a Danish tax lawyer about the suspected fraud on June 16, 2015.

SKAT has not suffered any loss. It is not disputed that SKAT unjustifiably paid a total of DKK 1,135,775,442.18 in refunds of withholding tax on the basis of applications attached to dividend notes issued by North Channel Bank. A statement of losses must be limited to the relevant period, which is why notes totaling at least DKK 600,228,186.33 must be disregarded, in addition to which payments received from others must be deducted. The Tax Administration has stated that it has received DKK 1,010,424,596.73 in accordance with the secret settlement agreement from May 2019 with, among others, the bank's owners and customers, but despite disclosure orders, the Tax Administration has failed to document which payments should be attributed to dividend notes issued by North Channel Bank. The Tax Administration cannot excuse itself for any self-created lack of evidence, and a loss is therefore not compensated. It follows from the general law of obligations that in cases where there are several claims, each with its tortfeasors, and where a claimant receives partial payments from some tortfeasors, the claimant is obliged to distribute the payments to the claims to which the payments relate.

There is nothing to prevent the total payment under the settlement agreement of DKK 1,010,424,596.73 from

**849**

originate from settlement parties responsible for the "NCB share". Without documentation as to whether the payments received relate to the "NCB share", there is no other option than to deduct the full payment from the claim against Bech-Bruun.

In addition, the Tax Administration has failed to comply with its duty to mitigate losses and is therefore also precluded from asserting a claim against Bech-Bruun. Recovery of the amounts that the tax authorities have unjustifiably paid must, on the whole, precede a claim for damages against Bech-Bruun, and a claim against Bech-Bruun must presuppose that the Tax Administration documents that recovery has not been possible.

The tax administration's highly unusual interest claim is disputed in its entirety. On the contrary, an interest claim in a case such as the present one must be waived, or alternatively the interest rate must be reduced, see sections 3(5) and 5(3) of the Danish Interest Act. In all cases, there is no basis for interest on any claim for damages from an earlier date than the commencement of the case, cf. section 3(4).

## The Supreme Court's reasoning and result

*1. Case background and issues*

In 2014, Bech-Bruun I/S advised the German bank, North Channel Bank, on the bank's potential liability by participating in transactions with Danish listed shares. The transactions involved North Channel Bank issuing dividend credit advices (Dividend Credit Advice), which could be used when submitting applications to SKAT (now Skatteforvaltningen) for refund of dividend tax.

During 2014 and 2015, North Channel Bank issued dividend notes, which in the period from May 12, 2014 to July 22, 2015 were attached by so-called reclaim agents to applications to

SKAT for refund of dividend tax to US pension plans that had an advantageous dividend tax position as a result of a double taxation treaty between the US and Denmark. Based on the applications received, SKAT paid a total of DKK 1,135,775,442.18.

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

The refund applications subsequently turned out to be unjustified on the whole. The parties agree that the refund applications were based on fictitious transactions, as there were no shares, dividends or cash flows.

On September 23, 2019, North Channel Bank was fined DKK 110 million by the Court in Glostrup for fraud of a particularly serious nature. In the fine, North Channel Bank pleaded guilty to having registered fictitious share and money movements in the period 2014-2015 and issued dividend notes containing false information about the payment of dividends on Danish shares, which the bank's accomplices used on behalf of US pension plans to obtain unjustified payments of no less than DKK 1.1 billion from the Danish tax authorities. The bank thereby obtained unjust enrichment of no less than DKK 55 million.

The main issue in the case is whether Bech-Bruun, based on the advice given to North Channel Bank, is liable for the loss suffered by the Tax Administration as a result of the unauthorized refunds of dividend tax.

The case concerns an amount of just over DKK 700 million plus interest, as the Tax Administration has reduced the claim totaling approximately DKK 1.135 billion with payments that the Tax Administration has received through settlements with various parties who have participated in the submission of unjustified refund applications, including mergers based on dividend notes issued by North Channel Bank. During the case, questions have been raised regarding the basis of liability, causal connection, adequacy, calculation of loss, own fault and acceptance of risk, limitation and interest.

*2. General about the liability assessment*

When assessing whether a lawyer, when advising a client, has acted against the tax authorities, the decisive factor is whether the lawyer has recklessly disregarded the interests of the tax authorities. Whether this is the case depends on an overall assessment of the circumstances at the time of the lawyer's advice.

A key element in the assessment is whether the transactions advised by the lawyer had a commercial purpose and whether the transactions were of an unusual nature.

In addition, the specific content of the lawyer's assignment and the advice that the lawyer has provided in the individual case is included.

*3. The concrete assessment of responsibility*

*3.1. The advisory process*

On February 3, 2014, the law firm Jones Day in Germany contacted Bech-Bruun by email. A Danish translation of the email states, among other things *that* North Channel Bank would not be a party to the transaction in question, but only provide services, *that* the parties to the transaction "will realize a tax advantage in Denmark, which probably consists of a double refund of withheld dividend tax", *that* North Channel Bank was concerned about whether they should be aware of "problems" in DenmarkFor example, "tax fraud" and *that* until recently there had been loopholes in German tax law allowing for double refunds, but that the German tax authorities "are now investigating these transactions and trying to claim that they are abusive or even criminal offenses". A reply the same day to the law firm Jones Day from lawyer A, who advised Bech-Bruun's North Channel Bank, states *that* transactions such as the ones described "may involve the possibility that two shareholders can apply for

**850**

refund of the same withholding tax ... ('cum/ex transactions')" and *that* such transactions are "generally problematic from a

legal perspective and it is often not possible to provide the kind of opinion on legal and liability issues that the parties involved usually seek".

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

On February 5, 2014, Jones Day stated, among other things, that North Channel Bank would like a fee offer and that the bank's role "will be limited to providing custodian services to the parties to the cum/ex transaction". To this, Bech-Bruun replied the same day that the fee would be around EUR 6,000-7,000 and that "these structures are typically problematic under Danish law".

On February 6, 2014, Jones Day asked Bech-Bruun whether a legal opinion could be a reasoned "should-opinion", "(i.e. 'NCB [North Channel Bank] should not be subject to criminal prosecution etc.') with certain reasonable assumptions (e.g. acting in good faith, relying on an expert opinion, no participation in - potentially - unjustified tax benefit etc.) and qualifications (no precedent/case law etc.)". In a reply dated February 7, 2014, Bech-Bruun repeated *that* the transaction in question is "problematic from a Danish legal point of view", *that* "should-level cannot be promised", and *that* "In order to make this assessment, we must have a full overview of the transaction and the client's role, including what is going on in Denmark".

In the following days, Jones Day and Bech-Bruun exchanged further emails, among other things on the basis of a "tax opinion" dated June 27, 2012, which Bech-Bruun received on February 10, 2014. This

The "tax opinion" was prepared by, among others, Attorney I and concerned the issue of the Danish tax consequences of a US pension plan's participation in transactions with Danish listed shares. In Jones Day's email of February 13, 2014, it is stated, among other things, *that* the law firm does not need a "reconfirmation ... from a tax perspective, but a reasoned tax analysis of the risk that our client may be exposed to if they act as custodian bank in this project", and *that* the relevant question is whether North Channel Bank under Danish tax law "can be held responsible or even prosecuted for supporting/facilitating a tax evasion committed by one of the other actors in this transaction...".

Thereafter, the dialog between Bech-Bruun and Jones Day continued and on 10 April 2014, Bech-Bruun received a transaction slide prepared in German. On April 15, 2014, Bech-Bruun received a summary in English of the proposed transactions and the

April 22, 2014 a revised English summary. Following receipt of the first English summary, Bech-Bruun wrote to Jones Day on April 16, 2014, inter alia, *that* it had read the new "factual description", *that* "there is indeed an indication that the transaction is a cum/ex transaction, which was our original concern but which we felt we could rule out after reading the tax opini- on", and *that* the new factual description "seems ... in any event, preclude us from retaining assumption 5 in our draft opinion, since USPF [US pension plan] acquires cum dividend shares from a Seller that does not own (or provide) cum dividend shares, and therefore USPF cannot by definition be the owner of cum dividend shares. definition, cannot be the owner of cum dividend shares on the Dividend Approval Date".

During the advisory process, Bech-Bruun submitted several draft legal opinions. Bech-Bruun submitted the first draft legal opinion on

February 18, 2014, the second draft on February 20, 2014, the third

draft on April 15, 2014, the fourth draft on April 23, 2014 and the fifth draft on May 2, 2014.

In the fifth draft, it is stated in section 2 ("Scope") in a Danish translation of the legal opinion that it concerns "whether NCB is taxable in Denmark, NCB's civil liability for a loss suffered by the Danish state and Danish criminal law issues for NCB as a result of the transaction ...".

Section 3 ("Proposed transactions") describes the proposed transactions in the form of purchase, sale and loan of shares and the issuance of dividend notes by North Channel Bank.

The conclusion in section 5 ("Opinion") states *that* "NCBs should not be subject to Danish civil liability, which entails a duty

Copyright © 2024 Karnov Group Denmark A/S

to compensate the Danish State for any losses resulting from the bank's role in the proposed transaction", but *that* a number of specified circumstances "prevent us from reaching a more definitive assessment of NCB's position". Point 5 also states that "NCB should not be subject to Danish criminal liability as a result of its role in the proposed transaction".

On August 4, 2014, Bech-Bruun sent a signed legal opinion to Jones Day, which essentially corresponded to the fifth draft of May 2, 2014.

### 3.2. The assessment of responsibility

The Supreme Court finds that Attorney A - based on the dialogue with Jones Day, the content of the German transaction diagram, the English summaries of the intended transactions and the transaction descriptions in the legal opinion - had to realize that there was an obvious risk that North Channel Bank, together with others, was involved in developing a model for unjustified refund of dividend tax.

In this connection, the Supreme Court has emphasized that already after Jones Day's email of 3 February 2014, in which he was made aware of the risk of double refund of dividend tax, Attorney A had particular reason to be aware of the risk of disregarding the interests of the tax authorities by applying for an unjustified refund. There was reason for further

**851**

heightened awareness due to the transaction descriptions that he subsequently received during the advisory process. Attorney A thus found himself in a heightened liability environment.

Furthermore, the Supreme Court has emphasized that the proposed transactions
- which was part of a so-called cum/ex model - appeared without business justification.

During the advisory process, Attorney A had several times expressed his concern that the transaction model appeared to be a cum/ex model and that the model was generally problematic. Nevertheless, according to his explanation, he failed to familiarize himself with the content of the German transaction diagram. In addition, he knew that a dividend note was an important document as a basis for dividend tax refunds.

As stated, Attorney A had to realize that there was an obvious risk that North Channel Bank, together with others, was involved in preparing a model for unjustified refund of dividend tax, he has recklessly disregarded the interests of the tax authorities by advising the bank as he did, including by stating in his legal opinion that the bank "should not be subject to" a civil or criminal liability for its participation. Attorney A has thus acted in breach of responsibility towards the tax authorities.

Under the present circumstances, it cannot lead to a different assessment that Attorney A had included a number of assumptions and reservations in his legal opinion.

Nor can it lead to a different assessment that the model for unjustified refund of dividend tax, which Attorney A's advice concerned, was applied without the use of shares or dividends.

### 4. Causal link

Bech-Bruun has argued, among other things, that the fraud committed would have been carried out even if Bech-Bruun's legal opinion had not been available, and that there is therefore no necessary causal link between Bech-Bruun's advice and the loss suffered by the Tax Administration as a result of the wrongful refund of dividend tax.

When assessing whether there is a causal connection, the Supreme Court finds for the reasons stated by the High Court that the content of Bech-Bruun's advice was already established on May 5, 2014, when Jones Day forwarded Bech-Bruun's legal

opinion of May 2, 2014 to North Channel Bank. The bank received Jones Day's legal opinion on May 9, 2014. The first refund applications attached to the bank's exchange notes were submitted to SKAT on May 12, 2014. The following is available

Copyright © 2024 Karnov Group Denmark A/S

Thus, there is a close temporal connection between Bech-Bruun's legal opinion on May 5, 2014 and the submission of the first unjustified refund applications.

Against this background, the Supreme Court finds that it must be assumed that there is the necessary causal connection between Bech-Bruun's negligent advice and the fact that the Tax Administration has suffered a loss as a result of improper refund of dividend tax.

*5. Adequacy*

When assessing whether Bech-Bruun's liability should be limited based on considerations of lack of adequacy, it must be emphasized that Bech-Bruun, as mentioned above, had to realize that there was an obvious risk that North Channel Bank, together with others, was involved in preparing a model for unjustified refund of dividend tax. Bech-Bruun thus knew that the bank actively participated in the preparation of the model, and Bech-Bruun had to realize the obvious possibility that the bank was not acting in good faith. Regardless of this, Bech-Bruun stated in its legal opinion that the bank "should not be subject" to civil or criminal liability for its participation.

On the other hand, it must be emphasized that the unjustified re-merger of dividend tax, which took place on the basis of dividend notes issued by North Channel Bank, took place by booking fictitious transactions, so that the size of the Tax Administration's loss was independent of actual shares and dividends.

The Supreme Court then finds that Bech-Bruun's liability cannot include the full amount of DKK 705,821,108.92 stated in the Tax Administration's claim 1, cf. section 8 below.

*6. Tax administration losses*

Bech-Bruun has objected to the Tax Administration's loss calculation, including that it has been made without taking into account what, as a result of the settlement reached on May 28, 2019 between the Tax Administration on the one hand and a large number of pension plans and other actors who participated in the unjustified refund applications on the other hand, has been paid *by* the pension plans whose refund applications were based on dividend notes issued by North Channel Bank.

The settlement states that the settlement parties are jointly and severally liable *for* specified amounts paid to the individual pension plans. The tax administration's deduction in the claim against Bech-Bruun is therefore based on the extent to which payments from the settlement parties can be proportionally attributed to the pension plans that have used dividend notes from North Channel Bank and not on what has been paid *by* the individual pension plan.

The Supreme Court finds that in the situation at hand, it was well-founded that the Tax Administration entered into the settlements in question, including the settlement of May 28, 2019, and that the Tax Administration under the circumstances was entitled to deduct the settlement parties' payments as made.

*7. Own fault and acceptance of risk*

The Supreme Court finds that there are no circumstances that can justify Bech-Bruun's liability for damages

**852**

is waived or limited based on considerations of fault or acceptance of risk.

*8. The size of the tax administration's claim*

After the stated basis of liability, causal connection, loss compensation, own fault and acceptance of risk, the Tax Administration's claim against Bech-Bruun can be calculated at DKK 705,821,108.92; in accordance with the Tax Administration's claim 1.

Based on what is stated in section 5 on adequacy, the Supreme Court finds that Bech-Bruun's liability for damages, based on an overall assessment, should only include an amount of DKK 400 million.

*9. Statute of limitations*

The Supreme Court finds that the limitation period did not run from the time of the Tax Administration's payments to the pension plans (the damage occurred), cf. section 2(4) of the Limitation Act. The limitation period was thus suspended and would only run from the time when the Tax Administration became or should have become aware of the claim or the debtor.

The Tax Administration brought the case on June 8, 2020, and it is therefore decisive whether the suspension of the limitation period had ended on June 8, 2017, as the Tax Administration's claim will in that case be time-barred at the time the case was brought due to the 3-year limitation period.

Bech-Bruun has argued in particular that the suspension of the limitation period ended with the email of October 10, 2016, which the Tax Administration received from the German authorities. The Supreme Court finds that, based on the content of the email in question, the Tax Administration did not or should not have become aware that Bech-Bruun was the responsible tortfeasor (debtor), cf. the Limitation Act. § 3, paragraph 2.

The Supreme Court finds that there are no other circumstances that can justify that the suspension of the limitation period had ended on June 8, 2017. The tax administration's claim against Bech-Bruun was thus not time-barred when the case was brought on June 8, 2020.

*10. Pension*

The Supreme Court finds that there is no basis for interest on the Tax Administration's claim from an earlier or later date than the date on which the case was brought, cf. section 3(2), (4) and (5) of the Interest Act, or for interest to be paid at a lower interest rate, cf. section 5(3) of the Act.

The tax administration's claim must therefore be subject to interest with process interest from the commencement of the case on June 8, 2020.

*11. Overall conclusion*

Bech-Bruun must pay the Tax Administration DKK 400 million with process interest from June 8, 2020. The Supreme Court thus partially upholds the Tax Administration's claims 1 and 3 and acquits Bech-Bruun of the Tax Administration's claim 2.

The Supreme Court also accepts the Tax Administration's claim 4 for repayment of legal costs before the High Court.

*12. Legal costs*

Based on the nature, scope and outcome of the case, the Supreme Court finds that Bech-Bruun must pay a total of DKK 12,394,000 in partial costs before the High Court and the Supreme Court to the Tax Administration. Of this amount, DKK 12 million is to cover legal fees and DKK 394,000 is to cover court fees.

## For it is recognized as right

Bech-Bruun I/S must pay DKK 400,000,000 to the Tax Administration with process interest from June 8, 2020.

Bech-Bruun I/S must repay DKK 6,189,953.70 to the Tax Administration with process interest from May 24, 2022.

Bech-Bruun I/S must pay a total of DKK 12,394,000 in legal costs for the High Court and Supreme Court to the Tax Administration.

The sums ordered must be paid within 14 days of the judgment of this Supreme Court.

The amount of legal costs shall bear interest in accordance with section 8a of the Interest Act.

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746
U.2024.746
SKM2024.123.HR

*Bech-Bruun var erstatningsansvarlig med et beløb på 400 mio. kr. for Skatteforvaltningens tab som følge af uberettigede refusioner af udbytteskat.*

*Erstatning uden for kontraktforhold 111.4, 21.1, 22.9, 3.9, 4.2, 5 og 7.5.*

Bech-Bruun rådgav i 2014 den tyske bank, North Channel Bank, om bankens mulige ansvar ved at medvirke i transaktioner med danske børsnoterede aktier. Transaktionerne indebar, at banken udstedte udbyttenotaer, der kunne anvendes ved indgivelse af ansøgninger til Skatteforvaltningen om refusion af udbytteskat. I løbet af 2014 og 2015 udstedte North Channel Bank de nævnte udbyttenotaer, som blev vedlagt ansøgninger om refusion af udbytteskat. På baggrund af ansøgningerne udbetalte skattemyndighederne ca. 1,135 mia. kr. Refusionsansøgningerne viste sig efterfølgende i det hele at være uberettigede, idet ansøgningerne var baseret på fiktive transaktioner, da der hverken var aktier, udbytter eller pengestrømme. Sagens hovedspørgsmål var, om Bech-Bruun på baggrund af rådgivningen af North Channel Bank var erstatningsansvarlig for Skatteforvaltningens tab som følge af de uberettigede refusioner af udbytteskat. Højesteret udtalte, at det ved vurderingen af, om en advokat ved sin rådgivning af en klient har handlet ansvarspådragende over for skattemyndighederne, er afgørende, om advokaten på uforsvarlig måde har tilsidesat skattemyndighedernes interesser. Dette er en tilfældet, beror på en samlet vurdering af omstændighederne på tidspunktet for advokatens rådgivning. I vurderingen indgår som et centralt element, om de dispositioner, som advokaten har rådgivet om, havde et forretningsmæssigt formål, og om dispositionerne havde en usædvanlig karakter. Herudover indgår det nærmere indhold af advokatens opdrag samt den rådgivning, som advokaten har ydet i det enkelte tilfælde. Højesteret fandt efter en samlet vurdering af sagens omstændigheder, at advokat A fra Bech-Bruun under sin rådgivning af North Channel Bank måtte indse, at der var en nærliggende risiko for, at banken sammen med andre var involveret i at udarbejde en model for uberettiget refusion af udbytteskat. A havde derfor på uforsvarlig måde tilsidesat skattemyndighedernes interesser ved at rådgive banken som sket under sagen, herunder ved i en legal opinion at angive at banken »ikke bør være underlagt« civilretligt eller strafferetligt ansvar for sin deltagelse. Højesteret fandt således, at der var handlet ansvarspådragende over for Skatteforvaltningen. Endvidere fandt Højesteret, at det måtte lægges til grund, at der forelå den fornødne årsagsforbindelse mellem Bech-Bruuns ansvarspådragende rådgivning og det forhold, at Skatteforvaltningen havde lidt et tab som følge af den uretmæssige refusion af udbytteskat. Sagen angik beløbsmæssigt lidt over 700 mio. kr. med tillæg af renter, idet Skatteforvaltningen havde reduceret sit krav på i alt ca. 1,135 mio. kr. med betalinger, som Skatteforvaltningen havde modtaget gennem forlig indgået med forskellige aktører. Højesteret udtalte, at det i foreliggende situation var velbegrundet, at Skatteforvaltningen indgik de omhandlede forlig, og at Skatteforvaltningen under de foreliggende omstændigheder var berettiget til at foretage fradrag af forligs-

parternes indbetalinger som sket. Herudover udtalte Højesteret, at der ikke forelå forhold,

**747**

der kunne begrunde, at Bech-Bruuns erstatningsansvar bortfaldt eller blev begrænset ud fra betragtninger om egen skyld eller accept af risiko. Skatteforvaltningens krav var desuden ikke forældet. På baggrund af betragtninger om adækvans fandt Højesteret, at Bech-Bruuns erstatningsansvar ud fra en samlet vurdering alene burde omfatte et beløb på 400 mio. kr. og således ikke Skatteforvaltningens fulde krav på lidt over 700 mio. kr. Kravet skulle forrentes med procesrente fra sagens anlæg.[1]

**H.D. 20. november 2023 i sag BS-20331/2022 (1. afd.)**

(Jens Peter Christensen, Ole Hasselgaard, Rikke Foersom, Peter Mørk Thomsen og Mohammad Ahsan).

*Skatteforvaltningen (adv. Boris Frederiksen og adv. Steffen Sværke, Kbh.)*
mod
*Bech-Bruun I/S (adv. Ole Spiermann og adv. Jakob Lentz, Kbh.)*

## Østre Landsrets dom 28. april 2022 (12. afd.), BS-26436/2020-OLR

### Indledning og påstande mv.

Landsdommerne Bloch Andersen, Ib Hounsgaard Trabjerg og Ane Røddik Christensen har deltaget i sagens afgørelse.

Sagen er anlagt ved Københavns Byret den 8. juni 2020. Ved byrettens kendelse af 1. juli 2020 er sagen henvist til behandling ved landsretten efter retsplejelovens § 226, stk. 1.

Sagen angår, om Bech-Bruun I/S (herefter Bech-Bruun) har pådraget sig et erstatningsansvar over for Skatteforvaltningen i anledning af den rådgivning, som advokat A fra Bech-Bruun ydede North Channel Bank i 2014 vedrørende et muligt ansvar for banken ved at medvirke til et påtænkt skattearrangement med refusion af dansk udbytteskat.

*Sagsøgeren, Skatteforvaltningen*, har nedlagt følgende påstande:
»Principalt
*Påstand 1*
Bech-Bruun I/S tilpligtes at betale 722.290.313,77 kr. til Skatteforvaltningen med tillæg af renter fra 3. september 2021 og til betaling sker.
*Påstand 2*
Bech-Bruun I/S tilpligtes at betale 447.357.276,28 kr. til Skatteforvaltningen.
*Påstand 3*
Bech-Bruun I/S tilpligtes at betale 78.129.171,06 kr. til Skatteforvaltningen.
*Subsidiært*
Bech-Bruun I/S skal anerkende, at Bech-Bruun I/S er erstatningsansvarlig over for Skatteforvaltningen for sin rådgivning til North Channel Bank.
*Mere subsidiært*
Bech-Bruun I/S skal anerkende at være erstatningsansvarlig for Skatteforvaltningens tab som følge af ansøgninger om refusion af indeholdt udbytteskat dateret i perioden 12. maj 2014 til 22. juli

---

[1]  U 1997.364H, U 2000.365/2H, U 2006.145H, U 2012.1978H og U 2022.4515H samt Henry Ussing i Obligationsretten: almindelig del (4. udg. 1961) s. 310-11, Anders Vinding Kruse i Erstatningsretten (3. udg. 1976) s. 203, Henrik Kure i Finansieringsret (3. udg. 2021) s. 492, Vibeke Ulfbeck i Erstatningsretlige grænseflader I (3. udg. 2021) s. 76-79, Søren Halling Overgaard i Advokaters erstatningsansvar (4. udg. 2022) s. 362-67 og 448-49, Mads Bryde Andersen m.fl. i Advokatretten (2. udg. 2022) s. 854, 871-72 og 876, Søren Halling Overgaard m.fl. i Skatterådgiverens erstatningsansvar (1. udg. 2023) s. 48-52, 64, 68, 207-30 og 253-60 og Advokatsamfundets vejledning i afgivelse af Legal Opinions (september 2000).

U.2024.746H – SKM2024.123.HRH

2015 baseret på Credit Advices udstedt af North Channel Bank, subsidiært i en kortere periode fastsat efter rettens vurdering.«

*Sagsøgte, Bech-Bruun,* har nedlagt følgende påstande:

»*1. Påstand*

1.1 *Over for Skatteforvaltningens principale påstand* Frifindelse, subsidiært frifindelse for tiden.

1.2 *Over for Skatteforvaltningens subsidiære påstand* Afvisning, subsidiært frifindelse.

1.3 *Over for Skatteforvaltningens mere subsidiære påstand* Frifindelse.«

Under sagens forberedelse har landsretten den 29. september 2021 afsagt kendelse, hvorefter det blev pålagt Skatteforvaltningen at fremlægge kreditoraftale af 11. september 2019 mellem North Channel Bank og Skatteforvaltningen/Skattestyrelsen og forligsaftale af 28. maj 2019 mellem 61 amerikanske pensionsplaner m.fl. og Skatteforvaltningen/Skattestyrelsen, begge med tilhørende bilag, for så vidt angår de dele af aftalerne med bilag, der vedrører grundlaget for og størrelsen af kravene mod de enkelte forligsparter, herunder oplysninger om, hvilke poster der indgår i forligsbeløbene, hvad der allerede måtte være betalt af de enkelte forligsparter, vilkår for indbetaling af forligsbeløbet samt oplysninger om forrentning.

Under hovedforhandlingen har landsretten den 28. februar 2022 afsagt kendelse om, at Skatteforvaltningens anbringende om, at en udbyttenota, eller såkaldt »Dividend Credit Advice«, alene skulle kunne udstedes ved bankens modtagelse af udbytte direkte fra det udbytteuddelodende selskab, men ikke ved modtagelse af en kompensationsbetaling, uanset betalingen svarer til og repræsenterer sådant udbytte, ikke tillades fremsat.

**748**

## Sagsfremstilling

*Rådgivningsforløbet*

Ved mail af 3. februar 2014 blev advokat V5, Bech-Bruun, kontaktet af advokat H fra advokatfirmaet Jones Day i Tyskland.

Af mailen fremgår:

»…

Vi arbejder for en klient (North Channel Bank GmbH & Co.KG, en tysk bank), som er blevet bedt om at levere visse banktjenester i relation til en dividend stripping-transaktion med aktier i et dansk børsnoteret aktieselskab. Vores klient vil ikke være en del af selve transaktionen, men vil levere ydelser til parterne i transaktionen.

Vi forstår, at parterne i transaktionen vil realisere en skattefordel i Danmark, som formentlig består i dobbelt refusion af indeholdt udbytteskat (men vi har ikke set en strukturdokument). Måske du kender disse strukturer?

Klienten er bekymret for, om der er problemer for dem i Danmark, som de skal være opmærksomme på (skattesvig, lovgivning til bekæmpelse af omgåelse mv.). Kan du komme i tanke om nogen relevante problemer, som de kunne stå over for i Danmark (herunder omdømmeproblemer)?

Vi skal udarbejde et notat til klienten, som skal bekræfte, at de ikke løber ind i problemer i henholdsvis Tyskland (regulatorisk) eller dit land.

Indtil for nylig var der smuthuller i den tyske skattelovgivning, som gav mulighed for dobbelt refusion af kildeskat. Skattemyndighederne undersøger nu disse transaktioner og forsøger at gøre gældende, at de er misbrug eller endda strafbare forhold.

Vi skal have et telefonmøde med klienten i løbet af i morgen, og det ville være godt, hvis du kunne give mig dine første tanker. Vi kan naturligvis også tage en snak på telefonen før at gennemgå dette spørgsmål.«

Samme dato besvarede advokat A, Bech-Bruun, henvendelsen fra H således:

»Jeg har modtaget nedenstående mail fra F som også lagde en telefonbesked til dig.

Den type transaktion, du beskriver, som kan indebære mulighed for, at to aktionærer kan ansøge om refusion af den samme kildeskat, har været forelagt os før (»cum/ex-transaktioner«). Som jeg mener, F også tilkendegav, er transaktionerne efter vores erfaring generelt problematiske set ud fra et juridisk perspektiv, og oftest er det ikke muligt at give den form for opinion om juridiske og ansvarsmæssige spørgsmål, som de involverede parter normalt ansøger om.

Skulle du have lyst til at diskutere eller drøfte nærmere, deltager vi gerne i et opkald, ligesom vi gerne uddyber vores analyse, hvis det ønskes.«

I en mail af 5. februar 2014 skrev H herefter blandt andet følgende til A og V5 :

»…

Vi talte med klienten i går og forelagde dem jeres første reaktion. De vil gerne have et salærtilbud fra jer for en udtalelse om de risici, der kan opstå for dem i henhold til dansk ret. Vi får en kopi af den opinion, som en af parterne i cum/ex-transaktionen modtog fra dansk advokat og vil dele den med jer. Denne opinion giver os forhåbentlig flere oplysninger om transaktionen. Klientens rolle vil være begrænset til at levere tjenester som depotbank til parterne i cum/ex-transaktionen.

Klienten vil være North Channel Bank GmbH & Co.KG (HYPERLINK »http://www.northchannelbank.com« www.northchannelbank.com). Vi har (endnu) ikke fået oplyst identiteten af parterne i cum/ex-transaktionen.«

Samme dag skrev V5 på mail følgende til H:

»…

Baseret på de meget begrænsede oplysninger, som er tilgængelige lige nu, mener jeg, at vi kan lave denne analyse til et sted mellem 6.000-7.000 EUR eks. moms for selve opinion. Kan det accepteres? Bemærk, at disse strukturer typisk er problematiske i henhold til dansk ret.«

Ved mail af 6. februar 2014 besvarede H V5's henvendelse således:

»Tak for det. Jeg sender dette videre til klienten.

Tror du, at din opinion kan være en begrundet »bør«-opinion (dvs. »NCB bør ikke være genstand for strafferetlig forfølgning mv.«) med visse rimelige forudsætninger (f.eks. at handle i god tro, henholde sig til en ekspert-opinion, ingen deltagelse i - potentielt - uberettiget skattefordel mv.) og forbehold (ingen præcedens/retspraksis mv.)

Ved mail af 7. februar 2014 besvarede A denne henvendelse:

»Jeg henviser til din mail til F nedenfor.

Som nævnt er transaktionen problematisk fra et dansk juridisk synspunkt, og bør-niveau kan ikke loves. For at foretage denne vurdering skal vi have et fuldt overblik over transaktionen og klientens rolle, herunder hvad der foregår i Danmark.«

H skrev herefter på mail af 7. februar 2014 til A :

»Forstået.

Vi håber, at alle oplysningerne om transaktionen bliver tydeligere, når vi har set den opinion, som parterne har modtaget fra deres rådgivere.«

I en mail af 10. februar 2014 til V5 og A fremsendte H et udkast til opinion om skattemæssige forhold udarbejdet af advokat I og advokat J fra Hannes Snellman Advokatpartnerselskab. Af mailen fremgår:

»Jeg vedhæfter et udkast til opinion om den påtænkte transaktion, som [jeg] lige har modtaget. Kan I allerede se på dette dokument, om det vedrører den type transaktion, som I allerede har set. (Jeg har videresendt jeres tilbud til klienten og afventer bekræftelse).«

**749**

Den i mailen omtalte opinion af 27. juni 2012 har følgende ordlyd:
»DANSK TAX OPINION

*1 INDLEDNING*

Denne opinion (»*Opinion*«) er udarbejdet på anmodning af [*streget ud*] LLP.

Denne Opinion omhandler de danske skattemæssige konsekvenser af visse transaktioner med danske børsnoterede aktier, som er indgået af en amerikansk pensionsfond (»*USPF*«).

*2 SCOPE*

I denne Opinion vurderes de danske skattemæssige konsekvenser for USPF af de påtænkte transaktioner. Denne Opinion omhandler ikke de potentielle skattemæssige konsekvenser for nogen modparter i de påtænkte transaktioner.

*3 PÅTÆNKTE TRANSAKTIONER*

USPF påtænker at foretage følgende transaktioner:

1) USPF køber danske børsnoterede aktier (»*Aktierne*«) (enten via en reguleret inter-dealer-mægler eller ved at købe Eurex-enkeltaktier, fysisk leverede børsnoterede Eurex futurekontrakter vedrørende de relevante Aktier)

2) Købet af Aktierne vil finde sted for ex udbyttedatoen, men senest på udbyttegodkendelsesdatoen [Dividend Approval Date], hvilket betyder den dato, hvor udbyttet endeligt godkendes til udlodning (generelt datoen for den årlige generalforsamling) (»*Udbyttegodkendelsesdatoen*«) [Dividend Approval Date]. Afviklingsdatoen [Settlement Date] for købet af Aktierne vil være på eller efter udbytteregistreringsdatoen [Dividend Record Date]. I tilfælde af fysisk leverede børsnoterede futurekontrakter vil opfyldelsen af futurekontrakten senest på Udbyttegodkendelsesdatoen [Dividend Approval Date].

3) USPF modtager det udbytte, som er deklareret på Aktierne på udbyttegodkendelsesdatoen [Dividend Approval Date] (det »*Danske Udbytte*«).

4) Ved køb af Aktierne afdækker USPF sin lange eksponering på Aktierne ved at sælge børsnoterede, kontantafviklede enkeltaktiefutures vedrørende Aktierne (det »*Korte Derivat*«). Prisen på det Korte Derivat tager højde for en andel af det forventede Danske Udbytte i beregningen af strike-prisen for det Korte Derivat, men der foretages ingen justering, hvis det faktiske udbyttebeløb er mere eller mindre end det forventede udbyttebeløb.

5) På eller efter ex udbyttedatoen sælger USPF Aktierne via en interdealer-mægler. Afviklingsdatoen [Settlement Date] for salget af Aktierne er den samme dato som Afviklingsdatoen [Settlement Date] for købet af Aktierne i 2) ovenfor. Samtidig vil USPF indgå i en lang futureposition vedrørende Aktierne for at lukke den korte futureposition, der blev oprettet i trin 4 ovenfor. Den lange futureposition udløber på samme dato som den korte futureposition oprettet i trin 4 ovenfor.

6) Det er muligt, at Aktierne i perioden frem til salget vil blive udlånt ved et aktieudlån (ved brug af en standard Global Master Securities Lending Agreement) til en ikke-relateret part (som kan være hjemmehørende i enhver jurisdiktion) for at minimere finansieringsomkostningerne. Aktielånets løbetid forventes ikke at overstige 3 måneder, og aktielånet ydes mod kontant sikkerhedsstillelse. Aktielåntransaktionen kan indgås på eller efter Udbytteregistreringsdatoen [Dividend Record Date] (med afvikling af aktielånet samme dag), men altid efter udbyttegodkendelsesdatoen [Dividend Approval Date], og låntageren af Aktierne vil ikke modtage noget udbytte på Aktierne.

*4 FORUDSÆTNINGER*

Med henblik på denne Opinion har vi antaget følgende:

1) USPF er skattemæssigt hjemmehørende i USA.

2) USPF har ikke et fast driftssted i Danmark.

3) Udbyttet modtaget af USPF på Aktierne hidrører ikke fra udøvelse af virksomhed ved USPF eller gennem et forbundet foretagende.

4) USPF er omfattet af artikel 22, stk. 2, litra e), i den gældende dobbeltbeskatningsoverenskomst mellem Danmark og USA »*Dobbeltbeskatningsoverenskomsten mellem Danmark og USA4*«), hvilket betyder, at USPF er:

   a) en juridisk person, en juridisk person, der er organiseret efter lovgivningen i USA med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændige erhvervsdrivende, og

   b) mere end 50 pct. af USPFs begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i enten USA eller Danmark.

5) Ved køb af Aktierne opnår USPF ubetinget ejerskab til Aktierne og vil have fulde ejerskabsrettigheder over Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date], herunder retten til at modtage det udbytte, som deklareres på den pågældende dato

6) Aktierne vil blive holdt af USPF gennem en depotbank. USPF's ejerskab til Aktierne registreres hos depotbanken og, afhængigt af depotbankens og underdepotbankens andre lange og korte positioner, Værdipapircentralen i Danmark.

7) Depotbankens register vil vise, at USPF er den juridiske og retmæssige ejer af Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date], og at det Danske Udbytte repræsenterer reelt udbytte på Aktierne, som videregives til USPF af depotbanken.

**750**

*5 OPINION*

På grundlag af de fakta og forudsætninger, som er anført i punkt 3 og punkt 4 ovenfor, er det vores opinion, at:

1) De påtænkte transaktioner over Aktierne bør ikke pålægges anden dansk skat end kildeskat af udbytte udloddet på Aktierne.

2) USPF bør være berettiget til at kræve fuld refusion af det danske indeholdte udbytte på Aktierne i henhold til Dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

*6 ANVENDELIGE DANSKE SKATTEREGLER*

*6.1 Skattemæssig behandling af udgående udbytte*

Udbytte, der udloddes af et dansk selskab, er som hovedregel skattepligtigt hos den person eller enhed, som er registreret som indehaver af de udbyttebetalende aktier på Udbyttegodkendelsesdatoen [Dividend Approval Date].

Hvis indehaveren af de udbyttebetalende aktier er en udenlandsk person eller enhed, er udbyttet som udgangspunkt underlagt dansk udbytteskat på 27 %.

Der findes dog visse undtagelser, ifølge hvilke visse udenlandske aktionærer kan være berettiget til hel eller delvis fritagelse for dansk udbytteskat.

En amerikansk pensionsfond er berettiget til fuld fritagelse for dansk udbytteskat, hvis pensionsfonden opfylder følgende betingelser i artikel 10, stk. 3, litra c), og artikel 22, stk. 2, litra e), i Dobbeltbeskatningsoverenskomsten mellem Danmark og USA:

1) Den amerikanske pensionsfond er skattemæssigt hjemmehørende i USA.

2) Den amerikanske pensionsfond er den retmæssige ejer af udbyttet.

Copyright © 2024 Karnov Group Denmark A/S

3) Det pågældende udbytte hidrører ikke fra udøvelse af virksomhed af pensionskassen eller gennem et forbundet foretagende.
4) Den amerikanske pensionsfond er en juridisk person, der er organiseret efter lovgivningen i USA med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændige erhvervsdrivende, og mere end 50 pct. af denne persons begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i USA eller Danmark.

En amerikansk pensionsfond, som opfylder ovenstående betingelser, er berettiget til fuld fritagelse for dansk udbytteskat på danske kilder.

Denne fritagelse sker dog ikke ved kilden, og den udbytteudloddende danske enhed skal indeholde skat af udbyttet (til standardsatsen på 27 %), uanset fritagelsen. For at opnå fritagelsen skal en amerikansk pensionsfond indgive en refusionsansøgning til de danske skattemyndigheder som beskrevet i punkt 6.2 nedenfor.

*Betingelsen for retmæssigt ejerskab*

Som det fremgår af ovenstående, kræver retten til fritagelse fra dansk udbytteskat i henhold til Dobbeltbeskatningsoverenskomsten mellem Danmark og USA, at den amerikanske pensionsfond kvalificerer sig som den retmæssige ejer (*beneficial owner*) af udbyttet.

Begrebet retmæssig ejer findes ikke i dansk national ret, og der skelnes således ikke formelt i dansk ret mellem retmæssigt og juridisk ejerskab af aktier og udbytte modtaget heraf. Den generelle opfattelse er derfor, at betingelsen for retmæssigt ejerskab skal forstås i overensstemmelse med begrebets overenskomstmæssige betydning. De danske skattemyndigheder har hidtil baseret deres fortolkning af betingelsen om retmæssigt ejerskab på vejledningen i OECD's kommentarer til udbytte- og rentebestemmelserne i OECD's modeloverenskomst.

De danske skattemyndigheder har sat spørgsmålstegn ved en række udbyttekildeskattekrav med den begrundelse, at den udenlandske udbyttemodtager ikke er den retmæssige ejer af udbyttet og derfor ikke er berettiget til overenskomstfordele. Sådanne krav er dog kun blevet rejst i tilfælde, hvor der er udbetalt udbytte til et mellemliggende moder-/holdingselskab, som kontrolleres af en investor i en offshorejurisdiktion. De danske skattemyndigheder har indtaget det standpunkt, at sådanne holdingselskaber skal anses for rene gennemstrømningsselskaber, som ikke kan anses for at være den retmæssige ejer af det modtagne udbytte.

Indtil videre har de danske skattemyndigheder ikke nægtet fritagelse for dansk udbytteskat, der udbetales til andre enheder end mellemliggende holdingselskaber, og vi har ikke set noget, der tyder på, at de ville overveje at udvide anvendelsen af betingelsen om den retmæssige ejer til andre kategorier af aktionærer.

En nylig kendelse fra den schweiziske føderale forvaltningsdomstol antyder kraftigt, at betingelsen om den retmæssige ejer i dobbeltbeskatningsoverenskomster ikke kan anvendes til at nægte fritagelse for udbytteskat med den begrundelse, at udbyttemodtageren har indgået en derivattransaktion vedrørende de pågældende aktier.

*6.2 Procedure for refusion af indeholdt dansk udbytteskat*

For at opnå fritagelse for dansk udbytteskat i henhold til Dobbeltbeskatningsoverenskomsten mellem Danmark og USA skal en amerikansk pensionsfond indgive en ansøgning om refusion af det indeholdte skattebeløb til de danske skattemyndigheder. Der findes en særlig formular (formular nr. 06.003), som skal bruges til dette formål. Denne formular er vedlagt denne Opinion. Formularen er også tilgængelig på skattemyndighedernes hjemmeside.

Ansøgningen om refusion skal ledsages af dokumentation, der viser, at den amerikanske pensionsfond er

**751**

skattemæssigt hjemmehørende i USA. Endvidere skal den amerikanske pensionsfond fremlægge dokumentation for, at den amerikanske pensionsfond opfylder betingelserne i artikel 22, stk. 2, litra e), i Dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

Refusionsprocessen tager normalt en måned. Der opstår ret til rentegodtgørelse, hvis det indeholdte skattebeløb ikke refunderes af de danske skattemyndigheder senest seks måneder efter indgivelsen af ansøgningen. I så fald tilbydes rentekompensation med en sats på 0,5 % pr. måned i det tidsrum, der overstiger perioden på seks måneder.

*6.3 Skattemæssig behandling af kursgevinster på aktier*

Udenlandske aktionærer er ubetinget fritaget for dansk beskatning af kursgevinster på danske aktier. Derfor vil hverken en udenlandsk aktionærs besiddelse eller salg af danske aktier give anledning til dansk aktieavancebeskatning.

Det betyder også, at indgåelse af en aktielånstransaktion med danske aktier ikke vil give anledning til aktieavancebeskatning for den udenlandske långiver eller udenlandske låntager af aktien.

*6.4 Skattemæssig behandling af aktiefuturetransaktioner*

En aktiefuturetransaktion med danske aktier giver ikke anledning til dansk beskatning af en udenlandsk hjemmehørende part i transaktionen.

*6.5 Overførselsafgifter*

Der pålægges ingen stempelafgift eller andre overførselsafgifter på transaktioner med danske aktier.

*7 ANALYSE*

*7.1 Dansk udbytteskat*

På grundlag af vores forståelse af, at USPF vil have fulde ejerskabsrettigheder over Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date], og at USPF kun vil udlåne Aktierne efter Udbyttegodkendelsesdatoen [Dividend Approval Date] uden tilknyttede udbytterettigheder, mener vi, at USPF skal betragtes som modtageren af det Danske Udbytte fra et dansk nationalretligt perspektiv.

Vi finder derfor, at det Danske Udbytte skal beskattes hos USPF.

USPF vil dog være berettiget til fuld fritagelse for dansk udbytteskat, hvis betingelserne i artikel 10, stk. 3, litra c), og artikel 22, stk. 2, litra e), i Dobbeltbeskatningsoverenskomsten mellem Danmark og USA er opfyldt. På grundlag af de fakta og forudsætninger, som er anført i punkt 3 og 4 ovenfor, finder vi, at USPF må anses for at opfylde disse betingelser.

Med hensyn til betingelsen om retmæssigt ejerskab noterer vi følgende:
*   USPF er ikke juridisk forpligtet til at betale nogen del af det Danske Udbytte til nogen person.
*   I prisen for det Korte Derivat tages der højde for en andel af det forventede Danske Udbytte ved beregning af strikekursen på det Korte Derivat, men der foretages ingen justering, hvis det faktiske udbyttebeløb er højere eller lavere end det forventede udbyttebeløb.
*   Forpligtelserne under det Korte Derivat eksisterer og skal opfyldes af USPF, uanset om USPF erhverver de danske Aktier.

Under disse omstændigheder finder vi, at USPF bør anses for at være den retmæssige ejer af det Danske Udbytte i henhold til Dobbeltbeskatningsoverenskomsten mellem Danmark og USA. Vi finder derfor, at USPF bør være berettiget til fuld fritagelse for dansk kildeskat på det Danske Udbytte.

For at opnå fritagelsen skal USPF dog indgive en ansøgning om refusion til de danske skattemyndigheder ledsaget af dokumentation, der viser, at USPF er skattemæssigt hjemmehørende i USA, og endvidere at betingelserne i artikel 22, stk. 3, litra e), i Dobbeltbe-

skatningsoverenskomsten mellem Danmark og USA er opfyldt. Det betyder, at USPF skal indsende dokumentation, der viser, at USPF er en juridisk person, der er organiseret efter lovgivningen i USA med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændige erhvervsdrivende, og at mere end 50 pct. af denne persons begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i USA eller Danmark.

*7.2 Andre danske skattemæssige konsekvenser af de påtænkte transaktioner*

Der bør også gælde andre danske skatter for påtænkte transaktioner, og de påtænkte transaktioner bør derfor ikke give anledning til andre danske skattemæssige konsekvenser end indeholdelse og efterfølgende krav om refusion af dansk skat på det Danske Udbytte.

For at undgå tvivl bemærkes det, at udstedelse af bankgebyrer eller lignende gebyrer som følge af registrering af ejerskab hos Værdipapircentralen i Danmark eller tilsvarende udenlandsk værdipapircentral ikke tages i betragtning.

*8. GÆLDENDE LOV OG VÆRNETING*

Denne Opinion henhører under og skal fortolkes i overensstemmelse med dansk ret, og enhver tvist, der opstår som følge af eller i forbindelse med denne Opinion er underlagt de danske domstoles enekompetence.

*9. PÅBERÅBELSE*

Denne Opinion er udelukkende afgivet til brug for jer og kan kun påberåbes i forbindelse med denne sag og den heri anførte kontekst.

Denne Opinion må ikke uden forudgående skriftligt samtykke videregives til nogen anden person, bortset fra at den må videregives uden sådant samtykke til jeres juridiske rådgiver.

**752**

Vi påtager os ingen forpligtelse til at underrette jer om nogen ændringer i de heri anførte udtalelser som følge af fakta eller om stændigheder, der kan komme til vores kendskab i fremtiden eller som følge af enhver efterfølgende ændring i dansk ret.«

I mail af 11. februar 2014 skrev H herefter således til V5 og A :

»Jeg har læst den danske opinion. Jeg kan forstå, at formålet med denne opinion er at bekræfte, at den amerikanske pensionsfond er berettiget til refusion af kildeskat, uanset at den kun ejer aktierne i meget kort tid.

Jeg var bekymret for, at i transaktionen ville være en dobbelt refusion af kildeskat eller en anden skattefordel ud over refusionen af kildeskatten til pensionsfonden. (Det var faktisk formålet med de cum/extransaktioner, vi har set i Tyskland under tidligere lovgivning).

Da jeg læste denne opinion, fandt jeg ikke nogen indikation af sådanne yderligere skattefordele. Forventer I, at der en yderligere skattefordel for nogen af transaktionens modparter?«

A besvarede samme dag mailen således:

»Ud fra en foreløbig gennemgang er jeg enig i, at den beskrevne transaktion ikke afslører et faktuelt mønster, der med sikkerhed indebærer en cum/ex-handel, selv om mønstret afspejler en transaktion, hvor et aktiekøb sker før (eller på) registreringsdatoen [record date], og leveringen sker (på eller) efter registreringsdatoen [record date], hvilket vi også typisk har set i cum/ex-handlerne. For at være sikker vil jeg normalt også indbygge en forudsætning om, at sælgeren af aktierne til den amerikanske pensionsfond faktisk selv var ejer af de cum udbytteaktier, som i sidste ende bliver leveret, på salgstidspunktet eller i det mindste på udbytteregistreringsdatoen. Dette kunne dog formodentlig læses ind i forudsætningerne 5-7.

For så vidt angår den korte ejerperiode, har vi tidligere i lyset af faktiske forhold kunnet finde en løsning, hvis dette er bekymringen. Jeg ville dog tøve med at fremsætte min mening om et køb og salg,

som begge sker på registreringsdatoen [record date] - også hvis køb og salg sker med blot en par dages mellemrum.

Den omstændighed, at transaktionen involverer derivater og aktieudlånstransaktioner, skaber normalt udfordringer med hensyn til komfortniveauet i en tax opinion, men ofte oplever vi, at vi kan finde et komfortniveau, som er tilfredsstillende for klienten.«

Ved mail af 12. februar 2014 skrev advokat K fra Jones Day til A, at Jones Days klient gerne ville gå videre med projektet på grundlag af salæroverslaget, og samtidig anmodede K A om at påbegynde arbejdet med at udarbejde »et udkast til tax opinion«.

A skrev herefter i en mail af 12. februar 2014 til K :

»Vi går gerne videre. Vi har bare lige et par foreløbige spørgsmål: Kan du bekræfte, at vi kan gå videre på grundlag af det faktuelle mønster, som fremgår af den anden danske opinion, som vi har modtaget?

Kan du oplyse os om, hvilke punkter vores opinion skal omhandle?«

K besvarede den 13. februar 2014 denne mail således:

»Mange tak for din e-mail. Jeg kan forstå, at du er blevet orienteret af H om den faktuelle baggrund og strukturen for denne transaktion. Da vores klient udelukkende er involveret som depotbank, har vi ikke behov for en genbekræftelse af transaktionen ud fra et skattemæssigt perspektiv, men en begrundet skatteanalyse af den risiko, som vores klient kan være eksponeret for, hvis de handler som depotbank i dette projekt. Jeg er ikke skatteekspert, men det spørgsmål, der skal besvares i min opinion er, om klienten ud fra et dansk skatteretligt perspektiv kan gøres ansvarlig eller endda retsforfølges for at støtte/facilitere en skatteunddragelse begået af en af de andre aktører i denne transaktion (hvilket var årsagen til, at vi anmodede om at få udleveret den danske tax opinion).

Af hensyn til din analyse kan du henvise til den danske opinion og antage følgende:

Strukturen blev ikke udviklet af vores klient.

Vores klient vil udfylde rollen som værdipapirdepotbank, men ingen anden rolle.

Vores klient er blevet anmodet om at udfylde [*rollen som*] depotbank, dvs. at klienten ikke aktivt markedsfører denne struktur til andre. Vores klient har ingen oplysninger eller viden om, hvorvidt ansøgningen om refusion af skat vil blive indgivet to gange/af en anden person.

Vil det være muligt at få et første udkast til din analyse i begyndelsen af næste uge?

H er der andet, som A skal være opmærksom på?«

H var kopimodtager af mailen.

Den 14. februar 2014 skrev A i en mail til K og H følgende:

»På baggrund af mailen fra K vil vi udelukkende fokusere vores opinion på spørgsmålet om klientens ansvar som depotbank i en transaktion, der - som vi forstår det - er skitseret i den faktuelle beskrivelse i den modtagne tax opinion fra Hannes Snellman. I det omfang, det måtte være nødvendigt, vil vi foretage de forudsætninger, der er anført deri, samt forudsætningerne i K's mail nedenfor, medmindre vi får andre anvisninger.

På den baggrund sigter vi efter at give jer et første udkast tirsdag den 18. februar.

Lad mig endelig vide, hvis ovenstående giver anledning til kommentarer på nuværende tidspunkt.«

A fremsendte den 18. februar 2014 på mail det første udkast til legal opinion til K og H fra Jones Day. Af mailen, der ledsagede udkastet, fremgår:

**753**

»Vedlagt finder I vores udkast til dansk opinion vedrørende North Channel Bank i relation til den påtænkte transaktion, hvor NCB fungerer som depotbank.

Vi modtager gerne eventuelle kommentarer eller spørgsmål, som I måtte have. Bemærk især uddybningerne af de forudsætninger, vi har foretaget, hvor de vigtigste er markeret med gult. Vi bemærker, at det i den danske tax opinion, som vi har fået forelagt, forudsættes, at NCB vil afgive en erklæring om retmæssigt ejerskab i sine registre, hvilket forekommer usædvanligt, og vi er faktisk gået ud fra, at der ikke er en sådan registrering, men kommenter endelig. Hvis der faktisk er en registrering af retmæssigt ejerskab, og dette også vil afspejles i et bevis udstedt af NCB om Aktierne, vil vi gerne vide det, da det kan have en indflydelse på vores analyse.«

Det første udkast til legal opinion af 18. februar 2014 har følgende ordlyd:

»Dansk opinion

*1. Indledning*

Denne opinion (*»Opinion«*) er udarbejdet på anmodning af Jones Day, Tyskland, på vegne af North Channel Bank GmbH & Co. KG (*»NCB«*).

Denne Opinion omhandler de danske ansvarsmæssige konsekvenser for NCB af at fungere som depotbank i visse transaktioner med danske børsnoterede aktier, som er indgået af en amerikansk pensionsfond (*»USPF«*).

*2. Scope*

I denne Opinion vurderes alene, om NCB er skattepligtig i Danmark, NCB's civilretlige ansvar for et tab lidt af den danske stat og danske strafferetlige spørgsmål for NCB som følge af transaktionen på grundlag af den faktiske baggrund og forudsætningerne angivet i 3 og 4 nedenfor.

I denne Opinion vurderes ikke:

• den skattemæssige behandling i Danmark andre parter i den påtænkte transaktion end NCB

• NCB's ansvar for krav rejst af andre parter end den danske stat, hvis den forudsatte danske skattemæssige behandling ikke i sidste ende opnås

• beregningen af størrelsen af et ikke-kontraktuelt ansvar, som NCB potentielt har pådraget sig

• spørgsmål om ansvar hos andre parter end NCB for krav rejst af den danske stat som følge af transaktionen

• om dansk ret finder anvendelse med hensyn til at fastlægge et ansvar i henhold til de internationale lovvalgsregler

• spørgsmål vedrørende de påtænkte transaktioner i henhold til anden lovgivning end dansk ret

• de danske skattemyndigheders muligheder for at forfølge et dansk eller strafferetligt krav eller civilretligt ansvar i anledning af et lidt tab, hvor dette er relevant.

*3. Påtænkte transaktioner*

Vi forstår, at USPF påtænker at foretage følgende transaktioner:

1. USPF køber danske børsnoterede aktier (*»Aktierne«*) (enten via en reguleret inter-dealer-mægler eller ved at købe Eurexenkeltaktier, som er fysisk leverede børsnoterede flex futureskontrakter vedrørende de relevante Aktier).

2. Købet af Aktierne vil finde sted før ex-udbyttedatoen, men senest på Udbyttegodkendelsesdatoen [Dividend Approval Date], hvilket betyder den dato, hvor udbyttet endeligt godkendes til udlodning (generelt datoen for den årlige generalforsamling) (*»Udbyttegodkendelsesdatoen«*) [Dividend Approval Date]. Afviklingsdatoen [Settlement Date] for købet af Aktierne vil være på eller efter udbytteregistreringsdatoen [Dividend Record Date]. I tilfælde af fysisk leverede børsnoterede futureskontrakter er udløbsdatoen for futureskontrakten senest på Udbyttegodkendelsesdatoen [Dividend Approval Date].

3. USPF modtager det udbytte, som er deklareret på Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date] (det *»Danske Udbytte«*).

4. Ved køb af Aktierne afdækker USPF sin lange eksponering på Aktierne ved at sælge børsnoterede, kontantafviklede enkeltaktiefutures vedrørende Aktierne (det *»Korte Derivat«*). Prisen på det Korte Derivat tager højde for en andel af det forventede Danske Udbytte i beregningen af strike-prisen for det Korte Derivat, men der foretages ingen justering, hvis det faktiske udbyttebeløb er mere eller mindre end det forventede udbyttebeløb.

5. På eller efter ex-udbyttedatoen sælger USPF Aktierne via en inter-dealermægler. Afviklingsdatoen [Settlement Date] for salget af Aktierne er den samme dato som Afviklingsdatoen [Settlement Date] for købet af Aktierne i 2) ovenfor. Samtidig vil USPF indgå i en lang futuresposition vedrørende Aktierne for at lukke den korte futuresposition, der blev oprettet i trin 4 ovenfor. Den lange futuresposition udløber på samme dato som den korte futuresposition oprettet i trin 4 ovenfor.

6. Det er muligt, at Aktierne i perioden frem til salget vil blive udlånt ved et aktieudlån (ved brug af en standard Global Master Securities Lending Agreement) til en ikke-relateret part (som kan være hjemmehørende i enhver jurisdiktion) for at minimere finansieringsomkostningerne. Aktielånets løbetid forventes ikke at overstige 3 måneder, og aktielånet ydes mod kontant sikkerhedsstillelse.. Aktielånstransaktionen kan indgås på eller efter udbyttedatoen (med afvikling af aktielånet samme dag), men altid efter Udbyttegodkendelsesdatoen

**754**

[Dividend Approval Date], og låntageren af Aktierne vil ikke modtage noget udbytte på Aktierne.

7. USPF har indhentet en tax opinion fra dansk skatteadvokat, som bekræfter, at USPF i ovenstående faktiske scenarie bør være berettiget til at opnå fuld refusion af indeholdt dansk udbytteskat betalt på Aktierne.

*4. Forudsætninger*

Med henblik på denne Opinion har vi antaget følgende:

1. USPF er skattemæssigt hjemmehørende i USA.

2. USPF har ikke et fast driftssted i Danmark.

3. Udbytte modtaget af USPF på Aktierne hidrører ikke fra udøvelse af virksomhed af USPF eller gennem et forbundet foretagende.

4. USPF er omfattet af artikel 22, stk. 2, litra e), i den gældende dobbeltbeskatningsoverenskomst mellem Danmark og USA *»Dobbeltbeskatningsoverenskomsten mellem Danmark og USA«*), hvilket betyder, at USPF er:

a) en juridisk person, en juridisk person, der er organiseret efter lovgivningen i USA med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændige erhvervsdrivende, og

b) mere end 50 pct. af USPFs begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i enten USA eller Danmark.

5. Ved køb af Aktierne opnår USPF ubetinget ejerskab til Aktierne og vil have fulde ejerskabsrettigheder over Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date], herunder retten til at modtage det udbytte, som deklareres på den pågældende dato

6. Aktierne vil blive holdt af USPF gennem en depotbank. USPF's ejerskab til Aktierne registreres hos depotbanken

og, afhængigt af depotbankens og underdepotbankens andre lange og korte positioner, Værdipapircentralen i Danmark.

7. NCB's register vil vise, at USPF er den juridiske ejer [*men ikke indeholde oplysninger om det retmæssige ejerskab*] til Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date], og at det Danske Udbytte repræsenterer reelt udbytte på Aktierne, som videregives til USPF af depotbanken. *Det antages endvidere, at NCB på anmodning fra USPF vil udstede standarddokumentation om Aktierne i depotet, der viser det juridiske ejerskab til Aktierne og det modtagne udbytte.*

8. NCB vil ikke udstede ejerskabsdokumentation vedrørende de Aktier, som er omfattet af den påtænkte transaktion, til andre parter end USPF i perioden fra USPF's køb af Aktierne, og indtil der er udbetalt udbytte til USPF på Aktierne.

9. Den påtænkte transaktion blev ikke udviklet af NCB.

10. NCB vil udføre rollen som værdipapirdepotbank, men ingen anden rolle, *og NCB udfører sin rolle som depotbank i forbindelse med den påtænkte transaktion i overensstemmelse med sine standardprocedurer, der er i overensstemmelse med de normale procedurer for depotbanker generelt.*

11. *NCB opkræver et gebyr for leverede depotbanktjenester i denne transaktion, som ikke afviger fra de gebyrer, der opkræves for depotbanktjenester generelt.*

12. NCB er blevet anmodet om at udføre rollen som depotbank, dvs. at klienten ikke aktivt markedsfører denne struktur til andre.

13. NCB har ingen oplysninger eller viden om, hvorvidt ansøgningen om refusion af skat vil blive indgivet to gange/af en anden person.

*5. Opinion*

Baseret udelukkende på vores forståelse af de fakta, der er beskrevet i punkt 3, og de forudsætninger, der er beskrevet i punkt 4, som vi ikke har undersøgt eller verificeret særskilt, og med de kvalifikationer, der er beskrevet i punkt 7, finder vi, at:

5.1 NCB vil ikke være underlagt dansk skattepligt som følge af den påtænkte transaktion.

5.2 NCB bør ikke være underlagt dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat for eventuelle tab som følge af bankens rolle i den påtænkte transaktion.

5.3 NCB bør ikke være underlagt dansk strafferetligt ansvar som følge af sin rolle i den påtænkte transaktion.

*6. Danske skatteregler og analyse*

6.1 Ansvar for dansk kildeskat

6.1.1 Retsgrundlaget kort

I henhold til dansk national ret vil udenlandske aktionærer, som ejer mindre end 10 % af aktiekapitalen i dansk selskab (børsnoteret eller ikke-børsnoteret) i første omgang være underlagt dansk kildeskat på 27 % af det modtagne udbytte, medmindre (for børsnoterede selskaber) det pågældende udbytteudloddende selskab eller Værdipapircentralen specifikt har aftalt med de danske skattemyndigheder, at der gælder en nedsat skattesats for udbytte fra det udloddende selskab til det relevante udenlandske selskab i overensstemmelse med den dobbeltbeskatningsoverenskomst, som gælder for den pågældende aktionær.

Eventuel dansk kildeskat kan søges refunderet af de danske skattemyndigheder i overensstemmelse med den gældende dobbeltbeskatningsoverenskomst ved at indgive en udbytterefusionsformular til de danske skattemyndigheder.

Siden 2002 har de danske skattemyndigheder fokuseret på begrebet retmæssigt ejerskab. I 2010 ændrede de

danske skattemyndigheder officielt deres fortolkning af de danske regler om kildeskat af udbytte for udenlandske aktionærer til, at de danske skatteregler indeholder et ikke-omgåelseskrav i form af en betingelse om retmæssigt ejerskab.

Når en udenlandsk udbyttemodtager ikke består en test vedrørende retmæssigt ejerskab som anvendt af de danske skattemyndigheder, kan der således være krav om indeholdelse af kildeskat på udbytte. Testen vedrørende retmæssigt ejerskab bygger på kravet om retmæssigt ejerskab i artikel 10 i OECD's modeloverenskomst og som yderligere forklaret i OECD's kommentarer.

I alle sager, hvor den danske kildeskat frafaldes eller nedsættes i henhold til en dobbeltbeskatningsoverenskomst, skal udbyttemodtageren indgive en ansøgning om refusion af den overskydende kildeskat til den danske skatteforvaltning. Den danske skatteforvaltning refunderer derefter det overskydende indeholdte udbytteskattebeløb.

For at ansøge om refusion af overskydende kildeskat skal udbyttemodtageren udfylde en refusionsformular 06.003 EN, som ligger på de danske skattemyndigheders hjemmeside (www.skat.dk). Udbyttemodtageren skal på formularen til refusionsansøgning bekræfte, at denne er den retmæssige ejer af udbyttet og vil være forpligtet til at vedlægge et dividend advice, typisk i form af et gyldig SWIFT-betalingsmeddelelse, som bevis for, at der er indeholdt skat af udbytte udbetalt på danske aktier.

Betalingen foretages normalt af de danske skattemyndigheder inden for én måned. Nylige ændringer af de gældende renteregler fastsætter, at hvis kildeskat af udbytte ikke er tilbagebetalt inden seks måneder fra skattemyndighedernes modtagelse af refusionsansøgningen og dokumentation for refusionsansøgningen, pålægges en rente på 0,5 % (2014) pr. påbegyndt måned.

6.1.2 Dansk skattepligt af udbytte for NCB

Da NCB ikke på noget tidspunkt direkte eller indirekte erhverver Aktierne, vil NCB ikke i dansk skattemæssig henseende blive anset for at være underlagt dansk udbytteskattepligt på Aktierne, da dette alene vil gælde for ejeren af Aktierne.

6.2 Civilretligt ansvar

6.2.1 Retsgrundlaget kort

I henhold til dansk civilret kræver erstatningsansvar uden for kontrakt generelt, at tre kriterier er opfyldt:

- Der skal være et retsgrundlag for ansvaret, normalt forsømmelighed [negligence] eller forseelse [misconduct].

- Der skal være et økonomisk tab.

- Der skal være årsagssammenhæng mellem forsømmeligheden/forseelsen og det økonomiske tab.

Den danske stat (skattemyndighederne) vil som udgangspunkt kun lide et tab, hvis den skattepligtige person eller enhed (skatteyderen) ikke betaler eller ikke er i stand til at betale de skyldige skatter. Endvidere lides et tab kun, hvis den skyldige skat ville være blevet betalt af eller på vegne af skatteyderen, hvis det ikke var for den udviste forsømmelighed eller forseelse.

Generelt vil de relevante spørgsmål i relation til ansvar for tab lidt af staten i skattespørgsmål være forekomsten af forsømmelighed eller forseelse og sammenhængen med det lidte tab.

Juridisk præcedens viser, at ledelsesmedlemmer, bestyrelsesmedlemmer og likvidatorer mv., der har en ledende eller kontrollerende funktion i en juridisk person efter omstændighederne kan blive ansvarlig for tab, som skattemyndighederne lider som kreditor, hvis den juridiske person bliver insolvent eller går konkurs.

Endvidere, men sjældnere, er revisorer og juridiske rådgivere blevet pålagt erstatningsansvar for skattemyndighedernes tab.

Så vidt vi ved, er en depotbank i dansk retspraksis aldrig blevet holdt ansvarlig for tab lidt af skattemyndighederne som følge af at have imødekommet en urigtig ansøgning om refusion af indeholdt

**755**

Copyright © 2024 Karnov Group Denmark A/S

udbytteskat. Endvidere er vi ikke bekendt med, at der er prøvet sager ved danske domstole eller i det danske administrative system, hvor danske skattemyndigheder fejlagtigt har udbetalt et refusionsbeløb og forsøgt at dække et tab ved en sådan forkert udbetaling hos andre parter end den tilbagesøgende part.

I en række retssager (»selskabstømmersagerne«) indledt af skattemyndighederne i slutningen af 90'erne og begyndelsen af 00'erne blev der rejst civilretlige erstatningskrav mod forskellige deltagere i en vis type transaktion, hvorved »tomme« danske selskaber, der ejede et beløb i kontanter og skyldte et tilsvarende beløb i dansk skat, blev solgt til købere, som i det væsentlige hævede kontanterne, brugte dem til egen fordel og dermed aldrig betalte de skyldige skatter. Det stod med det samme klart, at køberne af sådanne selskaber var ansvarlige for skattemyndighedernes tab, og mange ifaldt også strafferetlige sanktioner. Skattemyndighederne forfulgte dog også de sælgende aktionærer i selskaberne samt deres rådgivere og de banker, der var involveret i finansieringen eller blot foretog kontantoverførslerne i forbindelse med opkøbene. En række sager mod sælgerne af selskaberne blev vundet af skattemyndighederne, også i den danske Højesteret, da det blev fastslået, at sælgerne ikke havde opfyldt en bestemt forpligtelse til at sikre sig, at de skyldige skatter i sidste ende ville blive betalt, selv om sælgerne (eller deres rådgivere/bankerne) ikke var direkte involveret i selskabets manglende betaling af sådanne skatter, da dette skete efter salget.

I en højesteretssag fra 1999 blev en bank, der var involveret i salget af det »tomme« selskab, holdt ansvarlig for skattemyndighedernes tab på det grundlag, at

**756**

banken var bekendt med hver enkelt transaktion, der førte til købet, som førte til, at selskabets penge på en bankkonto blev anvendt til at finansiere køberens erhvervelse heraf, hvilket banken havde anset for at være afgørende i den risikovurdering, som banken havde foretaget (og medførte et højere gebyr end normalt til banken). Med sine handlinger blev banken anset for på en usædvanlig måde at medvirke til selvfinansiering, som ikke var i overensstemmelse med dansk selskabsret, og banken havde ikke foretaget sig noget for at forhindre risikoen for, at skattemyndighedernes interesser blev tilsidesat.

Ovenstående sager vedrørende de tomme selskaber anses generelt for at være noget ekstraordinære. Retsgrundlaget for de rejste krav findes endvidere - i hvert fald til dels - i særlige regler i den danske selskabslov om forbud mod visse former for selvfinansiering. Sagerne viser dog også det danske retssystems evne og beslutsomhed med hensyn til at placere ansvar hos andre parter end de danske skattemyndigheder, hvis skattemyndighederne skønnes at lide et tab, som er en følge af handlinger udført af flere parter, selv hvis en enkelt part kun har spillet en begrænset rolle.

**6.2.2 Civilretligt ansvar for NCB i den påtænkte transaktion**

Generelt er der ingen retspraksis til at underbygge, at der kan rejses et krav mod NCB for at virke som depotbank for USPF i relation til Aktierne.

Hvis andre parter end USPF ansøger om refusion af dansk kildeskat, vil NCB's eventuelle rolle i en sådan refusionsansøgningsproces, om nogen, efter vores opfattelse være så fjern, at den ikke har nogen forbindelse til det tab, som lides i forbindelse med betalingen af refusionsansøgningen.

Forekomsten af et krav mod NCB ville efter vores opfattelse og baseret på de omstændigheder og forudsætninger, der er angivet ovenfor, i første omgang kræve, at USPF fejlagtigt har ansøgt om refusion af indeholdt udbytteskat i Danmark. For at kunne foretage en sådan refusionsansøgning vil de danske skattemyndigheder som udgangspunkt kræve, at refusionsformularen ledsages af dokumentation for, at skatten er påført den skatteyder, der ansøger om refu-

sion, ofte i form af et udbyttebevis udstedt af depotbanken. Hvis NCB udsteder en sådan (standard)dokumentation til USPF, og USPF i dansk skattemæssig henseende anses for ikke at være berettiget til at ansøge om refusion af indeholdt dansk udbytteskat - efter refusionen er foretaget - vil NCB's rolle og handlinger være relevante for analysen af ansvar for NCB efter dansk ret.

Det bemærkes, at vi har forudsat, at NCB kun vil udstede standarddokumentation vedrørende USPF's ejerskab, at der er indhentet en dansk tax opinion vedrørende USPF's danske skattemæssige stilling, som er forelagt NCB, og at NCB - bortset fra eventuel udstedelse af standarddokumentation - ikke har haft nogen rolle i refusionsansøgningsprocessen eller de samlede oplysninger eller dokumentation, som er indgivet til de danske skattemyndigheder.

Det er derfor vores holdning, at NCB ikke bør være ansvarlig for ukorrekt tilbagebetaling af kildeskat til USPF foretaget af de danske skattemyndigheder.

Udfaldet af de i 6.2.1. ovenfor beskrevne sager vedrørende salget af »tomme« selskaber har vist de danske skattemyndigheders og de danske domstoles vilje til at placere erstatningsansvar for skattemyndighedernes tab hos andre involverede parter i de transaktioner, der har udløst tabet, når transaktionerne skønnes at have en tvivlsom karakter. I lyset deraf er det ikke sikkert, hvordan de danske skattemyndigheder ville opfatte den påtænkte transaktion vedrørende Aktierne og, hvis den skønnes tvivlsom, hvordan det danske retssystem vil reagere. Men selv om den skulle blive anset for tvivlsom, vurderer vi, at NCB's rolle i den påtænkte transaktion ikke kan sammenlignes med de ansvarlige parters rolle, herunder bankernes, i »selskabstømmersagerne«, som var mere alvorlige og medvirkende i relation til skattemyndighedernes tab.

**6.3 NCB's strafferetlige ansvar**

**6.3.1 Retsgrundlaget kort**

I henhold til § 13 i danske skattekontrollov straffes den, der med forsæt til at uddrage skat afgiver urigtige eller vildledende skatteoplysninger til skatteansættelse eller beløbet deraf, med sanktioner i form af bøde eller fængsel. Hvis den skattepligtige ikke er en fysisk person, er sanktionen en bøde. Dette gælder også, hvis de urigtige eller vildledende skatteoplysninger er afgivet som følge af forsømmelighed. Medvirken til sådant skattesvig er underlagt de samme sanktioner.

I henhold til § 15 i skattekontrolloven straffes den, der med forsæt til at uddrage skat undlader at indgive en selvangivelse, med strafferetlige sanktioner i form af bøde eller fængsel. Hvis den skattepligtige ikke er en fysisk person, er sanktionen en bøde.

Enhver undladelse af korrekt indgivelse af oplysninger til de danske skattemyndigheder vil ikke være underlagt strafferetlige sanktioner, hvis en sådan undladelse ikke skyldes grov forsømmelighed eller forsæt.

I henhold til § 23 i den danske straffelov anses en lovovertrædelse for begået af enhver, der ved tilskyndelse, råd eller dåd har medvirket til den strafbare handling.

Strafferetligt ansvar kræver generelt, at gerningsmanden har et kriminelt forsæt, men under visse omstændigheder er forsømmelighed tilstrækkeligt. De gældende strafferetlige sanktioner i tilfælde af forsømmelighed er dog generelt betydeligt mindre strenge.

Retspraksis har vist en høj grad af tilbageholdenhed med at anse andre end skatteyderen for at have

**757**

medvirket til skatteunddragelse eller skattesvig, og generelt vil dette kræve en ganske direkte involvering i den strafbare handling, f.eks. bistand til at udfylde og indgive en forkert selvangivelse.

**6.3.2 Strafferetligt ansvar for NCB**

NCB vil som hovedregel ikke skulle indsende oplysninger til de danske skattemyndigheder som følge af Transaktionen. NCB vil,

hvis overhovedet, kun være indirekte involveret i refusionsansøgningen ved at udstede det udbyttebevis, som de danske skattemyndigheder stiller krav om

Baseret på de i 2 ovenfor anførte omstændigheder og forudsætninger og navnlig under hensyntagen til de samme omstændigheder som beskrevet under 6.2.2 vedrørende civilretligt ansvar, bør der i dansk ret ikke være grundlag for at anse NCB som medvirkende til dansk skattesvig.

*7. Kvalifikationer*

7.1 Denne Opinion er afgrænset til forhold vedrørende dansk ret, som aktuelt er gældende og vedtaget af danske lovgivende myndigheder, og der udtrykkes ingen vurdering af lovgivningen i andre jurisdiktioner. Navnlig foregiver vi ikke at være bekendt med lovgivningen i Tyskland eller lovgivningen i nogen anden jurisdiktion end Danmark, og vi udtrykker ingen vurdering af forhold, der er underlagt eller fortolket i overensstemmelse med sådan lovgivning.

7.2 I denne Opinion beskrives danske juridiske begreber med engelske termer og ikke med deres oprindelige danske termer. De pågældende begreber svarer muligvis ikke til de begreber, der beskrives med de samme engelske termer, som forekommer under andre jurisdiktioners lovgivning. Denne Opinion kan derfor kun påberåbes på den udtrykkelige betingelse, at eventuelle fortolknings- eller ansvarsspørgsmål, der opstår i forbindelse hermed, er underlagt dansk ret og indbringes for en dansk domstol.

7.3 Denne Opinion afgives på det grundlag, at den underlægges og fortolkes i overensstemmelse med dansk ret.

7.4 Denne Opinion er strengt begrænset til forhold anført heri og skal ikke læses som værende implicit gældende for andre forhold i forbindelse med den påtænkte transaktion.

*8. Anvendelse*

Denne Opinion er rettet til NCB til dennes gavn og brug og kan ikke påberåbes af nogen anden person eller til noget andet formål end i forbindelse med den påtænkte transaktion og må ikke bruges, rundsendes, citeres eller på anden måde henvises til noget andet formål, undtagen (i) til NCB's juridiske eller skattemæssige rådgivere i forbindelse med Transaktionen, (ii) hvor det er påbudt ved lov, retskendelse eller af et relevant tilsynsorgan eller (iii) i forbindelse med enhver tvist eller retssag, som NCB er part i, i hvilket tilfælde vi skal informeres om sådan brug.«

Ved mail af 20. februar 2014 fremsendte K »nogle mindre kommentarer« til udkastet (påført med håndskrift), som de gerne ville have indarbejdet, og bad om at modtage et revideret udkast, som Jones Day sigtede på at sende til North Channel Bank den følgende dag.

A fremsendte herefter den 21. februar 2014 på mail et revideret udkast til legal opinion til Jones Day. Af fremsendelsesmailen fremgår:

»Vedhæftet finder du vores ændrede udkast i renset udgave og med ændringsmarkeringer.

Udsnittet i punkt 2, der nu lyder som følger:

»om dansk ret er gældende med hensyn til at fastlægge et ansvar uden for kontrakt for NCB, som er en ikke-dansk enhed, i henhold til de internationale lovvalgsregler«

skal adressere, at vi ikke har udarbejdet en vurdering af - eller en undersøgelse af - om dansk ret er gældende ret i henhold til internationale lovvalgsregler i det aktuelle grænseoverskridende scenarie, hvor det er en tysk enhed, der agerer i Tyskland, hvilket kunne have en tabsgivende effekt i Danmark for den danske stat.

Kontakt mig endelig, hvis vores ændringer giver anledning til bemærkninger eller ikke adresserer de bekymringer, du måtte have.«

Det reviderede udkast til legal opinion af 20. februar 2014 indeholdt - med rettelsesmarkeringer i forhold til det oprindelige udkast

- navnlig følgende ændringer i afsnit 2 og afsnit 4, pkt. 9, 12 og 13, samt afsnit 6.3.2.:

»...

*2. Scope*

I denne Opinion vurderes alene, om NCB er skattepligtig i Danmark, NCB's civilretlige ansvar for et tab lidt af den danske stat og danske strafferetlige spørgsmål for NCB som følge af transaktionen på grundlag af den faktiske baggrund og forudsætningerne angivet i 3 og 4 nedenfor.

I denne Opinion vurderes ikke:

- den skattemæssige behandling *af* andre parter *end NCB* i den påtænkte transaktion

- NCB's ansvar for krav rejst af andre parter end den danske stat, hvis den forudsatte danske skattemæssige behandling ikke i sidste ende opnås

- beregningen af størrelsen af et ikke-kontraktuelt ansvar, som NCB potentielt har pådraget sig

- spørgsmålet om ansvar hos andre parter end NCB for krav rejst af den danske stat som følge af transaktionen

- om dansk ret *er gældende* med hensyn til at fastlægge et ansvar *uden for kontrakt for NCB, som er en ikke-dansk enhed,* i henhold til de internationale lovvalgsregler

- spørgsmål vedrørende de påtænkte transaktioner i henhold til anden lovgivning end dansk ret

   **758**

- de danske skattemyndigheders muligheder for at forfølge et dansk eller strafferetligt krav eller civilretligt ansvar *mod NCB i Tyskland* i anledning af et tab, hvor dette er relevant

*4. Forudsætninger*

...

9.    Den påtænkte transaktion blev ikke *struktureret* af NCB.

...

12.    NCB er blevet anmodet om at udføre rollen som depotbank,

13.    NCB har ingen *grund til at antage, at - eller* oplysninger eller viden om, hvorvidt *en anden person end USPF vil indgive en ansøgning om refusion af skat med hensyn til den kildeskat på udbytte, som er indeholdt på Aktierne.*

...

*6. Danske skatteregler og analyse*

...

*6.3.2 Strafferetligt ansvar for NCB som følge af den påtænkte transaktion*

NCB vil som hovedregel ikke skulle indsende oplysninger til de danske Skattemyndigheder som følge af Transaktionen. NCB vil, hvis overhovedet, kun være indirekte involveret i refusionsansøgningen ved at udstede det udbyttebevis, som de danske skattemyndigheder *generelt* stiller krav om

Baseret på de i 2 ... ovenfor anførte omstændigheder og forudsætninger og navnlig under hensyntagen til de samme omstændigheder som beskrevet under 6.2.2 vedrørende civilretligt ansvar, bør der i dansk ret ikke være grundlag for at anse NCB som medvirkende til dansk skattesvig.

...«

Ved mail af 3. april 2014 skrev A til K og H, at Bech-Bruun var i gang med at udarbejde faktura i anledning af den ydede bistand. Det blev herunder oplyst, at salæret på baggrund af medgået tid ville udgøre 8.700 euro ekskl. moms set i forhold til det oprindelige salærskøn på 6.000 -7.000 euro ekskl. moms, og A anmodede den baggrund om en bekræftelse på, at dette var acceptabelt for kunden.

Samme dag skrev H på mail blandt andet følgende til A :

U.2024.746H - SKM2024.123.HRH

»Klienten har lige sendt en opdatering om strukturen, som vi er i gang med at gennemgå, og som kan påvirke vores opinion(s) - og som kan begrundelse en forhøjelse af salæret.

Vi vender snarest tilbage med et forslag til, hvordan vi skal gå videre med nye fakta og fakturaen. Tak for din tålmodighed!«

Ved mail af 7. april 2014 skrev H følgende til A og V5:

»I mellemtiden kan vi se på de opdaterede oplysninger, vi har modtaget. Den ændring i strukturen, som klienten overvejer, er, at transaktionen ikke længere vil blive afviklet/opløst med en »future«, men med en »forward«-handel. Som vi forstår det, vil der ellers ikke være nogen ændringer til den overordnede transaktion. Vil dette ændre jeres analyse?

Klienten har givens os et tysk resumé af transaktionen, som indeholder en teknisk beskrivelse af de forskellige trin og de relaterede posteringer [book entries]. Vi kan selvfølgelig dele dokumentet med jer og/eller køre jer igennem de forskellige trin, hvis I mener, at det vil være nyttigt. Lad os høre, hvad I mener.«

I mail af 7. april 2014 skrev A herefter følgende til H :

»Er det korrekt forstået, at dette medfører, at parterne i transaktionen dermed vil søge at anvende et OTC-instrument i stedet for et standardiseret finansielt instrument? Eller vil forwarden også være i en standardiseret form?«

H svarede samme dag på mail:

»Som jeg forstår det, vil dette være en slags OTC-transaktion, men beskrivelsen af handlen er ikke helt klar. Er det noget, vi kan spørge klienten om?«

A skrev herefter ligeledes samme dag til H :

»Jeg mener, at disse oplysninger kan være nyttige for en dansk analyse. Det er for tidligt at sige, om de er af stor betydning.«

I en mail af 8. april 2014 skrev H herefter til A at kunden havde bekræftet, »at forwards er OTC-transaktioner.

K skrev herefter i mail af 10. april 2014, kl. 15.29, til A :

»Jeg tror, H har bekræftet for dig, at de futures, som X og Z vil indgå i, erstattes af OTC-forwardtransaktioner.

Jeg vedhæfter et opdateret diagram fra klienten med angivelse af forskellige trin og med præcisering af de datoer, hvor transaktionerne indgås og afvikles. Det foreligger uheldigvis kun på tysk, så sig til, hvis du har spørgsmål eller har brug for yderligere præcisering.

Jeg vil være taknemmelig, hvis du kan sende os et opdateret udkast til din opinion (og en sammenligning med det tidligere udkast) hurtigst muligt.«

A skrev samme dato, kl. 15.51, på mail til K :

»Tak for det. Vi gennemgår det modtagne materiale/oplysningerne og ændrer vores udkast til opinion på denne baggrund og sender det til dig. Jeg sigter mod at kunne sende det til dig i morgen COB.«

Den tyske transaktionsbeskrivelse er modtaget som bilag 1 til denne dom.

Den 11. april 2014 skrev A på mail til K med oplysning om, at han først kunne være færdig med det nye udkast om mandagen, og den 14. april 2014 skrev A herefter følgende i en mail til K :

»Jeg har forsøgt at gennemgå den tyske strukturbeskrivelse, som var vedhæftet din mail i sidste uge, i et par

**759**

gange. Med hensyn til tyskkundskaber, som jeg mener uheldigvis er [quite] utilstrækkelige til det krævede niveau, er jeg ikke tryg ved, at jeg kan fastslå, i hvilket omfang beskrivelsen deri afspejler de faktuelle forudsætninger i vores første udkast til opinion, bortset fra afvigelsen fra den indledende forudsætning om at anvende Futures, som nu erstattet af forwards.

Jeg foreslår derfor enten, a) vi baserer vores opinion på den samme faktuelle beskrivelse som sidst (som var baseret på den faktuelle beskrivelse i den tax opinion, som den amerikanske pensionsfond fik), men erstatter futures med OTC-forwards, ii) at du

H ændrer den faktuelle beskrivelse i vores udkast til opinion, eller iii) at der indhentes/udarbejdes en engelsk version af det fremsendte strukturdokument. Jeg har kort tjekket med vores interne translatør, som forventer at kunne oversætte strukturdokumentet til under 1.000 EUR ekskl. moms og forventer at kunne levere oversættelsen til mig inden for en dags tid.

Ring endelig, hvis du vil drøfte mulighederne yderligere, inden du beslutter dig om ovenstående.«

I besvarelse af denne mail skrev K den 14. april 2014 følgende til A:

»Tak for det. Jeg tror ikke, vi har brug for en formel oversættelse af dokumentet og foreslår, at du baserer din opinion på den tidligere faktuelle beskrivelse og erstatter futures med forwards (som drøftet). Når vi har modtaget den opdaterede udkast, gennemgår vi beskrivelsen og bekræfter eventuelle faktuelle ændringer.«

Ved mail af 15. april 2014 sendte A herefter et nyt udkast til legal opinion til K. Af fremsendelsesmailen fremgår:

»Vedhæftet finder du vores ændrede udkast til opinion med ændringsmarkeringer i forhold til den seneste version fra den 20. februar.

Som du kan se, har vi ændret opinion en smule, fordi OTC-kontrakter erstatter futures. Det vi er mest bekymret for er, at der nu ikke er nogen tax opinion, som specifikt dækker den transaktion, som NCB vil fungere som depotbank for.

Kontakt mig endelig, hvis det vedhæftede giver anledning til kommentarer eller spørgsmål.«

Det reviderede udkast til legal opinion af 15. april 2014 indeholdt - med rettelsesmarkeringer i forhold til tidligere udkast - navnlig følgende ændringer i afsnit 3, afsnit 5 og afsnit 6, pkt. 6.2.2:

»…

*3. Påtænkte transaktioner*

Vi forstår, at USPF påtænker at foretage følgende transaktioner:

1.  USPF køber danske børsnoterede aktier (»*Aktierne*«) (enten via en reguleret inter-dealer-mægler eller ved at købe Eurexenkeltaktier, fysisk leverede børsnoterede flex futurekontrakter *[vil disse også blive ændret til OTC-kontrakter?]* vedrørende de relevante Aktier).

2.  Købet af Aktierne vil finde sted før ex udbyttedatoen, men senest på udbyttegodkendelsesdatoen [Dividend Approval Date], hvilket betyder den dato, hvor udbyttet endeligt godkendes til udlodning (generelt datoen for den årlige generalforsamling) (»*Udbyttegodkendelsesdatoen*«) [Dividend Approval Date]. Afviklingsdatoen [Settlement Date] for købet af Aktierne vil være på eller efter udbytteregistreringsdatoen [Dividend Record Date]. I tilfælde af fysisk leverede børsnoterede futurekontrakter er udløbsdatoen for futurekontrakten senest på Udbyttegodkendelsesdatoen [Dividend Approval Date] [vil disse også blive ændret til OTC-kontrakter?].

3.  USPF modtager det udbytte, som er deklareret på Aktierne på udbyttegodkendelsesdatoen [Dividend Approval Date] (det »*Danske Udbytte*«).

4.  Ved køb af Aktierne afdækker USPF sin lange eksponering på Aktierne ved at *indgå en OTC-forwardkontrakt med USPF på de korte side med reference til* Aktierne (det »*Korte Derivat*«). Prisen på det Korte Derivat tager højde for en andel af det forventede Danske Udbytte i beregningen af strikeprisen for det Korte Derivat, men der foretages ingen justering, hvis det faktiske udbyttebeløb er mere eller mindre end det forventede udbyttebeløb.

5.  På eller efter ex udbyttedatoen sælger USPF Aktierne via en inter-dealer-mægler. Afviklingsdatoen [Settlement Date] for salget af Aktierne er den samme dato som Afviklingsdatoen

[Settlement Date] for købet af Aktierne i 2) ovenfor. Samtidig vil USPF indgå i en *OTC-forwardkontrakt, hvori der har en lang position vedrørende Aktierne for at lukke den korte position, der blev oprettet i trin 4 ovenfor. Den lange position udløber på samme dato som den korte position oprettet i trin 4 ovenfor.

6.  Det er muligt, at Aktierne i perioden frem til salget vil blive udlånt ved et aktieudlån (ved brug af en standard Global Master Securities Lending Agreement) til en ikke-relateret part (som kan være hjemmehørende i enhver jurisdiktion) for at minimere finansieringsomkostningerne. Aktielånets løbetid forventes ikke at overstige 3 måneder, og aktielånet ydes mod kontant sikkerhedsstillelse. Aktielånstransaktionen kan indgås på eller efter Udbytteregistreringsdatoen [Divi-dend Record Date] (med afvikling af aktielånet samme dag), men altid efter udbyttegodkendelsesdatoen [Dividend Ap-proval Date], og låntageren af Aktierne vil ikke modtage noget udbytte på Aktierne.

7.  USPF har indhentet en tax opinion fra dansk skatteadvokat, som bekræfter at USPF i ovenstående faktiske scenarie, *idet det dog heri antages, at USPF*

**760**

*indgår futureskontrakter i stedet for OTC-kontrakter for at afdække deres position i Aktierne,* bør være berettiget til at opnå fuld refusion af indeholdt dansk udbytteskat betalt på Aktierne.

…

*5. Opinion*

Baseret udelukkende på vores forståelse af de fakta, der er beskrevet i punkt 3, og de forudsætninger, der er beskrevet i punkt 4 ovenfor, som vi ikke har undersøgt eller verificeret særskilt, og med de kvalifikationer, der er beskrevet i punkt 7, finder vi, at:

5.1 NCB vil ikke være underlagt dansk skattepligt som følge af den påtænkte transaktion.

5.2 NCB bør ikke være underlagt dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat for eventuelt tab som følge af bankens rolle i den påtænkte transaktion.

Følgende omstændigheder forhindrer os dog i at nå frem til en mere definitiv vurdering af *NCB's position:*

*1. Den omstændighed, at USPF indgår OTC-forwardkontrakter (og ikke f.eks. børsnoterede futures) for at afdække deres position, kan i princippet give mulighed for en »fuld afdækning« [»perfect hedge«] af USPF's position i Aktierne og kan muligt også pege i retning af en anden identificeret part, som kan anses for at være den retmæssige udbytteejer af det udbytte, som er modtaget på Aktierne, i stedet for USPF som retmæssig ejer. Dette vil kunne indebære en mulighed for arbitrage, som er identificerbar for NCB, og hvor standarddokumentationen for ejerskab udstedt af NCB kan være vildledende.*

*2. Den omstændighed, at USPF ikke har indhentet en tax opinion om den præcise transaktion, som er udført af USPF (tax opinion forudsætter futures og ikke OTC-forwardkontrakter), vil gøre det vanskeligere for NCB at gøre gældende, at banken pr. definition har handlet i god tro (og dermed ikke er ansvarspådragende) med hensyn til den danske skattemæssige behandling af transaktionen.*

*3. De i 6.2.1. nedenfor beskrevne sager vedrørende salget af »tomme« selskaber har vist de danske skattemyndigheders og de danske domstoles vilje til at placere erstatningsansvar for skatte-myndighedernes tab hos andre involverede parter i de transaktio-ner, der har udløst tabet, når transaktionerne skønnes at have en tvivlsom karakter. I lyset deraf er det ikke sikkert, hvordan de danske skattemyndigheder ville opfatte den påtænkte transaktion*

*vedrørende Aktierne og, hvis den skønnes tvivlsom, hvordan det danske retssystem vil reagere. Men selv om den skulle blive anset for tvivlsom, vurderer vi, at NCB's rolle i den påtænkte transaktion ikke kan sammenlignes med de ansvarlige parters rolle, herunder bankernes, i »selskabstømmersagerne«, som var mere alvorlige og medvirkende i relation til skattemyndighedernes tab.*

5.3 NCB bør ikke være underlagt dansk strafferetligt ansvar som følge af sin rolle i den påtænkte transaktion.

*6. Danske skatteregler og analyse*

…

*6.2.2 Civilretligt ansvar for NCB i den påtænkte transaktion*

Generelt er der ingen retspraksis til at underbygge, at der kan rejses et krav mod NCB for at virke som depotbank for USPF i relation til Aktierne.

Hvis andre parter end USPF søger om refusion af dansk kildeskat, vil NCB's eventuelle rolle i en sådan refusionsansøgningsproces efter vores opfattelse være så fjern, at den ikke har nogen forbin-delse til det tab, som lides i forbindelse med betalingen af refusions-ansøgningen.

Forekomsten af et krav mod NCB ville efter vores opfattelse og baseret på de omstændigheder og forudsætninger, der er angivet ovenfor, i første omgang kræve, at USPF fejlagtigt har søgt om refusion af indeholdt udbytteskat i Danmark. For at kunne foretage en sådan refusionsansøgning vil de danske skattemyndigheder som udgangspunkt kræve, at refusionsformularen ledsages af dokumen-tation for, at skatten er påført den skatteyder, der søger om refusion, ofte i form af et udbyttebevis udstedt af depotbanken. Hvis NCB udsteder en sådan (standard)dokumentation til USPF, og USPF i dansk skattemæssig henseende anses for ikke at være berettiget til at søge om refusion af indeholdt dansk udbytteskat - efter refusionen er foretaget - vil NCB's rolle og handlinger være relevante for analysen af ansvar for NCB efter dansk ret.

Det bemærkes, at vi har forudsat, at NCB kun vil udstede standard-dokumentation vedrørende USPF's ejerskab, *som ikke omhandler retmæssigt ejerskab,* at der er indhentet en dansk tax opinion ved-rørende USPF's danske skattemæssige stilling, som er forelagt NCB, og at NCB - bortset fra eventuel udstedelse af standarddoku-mentation - ikke har haft nogen rolle i refusionsansøgningsprocessen eller de samlede oplysninger eller dokumentation, som er indgivet til de danske skattemyndigheder.

Det er vores holdning, at NCB ikke bør være ansvarlig for ukorrekt tilbagebetaling af kildeskat til USPF foretaget af de danske skattemyndigheder.

*Følgende omstændigheder forhindrer os imidlertid i at nå frem til en mere definitiv vurdering af NCB's position:*

*4. Den omstændighed, at USPF indgår OTC-forwardkontrakter (og ikke f.eks. børsnoterede futures) for at afdække deres position, kan i princippet give mulighed for en »fuld afdækning« [»perfect hedge«] af USPF's position i Aktierne og kan muligt også pege i retning af en anden identificeret part, som kan anses for at være den*

**761**

*retmæssige udbytteejer af det udbytte, som er modtaget på Aktierne, i stedet for USPF som retmæssig ejer. Dette vil kunne indebære en mulighed for arbitrage, som er identificerbar for NCB, og hvor standarddokumentationen for ejerskab udstedt af NCB kan være vildledende.*

*5. Den omstændighed, at USPF ikke har indhentet en tax opinion om den præcise transaktion, som er udført af USPF (tax opinion forudsætter futures og ikke OTC-forwardkontrakter), vil gøre det vanskeligere for NCB at gøre gældende, at den pr. definition har handlet i god tro (og dermed ikke er ansvarspådragende) med hensyn til den danske skattemæssige behandling af transaktionen.*

*6.* De i 6.2.1. ovenfor beskrevne sager vedrørende salget af »tomme« selskaber har vist de danske skattemyndigheders og de danske domstoles vilje til at placere erstatningsansvar for skattemyndighedernes tab hos andre involverede parter i de transaktioner, der har udløst tabet, når transaktionerne skønnes at have en tvivlsom karakter. I lyset deraf er det usikkert, hvordan de danske skattemyndigheder ville opfatte den påtænkte transaktion vedrørende Aktierne og, hvis den skønnes tvivlsom, hvordan det danske retssystem vil reagere. Men selv om den skulle blive anset for tvivlsom, vurderer vi, at NCB's rolle i den påtænkte transaktion ikke kan sammenlignes med de ansvarlige parters rolle, herunder bankernes, i selskabstømmersagerne«, som var mere alvorlige og medvirkende i relation til skattemyndighedernes tab.

…«

Ved mail af 15. april 2014 skrev K herefter følgende til A :

»Mange tak for det opdaterede udkast. For at bringe din forståelse af transaktionen på linje med klientens beskrivelse og for at undgå forvirring om forwards har vi udarbejdet en beskrivende resumé af transaktionen, som jeg vedhæfter. Jeg vil foreslå, at du erstatter din beskrivelse i punkt 3 i opinion med vedhæftede beskrivelse (med de nødvendige tilpasninger til terminologien). Hvis du har spørgsmål, eller hvis noget er uklart, så sig til, så vi kan drøfte det.

Så snart vi har modtaget dit opdaterede udkast, sender vi til klienten. Vi vil også spørge klienten, om de vil fremskaffe en opdateret tax opinion til USFP (se din bemærkning i punkt 5.2 og 6.2.2).«

Det i mailen omtalte resumé af transaktionen, der er udfærdiget på engelsk, har følgende ordlyd i den danske oversættelse:

»…

1.  På handelsdatoen (*»Handelsdatoen«*) [Trade Date] køber US-FP/Partnerskabet danske/belgiske børsnoterede aktier (*»Aktierne«*) gennem en reguleret inter-dealer-mægler (*»Mægleren«*). Købet vil finde sted forud for ex udbyttedatoen, men efter udbyttegodkendelsesdatoen [Dividend Approval Date] (cum udbytte). Afviklingsdatoen [Settlement Date] for transaktionen (*»Afviklingsdatoen«*) [Settlement Date] vil være efter udbytteregistreringsdatoen [Dividend Record Date] (ex udbytte).

2.  På handelsdatoen [Trade Date] sælger sælgeren (*»Sælgeren«*) Aktierne gennem Mægleren. Salget vil finde sted forud for ex udbyttedatoen, men efter udbyttegodkendelsesdatoen [Dividend Approval Date] (cum udbytte). Afviklingsdatoen [Settlement Date] vil være efter udbytteregistreringsdatoen [Dividend Record Date] (ex udbytte).

3.  Både USFP/Partnerskabet og Sælgeren har en værdipapirkonto hos North Channel Bank GmbH & Co. KG (*»Depotbanken«*).

4.  USFP/Partnerskabet modtager det udbytte (ekskl. kildeskat), som er deklareret på Aktierne på udbyttegodkendelsesdatoen [Dividend Approval Date] (*»Udbyttet«*) gennem Depotbanken. Depotbanken forsyner USFP/Partnerskabet med et certifikat (credit advice) om modtagelsen af nettoudbyttet. Samtidig forsyner Depotbanken Sælgeren med et debit advice om nettoudbyttet.

5.  På Handelsdatoen [Trade Date]:

    a.  Sælgeren aftaler med en tredjepart (ikke relateret til Sælger) at indgå i en aktieudlånstransaktion (*»Aktieudlånstransaktionen«*) på Afviklingsdatoen [Settlement Date], i henhold til hvilken tredjeparten accepterer, at denne på Afviklingsdatoen [Settlement Date] vil udlåne Aktierne (plus udbytte) til Sælgeren. Da Aktierne leveres ex udbytte, vil tredjeparten foretage en kompensationsbetaling til Sælgeren; og

    b.  USFP/Partnerskabet aftaler med en tredjepart (ikke relateret til USFP/Partnerskabet) at indgå i en Aktieudlånstransaktion på Afviklingsdatoen [Settlement Date], i henhold til hvilken USFP/Partnerskabet accepterer, at denne/dette på Afviklingsdatoen [Settlement Date] vil udlåne Aktierne (plus udbytte) til tredjeparten. Da Aktierne leveres ex udbytte, vil USFP/Partnerskabet foretage en kompensationsbetaling til tredjeparten.

6.  På Handelsdatoen [Trade Date]:

    a.  Sælgeren indgår i en forwardtransaktion med en tredjepart (ikke relateret til Sælger) (*»Forwardtransaktionen«*), i henhold til hvilken tredjeparten på Afviklingsdatoen [Settlement Date] vil levere Aktierne (ex udbytte) til Sælgeren; og

    b.  USFP/Partnerskabet indgår i en Forwardtransaktion med en tredjepart (ikke relateret til USFP/Partnerskabet), i henhold til hvilken USFP/Partnerskabet på Afviklingsdatoen [Settlement Date] vil levere Aktierne (ex udbytte) til tredjeparten.

7.  På afviklingsdatoen [Settlement Date]:

    a.  Aktieudlånstransaktionen og Forwardtransaktionen mellem Sælgeren og tredjeparten afvikles, dvs. at

    **762**

    tredjeparten leverer Aktierne til Sælgeren i henhold til Forwardtransaktionen, og Sælgeren returnerer Aktierne til tredjeparten i henhold til Aktieudlånstransaktionen; og

    b.  Aktieudlånstransaktionen og Forwardtransaktionen mellem USFP/Partnerskabet og tredjeparten afvikles, dvs. USFP/Partnerskabet leverer Aktierne til tredjeparten i henhold til Forwardtransaktionen, og tredjeparten returnerer Aktierne til USFP/Partnerskabet i henhold til Aktieudlånstransaktionen.

Ved mail af 15. april 2014 besvarede A mailen fra K således:

»Tak for din mail. Jeg tilpasser den faktuelle beskrivelse og overvejer den eventuelle indvirkning på opinion som sådan.

Jeg sigter mod at sende dig et ændret udkast i løbet af i morgen.«

Ved mail af 16. april 2014 skrev A herefter følgende til K :

»I forlængelse af modtagelsen af den nye faktuelle beskrivelse, kan jeg muligvis forstå det forkert, men jeg har gennemgået beskrivelsen, og jeg læser den, som om der faktisk er en indikation af, at transaktionen er en cum/ex-transaktion, hvilket var vores oprindelige bekymring, men som vi følte, at vi kunne udelukke efter at have læst tax opinion.

Jeg forstår, at USFP i den nye faktuelle beskrivelse erhverver aktier fra sælger ved betaling af en cum udbyttepris, men som sælger vil levere ex udbytte i form af lånte ex udbytteaktier plus en udbytte »kompensationsbetaling«.

Endvidere anføres det i nr. 1 i den faktuelle beskrivelse, at købet endda vil ske efter »udbyttegodkendelsesdatoen« [Dividend Approval Date]. Hvis der med »udbyttegodkendelsesdato« [Dividend Approval Date] menes den dato, hvor generalforsamlingen i det danske udloddende selskab godkender udbytteudlodningen, er det fra et skattemæssigt perspektiv den afgørende dato for ejerskab af udbyttet, således at aktionæren på denne dato også er ejeren af udbyttet. Hvis USFP således ikke engang erhverver Aktierne før efter denne dato, bør dette i vores analyse i sig selv forhindre USPF i at blive anset for at erhverve cum udbytteaktier i dansk skattemæssig henseende og dermed formentlig forhindre NCB i at udstede et udbytteejercertifikat til USPF, som USPF kan bruge som grundlag for at søge om refusion af indeholdt dansk udbytteskat.

Ovenstående synes, som jeg læser det, under alle omstændigheder at udelukke, at vi beholder forudsætning 5 i vores udkast til opinion, da USPF erhverver cum udbytteaktier fra en sælger, som ikke ejer (eller leverer) cum udbytteaktier, og USPF kan derfor pr. definition ikke være ejer af cum udbytteaktier på udbyttegodkendelsesdatoen [Dividend Approval Date], hvilket efter vores opfattelse er en forudsætning for at blive betragtet som ejer af aktierne og dermed selve udbyttet i dansk skattemæssig henseende. Vores forudsætning 5 i vores udkast til opinion er derfor afgørende for at nå et bør-niveau for os for NCB, også selv om vi fik foreslået en ny tax opinion, der opnår bør-niveau i analysen af indeholdt dansk udbytteskat til USPF i lyset af ovenstående, og på hvilken NCB muligvis kan basere sin handlen i god tro i transaktionen.

Da NCB handler for både Sælgeren og USPF og kender karakteren af transaktionen, vil dette efter vores opfattelse gøre det endnu vanskeligere for NCB at distancere sin rolle i forhold til transaktionen.

Jeg modtager gerne dine tanker om ovenstående, og om du mener, at vores forudsætning 5 kan fastholdes, og jeg vil gerne ringe sammen og drøfte ovenstående for at kunne fastlægge den bedste fremgangsmåde herfra.«

K besvarede samme dag A's henvendelse således:

»Jeg tror, at det er bedst at ringe sammen for at gennemgå dine punkter og bekymringer, som jeg er sikker på kan løses. Da H er væk i denne uge, foreslår jeg, at vi ringer sammen næste tirsdag, hvis det passer dig. Jeg tjekker med H og L om de er tilgængelige.«

Der foreligger ikke i sagen et referat af det omtalte telefonmøde. I mail af 22. april 2014 skrev advokat L fra Jones Day følgende til A :

»Tak for at tage dig til til telefonmøde.

Som drøftet vedhæfter jeg et revideret resumé af transaktionen (med ændringsmarkeringer) baseret på K's tidligere mail. Jeg håber, det afspejler vores drøftelser derhiqt.

For vores klient vil det sandsynligvis være nyttigt at tilføje to aspekter til opinion:

1. En forudsætning om, at Udbyttegodkendelsesdatoen [»Dividend Approval Date«] - som det er almindelig dansk virksomhedspraksis [»corporate practice«] - er identisk med Udbytteregistreringsdatoen [»Dividend Record Date«] (alle som defineret).

2. En præcisering af, at ejerskabet af Aktierne i henhold til dansk civilret overgår, når køber og en sælger er enige om købet (genstanden for salget og prisen) af Aktierne (uanset den senere afviklingsdato [Settlement Date].

Ring endelig, hvis du har brug for yderligere præcisering.«

Det i mailen omtalte reviderede resumé af transaktionen dateret 22. april 2014 indeholder alene ændringer i punkt 1 og 2, der herefter har følgende ordlyd i den danske oversættelse:

»…

1.   På handelsdatoen (»Handelsdatoen«) [Trade Date] køber USFP/Partnerskabet danske børsnoterede

     **763**

     aktier (»Aktierne«) af en reguleret inter-dealer-mægler (»Mægleren«). Købet vil finde sted før eller på den dato, hvor generalforsamlingen i udstederen af Aktierne (»Udstederen«) beslutter at anvende hele eller en del af indtjeningen og overskuddet til at udlodde et udbytte (»Udbyttegodkendelsesdatoen«) [Dividend Approval Date], men senest på Udbytteregistreringsdatoen [Dividend Record Date] (cum udbytte), dvs. før ex udbyttedatoen. Afviklingsdatoen for Transaktionen »Afviklingsdatoen«) [Settlement Date] vil være efter udbytteregistreringsdatoen [Dividend Record Date] (ex dividend). »Udbytteregistreringsdatoen« [Dividend

     *Record Date] er udløbet af den børshandelsdag, der slutter umiddelbart før ex udbyttedatoen.*

2.   *På handelsdatoen [Trade Date] sælger sælgeren (»Sælgeren«) Aktierne gennem Mægleren. Salget vil* derfor finde sted før ex udbyttedatoen, dvs. før eller på udbyttegodkendelsesdatoen *[Dividend Approval Date], men senest på Udbytteregistreringsdatoen [Dividend Record Date] (cum udbytte). Afviklingsdatoen [Settlement Date] vil være efter udbytteregistreringsdatoen [Dividend Record Date] (ex udbytte).*

…«

Ved mail af 22. april 2014 til blandt andre K for A for mail og telefonmøde samme dato og anførte videre:

»…

Jeg ændrer den faktuelle beskrivelse og opinion på grundlag deraf i det fornødne omfang.«

Den 23. april 2014 fremsendte A herefter på mail et revideret udkast til legal opinion til L H og K. Det reviderede udkast til legal opinion af 23. april 2014 havde - med rettelsesmarkeringer i forhold til tidligere udkast - følgende ordlyd:

»Dansk Opinion

*1 Indledning*

Denne opinion (»*Opinion*«) er udarbejdet på anmodning af Jones Day, Tyskland, på vegne af North Channel Bank GmbH & Co. KG (»*NCB*«).

Denne Opinion omhandler de danske ansvarsmæssige konsekvenser for NCB at fungere som depotbank i visse transaktioner med danske børsnoterede aktier, som er indgået af en amerikansk pensionsfond (»*USPF*«).

*2 Scope*

I denne Opinion vurderes det alene, om NCB er skattepligtig i Danmark, NCB's civilretlige ansvar for et tab lidt af den danske stat og danske strafferetlige spørgsmål for NCB som følge af transaktionen på grundlag af den faktiske baggrund og forudsætningerne i 3 og 4 nedenfor. I denne Opinion vurderes ikke:

*2.1.1* den skattemæssige behandling i Danmark af andre parter end NCB i den påtænkte transaktion

*2.1.2 NCB's ansvar for krav rejst af andre parter end den danske stat, hvis den forudsatte danske skattemæssige behandling ikke i sidste ende opnås*

*2.1.3* beregningen af størrelsen af et ikke-kontraktuelt ansvar, som NCB potentielt har pådraget sig

*2.1.4* spørgsmålet om ansvar hos andre parter end NCB for krav rejst af den danske stat som følge af transaktionen

*2.1.5 om dansk ret er gældende med hensyn til at fastlægge et ansvar uden for kontrakt for NCB, som er en ikke-dansk enhed, i henhold til de internationale lovvalgsregler*

*2.1.6* spørgsmål vedrørende de påtænkte transaktioner i henhold til anden lovgivning end dansk ret

*2.1.7* de danske skattemyndigheders muligheder for at forfølge et dansk eller strafferetligt krav eller civilretligt ansvar mod NCB i Tyskland i anledning af et lidt tab, hvor dette er relevant.

*3 Påtænkte transaktioner*

Vi forstår, at USPF påtænker at foretage følgende transaktioner:

*3.1 På handelsdatoen (»Handelsdatoen«) [Trade Date] køber USPF/Partnerskabet danske børsnoterede aktier (»Aktierne«) af en reguleret inter-dealer-mægler (»Mægleren«) [som ejer Aktierne på Handelsdatoen [Trade Date]]. Købet vil finde sted før eller på den dato, hvor generalforsamlingen i udstederen af Aktierne (»Udstederen«) beslutter at anvende hele eller en del af indtjeningen og overskuddet til at udlodde et udbytte (»Udbyttegodkendelsesdatoen«) [Dividend Approval Date], men senest på Udbytteregistreringsdatoen [Dividend Record Date] (cum udbytte), dvs. før ex udbyttedatoen. Afviklingsdatoen for Transaktionen (»Afviklings-*

*datoen«) [Settlement Date] vil være efter Udbytteregistreringsdatoen [Dividend Record Date] (ex dividend). »Udbytteregistreringsdatoen« [Dividend Record Date] er udløbet af den børshandelsdag, der slutter umiddelbart før ex udbyttedatoen.*

*3.2 På Handelsdatoen [Trade Date] sælger sælgeren (»Sælgeren«) Aktierne gennem Mægleren. Salget vil derfor finde sted før ex udbyttedatoen, dvs. før eller på Udbyttegodkendelsesdatoen [Dividend Approval Date], men senest på Udbytteregistreringsdatoen [Dividend Record Date] (cum udbytte). Afviklingsdatoen [Settlement Date] vil være efter Udbytteregistreringsdatoen [Dividend Record Date] (ex udbytte).*

*3.3 Både USPF/Partnerskabet og Sælgeren har en værdipapirkonto hos North Channel Bank GmbH & Co. KG (»Depotbanken«).*

*3.4 USPF/Partnerskabet modtager det udbytte (ekskl. kildeskat), som er deklareret på Aktierne på udbyttegodkendelsesdatoen [Dividend Approval Date] (»Udbyttet«) gennem Depotbanken. Depotbanken forsyner USPF/Partnerskabet med et certifikat (credit advice) om*

**764**

*modtagelsen af nettoudbyttet. Samtidig forsyner Depotbanken Sælgeren med et debit advice om nettoudbyttet.*

*3.5 På Handelsdatoen [Trade Date]:*

*3.5.1 Sælgeren aftaler med en tredjepart (ikke relateret til Sælger) at indgå i en aktieudlånstransaktion (»Aktieudlånstransaktionen«) på afviklingsdatoen [Settlement Date], i henhold til hvilken tredjeparten accepterer, at denne på Afviklingsdatoen [Settlement Date] vil udlåne Aktierne (plus udbytte) til Sælgeren. Da Aktierne leveres ex udbytte, vil tredjeparten foretage en kompensationsbetaling til Sælger, og*

*3.5.2 USPF/Partnerskabet aftaler med en tredjepart (ikke relateret til USPF/Partnerskabet) at indgå i en Aktieudlånstransaktion på Afviklingsdatoen [Settlement Date], i henhold til hvilken USPF/Partnerskabet accepterer, at denne/dette på Afviklingsdatoen [Settlement Date] vil udlåne Aktierne (plus udbytte) til tredjeparten. Da Aktierne leveres ex udbytte, vil USPF/Partnerskabet foretage en kompensationsbetaling til tredjeparten. 3.6 På Handelsdatoen [Trade Date]:*

*3.6.1 Sælgeren indgår i en OTC-forwardtransaktion med en tredjepart (ikke relateret til Sælger) (»Forwardtransaktionen«), i henhold til hvilken tredjeparten på Afviklingsdatoen [Settlement Date] vil levere Aktierne (ex udbytte) til Sælgeren, og*

*3.6.2 USPF/Partnerskabet indgår i en OTC-Forwardtransaktion med en tredjepart (ikke relateret til USPF/Partnerskabet), i henhold til hvilken USPF/Partnerskabet på Afviklingsdatoen [Settlement Date] vil levere Aktierne (ex udbytte) til tredjeparten.*

*3.7 På Afviklingsdatoen [Settlement Date]:*

*3.7.1 Aktieudlånstransaktionen og Forwardtransaktionen mellem Sælgeren og tredjeparten afvikles, dvs. at tredjeparten leverer Aktierne til Sælgeren i henhold til Forwardtransaktionen, og Sælgeren returnerer Aktierne til tredjeparten i henhold til Aktieudlånstransaktionen; og*

*3.7.2 Aktieudlånstransaktionen og Forwardtransaktionen mellem USPF/Partnerskabet og tredjeparten afvikles, dvs. USPF/Partnerskabet leverer Aktierne til tredjeparten i henhold til Forwardtransaktionen, og tredjeparten returnerer Aktierne til USPF/Partnerskabet i henhold til Aktieudlånstransaktionen.*

*3.8. USPF har indhentet en tax opinion fra dansk skatteadvokat, som bekræfter, at USPF i ovenstående faktiske scenarie bør være berettiget til at opnå fuld refusion af indeholdt dansk udbytteskat betalt på Aktierne. [når Forwardtransaktionen beskrives i 3.6 gennemføres med futures og ikke forwardkontrakter]*

*4. Forudsætninger*

Med henblik på denne Opinion har vi antaget følgende:

1. USPF er skattemæssigt hjemmehørende i USA.
2. USPF har ikke en fast driftssted i Danmark.
3. Udbytte modtaget af USPF på Aktierne hidrører ikke fra udøvelse af virksomhed af USPF eller gennem et forbundet foretagende.
4. USPF er omfattet af artikel 22, stk. 2, litra e), i den gældende dobbeltbeskatningsoverenskomst mellem Danmark og USA *»Dobbeltbeskatningsoverenskomsten mellem Danmark og USA«*), hvilket betyder, at USPF er:
   a. en juridisk person, der er organiseret efter lovgivningen i USA med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændige erhvervsdrivende, og
   b. mere end 50 pct. af USPFs begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i enten USA eller Danmark.
5. På Handelsdatoen [Trade Date] opnår USPF ubetinget ejerskab til Aktierne og vil have fulde ejerskabsrettigheder over Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date], herunder retten til at modtage det Udbytte, som deklareres på den pågældende dato.
6. Aktierne vil blive holdt af USPF gennem NCB som depotbank. USPF's ejerskab til Aktierne registreres hos NCB og, afhængigt af NCB's/underdepotbankens andre lange og korte positioner, Værdipapircentralen i Danmark.
7. NCB's register vil vise, at USPF er den juridiske ejer men ikke indeholde oplysninger om det retmæssige ejerskab til Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date], og at det Danske Udbytte repræsenterer reelt udbytte på Aktierne, som videregives til USPF af depotbanken. Det antages endvidere, at NCB på anmodning fra USPF vil udstede standardejerskabsdokumentation om Aktierne i depotet, der viser det juridiske ejerskab til Aktierne og det modtagne udbytte.
8. NCB vil ikke udstede ejerskabsdokumentation vedrørende de Aktier, som er omfattet af den påtænkte transaktion, til andre parter end USPF i perioden fra USPF's køb af Aktierne, og indtil der er udbetalt udbytte til USPF på Aktierne *eller udstede dokumentation, der viser andre ejere end USPF i den pågældende periode.*
9. Den påtænkte transaktion blev ikke struktureret af NCB.
10. NCB vil udføre rollen som værdipapirdepotbank, men ingen anden rolle, *f.eks. assistance med at søge om refusion af indeholdt dansk udbytteskat på Aktierne,* og NCB udfører sin rolle som depotbank i forbindelse med den påtænkte transaktion i overensstemmelse med sine standardprocedurer, der er i overensstemmelse med de normale procedurer for depotbanker generelt.
11. **765**
NCB opkræver et gebyr for leverede depotbanktjenester i denne transaktion, som ikke afviger fra de gebyrer, der opkræves for depotbanktjenester generelt.
12. NCB er blevet anmodet om at udføre rollen som depotbank.
13. NCB har ingen grund til at antage - eller oplysninger eller viden om, hvorvidt en anden person *eller enhed* end USPF vil indgive en ansøgning om refusion af skat med hensyn til den kildeskat på udbytte, som er indeholdt på Aktierne.

*5. Opinion*

Baseret udelukkende på vores forståelse af de fakta, der er beskrevet i punkt 3, og de forudsætninger, der er beskrevet i punkt 4, som vi ikke har undersøgt eller verificeret særskilt, og med de kvalifikationer, der er beskrevet i punkt 7, finder vi, at:

5.1 NCB vil ikke være underlagt dansk skattepligt som følge af den påtænkte transaktion.

5.2 NCB bør ikke være underlagt dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat for eventuelle tab som følge af bankens rolle i den påtænkte transaktion.

Følgende omstændigheder forhindrer os dog i at nå frem til en mere definitiv vurdering af NCB's position:

1. Den omstændighed, at USPF *i Forwardtransaktionen* indgår OTC-forwardkontrakter (og ikke f.eks. børsnoterede futures) for at afdække deres position, kan i princippet give mulighed for en »fuld afdækning« [»perfect hedge«] af USPF's position i Aktierne*, som eliminerer ejerskabsrisikoen,* og kan muligt også pege i retning af en anden identificeret part, *der påtager sig en sådan ejerskabsrisiko,* som *således* kan anses for at være den retmæssige udbytteejer af det udbytte, som er modtaget på Aktierne, i stedet for USPF. Dette vil kunne indebære en mulighed for arbitrage, som er identificerbar for NCB, og hvor standarddokumentationen for ejerskab udstedt af NCB kan være vildledende.

2. Den omstændighed, at USPF *(eller NCB)* ikke har indhentet en tax opinion om den præcise transaktion, som er udført at USPF (tax opinion forudsætter futures og ikke OTC-forwardkontrakter), vil gøre det vanskeligere for NCB at gøre gældende, at banken pr. definition har handlet i god tro (og dermed ikke er ansvarspådragende) med hensyn til den danske skattemæssige behandling af transaktionen*, som af en professionel part med rimelighed kan anses for at indeholde problematiske forhold i relation til ejerskabet af Aktierne*

3. De i 6.2.1. nedenfor beskrevne sager vedrørende salget af »tomme« selskaber har vist de danske skattemyndigheders og de danske domstoles vilje til at placere erstatningsansvar for skattemyndighedernes tab hos andre involverede parter i den transaktioner, der har udløst tabet, når transaktionerne skønnes at have en tvivlsom karakter. I lyset deraf er det ikke sikkert, hvordan de danske skattemyndigheder ville opfatte den påtænkte transaktion vedrørende Aktierne og, hvis den skønnes tvivlsom, hvordan det danske retssystem vil reagere. Men selv om den skulle blive anset for tvivlsom, vurderer vi, at NCB's rolle i den påtænkte transaktion ikke kan sammenlignes med de ansvarlige parters rolle, herunder bankernes, i »selskabstømmersagerne«, som var mere alvorlige og medvirkende i relation til skattemyndighedernes tab.

5.3 NCB bør ikke være underlagt dansk strafferetligt ansvar som følge af sin rolle i den påtænkte transaktion.

*6. Danske skatteregler og analyse*

6.1 Ansvar for dansk kildeskat

6.1.1 Retsgrundlaget kort

*Generelt vil den juridiske ejer af aktierne på datoen for beslutningen om udlodning af udbytte også blive anset som ejer af udbyttet i et dansk skatte- og selskabsretligt perspektiv, selv om køberen (endnu) ikke er registreret som ejer af aktierne, hvilket udgør sikringsakten i henhold til dansk ret, på datoen for generalforsamlingen (både Udbyttegodkendelsesdato og Udbytteregistreringsdato).*

*Standardafviklingsbetingelserne for en salgs- og købstransaktion vedrørende børsnoterede danske Aktier registreret i VP Securities A/S er T+3.*

*VP Securities A/S afvikler således som udgangspunkt udbyttebetalinger på dag 4 efter generalforsamlingen i Udstederen. Den faktiske udbyttebetaling er baseret på Udstederens aktieregister pr. datoen for generalforsamlingen i Udsteder og som opdateret ved udgangen af dag 3. Distribution på dag 4 er derfor baseret på den forudsætning, at alle T+3-aktiehandler, der udføres til og med datoen for generalforsamlingen er registreret, når udbyttet udbetales. De aktionæroplysninger, der skal indgives til de danske skattemyndigheder af (eller på vegne af) Udstederen, er listen over aktio-*

*nærer på datoen for generalforsamlingen i Udstederen som opdateret ved udgangen af dag 3.*

*For handler, der udføres på standard-T+3-vilkår, bør en ansøgning fra køberen af de danske aktier om refusion af indeholdt dansk udbytteskat derfor generelt ikke give anledning til uoverensstemmelser mellem udbyttemodtageren og den juridiske ejer af aktierne, og endvidere bør den juridiske ejer af aktierne ikke have problemer med at få refunderet overskydende kildeskat, da den juridiske ejer også vil være registreret hos de danske skattemyndigheder som modtager af udbyttet.*

I henhold til dansk national ret vil udenlandske aktionærer, som ejer mindre end 10 % af aktiekapitalen i *en Udsteder* (børsnoteret eller ikkebørsnoteret) i første omgang være underlagt dansk kildeskat på 27 % af det modtagne udbytte, medmindre (for børsnoterede

**766**

selskaber) *Udstederen* eller Værdipapircentralen specifikt har aftalt med de danske skattemyndigheder, at der gælder en nedsat skattesats for udbytte fra det udloddende selskab til det relevante udenlandske selskab i overensstemmelse med den dobbeltbeskatningsoverenskomst, som gælder for den pågældende aktionær.

*I praksis indeholder og afvikler det udbytteudloddende selskab 27 % skat på alt udbytte, som ikke er berettiget til en lavere kildeskatterate. Hvis Udstederen indeholder utilstrækkelig kildeskat af udbytte, hæfter denne for den skat, som ikke indeholdes, medmindre den manglende indeholdelse ikke kan betragtes som* forsømmelig *[negligence].*

*Aktionæren (hvis denne er den retmæssige ejer) kan anmode* de danske skattemyndigheder *om refusion af eventuel danske kildeskat* i overensstemmelse med den gældende dobbeltbeskatningsoverenskomst ved at indgive en udbytterefusionsformular til de danske skattemyndigheder.

Siden 2002 har de danske skattemyndigheder fokuseret på begrebet retmæssig ejerskab. I 2010 ændrede de danske skattemyndigheder officielt deres fortolkning af de danske regler om kildeskat af udbytte for udenlandske aktionærer til, at de danske skatteregler indeholder et ikke-omgåelseskrav i form af en betingelse om retmæssigt ejerskab.

Når en udenlandsk udbyttemodtager ikke består en test vedrørende retmæssigt ejerskab som anvendt af de danske skattemyndigheder, kan der således være krav om indeholdelse af kildeskat på udbytte. Testen vedrørende retmæssigt ejerskab bygger på kravet om retmæssigt ejerskab i artikel 10 i OECD's modeloverenskomst og som yderligere forklaret i OECD's kommentarer.

I alle sager, hvor den danske kildeskat frafaldes eller nedsættes i henhold til en dobbeltbeskatningsoverenskomst, skal udbyttemodtageren indgive en ansøgning om refusion af den overskydende kildeskat til den danske skatteforvaltning. Den danske skatteforvaltning refunderer derefter det overskydende indeholdte udbytteskattebeløb.

For at søge om refusion af overskydende kildeskat skal udbyttemodtageren udfylde en refusionsformular 06.003 EN, som ligger på de danske skattemyndigheders hjemmeside (www.skat.dk). Udbyttemodtageren skal på formularen til refusionsansøgning bekræfte, at denne er den retmæssige ejer af udbyttet og vil være forpligtet til at vedlægge et dividend advice, typisk i form af en gyldig SWIFT-betalingsmeddelelse som bevis for, at der er indeholdt skat af udbytte udbetalt på danske aktier.

Betalingen foretages normalt af de danske skattemyndigheder inden for én måned. Nylige ændringer af de gældende renteregler fastsætter, at hvis kildeskat af udbytte ikke er tilbagebetalt inden seks måneder fra skattemyndighedernes modtagelse af refusionsansøgningen og dokumentation for refusionsansøgningen, pålægges en rente på 0,5 % (2014) pr. påbegyndt måned.

Copyright © 2024 Karnov Group Denmark A/S

### 6.1.2 Dansk skattepligt af udbytte for NCB

Da NCB ikke på noget tidspunkt direkte eller indirekte erhverver Aktierne, vil NCB ikke i dansk skattemæssig henseende blive anset for at være underlagt dansk udbytteskattepligt på Aktierne, da dette alene vil gælde for ejeren af Aktierne og - i tilfælde af forsømmelighed [negligence] med hensyn til at indeholde og/eller afvikle udbytteskat - Udstederen.

### 6.2 Civilretligt ansvar

### 6.2.1 Retsgrundlaget kort

I henhold til dansk civilret kræver erstatningsansvar uden for kontrakt generelt, at tre kriterier er opfyldt:

- Der skal være et retsgrundlag for ansvaret, normalt forsømmelighed [negligence] eller forseelse [misconduct].

- Der skal være et økonomisk tab.

- Der skal være årsagssammenhæng mellem forsømmeligheden/forseelsen og det økonomiske tab.

Den danske stat (skattemyndighederne) vil som udgangspunkt kun lide et tab, hvis den skattepligtige person eller enhed (skatteyderen) ikke betaler eller ikke er i stand til at betale de skyldige skatter. Endvidere lides et tab kun, hvis den skyldige skat ville være blevet betalt af eller på vegne af skatteyderen, hvis det ikke var for den udviste forsømmelighed eller forseelse.

Generelt vil de relevante spørgsmål i relation til ansvar for tab lidt af staten i skattespørgsmål være forekomsten af forsømmelighed eller forseelse og sammenhængen med det lidte tab.

Juridisk præcedens viser, at ledelsesmedlemmer, bestyrelsesmedlemmer og likvidatorer mv., der har en ledende eller kontrollerende funktion i en juridisk person efter omstændighederne kan blive ansvarlig for tab, som skattemyndighederne lider som kreditor, hvis den juridiske person bliver insolvent eller går konkurs.

Endvidere, men sjældnere, er revisorer og juridiske rådgivere blevet pålagt erstatningsansvar for skattemyndighedernes tab.

Så vidt vi ved, er en depotbank i dansk retspraksis aldrig blevet holdt ansvarlig for tab lidt af skattemyndighederne som følge af at have imødekommet en urigtig ansøgning om refusion af indeholdt udbytteskat. Endvidere er vi ikke bekendt med, at der er prøvet sager ved danske domstole eller i det danske administrative system, hvor danske skattemyndigheder fejlagtigt har udbetalt et refusionsbeløb og forsøgt at dække et tab ved en sådan forkert udbetaling hos andre parter end den tilbagesøgende part.

I en række retssager (»selskabstømmersagerne«) indledt af skattemyndighederne i slutningen af 90'erne og

**767**

begyndelsen af 00'erne blev der rejst civilretlige erstatningskrav mod forskellige deltagere i en vis type transaktion, hvorved »tomme« danske selskaber, der ejede et beløb i kontanter og skyldte et tilsvarende beløb i dansk skat, blev solgt til købere, som i det væsentlige hævede kontanterne, brugte dem til egen fordel og dermed aldrig betalte de skyldige skatter. Det stod med det samme klart, at køberne af sådanne selskaber var ansvarlige for skattemyndighedernes tab, og mange ifaldt også strafferetlige sanktioner. Skattemyndighederne forfulgte dog også de sælgende aktionærer i selskaberne samt deres rådgivere og de banker, der var involveret i finansieringen eller blot foretog kontantoverførslerne i forbindelse med opkøbene. En række sager mod sælgerne af selskaberne blev vundet af skattemyndighederne, også i den danske Højesteret, da det blev fastslået, at sælgerne ikke havde opfyldt en bestemt forpligtelse til at sikre sig, at de skyldige skatter i sidste ende ville blive betalt, selv om sælgerne (eller deres rådgivere/bankerne) ikke var direkte involveret i Partnerskabets manglende betaling af sådanne skatter, da dette skete efter salget.

I en højesteretssag fra 1999 blev den bank, der var involveret i salget af det »tomme« selskab, holdt ansvarlig for skattemyndighedernes tab på det grundlag, at banken var bekendt med hver enkelt transaktion, der førte til købet, som førte til, at Partnerskabets penge på en bankkonto blev anvendt til at finansiere køberens erhvervelse heraf, hvilket banken havde anset for at være afgørende i sin risikovurdering, som banken havde foretaget (og medførte et højere gebyr end normalt til banken). Med sine handlinger blev banken anset for på en uansvarlig måde at medvirke til den selvfinansiering [financial assistance], som ikke var i overensstemmelse med dansk selskabsret, og banken havde ikke foretaget sig noget for at forhindre risikoen for, at skattemyndighedernes interesser blev tilsidesat.

Ovenstående sager vedrørende de tomme selskaber anses generelt for at være noget ekstraordinære. Retsgrundlaget for de rejste krav findes eksplicitte - i hvert fald til dels - i særlige regler i den danske selskabslov om forbud mod visse former for selvfinansiering. Sagerne viser dog også det danske retssystems evne og beslutsomhed med hensyn til at placere ansvar hos andre parter end de danske skattemyndigheder, hvis skattemyndighederne skønnes at lide et tab, … som er et følge af tvivlsomme handlinger udført af flere parter, selv hvis en enkelt part kun har spillet en begrænset rolle.

### 6.2.2 Civilretligt ansvar for NCB i den påtænkte transaktion

Generelt er der ingen retspraksis til at underbygge, at der kan rejses et krav mod NCB for at virke som depotbank for USPF i relation til Aktierne.

Hvis andre parter end USPF søger om refusion af dansk kildeskat, vil NCB's eventuelle rolle i en sådan refusionsansøgningsproces, om nogen, efter vores opfattelse være så fjern, at den ikke har nogen forbindelse til det tab, som lides i forbindelse med betalingen af refusionsansøgningen.

Forekomsten af et krav mod NCB ville efter vores opfattelse og baseret på de omstændigheder og forudsætninger, der er angivet ovenfor, i første omgang kræve, at USPF fejlagtigt har søgt om refusion af indeholdt udbytteskat i Danmark. For at kunne foretage en sådan refusionsansøgning vil de danske skattemyndigheder som udgangspunkt kræve, at refusionsformularen ledsages af dokumentation for, at skatten er påført den skatteyder, der søger om refusion, ofte i form af et udbyttebevis udstedt af depotbanken. Hvis NCB udsteder en sådan (standard)dokumentation til USPF, og USPF i dansk skattemæssig henseende anses for ikke at være berettiget til at søge om refusion af indeholdt dansk udbytteskat - efter refusionen er foretaget - vil NCB's rolle og handlinger være relevante for analysen af ansvar for NCB efter dansk ret.

*I denne henseende henvises der specifikt til vores forudsætninger om i) at USPF vil erhverve Aktierne com udbytte, hvilket indebærer, at USPF vil blive ejer af det faktiske udbytte på Aktierne pr. Handelsdatoen [Trade Date], ii) at USPF kun skal levere aktier ex udbytte i den efterfølgende Aktieudlånstransaktion, iii) at NCB kun vil udstede standarddokumentation vedrørende USPF's formelle juridiske ejerskab, som ikke vedrører retmæssigt ejerskab, iv) at NCB kun vil udstede en sådan dokumentation til USPF, v) at der er indhentet en dansk tax opinion vedrørende USPF's danske skattemæssige stilling i en næsten identisk struktur, som er foreslået NCB, og vi) at NCB - bortset fra eventuel udstedelse af standarddokumentation til USPF - ikke har haft nogen rolle i eller faktisk viden om processen med ansøgning om refusion af indeholdt udbytteskat i Danmark vedrørende Aktierne eller de oplysninger eller den dokumentation, som er indgivet til de danske skattemyndigheder.*

Det er derfor vores holdning, at NCB ikke bør være ansvarlig for ukorrekt tilbagebetaling af kildeskat til USPF foretaget af de danske skattemyndigheder.

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

Følgende omstændigheder forhindrer os imidlertid i at nå frem til en mere definitiv vurdering af NCB's position:

1. Den omstændighed, at USPF indgår OTC-forwardkontrakter (og ikke f.eks. børsnoterede futures) for at afdække deres position, kan i princippet give mulighed for en »fuld afdækning« [»perfect hedge«] af USPF's position i Aktierne og kan muligt også pege i retning af en anden identificeret part, som kan anses for at være den retmæssige udbytteejer af det udbytte, som er modtaget på Aktierne, i stedet for USPF som retmæssig ejer. Dette vil kunne indebære en mulighed for arbitrage, som er identificerbar for NCB, og hvor standarddokumentationen for ejerskab udstedt af NCB kan være vildledende.

**768**

2. Den omstændighed, at USPF ikke har indhentet en tax opinion om den præcise transaktion, som er udført af USPF (tax opinion forudsætter futures og ikke OTC-forwardkontrakter), vil gøre det vanskeligere for NCB at gøre gældende, at den pr. definition har handlet i god tro (og dermed ikke er ansvarlig) med hensyn til den danske skattemæssige behandling af transaktionen.

3. De i 6.2.1. ovenfor beskrevne sager vedrørende salget af »tomme« selskaber har vist de danske skattemyndigheders og de danske domstoles vilje til at placere erstatningsansvar for skattemyndighedernes tab hos andre involverede parter i transaktionen, der har udløst tabet, når transaktionerne skønnes at have en tvivlsom karakter. I lyset deraf er det ikke sikkert, hvordan de danske skattemyndigheder ville opfatte den påtænkte transaktion vedrørende Aktierne og, hvis den skønnes tvivlsom, hvordan det danske retssystem vil reagere. Men selv om den skulle blive anset for tvivlsom, vurderer vi, at NCB's rolle i den påtænkte transaktion ikke kan sammenlignes med de ansvarlige parters rolle, herunder bankernes, i »selskabstømmersagerne«, som var mere alvorlige og medvirkende i relation til skattemyndighedernes tab.

6.3 NCB's strafferetlige ansvar

6.3.1 Retsgrundlaget her

I henhold til § 13 i den danske skattekontrollov straffes den, der med fortsæt til at unddrage skat afgiver urigtige eller vildledende skatteoplysninger til skatteansættelse eller beløbet deraf, med sanktioner i form af bøde eller fængsel. Hvis den skattepligtige ikke er en fysisk person, er sanktionen en bøde. Dette gælder også, hvis de urigtige eller vildledende skatteoplysninger er afgivet som følge af forsømmelighed. Medvirken til sådant skattesvig er underlagt de samme sanktioner.

I henhold til § 15 i skattekontrolloven straffes den, der med fortsæt til at unddrage skat undlader at indgive en selvangivelse, med strafferetlige sanktioner i form af bøde eller fængsel. Hvis den skattepligtige ikke er en fysisk person, er sanktionen en bøde.

Enhver undladelse af korrekt indgivelse af oplysninger til de danske skattemyndigheder vil ikke være underlagt strafferetlige sanktioner, hvis en sådan undladelse ikke skyldes grov forsømmelighed eller forsæt.

I henhold til § 23 i den danske straffelov anses en lovovertrædelse for begået af enhver, der ved tilskyndelse, råd eller dåd har medvirket til den strafbare handling.

Strafferetligt ansvar kræver generelt, at gerningsmanden har et kriminelt forsæt, men under visse omstændigheder er forsømmelighed tilstrækkeligt. De gældende strafferetlige sanktioner i tilfælde af forsømmelighed er dog generelt betydeligt mindre strenge.

Retspraksis har vist i en høj grad af tilbageholdenhed med at anse andre end skatteyderen for at have medvirket til skatteunddragelse eller skattesvig, og generelt vil dette kræve en ganske direkte involvering i den strafbare handling, f.eks. bistand til at udfylde og indgive en forkert selvangivelse.

6.3.2 Strafferetligt ansvar for NCB som følge af den påtænkte transaktion

NCB vil som hovedregel ikke skulle indsende oplysninger til de danske skattemyndigheder som følge af Transaktionen. NCB vil, hvis overhovedet, kun være indirekte involveret i refusionsansøgningen ved at udstede det udbyttebevis, som de danske skattemyndigheder generelt stiller krav om

Baseret på de 2 ovenfor anførte omstændigheder og forudsætninger og navnlig under hensyntagen til de samme omstændigheder som beskrevet under 6.2.2 … vedrørende civilretligt ansvar, bør der i dansk ret ikke være grundlag for at anse NCB som medvirkende til dansk skattesvig.

7. Kvalifikationer

7.1 Denne Opinion er afgrænset til forhold vedrørende dansk ret, som aktuelt er gældende og vedtaget af danske lovgivende myndigheder, og der udtrykkes ingen vurdering af om lovgivningen i andre jurisdiktioner. Navnlig foregiver vi ikke at være bekendt med lovgivningen i Tyskland eller lovgivningen i nogen anden jurisdiktion end Danmark, og vi udtrykker ingen vurdering af forhold, der er underlagt eller fortolket i overensstemmelse med sådan lovgivning.

7.2 I denne Opinion beskrives danske juridiske begreber med engelske termer og ikke med deres oprindelige danske termer. De pågældende begreber svarer muligvis ikke til de begreber, der beskrives med de samme engelske termer, som forekommer under andre jurisdiktioners lovgivning. Denne Opinion kan derfor kun påberåbes på den udtrykkelige betingelse, at eventuelle fortolkningseller ansvarsspørgsmål, der opstår i forbindelse hermed, er underlagt dansk ret og indbringes for en dansk domstol.

7.3 Denne Opinion afgives på det grundlag, at den underlægges og fortolkes i overensstemmelse med dansk ret.

7.4 Denne Opinion er strengt begrænset til forhold anført heri og skal ikke læses som værende implicit gældende for andre forhold i forbindelse med den påtænkte transaktion.

8. Anvendelse

Denne Opinion er rettet til NCB til dennes gavn og brug og kan ikke påberåbes af nogen anden person eller til noget andet formål end i forbindelse med den påtænkte transaktion og må ikke bruges, rundsendes, citeres eller på anden måde henvises til noget andet formål, undtagen i) til NCB's juridiske eller skattemæssige rådgivere i forbindelse med Transaktionen, ii) hvor der er påbudt ved lov, retskendelse eller af et relevant

**769**

tilsynsorgan eller iii) i forbindelse med enhver tvist eller retssag, som NCB er part i, i hvilket tilfælde vi skal informeres om sådan brug.«

Ved mail af 1. maj 2014 til L H og K skrev A følgende:

»Lige en opfølgning - er der sket yderligere i forhold til vores udkast af 23. april.«

K besvarede samme dag mailen således:

»Jeg talte i telefon med klienten i tirsdags. De har det generelt fint med udkastet med forbehold for to kommentarer.

1. Afviklingsdatoen for forwards [Forward Settlement Date] er efter afviklingsdatoen [Settlement Date] for aktietransaktionen. Brugen af det definerede udtryk »Afviklingsdato« [Settlement Date] indebærer, at dette er én og samme dag.

2. I næstsidste afsnit af afsnit 6.1.1 henviser du til en bestemt type dividend advice. NCB har informeret mig om, at de ikke vil udstede nogen form for skatteudtalelse mv., så det bedste vil være at slette henvisningen til »gyldig SWIFT-betalingsmeddelelse«.

Kan du hjælpe med de to punkter? Alternativt, hvis du sender os en Word-version af dit sidste udkast, kan vi give dig en rettet udgave, der afspejler ovenstående.«

I mail af 2. maj 2014 skrev A herefter følgende til K :

U.2024.746H - SKM2024.123.HRH

»Må jeg bede dig om at indsætte de to ændringsmarkeringer i den vedhæftede version. Derefter vil jeg tjekke, om dette vil påvirke vores opinion.«

K fremsendte herefter samme dag pr mail en rettet udgave af udkastet til legal opinion sammen med en sammenligningsversion i forhold til den seneste version af udkastet. I mailen anførte K videre:

»Sig til, hvis du ønsker at drøfte nogen af ændringerne, eller om de er acceptable for dig. I så fald beder jeg dig om at sende os et revideret endeligt udkast til din opinionsskrivelse.«

Det reviderede udkast til legal opinion af 2. maj 2014 indeholdt - med rettelsesmarkeringer i forhold til tidligere udkast - følgende ændringer i afsnit 3:

»…

*3. Påtænkte transaktioner*

Vi forstår, at USPF påtænker at foretage følgende transaktioner:

3.1 På handelsdatoen (»*Handelsdatoen*«) [Trade Date] køber USPF/Partnerskabet danske børsnoterede aktier (»*Aktierne*«) *gennem* en reguleret inter-dealermægler (»*Mægleren*«) andelsdatoen [Trade Date]. Købet vil finde sted før eller på den dato, hvor generalforsamlingen i udstederen af Aktierne (»*Udstederen*«) beslutter at anvende hele eller en del af indtjeningen og overskuddet til at udlodde et udbytte (»*Udbyttegodkendelsesdatoen*«) [Dividend Approval Date], men senest på Udbytteregistreringsdatoen [Dividend Record Date] (cum udbytte), dvs. før ex udbyttedatoen. Afviklingsdatoen for *Aktier*transaktionen (»*Aktieafviklingsdatoen*«) [Equities Settlement Date] vil være efter Udbytteregistreringsdatoen [Dividend Record Date] (ex dividend). *Udbytteregistreringsdatoen*« [Dividend Record Date] er udløbet af den børshandelsdag, der slutter umiddelbart før ex udbyttedatoen.

3.2 På Handelsdatoen [Trade Date] sælger sælgeren (»*Sælgeren*«) Aktierne gennem Mægleren. Salget vil derfor finde sted før en udbyttedatoen, dvs før eller på Udbyttegodkendelsesdatoen [Dividend Approval Date], men senest på Udbytteregistreringsdatoen [Dividend Record Date] (cum udbytte). *Aktieaf*viklingsdatoen [Equities Settlement Date] vil være efter Udbytteregistreringsdatoen [Dividend Record Date] (ex udbytte).

3.3 Både USPF/Partnerskabet og Sælgeren har en værdipapirkonto hos North Channel Bank GmbH & Co. KG (»*Depot-banken*«).

3.4 USPF/Partnerskabet modtager det udbytte (ekskl. kildeskat), som er deklareret på Aktierne på udbyttegodkendelsesdatoen [Dividend Approval Date] (»*Udbyttet*«) gennem Depotbanken. Depotbanken forsyner USPF/Partnerskabet med et certifikat (credit advice) om modtagelsen af nettoudbyttet. Samtidig forsyner Depotbanken Sælgeren med et debit advice om nettoudbyttet.

3.5 På Handelsdatoen [Trade Date]:

3.5.1 Sælgeren aftaler med en tredjepart (ikke relateret til Sælger) at indgå i en aktieudlånstransaktion (»*Aktieudlånstransaktionen*«) på *Aktieaf*viklingsdatoen [Equities] Settlement Date], i henhold til hvilken tredjeparten accepterer, at denne på *Aktieaf*viklingsdatoen [Equities] Settlement Date] vil udlåne Aktierne (plus udbytte) til Sælgeren. Da Aktierne leveres ex udbytte, vil tredjeparten foretage en kompensationsbetaling til Sælger, og

3.5.2 USPF/Partnerskabet aftaler med en tredjepart (ikke relateret til USPF/Partnerskabet) at indgå i en Aktieudlånstransaktion på *Aktieaf*viklingsdatoen [Equities] Settlement Date], i henhold til hvilken USPF/Partnerskabet accepterer, at denne/dette på *Aktieaf*viklingsdatoen [Equities] Settlement Date] vil udlåne Aktierne (plus udbytte) til tredjeparten. Da Aktierne leveres ex udbytte, vil USPF/Partnerskabet foretage en kompensationsbetaling til tredjeparten.

3.6 På Handelsdatoen [Trade Date]:

3.6.1 Sælgeren indgår i en OTC-forwardtransaktion med en tredjepart (ikke relateret til Sælger) (»*Forwardtransaktionen*«), i hen-

hold til hvilken tredjeparten på *en dag efter Aktiea*fviklingsdatoen [*Equities* Settlement Date] *(»Forwardafviklingsdatoen«) [Forward Settlement Date]* vil levere Aktierne (ex udbytte) til Sælgeren, og

3.6.2 USPF/Partnerskabet indgår i en OTC-Forwardtransaktion med en tredjepart (ikke relateret til USPF/Partnerskabet), i henhold til hvilken USPF/Partnerskabet på *Forwarda*fviklingsdatoen [*Forward*

**770**

Settlement Date] vil levere Aktierne (ex udbytte) til tredjeparten.

3.7 På *Aktiea*fviklingsdatoen [*Equities* Settlement Date]:

3.7.1 *Aktieudlånstransaktionen mellem Sælgeren og tredjeparten afvikles, dvs. at tredjeparten udlåner Aktierne til Sælgeren, og Sælgeren leverer Aktierne (ex udbytte) til USPF/Partnerskabet, og*

3.7.2 *Aktieudlånstransaktionen mellem USPF/Partnerskabet og tredjeparten afvikles, dvs. at USPF/Selskabet udlåner Aktierne til tredjeparten.*

*3.8 På Forwardafviklingsdatoen [Forward Settlement Date]:*

3.8.1 Forwardtransaktionen mellem Sælgeren Og tredjeparten afvikles, dvs. at tredjeparten leverer Aktierne til Sælgeren i henhold til Forwardtransaktionen, og Sælgeren returnerer Aktierne til tredjeparten i henhold til Aktieudlånstransaktionen; og

3.8.2 Forwardtransaktionen-mellem USPF/Partnerskabet og tredjeparten afvikles, dvs. USPF/Partnerskabet leverer Aktierne til tredjeparten i henhold til Forwardtransaktionen, og tredjeparten returnerer Aktierne til USPF/Partnerskabet i henhold til Aktieudlånstransaktionen.

3.9. USPF har indhentet en tax opinion fra dansk skatteadvokat, som bekræfter, at USPF i ovenstående faktiske scenarie bør være berettiget til at opnå fuld refusion af indeholdt dansk udbytteskat betalt på Aktierne *I modsætning til ovenstående beskrivelse forudsætter den danske tax opinion, at parterne leverer Aktierne i henhold til futurekontrakter og ikke forwardtransaktioner. Vi er blevet anmodet om at forudsætte, at der ikke er nogen økonomisk forskel mellem de oprindeligt påtænkte futurekontrakter og de ovenfor beskrevne forwardtransaktioner..*

…«

Herudover indeholdt udkastet et forslag til en ændring i pkt. 6.1.1, hvorefter en henvisning til, at Dividend Credit Advice typisk ville foreligge i form af en gyldig SWIFT-betalingsmeddelelse, skulle udgå.

Ved mail af 5. maj 2014 til K fremkom A herefter med bemærkninger til ændringerne i udkastet til legal opinion. Af mailen fremgår:

»Jeg har været igennem de foreslåede ændringer, og der synes ikke at være behov for ændringer til opinionen.

Vil du kort uddybe bevæggrundene til at adskille aktieafviklingsdatoen [Equities Settlement Date] og forwardafviklingsdatoen [Forward Settlement Date], så sidstnævnte falder en dag senere. Fra mit perspektiv ser det ud til, at det tydeligere skelner aktielånstransaktionen og forwardtransaktionen, men jeg ville sætte pris på at vide, om der er andet at opnå ud over dette.«

K besvarede samme dag henvendelsen således på mail:

»Mange tak for din bekræftelse. Det lyder godt.

Din forståelse af timingen og formålet bag er korrekt. Vigtigst af alt skal vi skelne mellem aktieafviklingsdatoen [Equities Settlement Date] og forwardafviklingsdatoen [Forward Settlement Date], da sælgeren ellers ikke vil være i stand til at levere aktierne til køberen, da denne har returneret dem til X og er short. Den måde, det nu er struktureret og beskrevet på, sikrer, at alle positioner afvikles i den rigtige rækkefølge.

Hvis du er enig, sender vi det reviderede udkast til opinion til vores klient til gennemgang og godkendelse.«

I forsættelse heraf skrev A samme dag følgende til K :

U.2024.746H - SKM2024.123.HRH

»Tak, K.

En enkelt ting: Jeg vil foretrække at beholde formuleringen om SWIFT-meddelelsen, da det er i det afsnit, den beskriver, hvordan det danske system normalt fungerer, altså uden specifik henvisning til den pågældende transaktion og dermed uden hensyntagen til, om NCB i dette tilfælde ville udsende en sådan meddelelse. Sig til, hvis det giver anledning til problemer fra din side.«

K anførte herefter samme dag på mail:

»Ok, kan vi formulere det som følger for at understrege, at det er et eksempel, men ikke nødvendigvis normen?

»… og vil være forpligtet til at vedlægge en udbytteadvisering som bevis (f.eks. i form af en bekræftet SWIFT-betalingsmeddelelse) for, at der er indeholdt skat på udbytte betalt på danske aktier.««

Denne formulering blev samme dag accepteret af A.

I juni 2014 blev der herefter fra Bech-Bruuns side taget initiativ til fakturering for den ydede rådgivning, og det blev indledningsvist afklaret, at Bech-Bruun skulle fakturere North Channel Bank direkte. Af K's mail af 23. juni 2014 til A fremgår således:

»Send venligst faktura og bilag direkte til NCB. Du må gerne give dem en forklaring på salæroverskridelsen og tage højde for, at du vil blive anmodet om at forelægge den udførte opinion i den form, som blev drøftet og aftalt i maj, uden tillægssalær.

Lad os tales ved.«

Bech-Bruuns faktura af 23. juni 2014 på 14.650 euro blev herefter sendt til T1, North Channel Bank. Salæropgørelsen indeholder følgende oplysninger:

»Vores salær for juridiske ydelser i ovennævnte sag i perioden 10. februar 2014 til i dag, inkl.

• Gennemgang af et udkast til tax opinion vedrørende den påtænkte transaktion som modtaget fra Jones Day den 10. februar 2014, gennemgang af din e-mail dateret den 11. februar, juridiske undersøgelser i forhold til gældende lov og jurisdiktion og vores svar herpå til 11. februar 2014.

• Udarbejdelse af vores opinion i relation til den påtænkte transaktion, hvor NCB fungerer som depotbank, som sendt til dig den 18. februar 2014.

    **771**

• Gennemgang af kommentarerne til opinion fra Jones Day og ændringer til opinion.

• Gennemgang af transaktionsdiagrammet, juridiske undersøgelser i forhold til OTC-instrumenter sammenlignet med standardiserede finansielle instrumenter og udarbejdelse af vores opinion baseret på den tidligere faktuelle oversigt, hvor futures dog erstattes med forwards, og fremsendelse heraf til Jones Day den 15. april 2014.

• Gennemgang af Jones Days kommentarer af 15. april 2014 og udarbejdelse af vores e-mail-memorandum dateret den 16. april 2014 til Jones Day.

• Forberedelse til og deltagelse i telefonkonference den 22. april 2014.

• Gennemgang af det reviderede resumé af transaktionen som modtaget den 22. april 2014 og udarbejdelse af et ændret udkast til opinion.

• Gennemgang af den reviderede opinion som modtaget den 2. maj 2014 og vores kommentarer hertil af 5. maj 2014.

• Diverse telefonsamtaler og omfattende mailkorrespondance med K H og L fra Jones Day.

Af et medfølgende brev af samme dato til T1 fremgår følgende:

»*Dansk tax opinion - North Channel Bank*

Som aftalt med K vedhæfter jeg vores faktura for assistance i 1. halvår 2014.

Bemærk, at det fakturerede beløb overstiger vores første estimat i februar 2014 på 6-7.000 EUR ekskl. moms, som var baseret på meget foreløbige oplysninger. Vores estimat var dog mere eller mindre nøjagtigt (bortset fra en overskridelse på 1.700 EUR), da vi færdiggjorde vores udkast til opinion den 21. februar på grundlag af den faktuelle beskrivelse, der var givet på det tidspunkt, og efter at have indarbejdet kommentarer fra Jones Day. Vi sendte vores salærstatus på 8.700 EUR til Jones Day den 3. april 2014.

Derefter blev den påtænkte transaktion ændret, og vi modtog en mere udførlig beskrivelse - først på tysk og derefter på engelsk - hvilket krævede en ny analyse for at fastslå de krævede ændringer i det oprindelige udkast til opinion som følge deraf. De nye oplysninger krævede yderligere og den kompleksitet til analysen og krævede yderligere drøftelser med Jones Day samt fremsendelse af ændrede udkast til versioner af vores opinion. Dette arbejde forudså vi ikke, da vi gav vores første estimat baseret på en anden faktuel beskrivelse.

Det fakturerede beløb i henhold til vores timeforbrug er fastsat på baggrund af medgået tid og til vores standardtimetakster, men omfatter også færdiggørelse af vores opinion på grundlag af faktiske omstændigheder heri og i dens nuværende form.

Jeg håber, ovenstående forklarer fakturaafvigelsen fra det oprindelige estimat, men vi uddyber naturligvis gerne, hvis I ønsker det.«

Den 18. juli 2014 rettede K på mail henvendelse til A, idet det blev oplyst, at North Channel Bank havde anmodet om at modtage den underskrevne opinion. Af mailen fremgår blandt andet:

»…

Jeg vedhæfter en opdateret version af udkastet, som vi har aftalt (sammen med en sammenligningsversion i forhold til den seneste version) og vil gerne bede dig om at udfærdige den på jeres brevpapir.

Vil du sende en kopi af den udfærdigede opinion på mail til mig og ligeledes sende originalen til min adresse. Så sender jeg alle dokumenterne til NCB.

Ring endelig, hvis du har spørgsmål.«

Mailen var vedhæftet et udkast til legal opinion dateret 5. maj 2014 med ganske få rettelsesmarkeringer.

Den endelige legal opinion af 4. august 2014, der er underskrevet af A og fremsendt til Jones Day samme dag, og som indholdsmæssigt svarer til det udkast, der blev fremsendt af Jones Day den 18. juli 2014, har følgende ordlyd:

»*Dansk Opinion*

*1. Indledning*

Denne opinion (»*Opinion*«) er udarbejdet på anmodning af Jones Day, Tyskland, på vegne af North Channel Bank GmbH & Co. KG (»*NCB*«).

Denne Opinion omhandler den ansvarsmæssige konsekvenser for NCB af at fungere som depotbank i visse transaktioner med danske børsnoterede aktier, som er indgået en amerikansk pensionsfond (»*USPF*«).

*2. Scope*

I denne Opinion vurderes det alene, om NCB er skattepligtig i Danmark, NCB's civilretlige ansvar for et tab lidt af den danske stat og danske strafferetlige spørgsmål for NCB som følge af transaktionen på grundlag af den faktiske baggrund og forudsætningerne i 3 og 4 nedenfor. I denne Opinion vurderes ikke:

2.1.1 den skattemæssige behandling i Danmark af andre parter end NCB i den påtænkte transaktion

2.1.2 NCB's ansvar for krav rejst af andre parter end den danske stat, hvis den forudsatte danske skattemæssige behandling ikke i sidste ende opnås

Copyright © 2024 Karnov Group Denmark A/S

2.1.3 beregningen af størrelsen af et ikke-kontraktuelt ansvar, som NCB potentielt har pådraget sig

2.1.4 spørgsmålet om ansvar hos andre parter end NCB for krav rejst af den danske stat som følge af transaktionen

2.1.5 om dansk ret er gældende med hensyn til at fastlægge et ansvar uden for kontrakt for NCB, som er en ikke-dansk enhed, i henhold til de internationale lovvalgsregler

2.1.6 spørgsmål vedrørende de påtænkte transaktioner i henhold til anden lovgivning end dansk ret

2.1.7 de danske skattemyndigheders muligheder for at forfølge et dansk eller strafferetligt krav eller

**772**

civilretligt ansvar mod NCB i Tyskland i anledning af et lidt tab, hvor dette er relevant.

*3. Påtænkte transaktioner*

Vi forstår, at USPF påtænker at foretage følgende transaktioner:

3.1 På handelsdatoen (»*Handelsdatoen*«) [Trade Date] køber USPF/Partnerskabet danske børshandlede aktier (»*Aktierne*«) gennem en reguleret inter-dealer-mægler (»*Mægleren*«). Købet vil finde sted før eller på den dato, hvor generalforsamlingen i udstederen af Aktierne (»*Udstederen*«) beslutter at anvende hele eller en del af indtjeningen og overskuddet til at udlodde et udbytte (»*Udbyttegodkendelsesdatoen*«) [Dividend Approval Date], men senest til Udbytteregistreringsdatoen [Dividend Record Date] (cum udbytte), dvs. før ex udbyttedatoen. Afviklingsdatoen [Settlement Date] for Aktietransaktionen (»*Aktieafviklingsdatoen*«) [Equities Settlement Date] vil være efter Udbytteregistreringsdatoen [Dividend Record Date] (ex dividend). *Udbytteregistreringsdatoen*« [Dividend Record Date] er udløbet af den børshandelsdag, der slutter umiddelbart før ex udbyttedatoen.

3.2 På Handelsdatoen [Trade Date] sælger sælgeren (»*Sælgeren*«) Aktierne gennem Mægleren. Salget vil derfor finde sted før ex udbyttedatoen, dvs. før eller på Udbyttegodkendelsesdatoen [Dividend Approval Date], men senest på Udbytteregistreringsdatoen [Dividend Record Date] (cum udbytte). Aktieafviklingsdatoen [Equities Settlement Date] vil være efter Udbytteregistreringsdatoen [Dividend Record Date] (ex udbytte).

3.3 Både USPF/Partnerskabet og Sælgeren har en værdipapirkonto hos North Channel Bank GmbH & Co. KG (»*Depotbanken*«).

3.4 USPF/Partnerskabet modtager det udbytte (ekskl. kildeskat), som er deklareret på Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date] (»*Udbyttet*«) gennem Depotbanken. Depotbanken udsteder [issues] til USPF/Partnerskabet et certifikat (credit advice) om modtagelsen af nettoudbyttet. Samtidig udsteder [issues] Depotbanken til Sælgeren et debit advice om nettoudbyttet.

3.5 På Handelsdatoen [Trade Date]:

3.5.1 Sælgeren aftaler med en tredjepart (ikke relateret til Sælger) at indgå i en aktieudlånstransaktion (»*Aktieudlånstransaktionen*«) på Aktieafviklingsdatoen [Equities Settlement Date], i henhold til hvilken tredjeparten accepterer, at denne på Aktieafviklingsdatoen [Equities Settlement Date] vil udlåne Aktierne (plus udbytte) til Sælgeren. Da Aktierne leveres ex udbytte, vil tredjeparten foretage en kompensationsbetaling til Sælger; og

3.5.2 USPF/Partnerskabet aftaler med en tredjepart (ikke relateret til USPF/Partnerskabet) at indgå i en Aktieudlånstransaktion på Aktieafviklingsdatoen [Equities Settlement Date], i henhold til hvilken USPF/Partnerskabet accepterer, at denne/dette på Aktieafviklingsdatoen [Equities Settlement Date] vil udlåne Aktierne (plus udbytte) til tredjeparten. Da Aktierne leveres ex udbytte, vil USPF/Partnerskabet foretage en kompensationsbetaling til tredjeparten.

3.6 På Handelsdatoen [Trade Date]:

3.6.1 Sælgeren indgår i en OTC-forwardtransaktion med en tredjepart (ikke relateret til Sælger) (»*Forwardtransaktionen*«), i henhold til hvilken tredjeparten på en dag efter Aktieafviklingsdatoen [Equities Settlement Date] (»*Forwardafviklingsdatoen*«) [Forward Settlement Date] vil levere Aktierne (ex udbytte) til Sælgeren; og

3.6.2 USPF/Partnerskabet indgår i en OTC-Forwardtransaktion med en tredjepart (ikke relateret til USPF/Partnerskabet), i henhold til hvilken USPF/Partnerskabet på Forwardafviklingsdatoen [Forward Settlement Date] vil levere Aktierne (ex udbytte) til tredjeparten.

3.7 På Aktieafviklingsdatoen [Equities Settlement Date]:

3.7.1 Aktieudlånstransaktionen mellem Sælgeren og tredjeparten afvikles, dvs. at tredjeparten udlåner Aktierne til Sælgeren, og Sælgeren leverer Aktierne (ex udbytte) til USPF/Partnerskabet; og

3.7.2 Aktieudlånstransaktionen mellem USPF/Partnerskabet og tredjeparten afvikles, dvs. at USPF/Partnerskabet udlåner Aktierne til tredjeparten.

3.8 På Forwardafviklingsdatoen [Forward Settlement Date]:

3.8.1 Forwardtransaktionen mellem Sælgeren og tredjeparten afvikles, dvs. at tredjeparten leverer Aktierne til Sælgeren i henhold til Forwardtransaktionen, og Sælgeren returnerer Aktierne til tredjeparten i henhold til Aktieudlånstransaktionen; og

3.8.2 Forwardtransaktionen mellem USPF/Partnerskabet og tredjeparten afvikles, dvs. at USPF/Partnerskabet leverer Aktierne til tredjeparten i henhold til Forwardtransaktionen, og tredjeparten returnerer Aktierne til USPF/Partnerskabet i henhold til Aktieudlånstransaktionen.

3.9. USPF har indhentet en tax opinion fra en dansk skatteadvokat, som bekræfter, at USPF i ovenstående faktiske scenarie bør være berettiget til at opnå fuld refusion af indeholdt dansk udbytteskat betalt på Aktierne. I modsætning til ovenstående beskrivelse forudsætter den danske tax opinion, at parterne leverer Aktierne i henhold til futurekontrakter og ikke forwardtransaktioner. Vi er blevet anmodet om at forudsætte, at der ikke er nogen økonomisk forskel mellem de oprindeligt påtænkte futurekontrakter og de ovenfor beskrevne forwardtransaktioner.

*4. Forudsætninger*

Med henblik på denne Opinion har vi antaget følgende:

1.    USPF er skattemæssigt hjemmehørende i USA.

**773**

2.    USPF har ikke et fast driftssted i Danmark.

3.    Udbyttet modtaget af USPF på Aktierne hidrører ikke fra udøvelse af virksomhed af USPF eller gennem et forbundet foretagende.

4.    USPF er omfattet af artikel 22, stk. 2, litra e), i den gældende dobbeltbeskatningsoverenskomst mellem Danmark og USA »*Dobbeltbeskatningsoverenskomsten mellem Danmark og USA*«), hvilket betyder, at USPF er:

    a.    en juridisk person, der er organiseret i henhold til lovgivningen i USA med henblik på at yde pension eller andre lignende fordele til ansatte, herunder selvstændige personer, i henhold til en plan, og

    b.    mere end 50 % af USPF's modtagere, medlemmer eller deltagere er personer bosiddende i enten USA eller Danmark.

5.    På Handelsdatoen [Trade Date] opnår USPF ubetinget ejerskab til Aktierne og vil have fulde ejerskabsrettigheder over Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date], herunder retten til at modtage det Udbytte, som erklæres på den pågældende dato.

6.    Aktierne vil blive holdt af USPF gennem NCB som depotbank. USPF's ejerskab til Aktierne registreres hos NCB og,

U.2024.746H - SKM2024.123.HRH

afhængigt af NCB's/underdepotbankens andre lange og korte positioner, Værdipapircentralen i Danmark.

7. NCB's register vil vise, at USPF er den juridiske ejer men ikke indeholdeoplysninger om det retmæssige ejerskab til Aktierne på Udbyttegodkendelsesdatoen [Dividend Approval Date], og at det Danske Udbytte repræsenterer reelt ejerskab på Aktierne, som videregives til USPF af depotbanken. Det antages endvidere, at NCB på anmodning fra USPF vil udstede standardejerskabsdokumentation til USPF om Aktierne i depotet, der viser det juridiske ejerskab til Aktierne og det modtagne udbytte.

8. NCB vil ikke udstede ejerskabsdokumentation vedrørende de Aktier, som er omfattet af den påtænkte transaktion, til andre parter end USPF i perioden fra USPF's køb af Aktierne, og indtil der er udbetalt udbytte til USPF på Aktierne eller udstede dokumentation, der viser andre ejere end USPF i den pågældende periode.

9. Den påtænkte transaktion blev ikke struktureret af NCB.

10. NCB vil udføre rollen som værdipapirdepotbank, men ingen anden rolle, f.eks. assistance med at ansøge om refusion af indeholdt dansk udbytteskat på Aktierne, og NCB udøver sin rolle som depotbank i forbindelse med den påtænkte transaktion i overensstemmelse med sine standardprocedurer, der er i overensstemmelse med de normale procedurer for depotbanker generelt.

11. NCB opkræver et gebyr for leverede depotbanktjenester i denne transaktion, som ikke afviger fra de gebyrer, der opkræves for depotbanktjenester generelt.

12. NCB er blevet anmodet om at udføre rollen som depotbank.

13. NCB har ingen grund til at antage, at - eller oplysninger eller viden om, hvorvidt - en anden person eller enhed end USPF vil indgive en ansøgning om refusion af skat med hensyn til den kildeskat på udbytte, som er indeholdt på Aktierne.

*5. Opinion*

Baseret udelukkende på vores forståelse af de fakta, der er beskrevet i punkt 3, og de forudsætninger, der er beskrevet i punkt 4 ovenfor, som vi ikke har undersøgt eller verificeret særskilt, og med de kvalifikationer, der er beskrevet i punkt 7, finder vi, at:

5.1 NCB vil ikke være underlagt dansk skattepligt som følge af den påtænkte transaktion.

5.2 NCB bør ikke være underlagt dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat for eventuelle tab som følge af bankens rolle i den påtænkte transaktion.

Følgende omstændigheder forhindrer os dog i at nå frem til en mere definitiv vurdering af NCB's position:

1. Den omstændighed, at USPF i Forwardtransaktionen indgår OTC-forwardkontrakter (og ikke f.eks. børsnoterede futures) for at afdække deres position, kan i princippet give mulighed for en »fuld afdækning« [»perfect hedge«] af USPF's position i Aktierne, som eliminerer ejerskabsrisikoen, og kan muligt også pege i retning af en anden identificeret part, der påtager sig en sådan ejerskabsrisiko, som således kan anses for at være den retmæssige udbytteejer af det udbytte, som er modtaget på Aktierne, i stedet for USPF. Dette vil kunne indebære en mulighed for arbitrage, som er identificerbar for NCB, og hvor standarddokumentationen for ejerskab udstedt af NCB kan være vildledende på en måde, som NCB har kendskab til eller mistænker.

2. Den omstændighed, at USPF (eller NCB) ikke har indhentet en tax opinion om den præcise transaktion, som er udført af USPF (tax opinion forudsætter futures og ikke OTC-forwardkontrakter), vil gøre det vanskeligere for NCB at gøre gældende, at banken pr. definition har handlet i god tro (og dermed ikke er ansvarspådragende) med hensyn til den danske skattemæssige behandling af

transaktionen, som af en professionel part med rimelighed kan anses for at indeholde problematiske forhold i relation til ejerskabet af Aktierne.

3. De i 6.2.1. nedenfor beskrevne sager vedrørende salget af »tomme« selskaber har vist de danske skattemyndigheders og de danske domstoles vilje til at placere erstatningsansvar for skattemyndighedernes tab hos andre involverede parter i transaktionen, der har

**774**

udløst tabet, når transaktionerne skønnes at have en tvivlsom karakter. I lyset deraf er det ikke sikkert, hvordan de danske skattemyndigheder ville opfatte den påtænkte transaktion vedrørende Aktierne og, hvis den skønnes tvivlsom, hvordan det danske retssystem vil reagere. Men selv om den skulle blive anset for tvivlsom, vurderer vi, at NCB's rolle i den påtænkte transaktion ikke kan sammenlignes med de ansvarlige parters rolle, herunder bankernes, i »selskabstømmersagerne«, som var mere alvorlige og medvirkende i relation til skattemyndighedernes tab.

5.3 NCB bør ikke være underlagt dansk strafferetligt ansvar som følge af sin rolle i den påtænkte transaktion.

*6. Danske skatteregler og analyse*

6.1 Ansvar for dansk kildeskat

6.1.1 Retsgrundlaget kort

Generelt vil den juridiske ejer af aktierne på datoen for beslutningen om udlodning af udbytte også blive anset som ejer af udbyttet i et dansk skatte- og selskabsretligt perspektiv, selv om køberen (endnu) ikke er registreret som ejer af aktierne, hvilket udgør sikringsakten i henhold til dansk ret, på datoen for generalforsamlingen (både Udbyttegodkendelsesdato og Udbytteregistreringsdato).

Standardafviklingsbetingelserne for en salgs- og købstransaktion vedrørende børsnoterede danske Aktier registreret i VP Securities A/S er T+3.

VP Securities A/S afvikler således som udgangspunkt udbyttebetalinger på dag 4 efter generalforsamlingen i Udstederen. Den faktiske udbyttebetaling er baseret på Udstederens aktieregister pr. datoen for generalforsamlingen i Udstederen og som opdateret ved udgangen af dag 3. Distribution på dag 4 er derfor baseret på den forudsætning, at alle T+3-aktiehandler, der udføres til og med datoen for generalforsamlingen, er registreret, når udbyttet udbetales. De aktionæroplysninger, der skal indgives til de danske skattemyndigheder af (eller på vegne af) Udstederen, er listen over aktionærer på datoen for generalforsamlingen i Udstederen som opdateret ved udgangen af dag 3.

For handler, der udføres på standard-T+3-vilkår, bør en ansøgning fra køberen af de danske aktier om refusion af indeholdt dansk udbytteskat derfor generelt ikke give anledning til uoverensstemmelser mellem udbyttemodtageren og den juridiske ejer af aktierne, og endvidere bør den juridiske ejer af aktierne ikke have problemer med at få refunderet overskydende kildeskat, da den juridiske ejer også vil være registreret hos de danske skattemyndigheder som modtager af udbyttet.

I henhold til dansk national ret vil udenlandske aktionærer, som ejer mindre end 10 % af aktiekapitalen i en Udsteder (børsnoteret eller ikke-børsnoteret) i første omgang være underlagt dansk kildeskat på 27 % af det modtagne udbytte, medmindre (for børsnoterede selskaber) Udstederen eller Værdipapircentralen specifikt har aftalt med de danske skattemyndigheder, at der gælder en nedsat skattesats for udbytte fra det udloddende selskab til det relevante udenlandske selskab i overensstemmelse med den dobbeltbeskatningsoverenskomst, som gælder for den pågældende aktionær.

I praksis indeholder og afvikler det udbytteudloddende selskab 27 % skat på alt udbytte, som ikke er berettiget til en lavere kildeskat. Hvis Udstederen indeholder utilstrækkelig kildeskat af udbytte,

Copyright © 2024 Karnov Group Denmark A/S                                                                    side 21

hæfter denne for den skat, som ikke indeholdes, medmindre den manglende indeholdelse ikke kan betragtes som forsømmelighed [»negligence«].

Aktionæren (hvis denne er den retmæssige ejer) kan anmode de danske skattemyndigheder om refusion af eventuel dansk kildeskat i overensstemmelse med den gældende dobbeltbeskatningsoverenskomst ved at indgive en udbytterefusionsformular til de danske skattemyndigheder.

Siden 2002 har de danske skattemyndigheder fokuseret på begrebet retmæssigt ejerskab. I 2010 ændrede de danske skattemyndigheder officielt deres fortolkning af de danske regler om kildeskat af udbytte for udenlandske aktionærer til, at de danske skatteregler indeholder et ikke-omgåelseskrav i form af en betingelse om retmæssigt ejerskab.

Når en udenlandsk udbyttemodtager ikke består en test vedrørende retmæssigt ejerskab som anvendt af de danske skattemyndigheder, kan der således være krav om indeholdelse af kildeskat på udbytte. Testen vedrørende retmæssigt ejerskab bygger på kravet om retmæssigt ejerskab i artikel 10 i OECD's modeloverenskomst og som yderligere forklaret i OECD's kommentarer.

I alle sager, hvor den danske kildeskat frafaldes eller nedsættes i henhold til en dobbeltbeskatningsoverenskomst, skal udbyttemodtageren indgive en ansøgning om refusion af den overskydende kildeskat til den danske skatteforvaltning. Den danske skatteforvaltning refunderer derefter det overskydende indeholdte udbytteskattebeløb.

For at søge om refusion af overskydende kildeskat skal udbyttemodtageren udfylde en refusionsformular 06.003 EN, som kan udskrives, og som ligger på de danske skattemyndigheders hjemmeside (www.skat.dk). Udbyttemodtageren skal på formularen til refusionsansøgning bekræfte, at denne er den retmæssige ejer af udbyttet og er forpligtet til at vedlægge et dividend advice (f.eks. i form af en gyldig SWIFT-betalingsmeddelelse) som bevis for, at der er indeholdt skat af udbytte udbetalt på danske aktier.

Betalingen foretages normalt af de danske skattemyndigheder inden for en måned. Nylige ændringer af de gældende renteregler fastsætter, at hvis kildeskat af

**775**

udbytte ikke er tilbagebetalt inden seks måneder fra skattemyndighedernes modtagelse af refusionsansøgningen og dokumentation for refusionsansøgningen, pålægges en rente på 0,5 % (2014) pr. påbegyndt måned.

6.1.2 Dansk skattepligt af udbytte for NCB

Da NCB ikke på noget tidspunkt direkte eller indirekte erhverver Aktierne, vil NCB ikke i dansk skattemæssig henseende blive anset for at være underlagt dansk udbytteskattepligt på Aktierne, da dette alene vil gælde for ejeren af Aktierne og - i tilfælde af forsømmelighed [»negligence«] med hensyn til at indeholde og/eller betale udbytteskat - Udstederen.

6.2 Civilretligt ansvar

6.2.1 Retsgrundlaget kort

I henhold til dansk civilret kræver erstatningsansvar uden for kontrakt generelt, at tre kriterier er opfyldt:

- Der skal være et retsgrundlag for ansvaret, normalt uagtsomhed [negligence] eller forseelse [misconduct].
- Der skal være et økonomisk tab.
- Der skal være en årsagssammenhæng mellem forsømmeligheden/forseelsen og det økonomiske tab.

Den danske stat (skattemyndighederne) vil som udgangspunkt kun lide et tab, hvis den skattepligtige person eller enhed (skatteyderen) ikke betaler eller ikke er i stand til at betale de skyldige skatter. Endvidere lides et tab kun, hvis den skyldige skat ville

være blevet betalt af eller på vegne af skatteyderen, hvis det ikke var for den påviste forsømmelighed eller forseelse.

Generelt vil de relevante spørgsmål i relation til ansvar for tab lidt af staten i skattespørgsmål være forekomsten af forsømmelighed eller forseelse og sammenhængen med det lidte tab.

Juridisk præcedens viser, at ledelsesmedlemmer, bestyrelsesmedlemmer og likvidatorer mv., der har en ledende eller kontrollerende funktion i en juridisk person eller omstændighederne kan blive ansvarlig for tab, som skattemyndighederne lider som kreditor, hvis den juridiske person bliver insolvent eller går konkurs. Endvidere, men sjældnere, er revisorer og juridiske rådgivere blevet pålagt erstatningsansvar for skattemyndighedernes tab.

Så vidt vi ved, er en depotbank i dansk retspraksis aldrig blevet holdt ansvarlig for tab lidt af skattemyndighederne som følge af at have imødekommet en urigtig ansøgning om refusion af indeholdt udbytteskat. Endvidere er vi ikke bekendt med, at der er prøvet sager ved danske domstole eller i det danske administrative system, hvor danske skattemyndigheder fejlagtigt har udbetalt et refusionsbeløb og forsøgt at dække et tab ved en sådan forkert udbetaling hos andre parter end den tilbagesøgende part.

I en række retssager (»selskabstømmersagerne«) indledt af skattemyndighederne i slutningen af 90'erne og begyndelsen af 00'erne blev der rejst civilretlige erstatningskrav mod forskellige deltagere i en vis type transaktion, hvorved »tomme« danske selskaber, der ejede et beløb i kontanter og skyldte et tilsvarende beløb i dansk skat, blev solgt til købere, som i det væsentlige hævede kontanterne, brugte dem til egen fordel og dermed aldrig betalte de skyldige skatter. Det stod med det samme klart, at køberne af sådanne selskaber var ansvarlige for skattemyndighedernes tab, og mange ifaldt også strafferetlige sanktioner. Skattemyndighederne forfulgte dog også de sælgende aktionærer i selskaberne samt deres rådgivere og de banker, der var involveret i finansieringen eller blot foretog kontantoverførslerne i forbindelse med opkøbene. En række sager mod sælgerne af selskaberne blev vundet af skattemyndighederne, også i den danske Højesteret, da det blev fastslået, at sælgerne ikke havde opfyldt en bestemt forpligtelse til at sikre sig, at de skyldige skatter i sidste ende ville blive betalt, selv om sælgerne (eller deres rådgivere/bankerne) ikke var direkte involveret i selskabets manglende betaling af sådanne skatter, da dette skete efter salget.

I en højesteretssag fra 1999 blev den bank, der var involveret i salget af det »tomme« selskab, holdt ansvarlig for skattemyndighedernes tab på det grundlag, at banken var bekendt med hver enkelt transaktion, der førte til købet, som betalt, at selskabets penge på en bankkonto blev anvendt til at finansiere køberens erhvervelse heraf, hvilket banken havde anset for at være afgørende i den risikovurdering, som banken havde foretaget (og medførte et højere gebyr end normalt til banken). Med sine handlinger blev banken anset for på en uvanlig måde at medvirke til selvfinansiering [Financial assistance], som ikke var i overensstemmelse med dansk selskabsret, og banken havde ikke foretaget sig noget for at forhindre risikoen for, at skattemyndighedernes interesser blev tilsidesat.

Ovenstående sager vedrørende de tomme selskaber anses generelt for at være noget ekstraordinære. Retsgrundlaget for de rejste krav findes endvidere - i hvert fald til dels - i særlige regler i den danske selskabslov om forbud mod visse former for selvfinansiering. Sagerne viser dog også det danske retssystems evne og beslutsomhed med hensyn til at placere ansvar hos andre parter end de danske skattemyndigheder, hvis skattemyndighederne skønnes at lide et tab, som en en følge af tvivlsomme handlinger udført af flere parter, selv hvis en enkelt part kun har spillet en begrænset rolle.

6.2.2 Civilretligt ansvar for NCB i den påtænkte transaktion

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

Generelt er der ingen gældende retspraksis til at underbygge, at der kan rejses et krav mod NCB for at virke som depotbank for USPF i relation til Aktierne.

Hvis andre parter end USPF søger om refusion af dansk kildeskat, vil NCB's eventuelle rolle i en sådan

**776**

refusionsansøgningsproces, om nogen, efter vores opfattelse være så fjern, at den ikke har nogen forbindelse til det tab, som lides i forbindelse med betalingen af refusionsansøgningen.

Forekomsten af et krav mod NCB ville efter vores opfattelse og baseret på de omstændigheder og forudsætninger, der er angivet ovenfor, i første omgang kræve, at USPF fejlagtigt har søgt om refusion af indeholdt udbytteskat i Danmark. For at kunne foretage en sådan refusionsansøgning vil de danske skattemyndigheder som Udgangspunkt kræve, at refusionsformularen ledsages af dokumentation for, at skatten er påført de skattebyder, der søger om refusion, ofte i form af et udbyttebevis udstedt af depotbanken. Hvis NCB udsteder en sådan (standard)dokumentation til USPF, og USPF i dansk skattemæssig henseende anses for ikke at være berettiget til at søge om refusion af indeholdt dansk udbytteskat - efter refusionen er foretaget - vil NCB's rolle og handlinger være relevante for analysen af ansvar for NCB efter dansk ret.

I denne henseende henvises der specifikt til vores forudsætninger om (i) at USPF vil erhverve Aktierne som udbytte, hvilket indebærer, at USPF vil blive ejer af det faktiske udbytte på Aktierne pr. Handelsdatoen [Trade Date], (ii) at USPF kun skal levere aktier ex udbytte i den efterfølgende Aktieudlånstransaktion, (iii) at NCB kun vil udstede standarddokumentation vedrørende USPF's formelle juridiske ejerskab, som ikke omhandler retmæssigt ejerskab, (iv) at NCB kun vil udstede en sådan dokumentation til USPF, (v) at der er indhentet en dansk tax opinion vedrørende USPF's danske skattemæssige stilling i en næsten identisk struktur, som er forelagt NCB, og (vi) at NCB - bortset fra eventuel udstedelse af standarddokumentation til USPF - ikke har haft nogen rolle i eller faktisk viden om processen med ansøgning om refusion af indeholdt udbytteskat i Danmark vedrørende Aktierne eller de oplysninger eller den dokumentation, som er indgivet til de danske skattemyndigheder.

Det er derfor vores holdning, at NCB ikke bør være ansvarlig for ukorrekt tilbagebetaling af kildeskat til USPF foretaget af de danske skattemyndigheder.

Følgende omstændigheder forhindrer os imidlertid i at nå frem til en mere definitiv vurdering af NCB's position:

1. Den omstændighed, at USPF indgår OTC-forwardkontrakter (og ikke f.eks. børsnoterede futures) for at afdække deres position, kan i princippet give mulighed for en »fuld afdækning« [»perfect hedge«] af USPF's position i Aktierne og kan muligt også pege i retning af en anden identificeret part, som kan anses for at være den retmæssige udbytteejer af det udbytte, som er modtaget på Aktierne, i stedet for USPF som retmæssig ejer. Dette vil kunne indebære en mulighed for arbitrage, som er identificerbar for NCB, og hvor standarddokumentation for ejerskab udstedt af NCB kan være vildledende.

2. Den omstændighed, at USPF ikke har indhentet en tax opinion om den præcise transaktion, som er udført af USPF (tax opinion forudsætter futures og ikke OTC-forwardkontrakter), vil gøre det vanskeligere for NCB at gøre gældende, at banken pr. definition har handlet i god tro (og dermed ikke er ansvarlig) med hensyn til den danske skattemæssige behandling af transaktionen.

3. De i 6.2.1. ovenfor beskrevne sager vedrørende salget af »tomme« selskaber har vist de danske skattemyndigheders og de danske domstoles vilje til at placere erstatningsansvar for skattemyndighedernes tab hos andre involverede parter i de transaktioner,

der har udløst tabet, når transaktionerne skønnes at have en tvivlsom karakter. I lyset deraf er det ikke sikkert, hvordan de danske skattemyndigheder ville opfatte den påtænkte transaktion vedrørende Aktierne og, hvis den skønnes tvivlsom, hvordan det danske retssystem vil reagere. Men selv om den skulle blive anset for tvivlsom, vurderer vi, at NCB's rolle i den påtænkte transaktion ikke kan sammenlignes med de ansvarlige parters rolle, herunder bankernes, i »selskabstømmersagerne«, som var mere alvorlige og medvirkende i relation til skattemyndighedernes tab.

## 6.3 NCB's strafferetlige ansvar

### 6.3.1 Retsgrundlaget kort

I henhold til § 13 i danske skattekontrollov straffes den, der med forsæt til at uddrage skat afgiver urigtige eller vildledende skatteoplysninger til afgørelse af skattepligt eller skatteansættelse eller beløbet deraf, med strafferetlige sanktioner i form af bøde eller fængsel. Hvis den skattepligtige ikke er en fysisk person, er sanktionen en bøde. Dette gælder også, hvis de urigtige eller vildledende skatteoplysninger er afgivet som følge af forsømmelighed. Medvirken til sådant skattesvig er underlagt de samme sanktioner.

I henhold til § 15 i skattekontrolloven straffes den, der med forsæt til at uddrage skat undlader at indgive en selvangivelse, med strafferetlige sanktioner i form af bøde eller fængsel. Hvis den skattepligtige ikke er en fysisk person, er sanktionen en bøde.

Enhver undladelse af korrekt indgivelse af oplysninger til de danske skattemyndigheder vil ikke være underlagt strafferetlige sanktioner, hvis en sådan undladelse ikke skyldes grov forsømmelighed eller forsæt.

I henhold til § 23 i dansk straffelov anses en lovovertrædelse for begået af enhver, der ved tilskyndelse, råd eller dåd har medvirket til den strafbare handling.

Strafferetligt ansvar kræver generelt, at gerningsmanden har et kriminelt forsæt, men under visse omstændigheder er forsømmelighed tilstrækkeligt. De gældende strafferetlige sanktioner i tilfælde af forsømmelighed er dog generelt betydeligt mindre strenge.

**777**

Retspraksis har vist en høj grad af tilbageholdenhed med at anse andre end skatteyderen for at have medvirket til skatteunddragelse eller skattesvig, og generelt vil dette kræve en ganske direkte involvering i den strafbare handling, f.eks. bistand til at udfylde og indgive en forkert selvangivelse.

### 6.3.2 Strafferetligt ansvar for NCB som følge af den påtænkte transaktion

NCB vil som hovedregel ikke skulle indsende oplysninger til de danske skattemyndigheder som følge af Transaktionen. NCB vil, hvis overhovedet, kun være indirekte involveret i refusionsansøgningen ved at udstede det udbyttebevis, som de danske skattemyndigheder generelt stiller krav om

Baseret på de i 2 ovenfor anførte omstændigheder og forudsætninger og navnlig under hensyntagen til de samme omstændigheder som beskrevet under 6.2.2 vedrørende civilretligt ansvar, bør der i dansk ret ikke være grundlag for at anse NCB som medvirkende til dansk skattesvig.

### 7. Kvalifikationer

7.1 Denne Opinion er afgrænset til forhold vedrørende dansk ret, som aktuelt er gældende og vedtaget af danske lovgivende myndigheder, og der udtrykkes ingen vurdering af lovgivningen i andre jurisdiktioner. Navnlig foregiver vi ikke at være bekendt med lovgivningen i Tyskland eller lovgivningen i nogen anden jurisdiktion end Danmark, og vi udtrykker ingen vurdering af forhold, der er underlagt eller fortolket i overensstemmelse med sådan lovgivning.

7.2 I denne opinion beskrives danske juridiske begreber med engelske termer og ikke med deres oprindelige danske termer. De pågældende begreber svarer muligvis ikke til de begreber, der be-

U.2024.746H - SKM2024.123.HRH

skrives med de samme engelske termer, som forekommer under andre jurisdiktioners lovgivning. Denne Opinion kan derfor kun påberåbes på den udtrykkelige betingelse, at eventuelle fortolknings- eller ansvarsspørgsmål, der opstår i forbindelse hermed, er underlagt dansk ret og indbringes for en dansk domstol.

7.3 Denne Opinion afgives på det grundlag, at den underlægges og fortolkes i overensstemmelse med dansk ret.

7.4 Denne Opinion er strengt begrænset til forhold anført heri og skal ikke læses som værende implicit gældende for andre forhold i forbindelse med den påtænkte transaktion.

*8. Anvendelse*

Denne Opinion er rettet til NCB til dennes gavn og brug og kan ikke påberåbes af nogen anden person eller til noget andet formål end i forbindelse med den påtænkte transaktion og må ikke bruges, rundsendes, citeres eller på anden måde henvises til til noget andet formål, undtagen (i) til NCB's juridiske eller skattemæssige rådgivere i forbindelse med Transaktionen, (ii) hvor der er påbudt ved lov, retskendelse eller af et relevant tilsynsorgan eller (iii) i forbindelse med enhver tvist eller retssag, som NCB er part i, i hvilket tilfælde vi skal informeres om sådan brug.«

I sommeren 2015 blev Bech-Bruun på ny kontaktet af Jones Day om den legal opinion, som blev afgivet den 4. august 2014, idet North Channel Bank nu ønskede at modtage bekræftelse på indholdet heraf. Af H's mail af 15. juli 2015 til A fremgår således følgende:

»…

Siden du afgav din opinion, har klienten foretaget en række transaktioner for sine kunder i henhold til det arrangement [scheme] som du gav din opinion om sidste år.

Vi er blevet bedt om at bekræfte, at transaktionerne er blevet gennemført som beskrevet i den tyske opinion og bekræfte, at der ikke er nogen juridisk udvikling, som kan påvirke disse opinions, siden den blev afgivet.

Vi har gennemgået eksempler på posteringer [Sample book entries] for et par »rigtige« transaktioner og kan bekræfte, at transaktionerne blev udført som tidligere påtænkt. Vi kan naturligvis bekræfte, at de tyske retsforhold ikke har ændret sig [siden] den tyske opinion blev afgivet. Vi har dog brug for din hjælp til at bekræfte, at den juridiske/skattemæssige situation i Danmark ikke har ændret sig, siden opinionen blev afgivet.

Vi beder dig venligst udarbejde et dokument, som henviser til den oprindelige opinion, og bekræfter, at der ikke er sket nogen (relevante) ændringer i dansk ret, og at du kan gentage din opinions indhold i dag. Ideelt set vil vi gerne sende udkast til et sådant dokument til klienten i [løbet af] næste uge.

Kontakt mig endelig, hvis du har spørgsmål.«

Ved mail af 20. juli 2015 bekræftede Bech-Bruun den tidligere afgivne legal opinion. Samtidig gjorde Bech-Bruun I/S opmærksom på ligningslovens § 3 som indsat ved lov nr. 540 af 29. april 2015 om ændring af ligningsloven, boafgiftsloven, fondsbeskatningsloven, skatteforvaltningsloven og forskellige andre love (Skattelypakke om trusts, værdiansættelse af aktiver i forbindelse med bindende svar og international omgåelsesklausul samt udskydelse af selvangivelsesfristen for selskaber m.v., lempelse af sanktionen ved manglende registrering af underskud og korrektion af satserne for vægtafgift af personbiler m.v.), hvorved der blandt andet blev indført en generel omgåelsesklausul. Af mailen fremgår blandt andet:

»Den danske lov øger usikkerheden i forhold til at kræve dobbeltbeskatningsoverenskomstmæssige fordele i en række tilfælde. Efter vores opfattelse kan den nye omgåelsesklausul have indflydelse på USPF's mulighed for at kræve overenskomstmæssige fordele i relation til de transaktioner, der er beskrevet i opinionen. Det er

dog vores vurdering, at risikoen vil være USPF's og ikke NCB's.«

Ved en mail af samme dato anmodede H Bech-Bruun om at udarbejde en skrivelse - ideelt i samme format som legal opinion fra 2014 - med en drøftelse af, om ændringerne havde betydning for analysen/opinion fra året før.

En bekræftelse af indholdet af den tidligere afgivne legal opinion, som i punkt 6.1. medtager et afsnit svarende til det ovenfor citerede fra mailen af 20. juli 2015, blev herefter fremsendt til Jones Day den 24. juli 2015. Bekræftelsen var i A's fravær underskrevet af N. Det fremgår af sagen, at Bech-Bruun I/S modtog et salær på 3.900 euro for bekræftelsen. Af faktureringen fremgår, at Bech-Bruun I/S' bistand har omfattet: »… gennemgang af legal opinion vedrørende de danske ansvarsmæssige konsekvenser for NCB af at handle som depotbank i visse transaktioner og for udstedelse af bekræftende legal opinion af 24. juli 2015.«

Det fremgår af sagen, at der i november og december 2015 var kontakt på mail mellem Bech-Bruun og Jones Day, idet Jones Day var blevet kontaktet af North Channel Bank i anledning af, at man var bekymret for, om de transaktioner, som banken var involveret i, kunne blive genstand for undersøgelse fra de danske myndigheders side i tilknytning til den nu verserende sag om svig med ansøgninger om refusion af dansk udbytteskat. For denne rådgivning modtog Bech-Bruun et salær fra North Channel Bank på 3.200 euro. I 2017 blev Bech-Bruun på ny kontaktet af Jones Day om sagen i lyset blandt andet af en henvendelse til North Channel Bank fra den tyske indskydergarantiordning, og ved brev af 5. april 2017 skrev Bech-Bruun følgende til Jones Day:

»Med henvisning til vores telefonmøde sidste fredag kan jeg bekræfte, at dansk ret ikke har noget koncept om sekundær skattepligt for kildeskatter.

Endvidere kan jeg bekræfte, at gældende retspraksis og administrativ praksis ikke støtter et ansvar for dansk kildeskat for en depotbank, der udelukkende handler i sin kapacitet som depotbank uden nogen involvering i processen med at søge om refusion af dansk kildeskat. North Channel Banks stilling i forhold til dansk udbytteskattepligt, som er beskrevet i vores legal opinion af 4. august 2014, har efter vores opfattelse ikke ændret sig.«

*North Channel Banks forhold*

North Channel Bank GmbH & Co. KG (herefter North Channel Bank) er en bank med hovedsæde i Mainz, Tyskland. Banken er ultimativt ejet af det i USA hjemmehørende selskab Oban Holdings LLC.

I perioden fra juni 2013 til april 2014 var der overvejelser om etablering af depotvirksomhed som et nyt forretningsområde i North Channel Bank. Der er i sagen dokumenteret mailkorrespondance mellem bankens daværende ledelse, direktørerne T2 og T1, bankens hovedaktionærer samt en række eksterne samarbejdspartnere, herunder P, Q og R vedrørende den nærmere tilrettelæggelse heraf. Der blev i den forbindelse blandt andet udvekslet udkast til transaktionsbeskrivelser og projektplaner.

I november 2013 blev der i kredsen udvekslet nogle regneark med beskrivelser af de forskellige skridt i forbindelse med handel med henholdsvis aktier og futures. Der fremgår nederst på et regneark vedrørende aktiehandler med rød skrift: »VIGTIGST: Alle afviklinger skal ske på én gang. Alle afviklinger bør foretages »fri for betaling« for at undgå kreditrisiko.«

Den 29. januar 2014 blev der internt i North Channel Bank rundsendt en milestone-plan. Det fremgår af planen, at der som led i projektet skulle indhentes legal opinions, og at opgaven var allokeret til North Channel Bank. Der er mellem sagens parter ikke enighed om, hvorvidt det kan udledes af planen, at opgaven skulle være udført inden udgangen af uge 9 i 2014.

Den 11. februar 2014 skrev T1 til P, R, S, M, … og T2:

**778**

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

»venligst brug kun vores mailadresse @bankingbusiness.de til al e-mailtrafik i forbindelse med de »særlige« handler.

Alle mails til de officielle bankadresser gemmes automatisk og kan ikke slettes.«

De for denne sag relevante ansøgninger om refusion af udbytteskat blev indsendt til SKAT i perioden fra den 12. maj 2014 til den 22. juli 2015.

Den 17. juni 2015 skrev det tyske Finanstilsyn (BaFin) til direktionen i North Channel Bank, at det på baggrund af revisionsrapport for bankens årsregnskab for 2014 kunne konstateres, at der var foretaget 567 kundetransaktioner i aktier udstedt i danske, belgiske, japanske og tyske selskaber, og at ingen af kundedepoterne ved årets udgang udviste en beholdning. Det fremgår videre af brevet, at transaktionerne fremtrådte med en høj grad af lighed med udbyttestrippingtransaktioner eller udbyttearbitrage-transaktioner, hvorfor BaFin anmodede banken om at redegøre for, hvorledes banken havde sikret sig, at der for banken ikke var tale om sådanne lovmæssige eller omdømmemæssige risici.

Ved skrivelse af 1. juli 2015 svarede North Channel Bank ved T1 og T2 følgende:

»Vi har under det forberedende arbejde i forbindelse med kundetransaktionerne beskæftiget os med de juridiske og - især på baggrund af de i Deres skrivelse omtalte problemstillinger - skatteretlige aspekter. For at udelukke eventuelle juridiske og omdømmemæssige risici har vi forud for udførelsen af kundetransaktionerne i begyndelsen af 2014 indhentet en udtalelse fra et velrenommeret, internationalt advokatfirma.

Inden for rammerne af udfærdigelsen af udtalelsen er der af advokatfirmaet indhentet tilsvarende

**779**

forberedende udtalelser for landene Belgien og Danmark fra advokater …, der er hjemmehørende i disse lande, som der i udtalelsen indholdsmæssigt er taget hensyn til. For Japans vedkommende er der alene gennemført fem testtransaktioner, hvorfor man her har fravalgt udarbejdelse af en specifik udtalelse. Efter at have konfereret med vores kunder påtænkes der ikke gennemført yderligere transaktioner i Japan. For så vidt angår den tyske transaktion, er skatten på kapitalafkast indbetalt som skattemæssigt foreskrevet.

Da den af os under det forberedende arbejde i forbindelse med transaktionerne bestilte udtalelse er udarbejdet på grundlag af beskrivelser af kunderne, har vi i mellemtiden bedt advokatfirmaet om endnu engang at bekræfte udsagnene i deres udtalelse ud fra de rent faktisk gennemførte transaktioner og i den forbindelse også tage hensyn til eventuelle juridiske eller skattemæssige ændringer. Efter vores opfattelse afviger de oprindelige beskrivelser ikke fra de gennemførte transaktioner.

Vi forventer at fremlægge den opdaterede udtalelse inden udgangen af juli.

Der vil desuden i vores risikokapacitetsmodel blive taget hensyn til eventuelt tilbageværende omdømmemæssige risici.«

Den 31. marts 2016 meddelte BaFin ledelsen i North Channel Bank, at BaFin havde besluttet at iværksætte en revision af bankens forretningsførelse. Revisionen skulle foretages af KPMG's afdeling i Frankfurt am Main.

KPMG's rapport forelå den 29. juli 2016. Af rapporten fremgår blandt andet følgende:

»*1 Revisionsopdrag*

Det tyske Finanstilsyn i Bonn (BaFin) har med skrivelse af 22. marts 2016 … givet os i opdrag at gennemføre en ekstern revision iht. § 44, stk. 1, 2. pkt. i den tyske Lov om Finansiel Virksomhed [KWG] hos

*North Channel Bank GmbH & Co. KG, Mainz*

- efterfølgende kort benævnt »NCB« eller »Banken« -

Iht. den af BaFin … trufne beslutning af 31. marts 2016 om iværksættelse af en ekstern revision af NCB skal de nærmere omstændigheder i forbindelse med 567 i 2014 gennemførte kundetransaktioner i aktier udstedt af danske, belgiske, japanske og tyske udstedere undersøges … Særligt skal det afklares om og i hvilket omfang der i Banken forefandtes informationer om den forretningsmæssige baggrund for transaktionerne. Det skal også undersøges, hvordan og på hvis initiativ de pågældende transaktioner er kommet i stand, og om gennemførelsen af transaktionerne, henset til de i 2014 og 2015 indhentede Legal Opinions, er i overensstemmelse med behørig og forsvarlig forretningsledelse.

Ifølge den af BaFin trufne beslutning om iværksættelse af en ekstern revision er der en høj grad af lighed mellem de omhandlede transaktioner og dividend stripping- eller arbitragetransaktioner –såkaldte »cum/ex-transaktioner«. Det er derfor nødvendigt gennem denne eksterne revision at afklare de nærmere omstændigheder i forbindelse med disse transaktioner for at gøre det muligt for BaFin at foretage en endelig vurdering af, om der har været tale om behørig og forsvarlig forretningsledelse i Banken (ledelsens overordnede ansvar).

…

Ved planlægningen af revisionen har vi i forbindelse med gennemgangen af de i 2014 hos NCB gennemførte værdipapirtransaktioner taget udgangspunkt i de problematikker, der er redegjort for i udbudsmaterialet fra BaFin. På baggrund heraf har vi opstillet følgende fokusområder:

- Overholdelse af Finanstilsynets krav til omsættelsen til praksis af forpligtelsen til at udvise omhu og agtpågivenhed (Know-Your-Customer-princippet), herunder særligt kravet om indhentning af informationer og dokumentation for kundernes økonomiske baggrund hhv. den økonomiske baggrund for de transaktioner, der er gennemført for de i 2014 antageligt 39 kunder;
- Kortlægning af de i 2014 gennemførte værdipapirtransaktioner med henblik på identifikation af transaktionsmønstre;
- Gennemgang af de af Banken indhentede Legal Opinions;
- Undersøgelse af, om tilrettelæggelsen af proceduren i forbindelse med oprettelse af nye produkter inden for forretningsområdet Depotservices … samt det skriftligt fastlagte regelsæt for depotservices, der var til rådighed i 2014, var adækvat og tilstrækkeligt.

…

Iht. aftale med BaFin omfatter revisionen ikke en vurdering af lovmedholdeligheden af de transaktioner i ind- og udenlandske aktier, der i hvert enkelt tilfælde finder sted umiddelbart før og efter udbytteregistreringsdagen [dividend record date] i den pågældende aktieudsteders aktier.

Efter aftale med BaFin omfatter revisionen heller ikke en vurdering af, om de af advokatfirmaerne i de af disse afgivne Legal Opinions beskrevne og bedømte strukturer for de respektive værdipapirtransaktioner stemmer overens med de i Banken rent faktisk gennemførte transaktioner, og om og hvorvidt de i disse Legal Opinions nævnte forudsætninger og trufne antagelser er overholdt hhv. bliver overholdt.

Vi har ej heller undersøgt de skattemæssige implikationer af transaktionerne med henblik på tysk og udenlandsk skatteret eller mulige aspekter af transaktionernes manglende forenelighed med tysk eller udenlandsk skatteret, således som disse [implikationerne] diskuteres

**780**

i forbindelse med cum/extransaktioner i tyske aktier i årene før 2012. En bedømmelse af clearing-transaktionerne ud fra et skatte-

U.2024.746H · SKM2024.123.HRH

retligt, civilretligt eller strafferetligt synspunkt og mulige retlige konsekvenser heraf i jurisdiktionerne Belgien, Danmark, Tyskland, Japan og hjemlandene for de involverede kunder samt en bedømmelse af den principielle lovmedholdelighed af clearing-transaktionerne har udtrykkeligt efter aftale med BaFin ikke været genstand for revisionen.

…

*2 Resumé af resultaterne af den gennemførte revision*

…

*Depotservices*

I 2014 blev forretningsområdet Sekundære Services i Forbindelse med Værdipapirhandel … taget op som nyt forretningsområde, og der blev foretaget en række volumenmæssigt store aktietransaktioner med aktier udstedt af udenlandske børsnoterede aktieselskaber, som tidsmæssigt blev gennemført i umiddelbar tilknytning til udbytteregistreringsdagen [dividend record date] i de handlede aktier. Med en tysk udsteders aktier blev der gennemført et t, to transaktioner (to køb og to salg), hver især med et volumen på 100 styk. De for NCB's kunder i 2014 gennemførte værdipapirtransaktioner blev normalt udført efter et fast mønster.

- Organisationsmanualen for Værdipapirservices (OHB Wertpapierservice) blev udarbejdet i 2014 og af Bankens ledelse sat i kraft den 31. oktober 2014. Den omfatter en redegørelse for de væsentlige opgaver inden for forretningsområdet Værdipapirservices samt en redegørelse for afviklingen af værdipapirtransaktioner inden for forretningsområdet Depotservices. Dermed forelå på tidspunktet for optagelsen af forretningsområdet Depotservices i marts 2014 og frem til tidspunktet for ikrafttrædelsen af Organisationsmanualen for Værdipapirservices ikke noget skriftligt fastlagt regelsæt. Ligeledes er yderligere procedurebeskrivelser og instrukser, som vedrører depotservices, først trådt i kraft i maj og august 2014 hhv. i januar 2015.

- Iht. kravene i MaRisk AT 5 skal pengeinstituttet sikre, at forretningsaktiviteterne sker på grundlag af *organisationsretningslinjer*. Dette krav er opfyldt for depotservices.

- Mønsteret for de i 2014 gennemførte *værdipapirtransaktioner* er beskrevet i afsnit 5.2 i Rapporten. Overordnet set blev der på et tidspunkt af en kunde i Banken af en broker købt et bestemt antal aktier af en bestemt type … til en aftalt fast kurs …, og af en anden kunde i Banken til samme aftalte faste kurs … solgt samme antal aktier af samme type til brokeren. For så vidt angår Køberen, var der altid tale om en Pension Plan med hjemsted i USA, sælgerne havde hjemsted i Belize eller British Virgin Islands. Brokeren havde et depot og en konto hos NCB.
  På samme tidspunkt indgik Køber og Sælger værdipapirlåneforretninger med en tredjepart, der ligeledes var kunde i NCB. Dette betød, at Køber udlånte de erhvervede værdipapirer til tredjeparten, og at Sælger lånte værdipapirerne. På valørdagen var der således ingen beholdning i depoterne.
  På et senere tidspunkt blev aktierne via brokeren solgt hhv. købt af Køber og Sælger til den aftalte faste kurs …, og værdipapirlåneforretningerne blev afviklet. På grundlag af de mellem Køberne hhv. Sælgerne og tredjeparten indgåede OTC-forward-forretninger, som var baseret på cash settlement, opstod der tinan kursgevinster hhv. kurstab i forbindelse med transaktionerne.

…

Købs- hhv. salgstidspunktet for aktierne lå i hvert enkelt tilfælde kort før udbytteregistreringsdagen [dividend record date] for de respektive aktier og settlement efter udbytteregistreringsdagen [dividend record date]. I overensstemmelse

med de aktiebeholdningen, der eksisterede pr. udbytteregistreringsdagen [dividend record date], blev der for bankens kunder udstedt skriftlige bekræftelser »Dividend Credit for non-resident tax payer status« *(Dividend Credit Advice)* på hhv. krediteringer og debiteringer af beløb svarende til nettoudbyttet

Ifølge en henvisning på disse Dividend Credit Advices var der i den forbindelse ikke tale om skatteattester …. Det bemærkes dog, at formatet og den grafiske udformning af disse Dividend Credit Advices er meget lig formatet og udformningen af de pågældende skatteattester.

Udstedelsen af Dividend Credit Advices synes at have været relevant for gennemførelsen af de her omhandlede transaktioner. De respektive Dividend Credit Advices synes i den forbindelse at have spillet en rolle for processen i forbindelse med den refusion af udbytteskat, som udenlandske serviceudbydere har forestået.

…

*- Proceduren i forbindelse med oprettelse af nye produkter inden for forretningsområdet*

*Depotservices* blev startet op i henhold til ledelsesbeslutning af 29. august 2013. Det var hensigten at afslutte denne procedure inden udgangen af 2013 og at kunne tilbyde produktet Depotservices fra første kvartal 2014.

Beslutningsforlægget/ledelsesbeslutningen med henblik på afslutning af proceduren i forbindelse med oprettelse af nye produkter inden for forretningsområdet Depotservices blev underskrevet den 24. november 2014, og proceduren i forbindelse med oprettelse af nye produkter inden for forretningsområdet Depotservices blev dermed først på dette tidspunkt afsluttet.

**781**

Forretningsområdet Depotservices blev startet op, før proceduren i forbindelse med oprettelse af nye produkter inden for forretningsområdet Depotservices var afsluttet, og kravene i MaRisk AT 8.1, var dermed, hvad angår indholdet, ikke på alle områder omsat til praksis. Kravene i MaRisk AT 8.1 var således ikke i fuldt omfang overholdt.

De antagelser, der ligger til grund for proceduren i forbindelse med oprettelse af nye produkter inden for forretningsområdet Depotservices, for så vidt angår de gennemsnitlige størrelse af transaktionerne og det gennemsnitlige antal transaktioner, var i forhold til det faktiske omfang af forretningsområdet ikke tilstrækkelige. Der må derfor stilles spørgsmålstegn ved arten og omfanget af de krav, der stilledes til den organisatoriske opbygning af forretningsområdet og afviklingen af transaktionerne, IT systemer, kontrolkoncepter og integreringen i risikostyringsprocesser.

…

*Forretningsmæssig baggrund*

En forretningsmæssig baggrund for transaktionerne, som kunne retfærdiggøre foretagelsen af transaktionerne, har vi ikke kunnet identificere, hhv. har vi på vor forespørgsel til Bankens ledelse ikke fået nogen informationer om.

- De pågældende Pension Plans og selskaberne har ikke opnået nogen kursgevinster af købet og salget af værdipapirerne hhv. der har ikke været nogen kurstab, dvs. en formuetilvækst i form af kursgevinster var øjensynlig ikke tilsigtet. Da forretningerne blev indgået som OTC- forwardforretninger var der for køberne og sælgerne ingen kursrisiko forbundet med køb og salg af værdipapirerne.

- På baggrund af, at der øjensynlig ikke var andre motiver, f.eks. opnåelse af kursgevinster, må man få det indtryk, at værdipapirtransaktionerne for de pågældende Pension Plans var skattemæssigt motiverede og tog sigte på refusion af en

mulig udenlandsk kildeskat. Resultatrelevante indgående betalingsstrømme, som ikke modsvaredes af direkte modsatrettede udgående betalingsstrømme, eller som skulle tilbageføres igen, har der for disse Pension Plans' vedkommende kun været i form af krediteringer fra Accupay, Goal Taxback og Syntax, hvor der i den forbindelse synes at være tale om resultat af refusion af udenlandsk kildeskat. Vi har fra Banken ikke fået oplysninger herom.

- For selskaberne er der kun indtægter i form af termination fees for mulig førtidig indfrielse *[Fodnote:* Værdipapirlåneforretningerne er øjensynligt bragt til ophør før udløbet af den oprindeligt aftalte løbetid; vi har i så henseende ikke fået endegyldige informationer fra Banken.] af værdipapirlåneforretningerne.

…

*Initiativet*

Initiativet til etableringen af kundeforholdene i 2014 udgik efter det af Bankens ledelse oplyste altid fra ejerne af Banken, som har tilstillet NCB oplysninger om kundernes navne og adresser.

- Transaktionerne for Pension Plans blev med en enkelt undtagelse rekvireret af Y. Y har afgivet ordrerne pr. e-mail hhv. har underskrevet de respektive anvisninger på eksempelvis overførsel af værdipapirer inden for rammerne af værdipapirlånet eller på overførsel af penge. Det bemærkes i den forbindelse, at Y's underskrift på de anmodninger om overførsler, vi har taget indseende med, i overvejende grad var indføjet i form af et scannet billede.

- Selskaberne handlede ved de i hvert enkelt tilfælde tegningsberettigede personer. Afgivelse af ordrer hhv. indhentning af bekræftelser skete i hele perioden pr. e-mail, hhv. ved pr. e-mail fremsendte uformelle pdf-filer. I de pdf-dokumenter, vi har taget indseende med, var de handlende personers underskrift i overvejende grad indføjet i form af scannede billeder.

- Henset til det forhold, at strukturen i værdipapirtransaktionerne og kredsen af involverede parter samt i de nødvendige aftaler forud for transaktionerne (værdipapirudlåns- og forward-forretninger) i alle tilfælde i 2014 var den samme, har vi spurgt ind til relationerne mellem de handlende personer. Ledelsen i Banken og ressortchefen for forretningsområdet Værdipapirservices er efter det oplyste ikke bekendt med, at der skulle være tale om relationer mellem disse.

…

*De udarbejdede Legal Opinions*

Advokatfirmaerne Jones Day og Bech-Bruun er via de med disse selskaber indgåede rammeaftaler af NCB blevet anmodet om at udarbejde Legal Opinions; der har iflg. det af Bankens direktør oplyste ikke været tale om et særskilt meddelt opdrag (individuel ordre) på udarbejdelse af de respektive Legal Opinions. Det er derfor ikke muligt at fastslå et tidspunkt for mandatet.

Generelt bemærkes, at Banken ikke var pålagt en tilsynsretlig forpligtelse til forud for gennemførelsen af værdipapirtransaktionerne at indhente Legal Opinions i relation til ngen som helst aspekter af transaktionerne. Under samtalerne med Banken er det dog blevet fremhævet, som det også fremgår af skriftvekslingen med BaFin, at transaktionerne for Banken kunne eller kan være forbundet med lovmæssige eller omdømmemæssige risici. Udarbejdelsen af de respektive Legal Opinions er sket med henblik på identifikation af mulige risici for NCB i Bankens rolle som depotbank. De i Legal

Opinions også anførte betragtninger mht. de skatteretlige aspekter er begrænset til de skattemæssige implikationer for NCB, og transaktionerne som sådanne er ikke undersøgt med henblik herpå.«

Det er mellem parterne ubestridt, at der ikke forelå en rammeaftale mellem North Channel Bank og Bech-Bruun.

Den danske anklagemyndighed anmodede den 10. februar 2017 Retten i Lyngby om at påse, at betingelserne for at fremsætte begæring over for de kompetente myndigheder i Tyskland om ransagning hos North Channel Bank var opfyldt. Anklagemyndigheden anførte i sin anmodning blandt andet, at North Channel Bank i foråret 2016 på vegne af det tyske finanstilsyn var blevet undersøgt af revisionsfirmaet KPMG, og at SØIK havde modtaget rapporten gennem JIT-samarbejdet.

Den 12. september 2018 anlagde SKAT et civilt søgsmål ved den engelske High Court of Justice mod blandt andre North Channel Bank med henblik på tilbagesøgning af den uberettiget udbetalte refusion af udbytteskat. Efter det oplyste verserer sagen fortsat.

Den 23. september 2019 vedtog North Channel Bank ved administrerende direktør C et bødeforelæg på 110 mio. kr. for overtrædelse af straffelovens § 279, jf. § 286, stk. 2, jf. § 306, i et retsmøde i Retten i Glostrup. Det fremgår af retsmødebegæringen, at sigtelsen mod North Channel Bank angik:

»*bedrageri af særlig grov beskaffenhed efter straffelovens § 279, jf. § 286, stk. 2, jf. § 306,*

ved at ledere og medarbejdere i sigtede selskab i perioden 2014-2015 i forening og efter forudgående aftale eller fælles forståelse med flere fysiske og juridiske personer med henblik på at skaffe sigtede og dennes medgerningsmænd uberettiget vinding at have tilrettelagt og eksekveret et system, hvori sigtede kunne registrere fiktive aktie- og pengebevægelser, hvorefter sigtede udfærdigede dokumenter (såkaldte Dividend Credit Advices) indeholdende urigtige oplysninger om udbetaling af udbytte på danske aktier, som sigtedes medgerningsmænd i mindst 284 tilfælde på vegne af mindst 27 amerikanske »401 K pension plans« anvendte til at bringe ansatte i Skattestyrelsen (tidligere SKAT) i en vildfarelse om, at de amerikanske »401 K pension plans« havde fået indeholdt udbytteskat i Danmark og derved var berettiget til refusion heraf, alt hvorved Skattestyrelsen (tidligere SKAT) bestemtes til at udbetale ikke under 1,1 mia. kr., og hvorved sigtede opnåede en uberettiget vinding på ikke under 55 mio. kr.«

Af retsbogen fra retsmødet fremgår blandt andet følgende:

»North Channel Bank GmbH & Co. KG ved administrende direktør, V2 var mødt.

V2 blev gjort bekendt med, at han som repræsentant for sigtede ikke havde pligt til at udtale sig.

…

V2 forklarede blandt andet, at han siden 1. januar 2017 har været administrerende direktør i North Channel Bank. Banken ejes af 3 hovedaktionærer bosiddende i New York.

Kort efter sin tiltræden blev han klar over uregelmæssigheder vedrørende Bankens medvirken til uretmæssig tilbagebetaling af udbytteskat. Han tog kontakt til det tyske Finanstilsyn og iværksatte en nærmere undersøgelser af forholdene. I maj 2017 fik han resultatterne heraf. Disse viste blandt andet, at der var flere mystiske udlån i banken, hvor låntager var bosiddende i skattely lande.

Den 20. juni 2017 blev banken ransaget af politiet. Det var en voldsom oplevelse. Myndighederne er fortsat i besiddelse af det materiale, som blev beslaglagt ved ransagningen. Efter ransagningen var der et intenst samarbejde med de tyske, danske og belgiske myndigheder omkring oplysning af sagen. Undersøgelserne bekræftede politiets mistanke.

**782**

I 2014 havde banken provisionsindtægter i forbindelse med tilbagebetaling af udbytteskat på 4,1 mio. euro og i 2015 på 7,94 mio. euro. Det er bankens gebyrer for de omhandlede transaktioner.

Foreholdt … forklarede han, at banken i 2014 modtog 2,5 mio. euro i depotgebyrer og i 2015 6,5 mio. euro i provision på værdipapirer. De i alt 9 mio. euro var bankens bruttoindtægt på de aktiver, som var blevet handlet både i Danmark og i Belgien. På den danske del var bankernes indtægt ialt på 55 mio. kr.«

Ved anklageskrift af 24. juli 2020 rejste den tyske anklagemyndighed tiltale mod T1 og T2 samt T3, T4, T5 og T6 som ligeledes var ansatte i North Channel Bank.

Af anklageskriftet fremgår blandt andet:
»i tiden fra den 05.02.2015 til den 18.05.2017
i Mainz
ved 27 selvstændige handlinger
at have skjult en genstand [udbyttet af et strafbart forhold], som stammer fra en i § 261, stk. 1, 3. pkt. og stk. 8 [i den tyske Straffelov (St-GB/Strafgesetzbuch)] nævnt lovovertrædelse, nemlig erhvervsmæssigt og bandemæssigt organiseret skattesvig begået i udlandet, som også der er strafbart, at have dækket over genstandens [udbyttets] oprindelse eller at have undergravet eller kan hindringer i vejen for bestræbelserne på at finde frem til oprindelsen af, konfiskere eller sikre en sådan genstand [udbyttet], i hvilken forbindelse de har handlet i forening og erhvervsmæssigt.

Tiltalte T1 har i tiden fra den 06.04.2010 til den 18.01.2017 og tiltalte T2 i tiden fra den 01.07.2010 til den 18.01.2017 været registreret som direktører for det i Handelsregistret ved Amtsgericht Mainz under HRB 42622 registrerede selskab North Channel GmbH med hjemsted i Mainz. Der er i den forbindelse tale om

**783**

komplementarselskabet i North Channel [Bank] GmbH & Co. KG (efterfølgende NCB), ligeledes med hjemsted i Mainz. Selskabets formål er at drive finans- og bankforretninger.

Tiltalte T6 har fra den 01.08.2009 været ansat som afdelingsleder i den såkaldte Treasury-afdeling i North Channel Bank GmbH & Co. KG, som på daværende tidspunkt stadig førte navnet Bankhaus Oswald Gruber GmbH & Co. KG. Tiltalte T6 var og er i sin funktion ansvarlig for organisationen og afviklingen af virksomhedens [bankens] betalingstransaktioner. Derudover har tiltalte T6 fra midten af 2010 haft prokura i North Channel Bank GmbH. Han har desuden fungeret som prokurist i OBAN Beteiligungsgesellschaft mbH, som er kommanditist i North Channel Bank GmbH & Co. KG1.

Tiltalte T3 var den hovedansvarlige leder af værdipapirserviceafdelingen i NCB og har fra den 14.01.2015 haft prokura i NCB. Han havde ledelsesbeføjelser over for medarbejderne i værdipapirserviceafdelingen, herunder særligt de tiltalte T4 og T5 samt den separat retsforfulgte T7.

De tiltalte T4 og T5 var ansat i værdipapirservice-afdelingen, i hvilken forbindelse tiltalte T5 dog først indtrådte den 01.06.2014. Hun var før det tidspunkt ansat i virksomhedens [bankens] kreditafdeling.

*A. North Channel Bank*

NCB har fra den 06.04.2010 været registreret i Handelsregistret ved Amtsgericht Mainz under HRA 41054. Komplementar i selskabet er det tidligere nævnte selskab North Channel GmbH. Kommanditist i selskabet var i gerningsperioden selskabet OBAN Beteiligungsgesellschaft mbH. Ledelsen af NCB blev i gerningsperioden varetaget af de tiltalte T1 og T2 i forening.

Via kapitalandele i en række tyske og luxemburgske selskaber er sluttelig det i Delaware/USA hjemmehørende selskab Oban Holdings LLC den reelle ejer af NCB. I dette selskab har de af Danmark

separat retsforfulgte M … og S fra regnskabsåret 2013/2014 udøvet stemmemajoriteten. Også de tiltalte T1 og

T2 har med kapitalandele på 7,3% og 9,0% fra og med regnskabsåret 2013/2014 været stemmeberettigede i Oban Holdings LLC. Faktisk har især de separat retsforfulgte … udøvet indflydelse på direktørerne og andre ansatte i banken.

*B. Underliggende lovovertrædelser - konstateret modus operandi*

En international agerende gruppe af gerningsmænd har fingeret aktiehandler i form af dækket short selling og har med urette til de kompetente skattemyndigheder i Danmark og Belgien indgivet anmodning om og også modtaget refusion af den angiveligt betalte udbytteskat. Konkret har de danske og belgiske myndigheder konstateret fiktive aktiehandler, ved hvilke der i tiden omkring skæringsdagen for retten til udbytte i det pågældende aktieselskab blev handlet aktier uden for børsregi (»over the counter«). De i Danmark og Belgien separat retsforfulgte individer har i tilknytning hertil - ved at indskyde banker som depositarer (»custodians«) og virksomheder med fuldmagt til at søge udbytteskatten refunderet (»tax-reclaim-agents«) - foregivet, at der af den angiveligt pr. skæringsdagen for retten til udbytte udbetalte udbytter var indbetalt kildeskat [udbytteskat] til de danske og belgiske skattemyndigheder.

Via de indskudte depositarer (»custodians«) blev der udfærdiget bekræftelser på indeholdt udbytteskat (såkaldte Dividend Credit Advices, kort: DCA'er), af hvilke den fiktive aktietransaktion og også den angiveligt indeholdte kildeskat [udbytteskat] fremgik. Disse bekræftelser blev via en mellemmand i Storbritannien, den af Danmark og Belgien separat retsforfulgte og under firmanavnet Indigo Securities Ltd. handlende R stillet til rådighed for de respektive »tax-reclaim-agents«, som tillige med anmodningerne om refusion af udbytteskatten indsendte de pågældende udbyttebekræftelser til både den danske skattemyndighed SKAT og de belgiske skattemyndigheder.

I den forbindelse har de i strid med sandheden gjort gældende, at der, for så vidt angår indehaverne af aktierne, var tale om amerikanske selskaber (pensionsfonde), som i forvejen blev beskattet i USA. Iht. den mellem Danmark og USA eksisterende dobbeltbeskatningsaftale af 19. august 1999 samt den mellem Belgien og USA eksisterende dobbeltbeskatningsaftale overførte de danske og belgiske skattemyndigheder den refunderede udbytteskat til konti tilhørende de »tax-reclaimagents«, der havde fået til opgave at indsende refusionsanmodningerne, fordi de fiktive udbytter angiveligt blev beskattet i USA. I realiteten modtog pensionsfondene overhovedet ikke nogen udbytter, der skulle beskattes. Derfra [*Fodnote: Fra »tax reclaim-agents«*] blev refusionsbeløbene i form af batchoverførsler overført til konti tilhørende de angivelige indehavere af aktierne, de amerikanske pensionsfonde.

Via denne konstaterede modus operandi blev der iflg. det af Danmark oplyste i tiden fra 2012 til 2015 på bedragerisk vis opnået refusion af udbytteskat i størrelsesordenen ca. 1,67 mia. EUR. Der er her tale om strafbart, erhvervsmæssigt begået skattesvig udført af flere i forening, som omhandlet i §§ 279, 286 og 88 i den danske Straffelov, som straffes med frihedsstraf på indtil 12 år.

Iflg. det af Belgien oplyste er ved denne modus operandi i tiden fra 2012 til 2015 på bedragerisk vis opnået refusion af udbytteskat i størrelsesordenen ca. 46.218.455,91 EUR. Der er her tale om strafbart bedrageri iht. art. 496 i den belgiske Straffelov, som straffes med frihedsstraf indtil 10 år.

28 af de af de separat retsforfulgte individer stiftede og benyttede pensionsfonde havde konti i NCB. NCB

**784**

fungerede for gruppen af gerningsmænd som en af flere depositarer, som for bagmændene udfærdigede falske udbyttebekræftelser med henblik på forelæggelse for de udenlandske skattemyndigheder.

De tiltalte T1 og T2 anvendte i forening med de øvrige tiltalte bevidst den af dem drevne bank til deres medvirken til den i Danmark begåede skattesvig og til at dække over de fra skattesvigen stammende belastede [inkriminerede] penge. Med dette for øje oprettede de tiltalte T1 og T2 først en indtil dette tidspunkt ikke eksisterende værdipapirservice-afdeling i NCB og ansatte nye medarbejdere til denne afdeling. De instruerede på særlige kurser, i vejledninger og på møder medarbejderne i at foretage de respektive posteringer, udstede og fremsende DCA'er samt modtage de belastede [inkriminerede] penge, der indgik, og, som beskrevet i det følgende, dække over disse. For at dække over deres ulovlige aktiviteter oprettede tiltalte T2 uden for virksomhedens [bankens] regi e-mail-adresser for alle de personer, der var involveret i skattesvigen, hos e-mail-udbyderen bankingbusiness.de.

De tiltalte T1 og T2 var desuden fuldt ud inddraget i NCB's e-mailkorrespondance med de i Danmark og Belgien separat retsforfulgte Y, Q, R, S, … og M. De afholdt via teletjenesten Skype ugentlige telefonmøder og tog regelmæssigt imod aktionærerne i NCB, de separat retsforfulgte …, M og S i Mainz til drøftelser.

…

Den hvidvaskansvarlige i NCB, vidnet … afsluttede i 2013 anden del af den juridiske embedseksamen og blev i maj 2015 ansat i NCB som junior compliancerundgivning. Hun blev dog i sidste ende, som det fra begyndelsen havde været planlagt, af de tiltalte T1 og T2 indsat som hvidvaskansvarlig. De tiltalte T1 og T2 gav helt bevidst, ud over hendes egentlige arbejde som hvidvaskansvarlig, vidnet … i opdrag primært at beskæftige sig med andre opgaver end opgaver i forbindelse med overvågningen af forhold af hvidvaskrelevant karakter. Vidnet … skulle implementere et prepaidkortprojekt i banken og anvendte efter det af hende selv oplyste 90% af sin arbejdskraft på dette projekt. På denne måde indsatte de tiltalte T1 og T2 en karrieremæssigt endnu uerfaren medarbejder som hvidvaskansvarlig og gav hende andre opgaver at varetage, således at hun end ikke kunne varetage et mindstemål af de opgaver, hun som hvidvaskansvarlig var pålagt. Dette gjorde de tiltalte T1 og T2 for at kunne gennemføre transaktionerne med de belastede [inkriminerede] penge uden at blive opdaget. Tiltalte T2 var vidnet …'s umiddelbare foresatte. Hun rapporterede ugentlig til tiltalte T2 og bad ham om selv at tage sig af problematiske anliggender, herunder særligt i forbindelse med Badia Capital S.A. Her fik vidnet ofte ingen tilbagemelding om status for sagen og så sig heller ikke i stand til uden den tegningsberettigede tiltalte T2'S medvirken at forfatte en anmeldelse om mistanke om hvidvask. Vidnet … fik ikke underretning om mange hvidvaskrelevante forhold i NCB og fik kun informationer »i små bidder«.

…

De tiltalte T1 og T2 har desuden haft et betydeligt økonomisk udbytte af deltagelsen i de i Danmark og Belgien begåede lovovertrædelser og den hvidvask, der har fundet sted i tilknytning hertil. Tiltalte T2 har for sin medvirken modtaget særlige bonusbetalinger (»special bonus«) på i alt mindst 675.000 EUR og tiltalte T1 på i alt mindst 810.000 EUR.

*C. Sagskompleks hvidvask af egne penge (forhold 1 - 26) I. Deltagelse i organiseret erhvervsmæssigt skattesvig udført af flere i forening i Danmark*

De tiltalte T1 og T2 fungerede med den af dem drevne NCB i overensstemmelse med den ovenfor beskrevne modus operandi til dels som depositar (»custodian«) for de separat retsforfulgte … M og S. Det vil sige, NCB oprettede konti for i alt 28 pensionsfonde og fingerede handlen med aktier, idet de alene gennemførte denne bogføringsteknisk, således at de respektive depoter ved dagens slutning ikke udviste nogen beholdning. Ikke desto mindre bekræftede de tiltalte T1 og T2 og de af dem instruerede medarbejdere i

NCB i de for de respektive pensionsfonde udstedte DCA'er, at der rent faktisk var sket udbetaling af udbytte og indeholdt udbytteskat.

…

Det konkrete forløb af de fiktive forretninger og forberedelsen og udfærdigelsen af DCA'erne var som følger:

Fra begyndelsen af 2013 har de tiltalte T1 og T2 i tæt samarbejde med de i Danmark separat retsforfulgte M, … S, P, …, …, R, Q og Y i NCB gennemført den fiktive handel med aktier for de ovenfor nævnte pensionsfonde. De første fiktive transaktioner blev gennemført af medarbejdere i NCB den 18.03.2014. Med henblik på aftalerne i forbindelse med disse i e-mailkorrespondancen som specialtransaktioner (»special trades«) betegnede forretninger oprettede tiltalte T2 e-mail-konti hos e-mailudbyderen »bankingbusiness.de«. Den 11.02.2014 opfordrede tiltalte T1 de øvrige involverede til kun at afvikle korrespondance af enhver art vedr. dette projekt, som blev døbt »Fennec«, over e-mailadresserne hos bankingbusiness.de. Derudover har der fra februar 2013 været ugentlige telefonmøder (»weekly calls«) mellem de separat retsforfulgte M … og S på den ene side og de tiltalte T1 og T2 på den anden side. I løbet af 2013 blev der så med henblik på gennemførelsen af de fiktive forretninger i NCB oprettet en værdipapirservice-afdeling og med henblik herpå pr. 01.10.2013 tiltalte T4 ansat og pr. 01.01.2014 tiltalte T7 (født …) ansat. Desuden blev tiltalte T5 pr. 01.06.2014 flyttet fra kreditafdelingen til værdipapirservice-afdelingen.

**785**

Tiltalte T4 udviklede efter konkrete retningslinjer fra den separat retsforfulgte R en køreplan i tabelform for gennemførelsen af de fiktive posteringer. I udviklingen heraf var også altid de tiltalte T1 og T2 involveret. I tilknytning hertil blev der af tiltalte T7 udfærdiget procesdiagrammer og opstillet aftaleforløb og også opstillet såkaldte etapemål.

Medarbejderne i NCB fik af den separat retsforfulgte Y købsinstrukserne (»payment orders«) pr. e-mail. Denne skrev i den forbindelse til den fælles e-mail postkasse i depotafdelingen depot@northchannelbank.de, som alle medarbejdere i denne afdeling og de tiltalte T1 og T2 kunne tilgå. Den separat retsforfulgte Y var i dokumenterne vedr. kontooprettelsen i NCB registreret som tegnings- og dispositionsberettiget for de forskellige pensionsfonde. De tiltalte T1 og T2 undlod dog at informere BaFin om alle de tilfælde, hvor den separat retsforfulgte Y var dispositionsberettiget i relation til de respektive konti, således at oplysningerne herom på forespørgsler iht. § 24c i den tyske Lov om Finansiel Virksomhed ikke svarede til de faktiske forhold.

Når den separat retsforfulgte Y havde afgivet en købsordre, blev ordren derefter registreret i dwp-Banks WP2-system, som NCB benyttede via en samarbejdsaftale med DZ Bank AG. Med dette for øje fremsendte særligt tiltalte T5 pr. fax såkaldte depotbogføringsordrer til DZ-Bank. Systemet i dwp-Bank udsteder på grundlag af de i WP2-systemet bogførte aktiebeholdninger automatisk en udbytteafregning til de banker, der er tilknyttet systemet. På grundlag af kundeoversigterne og de i systemet indlagte udbyttedata for de enkelte aktier udfærdigede NCB så under anvendelse af dwp-Banks system de allerede nævnte DCA'er, som optisk ligner tilsvarende skatteattester.

…

Transaktionen blev på et senere tidspunkt afsluttet bogføringsteknisk på en sådan måde, at de ovennævnte aktier via børsmægleren af de oprindelige købere og sælgere blev solgt hhv. opkøbt til en aftalt fast kurs. Da transaktionstidspunktet lå umiddelbart før skæringsdagen for retten til udbytte for pågældende type aktier, blev den respektive DCA udfærdiget i overensstemmelse med de

U.2024.746H - SKM2024.123.HRH

på skæringsdagen for retten til udbytte eksisterende beholdninger. Den beskrevne værdipapirtransaktion giver i økonomisk henseende ikke nogen som helst mening, da der er tale om en nulsumsforretning. Af de sikrede køreplaner for handelsdagen fremgår, at det absolut vigtigste var, at køb og salg (…) igen udlignes, og at depotet om aftenen udviser en saldo på »0«.«.

…

Af disse »tax-reclaim-agents« blev der til den danske skattemyndighed »SKAT«, her att. den af Danmark separat retsforfulgte medarbejder ved det danske skattevæsen V6 samt til de belgiske skattemyndigheder på vegne af de ovenfor eksplicit betegnede pensionsfonde fremsendt en kort skrivelse med henvisning til den mellem Danmark hhv. Belgien og USA eksisterende dobbeltbeskatningsaftale tillige med nedenstående bilag:

- Blanket, der redegør for kravet på fritagelse for dansk og belgisk udbytteskat (blanket nr. 06.003 ENG), underskrevet af en person, der handler på vegne af den pågældende »tax-reclaim-agent«;
- Dividend Credit Advice, udstedt af NCB og adresseret til den pågældende pensionsfond;
- Certifikat [certificate of residence] i original, der bekræfter hjemstedet for den pågældende Pension Plan [pensionsfond] i det pågældende skatteår;
- Fuldmagt fra den pågældende Pension Plan [pensionsfond] til »tax-reclaimagent«, for alle pensionsfondes vedkommende underskrevet af »Y«.

Efter behandling af sagen hos de danske og belgiske skattemyndigheder blev den af pensionsfondene angiveligt betalte udbytteskat refunderet på konti tilhørende de respektive »tax-reclaim-agents« og derfra i batchoverførsler videreoverført til i NCB førte konti tilhørende de pågældende pensionsfonde.

Ved at foretage de fiktive posteringer og foranledige de respektive DCA'er udfærdiget, som i bedragerisk øjemed blev forelagt de danske og belgiske skattemyndigheder sammen med refusionsanmodningen, har de tiltalte T1 og T2 som minimum gjort sig skyldige i medvirken til den til skade for det danske og belgiske skattevæsen begåede skattesvig, der er begået af de personer, som rent faktisk drev de respektive pensionsfonde. For gennemførelsen af de fiktive posteringer betalte pensionsfondene for hver enkelt værdipapirtransaktion en provision på 7.500,00 EUR til NCB.

…

*IV. indhentelse af [advokat]erklæringer / Legal Opinions*

Hos NCB forelå der diverse [advokat]erklæringer omhandlende den retlige kvalifikation af Cum-Ex-transaktioner, som til dels er fremlagt af bagmændene og til dels er indhentet af de tiltalte T1 og T2.

*1. Emnet for [advokat]erklæringerne*

Emnet for advokaterklæringerne [Legal Opinions] er clearingtransaktioner med belgiske og danske aktier og forsøget på at give svar på spørgsmålet om, hvorvidt der for NCB som depotbank kunne være mulige civilretlige, skatteretlige eller strafferetlige risici forbundet med disse transaktioner i Belgien, Danmark og Tyskland ….

…

*2. Vurdering af [advokat]erklæringerne [Legal Opinions]*

…

*b) Jones Day af 21.07.2014 samt bekræftelse af 30.07.2015 (= belgisk Opinion)*

**786**

I denne erklæring er det ved første øjekast den i NCB gennemførte transaktionsmodel, der bedømmes. Erklæringen forudsætter dog, at der rent faktisk kommer en handel med de pågældende aktier i

stand - i modsætning til hvad der i praksis var tilfældet i NCB - og forholder sig netop ikke eksplicit til rækkefølgen [af transaktionerne] på den pågældende handelsdag. Således tages der i forbindelse med beskrivelsen af transaktionen ikke hensyn til, at købet af aktierne bliver bogført på et tidspunkt, hvor salget af aktierne endnu ikke er eksekveret, og at pensionsfondenes udlån af værdipapirerne til det som långiver og låntager optrædende selskab foretages før Sherwood Enterprises Limited's udlån af værdipapirerne til kunde Z …

I erklæringen gøres der som resultat af bedømmelsen udtrykkeligt opmærksom på, at transaktioner som de beskrevne muligvis kan sættes i forbindelse med skatteoptimering, skatteunddragelse og aggressiv skatteplanlægning, og at de involverede banker kan være udsat for omdømmemæssige risici …

*c. Bech-Bruun af 04.04.2014 med bekræftelse af 24.07.2015 (= dansk Opinion)*

Også i denne erklæring er det ved første øjekast den i NCB gennemførte transaktionsmodel, der bedømmes. Erklæringen forudsætter dog, at der rent faktisk kommer en handel med de pågældende aktier i stand - i modsætning til hvad der i praksis var tilfældet i NCB - og forholder sig netop ikke eksplicit til rækkefølgen [af transaktionerne] på den pågældende handelsdag. Således tages der i forbindelse med beskrivelsen af transaktionen ikke hensyn til, at købet af aktierne bliver bogført på et tidspunkt, hvor salget af aktierne endnu ikke er eksekveret, og at pensionsfondenes udlån af værdipapirerne til det som långiver og låntager optrædende selskab foretages før Sherwood Enterprises Limited's udlån af værdipapirerne til kunde Z…

…

*3. Processen med udarbejdelse af erklæringerne*

Som det fremgår af fakturaen fra advokatfirmaet Jones Day af 15.03.2014 har advokatfirmaet Jones Day i månederne januar og februar 2014 ydet NCB rådgivning inden for områderne »Undersøgelse af depotbetingelser« og »Cum/Ex Securities Trading Transactions«. I alt har Jones Day debiteret ca. 80 timers rådgivningsydelser … Det fremgår endvidere af [NCB's] korrespondance med advokatfirmaet, at tiltalte T6 den 14.01.2014 har placeret en ordre omhandlende en tillægsaftale til depotforretningen hos den separat retsforfulgte advokat K der af Statsadvokaturen i Frankfurt am Main er sigtet for interessekonflikt til skade for NCB …

Af mødedokumentationen i NCB fremgår det, at der allerede kort tid efter den 29.01.2014 har været et møde på advokatkontoret hos Jones Day, i hvilket ud over den separat retsforfulgte K også de tiltalte T1 T2 og T3 deltog … Den 04.02.2014 fandt der efter ønske fra den separat retsforfulgte K endnu et telefonmøde sted, i hvilket de tiltalte T1 T2 og T3 ligeledes igen deltog. I mødet deltog desuden hr. H som skatteretsekspert …

Allerede en dag før dette møde kontaktede H advokat V5 fra det ovenfor nævnte danske advokatfirma Bech-Bruun og bad om, at man bistod advokatfirmaet Jones Day i NCB-sagen. H gør allerede i denne korrespondance opmærksom på, at der er tale om en dobbelt anmodning om refusion af udbytteskat:

»*We understand that the parties to the transaction will realize a tax benefit in Denmark which is probably consits in a double refund of dividend withholding tax but we have not seen a structure paper). Maybe you are aware of these structures?«* …

Allerede den første forespørgsel til de danske kolleger viser tydeligt, at der allerede fra begyndelsen af rådgivningsassistancen åbent blev kommunikeret om bagmændenes og de tiltaltes intention.

Svaret fra den danske advokat A fra advokatfirmaet Bech-Bruun viser, at sådanne transaktioner i Danmark er retligt problematiske.

»*The type of transaction you are describing which may entail a possibility for two shareholders to reclaim the same withholding tax*

*has been presented to us before (»cum-/ex trades«). As I believe is also indicated by F in our experience the trades are generally problematic from a legal perspective and most often it is not possible to provide the kind of opinion legal and liability issues which is normally requested by the parties involved.«* ...

Efter de betydelige betænkeligheder, repræsentanterne for advokatfirmaet Bech-Bruun gav udtryk for, efterspurgte H på vegne af NCB udtrykkeligt hos Bech-Bruun en såkaldt *»Should« [Fodnote udeladt]* Opinion«, i hvilken de af NCB ønskede resultater ganske vist ikke endeligt kunne konstateres, men i det mindste kunne anses for mulige.

I H's e-mail af 06.02.2014 hedder det:

*»Do you think your opinion could be a reasoned »should« opinion (i.e. »NCB should not be subject to criminal prosecution etc.«) subject to certain reasonable sumptions (e.g. acting in good faith, relied on expert opinion, no participation in - potentially - unjustified tax advantage, etc.) an reservations (no precedent/case law etc.).«* …

Da advokatfirmaet Bech-Bruun inden for rammerne af deres undersøgelse af de retlige aspekter ville være kommet til et negativt resultat og ville have bekræftet, at transaktionen var ulovlig, selv hvis der havde været tale om en rigtig og netop ikke blot fiktiv cum-/extransaktion, blev efterfølgende de tidligere krav til en sådan erklæring betydeligt reduceret. For de af de tiltalte T6 T1 og T2 antagne juridiske rådgivere samt for de tiltalte selv var det et spørgsmål om at få et fripas

**787**

[frie hænder] til at die i NCB foretagne formodede cum-/ex transaktioner. De måtte konstatere, at de ikke uden videre ville få en sådan udtalelse fra de danske advokater, forsøgte de at påvirke repræsentanterne for advokatfirmaet Bech-Bruun, så de i det mindste kunne få en vurdering, der anså det for muligt, at der var tale om lovlige transaktioner.

Efter at den danske advokat havde anmodet om at modtage en detaljeret oversigt over transaktionerne, meddelte H den 10.02.2014 den tiltalte T1 og den separat retsforfulgte K resultatet af drøftelserne med de danske kolleger. Konkret anførte han i sin e-mail:

*»Kollegerne gør i hvert enkelt tilfælde opmærksom på, at de er nødt til at få indsigt i de for »x« udfærdigede udtalelser (Opinions) for at kunne udfærdige deres udtalelser (Opinions), og at der i udtalelserne ville indgå forbehold og begrænsninger, da den retlige situation i jurisdiktionerne ikke var entydig.«* …

Endnu samme dag fremsendte tiltalte T1 nedennævnte dokumenter til den separat retsforfulgte K:

- Danish-US PF opinion.pdf
- Opinion Argremgt-Pension Funds-Us Treaty 20052012 (2).docx …

For så vidt angår disse dokumenter er der tale om erklæringer, der behandler spørgsmålet om fremsættelse af krav på tilbagebetaling af kildeskat til amerikanske pensionsfonde. Af filnavnet på den anden fil »Argremgt« er desuden referencen til bagmændene tydelig. Det var i sidste ende medarbejdere i Argre Management, der fremsendte dokumenterne fra pensionsfondene til NCB med henblik på åbning af konti … Den kvindelige direktør [Managerin] i Argre Management overtog desuden dele af forretningerne i Flamand Capital LLC.

Efter disse erklæringer var blevet fremsendt til advokat K videresendte denne dokumenterne til sine kolleger i Bruxelles og København …

Den 25.02.2014 blev de første udkast til de belgiske erklæringer fremsendt til de tiltalte T1 og T2 med titlen »Cum / Ex Trades, Entwürfe Belgische Opinion« …

I disse første vurderinger er der to centrale punkter, der tiltrækker sig opmærksomhed. For det første bliver der redegjort for, at retlige følger for NCB kun kan udelukkes, såfremt de netop ikke er gerningsmænd til eller meddelagtige i en i forening forøvet plan om misbrug af skatteretten. Endvidere modsiger koncipisten på væsentlige områder den af tiltalte T1 ovesendte erklæring fra advokatfirmaet Freshfields. I modsætning til redegørelsen i den fremsendte erklæring måtte det tværtimod lægges til grund, at både den herskende opfattelse i litteraturen og det belgiske finansministerium med henvisning til de respektive OECD-anbefalinger netop ikke ville lade sig nøje med pensionsfondenes formelle ejerskab, men tværtimod ville inddrage den reelle ejer for enden af kæden af holdingselskaber….

Sammenholder man følgelig dette udkast, der blev fremsendt til de tiltalte T1 og T2 allerede før gennemførelsen af de første transaktioner i marts 2014, med den senere midt på året 2014 fremlagte version, er det tydeligt, at de problematiske punkter ikke længere omtales …

I henseende til den i Danmark udarbejdede erklæring blev den af Bech-Bruun ønskede »deal-struktur«, som samme dag var videresendt af den separat retsforfulgte K til tiltalte T1 fremsendt den 03.04.2014 … I sin e-mail af 16.04.2014 gav den danske advokat A udtryk for betydelige betænkeligheder ved denne deal-struktur og spørgsmålet om, hvorvidt NCB var i god tro.

*»As NCB is acting both for Seller and USPF (anmærkning: amerikanske pensionsfonde) and knows the nature of the transaktion, this would in our view make it further difficult for NCB to distance its role from the transaction.«* ….

I tilknytning til denne e-mail blev samtalen mellem de involverede alene ført mundtligt …

Færdiggørelsen af de endelige, og når man sammenholder de forskellige versioner med hinanden, ufuldstændige erklæringer fandt endelig sted på et tidspunkt, hvor den fiktive handel med aktier allerede var fuldbyrdet af de tiltalte. Medens erklæringerne først blev underskrevet medio 2014, var de første fiktive transaktioner i NCB allerede påbegyndt medio marts 2014.

Endelig gjorde tiltalte T1 i sin e-mail af 09.10.2014 tiltalte T2 opmærksom på en afgørelse fra Bundesfinanzhof [Forbundsskatteretten] af 15.04.2014 …, i hvilken der særligt hedder:

*»Reelt ejerskab af anparterne i denne forstand kan dog ikke komme på tale ved såkaldte cum/ex-transaktioner med aktier, hvor købet af aktierne er forbundet med et af et pengeinstitut initieret og som model præsenteret overordnet kontraktligt koncept, iflg. hvilket initiator finansierer købet af anparterne med fremmedkapital, køber af aktierne umiddelbart efter købet af disse videregiver dem til initiator i forbindelse med et såkaldt værdipapirudlån, og køber overdrager den med aktierne forbundne markedsrisiko til initiator inden for rammerne af en såkaldt Total&Return Swaptransaktion.«*

*4. Sammenfatning*

Det er i den foreliggende sag i sidste ende afgørende, at der i erklæringerne på intet tidspunkt er taget stilling til, hvad der rent faktisk er foregået i NCB. Alle erklæringer tager udgangspunkt i, at der er tale om en klassisk cum-/ex-handel. Men en sådan handel har aldrig fundet sted i NCB, da de aktier, der blev »handlet« der, kun blev handlet bogføringsteknisk, og de involverede aktører på intet tidspunkt har været i besiddelse af retten til at disponere over aktierne. Dette ses allerede af det forhold, at det af udbyttebekræftelserne fremgår, at et identisk antal aktier på en og samme dag samtidig er

**788**

købt af flere pensionsfonde. Eller sagt mere enkelt: De handlede aktier fandtes i princippet på markedet, men disse var aldrig rent

Copyright © 2024 Karnov Group Denmark A/S

faktisk til stede i et af de af NCB førte depoter. Der var slet og ret tale om fiktive posteringer …

Men selv hvis der rent faktisk var blevet handlet aktier, ville man have været tale om ulovlige transaktioner, således som det fremgår af erklæringerne, især de tidlige versioner. Dette var de tiltalte T1 og T2 sig også bevidst, da de var i hyppig og intensiv kontakt med deres respektive juridiske rådgivere. Tværtimod forsøgte de tiltalte T1 og T2 i samspil med H og K at øve indflydelse på de udenlandske advokater og foranledigede, at der blev foretaget ændringer i de forskellige »Opinions«. Dette skete ene og alene med det formål i tilfælde af en mulig retsforfølgelse at kunne henholde sig til, at der var tale om en uundgåelig vildfarelse mht. et forbud og således at kunne foregive, at der ikke var handlet skyldspådragende.

…«

Der er efter det oplyste endnu ikke afsagt dom i sagen.

Den 13. april 2021 rejste den danske anklagemyndighed tiltale mod seks personer for overtrædelse af straffelovens § 279, jf. § 286, stk. 2, i forbindelse med udbetaling af 1.135.775.447,99 kr. i refusion for udbytteskat i forening med North Channel Bank. Der er endnu ikke afsagt dom i sagen.

*Transaktioner*

Der er i North Channel Bank dokumentation for i alt 284 transaktionskæder, som har ført til udbetaling af refusion af indeholdt udbytteskat.

Der er enighed mellem parterne om, at der i North Channel Bank faktisk hverken var udbytter, aktier eller pengestrømme og derfor heller ingen reelle transaktioner.

Der er endvidere enighed om, at den enkelte transaktionskæde omfatter følgende i alt 45 aftalebekræftelser:

*Indledende transaktioner:*

- Købsbekræftelse: Pensionsplanen og broker
- Købsbekræftelse: Broker og sælger
- Bekræftelse af potentielt aktielån mellem sælger og tredjemand
- Bekræftelse af aktielån: Sælger og tredjemand
- Bekræftelse af aktielån: Tredjemand og pensionsplanen
- Overførsel af sikkerhedsstillese: Sælger til tredjemand
- Overførsel af sikkerhedsstillese: Tredjemand til pensionsplanen
- Forward: Sælger og tredjemand
- Forward: Tredjemand og pensionsplanen
- Overførsel af aktier: Pensionsplanen til tredjemand
- Overførsel af aktier: Tredjemand til sælger
- Kompensationsbetaling: Pensionsplanen til tredjemand
- Kompensationsbetaling: Tredjemand til sælger

*Afvikling:*

- Forward: Sælger og tredjemand
- Forward Pensionsplanen og tredjemand
- Kontantafregning af forwards: Sælger og tredjemand
- Kontantafregning af forwards: Pensionsplanen og tredjemand
- Købsbekræftelse: Sælger og broker
- Købsbekræftelse: Pensionsplanen og broker
- Opsigelse af aktielån: Sælger og tredjemand
- Opsigelse af aktielån: Pensionsplanen og tredjemand
- Tilbagebetaling af sikkerhedsstillelse for aktielån: Tredjemand til sælger
- Tilbagebetaling af sikkerhedsstillelse for aktielån: Pensionsplanen til tredjemand
- Bekræftelse af opsigelse af aktielån: Pensionsplanen og tredjemand
- Bekræftelse af opsigelse af aktielån: Sælger og tredjemand
- Annulleringsgebyr: Pensionsplanen til tredjemand

- Annulleringsgebyr: Tredjemand til sælger
- Tilbagelevering af aktier fra aktielån: Tredjemand til pensionsplanen
- Tilbagelevering af aktier fra aktielån: Sælger til tredjemand

*Pengelån:*

- Tilbagekaldelse af pengelån, afvikling: Pensionsplanen og tredjemand
- Tilbagekaldelse af pengelån, afvikling: Sælger og tredjemand
- Tilbagekaldelse af pengelån, indledende: Sælger og tredjemand
- Tilbagekaldelse af pengelån, indledende: Pensionsplanen og tredjemand
- Udbetaling af pengelån, afvikling: Tredjemand til sælger
- Udbetaling af pengelån, afvikling: Pensionsplanen til tredjemand
- Udbetaling af pengelån, indledende: Tredjemand til pensionsplanen
- Udbetaling af pengelån, indledende: Sælger til tredjemand
- Bekræftelse af pengelån, afvikling: Pensionsplanen og tredjemand
- Bekræftelse af pengelån, afvikling: Sælger og tredjemand
- Bekræftelse af pengelån, indledende: Pensionsplanen og tredjemand
- Bekræftelse af pengelån, indledende: Sælger og tredjemand

**789**

- Tilbagebetaling af pengelån, indledende: Tredjemand til sælger
- Tilbagebetaling af pengelån, indledende: Pensionsplanen til tredjemand
- Tilbagebetaling af pengelån, afvikling: Sælger til tredjemand
- Tilbagebetaling af pengelån, afvikling: Tredjemand til pensionsplanen

Der er dog ikke enighed om, at oversigten er retvisende for så vidt angår rækkefølgen af de anførte transaktioner.

Der er under sagen dokumenteret et eksempel på en transaktionskæde med udgangspunkt i pensionsplanen Margaux Ventures Pension Plans køb af 1.025.500 B-aktier i Coloplast A/S. I eksemplet optræder Bastion Capital London Ltd. som broker, Claghan Capital Limited som sælger og Sherwood Enterprises Limited som tredjemand.

I eksemplet indgik Margaux Ventures Pension Plan den 6. maj 2015 en aftale med Bastion Capital London Ltd. om køb af 1.025.500 B-aktier i Coloplast A/S.

Det fremgår af aftalen, at afviklingsdagen er den 11. maj 2015. Samtidigt solgte Claghan Capital Limited de samme aktier til Bastion Capital London Ltd. ligeledes med afviklingsdag den 11. maj 2015. Margaux Ventures Pension Plan og Claghan Capital Limited har begge en værdipapirkonto hos North Channel Bank.

Den 6. maj 2015 indgik Claghan Capital Limited en OTC-forwardaftale med Sherwood Enterprises Limited, hvorefter Sherwood Enterprises Limited på en dato efter aktieafviklingsdagen vil levere aktierne uden udbytte til Claghan Capital Limited, og samme dag indgik Margaux Ventures Pension Plan en OTC-forwardaftale med Sherwood Enterprises Limited om levering af aktierne uden udbytte til Sherwood Enterprises Limited på forwardafviklingsdatoen.

Den 11. maj 2015 udstedte North Channel Bank følgende Dividend Credit Advice til Margaux Ventures Pension Plan: