**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION<br>OF THE KINGDOM OF DENMARK<br>(SKATTEFORVALTNINGEN) TAX REFUND<br>SCHEME LITIGATION<br><br>This document relates to: 18-cv-07828;<br>19-cv-01785; 19-cv-01867; 19-cv-01893;<br>19-cv-01781; 19-cv-01783; 19-cv-01866;<br>19-cv-01895; 19-cv-01794; 19-cv-01865;<br>19-cv-01904; 19-cv-01798; 19-cv-01869;<br>19-cv-01922; 19-cv-01800; 19-cv-01788;<br>19-cv-01870; 18-cv-07827; 19-cv-01791;<br>19-cv-01792; 19-cv-01928; 19-cv-01926;<br>19-cv-01868; 18-cv-07824; 19-cv-01929;<br>19-cv-01803; 19-cv-01806; 19-cv-01906;<br>19-cv-01801; 19-cv-01894; 19-cv-01808;<br>19-cv-01810; 19-cv-01809; 18-cv-04833;<br>19-cv-01911; 19-cv-01898; 19-cv-01812;<br>19-cv-01896; 19-cv-01871; 19-cv-01813;<br>19-cv-01930; 18-cv-07829; 18-cv-04434;<br>19-cv-01815; 19-cv-01818; 19-cv-01931;<br>19-cv-01918; 19-cv-01873; 19-cv-01924;<br>19-cv-10713; 21-cv-05339. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**PLAINTIFF SKATTEFORVALTNINGEN'S OPPOSITION MEMORANDUM OF LAW**
**ON ISSUES OF DISPUTED FOREIGN LAW AND CHOICE OF LAW**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT.......................................................................................................................2

I.      Defendants' Danish law arguments concerning beneficial ownership of shares and
        dividends are meritless...............................................................................................2

II.     Defendants misinterpret the Danish administrative law inquisitorial procedure..............10

III.    Defendants' new revenue rule argument is frivolous. ......................................................12

IV.     SKAT is a constituent part of the Kingdom of Denmark with authority to bring the
        Danish state's claims arising from defendants' fraudulent tax refund claims. ..................14

CONCLUSION....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*,
    No. 18-md-2865 (LAK), 2023 WL 8039623 (S.D.N.Y. Nov. 20, 2023) ...........2, 3, 11, 13, 14

In accordance with Pretrial Order No. 36 (ECF No. 978) and the Joint Stipulation and
Order Permitting the Filing of Oppositions to Rule 44.1 Briefs (ECF No. 1050), plaintiff
Skatteforvaltningen ("SKAT") submits this memorandum of law in opposition to the defendants'
memorandum regarding foreign law pursuant to Federal Rule of Civil Procedure 44.1 (ECF No.
1098).[1]

## PRELIMINARY STATEMENT

Defendants have not and cannot meet their burden under Federal Rule of Civil Procedure
44.1 to prove that Danish law means what they claim it does. Defendants' arguments conflict
with Danish law as this Court already has found it and misconstrue Danish property, corporate,
tax, and administrative law, and Danish case law on the statute of limitations.

There is no merit to defendants' arguments that final and binding share purchase
agreements are sufficient in and of themselves to convey ownership of shares and dividends. As
the Court already has recognized, Danish property law follows the *nemo dat* doctrine such that
the seller in such an agreement cannot convey ownership, beneficial or otherwise, of shares it
never owns and never delivers to the buyer. Nothing in Danish tax law changes that result.
Danish law does not, as defendants' argument necessarily implies, permit trading counterparties
to create unlimited amounts of new shares in a Danish company on which that company would
then be liable to pay dividends and withhold tax.

Defendants' statute of limitations argument rests on a misinterpretation of the so-called
"inquisitorial procedure" of Danish administrative law. That principle just means that Danish

---

1. Defendants assert that it would not "have been possible" for them to address SKAT's noticed choice of law
   issue in their brief "in light of SKAT's insufficient disclosure" and because "SKAT never previewed" the issue.
   (Defs. Br. 2 fn.1.) But SKAT's counsel in fact informed defendants on June 11 that SKAT contends that
   Danish and New York law conflict on the standard of proof for SKAT's fraud and aiding and abetting fraud
   claims and that the Danish law standard should apply, and defendants never asked for any further clarification.

administrative agencies have an obligation to ensure they collect all the relevant information necessary to decide a case before doing so. It does not, as defendants contend, require the agency to investigate to confirm the truth of the information provided to it or to see if other information has been concealed from it. As the Court previously found, Danish law did not impose on SKAT a duty to actively investigate all defendants' facially valid tax refund claims.

The argument that the revenue rule bars SKAT's claims if defendants purchased derivative contracts (that no party claims they did) is nonsensical and completely divorced from the parties' claims and defenses in these cases.

And defendants' arguments that SKAT does not have standing or suffered no injury from defendants' fraud because SKAT supposedly is a legal entity distinct from the rest of the Danish state are wrong as a matter of Danish law.

## ARGUMENT

### I.    Defendants' Danish law arguments concerning beneficial ownership of shares and dividends are meritless.

As the Court previously found, "Danish civil law follows the doctrine '*nemo dat quod non habet*' ('no one gives what they do not have'), including with respect to transfers of ownership of shares, under which a seller cannot convey rights greater than it itself possesses." *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, No. 18-md-2865 (LAK), 2023 WL 8039623, at *8 (S.D.N.Y. Nov. 20, 2023) (quotation omitted). As such, "if a seller does not have any ownership rights in, for instance, a share, the seller cannot convey any ownership rights to a purported buyer" and "for any transfer of ownership, beneficial or otherwise, in a Danish share to be effective, the seller must own the Danish share (and ultimately deliver that share to the buyer)." *Id.* (quotation omitted).

2

Defendants' argument to the contrary that, for tax purposes, a final and binding agreement to purchase shares makes the buyer the owner of shares and dividends, no matter whether the seller owns and delivers the shares to settle the trade, (Defs. Br. 3-9), has been rejected by the Danish courts and National Tax Tribunal and proceeds from several mistaken premises.  (SKAT's Mem. of Law on Issues of Disputed Foreign Law and Choice of Law, ECF No. 1071 ("SKAT Br.") 9-11.)  "Nothing in Danish tax law supplants th[e] basic [*nemo dat*] concept of Danish civil law, and therefore if a seller does not have ownership rights under Danish civil law, there is no construct in Danish tax laws that could convey or create an ownership right in a buyer."  *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, 2023 WL 8039623 at *8 (quotation omitted).

*First*, "under Danish law, a purchaser" does not, as defendants argue, "become[] the owner of securities upon the execution of a final, binding purchase agreement."  (Defs. Br. 4.)  A "valid and unconditional" "share purchase contract" creates "contractual rights and obligations between the parties," "not ownership."  (Declaration of Henning Aasmul-Olsen, dated June 24, 2024, ECF No. 1073 ("Aasmul-Olsen First Decl.") ¶ 26.)  Such a purchase agreement for dematerialized shares is "effective" "to transfer ownership" only if the trade settles, *i.e.*, the seller "deliver[s]" the shares (or the shares are subject to "other means of segregation").  (*Id.* ¶ 33 (emphasis omitted); *see also id.* ¶¶ 48-52.)  If it were otherwise that would conflict with "several fundamental" Danish "corporate law requirements."  (*Id.* ¶ 14.)

Under Danish law, a "share" is "a notional relative stake in the capital of a limited liability company."  (*Id.* ¶ 10.)  A publicly traded "company with limited liability must have a fixed share capital" and "shares of publicly traded Danish companies" are "issued in the systems of VP Securities," the Danish central securities depository.  (*Id.* ¶¶ 12, 16.)  Ownership of a

"share" comes with "shareholder rights" enforceable against the issuer, including "governance" and "financial rights," such as "the right to receive dividends." (*Id.* ¶ 11.)

If final and binding agreements created ownership of new shares other than those issued by the company through VP Securities, as defendants contend, that would violate requirements that a company's fixed "share capital and number of shares . . . be adopted by the general meeting (or the board of directors) of the company," all shares "be subscribed in writing," and "all shares have been fully paid in or at least paid in by 25 per cent (plus the full premium) into the company." (*Id.* ¶ 14.) And it also would create "uncertainty" with respect to, among other things, "total voting rights, total dividend rights, and the basis for per share derived financial metrics," "all of which could lead to" the company's unwitting "additional non-compliance with [Danish] law, including violations of disclosure obligations." (*Id.* ¶ 15.) As such, "ownership of any share in a Danish company" must mean "ownership of a share existing as book-entry in the systems of VP Securities" and two parties "trading 'a share' cannot by virtue of such trading create a share that has not been issued by a company and recorded" at VP Securities. (*Id.* ¶¶ 18-19.)

Nothing in Danish tax law changes that result. To be sure, when the Danish property law conditions for transfer of share ownership are satisfied, *i.e.*, delivery or segregation of the shares, Danish tax law generally provides that the buyer is deemed the owner of the shares for tax purposes on the trade date when the final and binding agreement was concluded, not the settlement date when it became the owner under Danish property law. (*Id.* ¶¶ 34, 46.) But that does not mean that for tax purposes there can be owners of more shares than the company has issued or that trading counterparties can create such new shares, for tax or any other purposes, just by agreeing to buy and sell them, absent delivery of shares to settle the trades.

Thus, SKAT's "Legal Guide" does not mean what defendants think. (Defs. Br. 3.) "The issue addressed in the Legal Guide . . . was *not* the conditions for transfer of ownership but rather the *effective time* for tax purposes in circumstances where the conditions for transfer of ownership *unquestionably* are and were satisfied." (Aasmul-Olsen First Decl. ¶ 46.) That is "evident" from the "commentary" explaining that "[t]he section" on which defendants rely "describes *when* a share is acquired or disposed of." (*Id.* (quoting *id.* Ex. 7).) The same is true for the Danish cases defendants cite, all of which involved actual transfers of shares. (Defs. Br. 3-4.) "In each case, the court considered only the timing of the transfer for taxation purposes," not whether any transfer of ownership had occurred in the first place. (Aasmul-Olsen First Decl. ¶ 52; *see also id.* App'x 5.)

**Second**, defendants' argument that "the purchaser who enters into a binding agreement to purchase shares becomes the owner . . . of any dividends declared for those shares" is wrong for much the same reasons. (Defs. Br. 4.) Under Danish law, "[d]ividends are a distribution of equity made by a company to the owners of its shares." (Aasmul-Olsen First Decl. ¶ 66.) A Danish company's declaration of a dividend creates "an enforceable right to the dividends for the shareholders" "as of the time of [the] declaration." (*Id.*) And in Denmark, publicly traded companies "can only pay dividends through VP Securities." (*Id.* (emphasis omitted).)

Thus, "any entitlement to dividends . . . require[s] ownership of shares as a prerequisite." (*Id.* ¶ 67.) That is a straightforward "consequence" of the Danish law definition of a "dividend" as "a corporate distribution of equity to shareholders." (*Id.*) If a party is not a shareholder in that it is not "an owner of shares," it "will not obtain the right to receive a dividend." (*Id.* ¶ 68.)

SKAT's "Legal Guide" and Danish case law concerning the tax treatment of dividends when shares are subject to a share lending agreement on the dividend declaration date are no help

to defendants.  (Defs. Br. 4-5.)  As SKAT's guidance explains, the lender "remains the beneficial owner of dividends" for tax purposes, unless the borrower has sold "the shares to a third party," in which case, "the third party is taxed on the dividends."  (Declaration of Daniel C. Davidson, dated July 11, 2024, ECF No. 1100 ("Davidson Decl.") Ex. 5 ¶ 201 (quoting Ex. 84 thereto).)  But that does not mean that a final and binding share purchase agreement makes the buyer the owner of dividends, irrespective of whether the seller delivers any shares.  Those rules are premised on each of the transactions described involving an actual transfer of shares.  (*Id.* ("A person is the actual shareholder if he owned the shares at the time the dividend payment was declared, meaning that he owned the shares on the vesting date.").)  Thus, if the lender never owned any shares, any contractual payments it received from the borrower are not a dividend.

Section 19 of the Danish Sale of Goods Act, (Defs. Br. 4), is likewise irrelevant because "[a] purchase contract" by itself "cannot create dividends any more than it can create shares or ownership of shares."  (Declaration of Henning Aasmul-Olsen, dated July 24, 2024 ("Aasmul-Olsen Second Decl.") ¶ 48.)  Under Danish law, dividends are "declared" in a "specific amount" that "cannot be changed by the actions or contracts of market participants."  (*Id.* ¶ 38.)  And "[n]o" additional "dividends can be created . . . without several corporate formalities at the initiative of the issuer."  (*Id.*)

Nor is there any merit to defendants' argument that a dividend does not have to come from "the paying company."  (Defs. Br. 4.)  Danish "[c]ompanies can only pay *dividends* through VP Securities," so if a "credit of funds" in an account "is to qualify as *dividends*, the credit must . . . originate from funds processed for payment by VP Securities and credited in the

first instance to an Account Holding Institution on an omnibus account in VP Securities." (Aasmul-Olsen First ¶¶ 39, 43.)[2]

    *Third*, defendants' argument that "if the ownership of a security and an associated dividend is transferred to a purchaser upon execution of a binding, final contract" then the "beneficial owner of that security and associated dividend must be the purchaser," (Defs. Br. 5), fails because final and binding share purchase agreements are not sufficient under Danish law to convey ownership of shares or dividends. And defendants have not identified any interpretation of "beneficial ownership" that supplants the fundamental requirement that shares and dividends must first exist for anyone to have ownership of them, beneficial or otherwise.[3]

    Further, defendants ignore that in the Bech-Bruun decision they cite, (Defs. Br. 5-6), the Danish Eastern High Court found that circular trading "without any shares and actual cash flows" is just "ordinary fraud under criminal law that is merely disguised by complicated transactions," not that it resulted in the U.S. pension plans being beneficial owners of shares or dividends. (Aasmul-Olsen Second Decl. ¶ 54.) And the Ministry of Taxation's early warning reply concerning beneficial ownership of shares "in the context of a securities lending

---

2. Defendants argue that in the stock loan scenario, the borrower's payment to the lender counts as a dividend for tax purposes "without regard to whether the borrower actually received a dividend payment from the issuer." (Defs. Br. 5.) But in such circumstances where the borrower has not resold the shares, "the borrower is the owner of the shares borrowed from delivery, and will, in transactions registered at VP Securities, be registered as the owner in VP Securities, thus receiving the dividends from the issuing company while the arrangement is in place." (Aasmul-Olsen Second Decl. ¶ 36 n.21.)

3. For instance, under Article 10 of the U.S.-Denmark Tax Treaty, Denmark may "tax" dividends "paid by" Danish companies to U.S. residents, but not if the U.S. resident "beneficial owner" of "such dividends" paid by the Danish company is among, other things, a "pension fund." (Declaration of Mads Bryde Andersen, dated June 24, 2024, ECF No. 1072 ("Andersen First Decl.") Ex. 5, Article 10.) Thus, if the defendant plans did not receive dividends paid by Danish companies and taxed by Denmark, they could not be the "beneficial owners" of such dividends entitled to a tax refund under the treaty. Indeed, as the English High Court of Justice observed, the "beneficial ownership" requirement "is an additional pre-requisite for entitlement to tax relief and, therefore, would be an extra condition to be satisfied for a tax refund claim," in addition to liability for Danish dividend tax in the first place. Skatteforvaltningen v. Solo Capital Partners LLP [2023] EWHC 590 (Comm) [92].

transaction" is irrelevant.  (Defs. Br. 6.)  The issue is whether the defendant plans owned shares at all, not whether they would still be the beneficial owners of shares if they lent them in a share loan transaction.[4]

**Finally**, there is nothing to defendants' arguments that the Court should reconsider its finding that Danish law follows the *nemo dat* principle, including with respect to transfers of ownership of shares, such that a seller cannot convey ownership of shares it never owned or delivered.  (Defs. Br. 6-9.)[5]

For instance, relying on an article about Article 8 of the Uniform Commercial Code, defendants argue that *nemo dat* "is not the law" in Denmark because "[i]n the context of securities transactions, the law places a high premium on finality and clarity."  (Defs. Br. 7.) Danish law provides a statutory exception to the *nemo dat* principle, inapplicable to defendants' supposed trades because they did not result in book-entry registration with VP Securities, in "Section 69 of the Securities Trading Act backing the integrity and finality of the VP Securities settlement that would follow all on-exchange trading on Nasdaq Copenhagen."  (Aasmul-Olsen Second Decl. ¶ 15; *see id.* ¶¶ 16-18.)[6]  This statute and its legislative history confirm that where

---

4. Further, even under the "international" meaning of "beneficial ownership" to which defendants allude, (Defs. Br. 5), the defendant plans were not "beneficial owners" of dividends to the extent they received them as agents or nominees.  The OECD Model Convention's definition for the term, consistent with SKAT's Legal Guidance, provides that "'Intermediaries' (mellemmænd) who receive dividends, but who are not the beneficial owners" include "an agent," "a nominee, [i.e.] a named representative of the beneficial owner," "a conduit company," and "a fiduciary, i.e. person who formally owns an asset (here a share or other ownership interest), but where the return actually accrues to a beneficiary."  (Andersen First Decl. ¶ 31 & Ex. 8, Section C.F.8.2.2.10.1.3.)

5. The English High Court of Justice likewise concluded in SKAT's English action that "Danish property law recognises a general principle that a buyer cannot acquire better rights than his seller" and that while "[t]he Latin tag *nemo dat quod non habet* . . . is not used in Danish law, . . . the principle is recognised." Skatteforvaltningen v. Solo Capital Partners LLP [2023] EWHC 590 (Comm) [82].

6. Under the statute, "once an agreement as to rights pertaining to dematerialized securities has been finally registered by book-entry at VP Securities, a purchaser in good faith may not be met with any objections as to the validity of the agreement (in the absence of forgery or duress under threat of violence)."  (*Id.* ¶ 18.)

the exception does not apply, "the principle of *nemo dat quod non habet* will apply to dematerialised shares and will mean that a seller cannot pass ownership to a purchaser unless and until such seller becomes the owner of the shares sold." (*Id.* ¶¶ 16, 19-20.)[7]

Nor is *nemo dat*, as defendants contend, irreconcilable "with the common practice of selling short." (Defs. Br. 8.) As with any other share trade, under Danish law, a short sale is not effective to transfer ownership of the shares to the buyer until the trade settles. (Aasmul-Olsen First Decl. ¶¶ 72-78.) Thus, the answer to defendants' question of what happens if "the purchaser in a short sale liquidat[ed] their position prior to settlement by selling to a third party, and then the original short seller fails to deliver?" (Defs. Br. 8), is not as complicated as they suggest. The original short sale will be a failed trade and the purchaser would need to acquire the shares from somewhere else, lest the second trade fail too. And neither trade "would need to be unwound," (*id.*), if neither trade settled in the first place.

To be sure, failed trades may be "destabilizing of markets." (*Id.*) But that is why the E.U. adopted the "Short Selling Regulation," *i.e.*, to "reduce" "settlement failure and volatility" by requiring that the short seller "has borrowed and, accordingly, is the owner of," "has a legally enforceable claim" to, or "reasonable expectation to obtain ownership of the share so that *settlement* can be effected when it is due." (Aasmul-Olsen Second Decl. ¶¶ 22-23.) Thus, "the Short Selling Regulation [recognizes] *a priori* that a short seller must own the share before he can pass ownership to purchasers at settlement, which is the very meaning of the *Nemo Dat* Doctrine in the context of short selling." (*Id.* ¶ 23.)

---

7. The journal article on Article 8 of the Uniform Commercial Code defendants cite simply explains that similar to the exception in Section 69 of the Danish Securities Trading Act, *nemo dat* does not apply to securities trades under the Code in the sense that a good faith purchaser's securities trade is final and cannot be undone by claims that the seller did not have the right to transfer the shares. (Davidson Decl. Ex. 19 at 1461-62.) But that does not mean a seller can transfer ownership of shares it never delivers to the buyer.

Defendants' "day-trading" "capital gain" tax argument is far afield from the issues in this case.  (Defs. Br. 8.)  But if the day-trader's two trades both settle, presumably the day-trader would owe any applicable tax on income from the trades.  And, in any event, "day-traders" cannot, any more than anyone else, "lawfully sell shares they *never* will own," otherwise "the share trading market would become a market for trading not just shares, *i.e.*, assets with shareholder and property rights, but also for trading thin air, and market participants would not know which of the two they sold or purchased."  (Aasmul-Olsen Second Decl. ¶ 34.)[8]

## II.    Defendants misinterpret the Danish administrative law inquisitorial procedure.

As SKAT previously explained, the Danish law "'test for whether the claimant should have become aware of its claim' against a particular defendant," such that the three-year limitation period begins to run, "is 'whether the claimant had sufficient information for a prudent person acting in the claimant's shoes to assess the basis for its claim' against that defendant." (SKAT Br. 6-9 (quoting Andersen First Decl. ¶ 159); *see also* Andersen Second Decl. ¶¶ 20-28.) Defendants' argument to the contrary that SKAT "should have known of its claims" when SKAT "had grounds to seek information to clarify the facts of those claims" or even "a class of similar claims," (Defs. Br. 10-17), is based on a misinterpretation of the Danish administrative law inquisitorial procedure that the Court already has rejected.

The "inquisitorial procedure, or principle of investigation," does not, as defendants argue, require "SKAT to obtain all relevant information before it renders an official decision, such as a decision to approve a tax reclaim application."  (Defs. Br. 11.)  Rather, that facet of Danish administrative law just obligates Danish public entities "to take steps to collect information

---

8.    SKAT's "legal guidance" on beneficial ownership of shares for tax purposes in a share lending agreement, (Defs. Br. 9), is irrelevant to whether Danish law recognizes the *nemo dat* principle for transfers of ownership of shares. (*See supra* pgs. 5-6.)

necessary to handle cases within their competences." (Andersen Second Decl. ¶¶ 6-19; *see also* Andersen First Decl. ¶¶ 189-99.) It does not impose "a duty to investigate into each and every detail that might be of relevance for deciding the case in question or to confirm independently the truth of all information provided to the administrative agency in question." (Andersen Second Decl. ¶ 9.)

Thus, as the Court previously held, "Danish law does not impose on SKAT a duty to make active investigations (like police investigations in criminal matters) of all facially sufficient tax refund applications it receives on a presumption that facts of relevance to the case may be hidden somewhere." *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, 2023 WL 8039623, at *15 (quotation omitted). Defendants have provided no new Danish legal authority to the contrary that was not presented to the Court on summary judgment.

In each of the defendants' Danish law cases—U 1981.72 H, Tfs 1988.581 V, TfS 2002.617 Ø, and TfS 1997.403 B (Defs. Br. 13-15)—the court concluded that SKAT's claims were time-barred because SKAT "knew" or "should have known" of its claims in that SKAT "did not act as a 'prudent person' in pursuing its claims." (Andersen Second Decl. ¶¶ 29-35.) Not because it had "grounds to seek additional information" under the inquisitorial procedure, "but [did] not do so." (Defs. Br. 13.) For instance, in U 1981.72 H, the Danish Supreme Court found SKAT's claim time-barred because it "was clear and undisputed" that SKAT could have known of its claim by conducting a routine "control inspection," as it was obligated to do in that case. (Andersen Second Decl. ¶ 31; Andersen First Decl. ¶¶ 180-84.) But no "similar rule of

inspections applies" here and it is far from clear and undisputed that any such inspection would have revealed defendants' fraudulent tax refund claims. (Andersen First Decl. ¶ 184.)[9]

"None of" defendants' cases "involves information that was fraudulently concealed from SKAT." (Andersen Second Decl. ¶ 35.) And defendants' argument ignores that Danish courts have consistently found that when the taxpayer conceals from SKAT the information necessary to reveal its claim, the limitations period does not begin to run until SKAT discovers the relevant information. (SKAT Br. 7-8 (citing Andersen First Decl. ¶¶ 162-76).)

Finally, defendants further misconstrue Danish law in arguing that under the inquisitorial procedure, the "statute of limitations begins as to SKAT's claims when SKAT had grounds to seek additional information regarding a certain *type* of claim." (Defs. Br. 14-15.) To the contrary, "in determining whether the claimant 'should have' known its claim, Danish courts will look into each of the claims individually." (Andersen Second Decl. ¶¶ 25-27.)[10]

## III.    Defendants' new revenue rule argument is frivolous.

Defendants' argument that the revenue rule would preclude SKAT's claims if they "purchased derivatives," which neither SKAT nor defendants contend they did, strains to connect with the reality of the parties' positions and the facts of these cases. (Defs. Br. 17-18.)

---

9.  In Tfs 1988.581 V, the court rejected SKAT's argument that the limitations period for "a *known* claim could be suspended until the result of a more general investigation of the taxpayer . . . that might conclude that further claims could be raised." (Andersen Second Decl. ¶ 32.) SKAT's claim in TfS 2002.617 Ø was time-barred because SKAT received information from "English tax authorities" that "should have made SKAT aware of its claim" more than five years before it brought the action. (*Id.* ¶ 33.) And in TfS 1997.403 B, SKAT's claim was time-barred because of the taxpayer's "ambiguous answers" to SKAT that should have alerted it to its claim. (*Id.* ¶ 34.)

10. The defendants reference SKAT's "ample tools to evaluate whether" Danish dividend issuers pay sufficient withholding taxes on issued dividends, the point of which is hard to decipher. (Defs. Br. 12.) SKAT's ability to assess Danish issuers' payment of withholding tax has no bearing on SKAT's ability to investigate whether, or which of, any tax refund claims it received were fraudulent. (*See* Andersen Second Decl. ¶¶ 17-19.)

For one thing, defendants mischaracterize the testimony of SKAT's expert Graham Wade, who did not opine, and will not testify at trial, that defendants had "derivative positions." (Defs. Br. 17.)  In response to defendants' expert Dr. Carr's opinion that the defendant plans had economic claims to dividends even if the Solo custodians held no shares, Mr. Wade simply noted that "if a prime broker represents to its . . . client that [it] has purchased securities, then the [client] may have a claim against the prime broker" based on the market value of the shares, but that would not "mean that there actually are any shares" or provide "any basis to claim receipt of a dividend . . . on what is, in effect, a derivative position."  (Davidson Decl. Ex. 9 (Reply Report of Graham Wade, dated February 28, 2022) ¶ 240(2).)

For another, the little information defendants provide about Danish tax law on derivatives shows that even if the defendants did have "a derivative position in Danish securities" (which, again, no one contends they did), they would not have owed Denmark any tax on the income from such a position.  (Defs. Br. 17.)  The defendant plans were neither "fully taxable in Denmark" nor did they carry "on business from a permanent establishment in Denmark" to which their hypothetical derivative contracts could be "attributable."  (Defs. Br. 17.)

And left entirely unexplained is how such a derivative position, even if the income on it were taxable by Denmark, could entitle the defendant plans under Danish tax law to a refund of tax withheld on actual dividends the Danish company paid to other people—its shareholders. (Defs. Br. 17-18.)

Finally, even if for some unrevealed reason some "analysis of Danish tax law" on derivatives were necessary to determine SKAT's actual claims in this case that defendants' representations of share ownership and dividend receipt in the tax refund claims were false, that still would not mean the revenue rule precludes SKAT's claims.  *In re Customs & Tax Admin. of*

13

*the Kingdom of Denmark (SKAT) Tax Refund Litig.*, 2023 WL 8039623, at *9 (quotation

omitted) ("even if there were a Danish tax law or laws concerning beneficial ownership, the

Court's consideration of those laws in determining whether the defendants owned the shares in

any respect would not necessarily implicate the revenue rule").

**IV.    SKAT is a constituent part of the Kingdom of Denmark with authority to bring the Danish state's claims arising from defendants' fraudulent tax refund claims.**

There is no basis for the defendants' assertion that as a matter of Danish law SKAT is a

separate legal entity from the Kingdom of Denmark.  Defendants appear to acknowledge as

much in renewing their arguments that SKAT lacks standing to assert its claims by merely

"incorporat[ing] by reference [their] prior arguments" with no further authority (Defs. Br. 18)—

despite the Court's previous finding that the defendants' prior submissions "have not established

that SKAT is a separate legal entity from the Kingdom of Denmark."  *In re Customs & Tax*

*Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, 2023 WL 8039623, at *13.  As

SKAT has explained, under Danish law, government ministries are constituent parts of the

Danish state and the Danish courts regularly permit SKAT and other ministerial authorities to

litigate private law claims belonging to the Kingdom of Denmark.  (SKAT Br. 12-15.)

Therefore, there is no reason for the Court to depart from its previous decisions rejecting

defendants' arguments to the contrary.

## CONCLUSION

For the reasons set forth above and in SKAT's Memorandum of Law on Issues of Disputed Foreign Law, SKAT respectfully submits that the Court reject defendants' erroneous interpretations of Danish law.

Dated: New York, New York          HUGHES HUBBARD & REED LLP
      July 24, 2024

                              By: /s/ Marc A. Weinstein
                                  William R. Maguire
                                  Marc A. Weinstein
                                  Neil J. Oxford
                                  Dustin P. Smith
                                  Gregory C. Farrell
                                  One Battery Park Plaza
                                  New York, New York 10004-1482
                                  Telephone: (212) 837-6000
                                  Fax: (212) 422-4726
                                  bill.maguire@hugheshubbard.com
                                  marc.weinstein@hugheshubbard.com
                                  neil.oxford@hugheshubbard.com
                                  dustin.smith@hugheshubbard.com com
                                  gregory.farrell@hugheshubbard.com

                                  *Counsel for Plaintiff Skatteforvaltningen (Customs and Tax Administration of the Kingdom of Denmark)*